No. 24-5588

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

STATE OF TENNESSEE; COMMONWEALTH OF KENTUCKY; STATE OF OHIO;
STATE OF INDIANA; COMMONWEALTH OF VIRGINIA; STATE OF WEST VIRGINIA,

*Plaintiffs-Appellees*

and

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL; A.C., by her next friend and
mother Next Friend, Abigail Cross,

*Intervenors-Plaintiffs-Appellees*

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education;
U.S. DEPARTMENT OF EDUCATION,

*Defendants-Appellants.*

*On appeal from the United States District Court
for the Eastern District of Kentucky - No. 2:24-cv-00072*

---

## Response to Appellants' Motion for a Partial Stay Pending Appeal

---

JONATHAN SKRMETTI
   *Tennessee Attorney General*
J. MATTHEW RICE
   *Solicitor General*
WHITNEY D. HERMANDORFER
   *Director of Strategic Litigation*
VIRGINIA N. ADAMSON
   *Strategic Litigation Counsel and
   Assistant Solicitor General*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL
 P.O. Box 20207
 Nashville, Tennessee 37202
 (615) 741-8726
 Whitney.Hermandorfer@ag.tn.gov

RUSSELL COLEMAN
   *Attorney General of Kentucky*
MATTHEW F. KUHN
   *Solicitor General*
OFFICE OF THE KENTUCKY ATTORNEY
GENERAL
 700 Capital Avenue, Suite 118
 Frankfort, Kentucky 40601
 (502) 696-5300
 Matt.Kuhn@ky.gov

 *Additional counsel listed in signature
block*

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

BACKGROUND ......................................................................................................3

LEGAL STANDARD .............................................................................................7

ARGUMENT ..........................................................................................................8

I.     The District Court Did Not Abuse Its Discretion by Entering Geographically Tailored, Interim Relief. ........................................................8

      A.     APA Principles Support the District Court's Relief. ...........................9

      B.     The District Court Properly Addressed the *Bostock* and Hostile-Environment Regulations. ...................................................................13

      C.     The Equities Support the District Court's Relief. ..............................18

II.    A Partial Stay Would Substantially Injure the States. ...................................19

III.   Denying a Partial Stay Would Not Meaningfully Harm Defendants or the Public Interest. ........................................................................................20

CONCLUSION ......................................................................................................24

**INTRODUCTION**

Departing from 50 years of practice, Defendants promulgated a Final Rule that distorted Title IX's bar on "sex" discrimination to impose sweeping gender-identity mandates. Defendants accept (at 14) that the term "sex" refers to "physio-logical or biological distinctions between male and female." Yet, citing *Bostock v. Clayton County*, 590 U.S. 644 (2020), they read Title IX to cover myriad other "sex-based characteristics." Rule, R.1-2, PageID#125. Defendants' *Bostock*-based inter-pretation of Title IX, the Final Rule explains, means schools unlawfully discriminate when they divide bathrooms, locker rooms, and other intimate facilities by sex—a result that renders many Title IX provisions "meaningless." *Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791, 813 (11th Cir. 2022) (en banc).

The district court concluded that the Final Rule was likely unlawful in a thor-ough, 93-page opinion. It then issued interim and geographically "limited" relief that preserved the longstanding pre-rule status quo pending review. *See* Op., R.100, PageID#2088. So limited, the district court's relief does not address the full scope of the States' harms—harms that might occur when the States' residents and school groups travel (as they often do) to educational activities "out of state." *E.g.*, Tr., R.109, PageID#2150-51. But pausing the full Final Rule at least ensures that the States do not sink extraordinary resources into implementing provisions whose proper reach remains in flux. Two other district courts have recently entered the

same or broader preliminary relief against the Final Rule.  *See* Mem. & Order, *Kansas v. U.S. Dep't of Educ.*, No. 24-4041 (D. Kan. July 2, 2024); *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-cv-563, 2024 WL 2978786 (W.D. La. June 13, 2024).

Defendants do not seek a stay of the district court's holding that the Final Rule contravenes Title IX and is "arbitrary in the truest sense of the word."  Op., R.100, PageID#2085.  Instead, Defendants seek a "partial stay" of the preliminary relief order—an ask they cast as "narrow[]."  Stay Mot. 2.  But as the record evidence shows, Defendants' proposal would hurl the States, their school districts, and hundreds of thousands of educators into a race to implement training and policy changes mere weeks before the start of a new school year.  And it's not even clear what the States' training would entail, given Defendants' internally inconsistent suggestion that schools should follow the gender-identity mandate, just not apply that mandate to bathrooms, locker rooms, and preferred-pronoun policies.  Even with a clear directive, witness testimony confirmed that the duplicative costs of rolling out new Title IX rules piecemeal, and the resulting confusion, would be substantial.

It was well within the district court's equitable power, and certainly no abuse of discretion, to conclude that preliminary relief should avoid compounding the States' unrecoverable costs and compliance confusion.  APA and Title IX principles counsel the same result.  Defendants' "partial stay" motion should be denied.

**BACKGROUND**

**A.**   Congress passed Title IX to remedy women's persistent disadvantage in education by barring discrimination "on the basis of sex." 20 U.S.C. § 1681(a). The States' briefing and the district court's opinion recount the history, administrative backdrop, and Title IX's allowance for certain sex-based distinctions at length.

For present purposes, it is enough to know that in late April 2024, following some two years of notice-and-comment proceedings, Defendants finalized a rule that for the first time expands Title IX beyond the meaning of "sex"—*i.e.*, male versus female—to cover a "not exhaustive" list of so-called "sex based" characteristics. *See generally* Rule, R.1-2. The Final Rule specified that its view of "sex discrimination" would outlaw schools' longstanding practices of requiring students, staff, and visitors to use bathrooms and other intimate facilities that align with their sex. *Id.*, PageID#429. The Final Rule embeds this expanded definition of sex discrimination into various other regulations, including a new provision broadening the meaning of hostile-environment harassment. *See* 34 C.F.R. § 106.2. A separate proposal that Defendants have delayed specifies that their Title IX reading also would bar States from dividing athletic teams by sex. *See* Op., R.100, PageID#2072.

Defendants' view prompted widespread concern about their new regime's effect on educational privacy, safety, and fairness. *See* Compl., R.1, PageID#35-38.

3

Commenters including Tennessee offered evidence of "numerous instances" of "males attacking females" in sex-segregated facilities. Op., R.100, PageID#2067. Yet the Final Rule responded that it "did not agree" that there is *any* evidence of safety risks or "legitimate" privacy concerns. Op., R.100, PageID#2068 (citation omitted). The Final Rule likewise insisted that its harassment definition aligns with the First Amendment—despite Defendants' history of reading similar language to "compel[]" the use of preferred pronouns in a manner this Court has rejected, *see id.*, PageID#2036-39; *Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021).

**B.** The Final Rule gave schools only three months—until August 1—to comply with its sweeping mandates. The States thus moved swiftly to challenge the Final Rule and seek preliminary relief to stave off their irreparable harm. The States submitted more than sixty pages of written testimony from seventeen different declarants, as well as several school district policies. *See* R.19-2-16; R.92-1-2. Together, this evidence demonstrated that the States and schools must expend "extraordinary" resources to comply with the Final Rule. Op., R.100, PageID#2077.

The district court held a hearing that featured live testimony from three witnesses covering the K-12, higher-education, and state-budgeting sectors. *See* Tr., R.109. That testimony further detailed the immense compliance efforts and expenses the Final Rule would impose on regulated parties. Part of the challenge stems

4

from the Final Rule's new obligation that States and schools train *every* educator and staff member who interacts with students on campus about the Final Rule's non-discrimination requirements. *See id.*, PageID#2135-36 (Christy Ballard, General Counsel, Tennessee Department of Education); Rule, R.1-2, PageID#161 (discussing 34 C.F.R. § 106.8(d)).[1] The evidence reflects that, in Tennessee alone, training would need to occur on the tail end of summer break and cover well over 140,000 personnel just at secondary schools; the remaining States' obligations are similar.[2] Scores of school districts would need to alter policies, too—in turn requiring public meetings on an emergency timeline.[3] Satisfying these onerous obligations "could not just be crammed in" without significant "planning and preparation." Tr., R.109, PageID#2140 (Ballard).

Prior to the hearing, Defendants' briefing floated the prospect of staying portions of the Final Rule while requiring other provisions to take effect. The States, over Defendants' objection, *id.*, asked their lead K-12 compliance witness to discuss the practicality of "invalidat[ing]" the rule "in part." *Id.* Her response: That type of

---

[1] *See also* Hersey Decl., R.92-1, PageID#1845-46; Fulks Decl., R.92-2, PageID#1854.

[2] *See* Hersey Decl., R.92-1, PageID#1845-46, 1848; Thacker Decl., R.19-7, PageID#941-42; Death Decl., R.19-8, PageID#947-48; Coons Decl., R.19-11, PageID#961; Purkey Decl., R.19-14, PageID#972.

[3] Tr., R.109, PageID#2132-40 (Ballard); Hersey Decl., R.92-1, PageID#1848; Thacker Decl., R.19-7, Page ID#944; Compl., R.1, PageID#63-68.

partial rollout "could be incredibly confusing to districts." *Id.*, PageID#2142. It also "might require training again later, which would be more time and more money spent training." *Id.* Ultimately, piecemeal training would "be more costly and confusing possibly for school officials, and for those people helping school officials." *Id.* Defendants offered no evidence to the contrary.

**C.** On June 17, 2024, the district court granted the States' motion for a preliminary injunction and interim stay of Defendants' Final Rule under 5 U.S.C. § 705. The Court reasoned that the Final Rule's gender-identity mandates reflected a patently unlawful reading of Title IX. Op., R.100, PageID#2087-88. And it concluded that the States, their schools, and their citizens—as well as Intervenors A.C. and the Chrisian Educators Association—faced extraordinary and impending irreparable harm from the Final Rule along multiple dimensions. *Id.*, PageID#2074-83.

The district court entered temporary injunctive and stay relief that would maintain the longstanding status quo under Title IX pending review. *Id.*, PageID#2088 (granting "injunction/stay"); *accord id.*, PageID#2009, 2086 (citing 5 U.S.C. § 705). The court moreover "limited" the scope of its relief to apply only within the Plaintiff States. *Id.*, PageID#2088. That was so even though hearing evidence highlighted that the States' school programs and residents often participate in covered educational activities out of state, where application of the Final Rule

6

could create confusion and inflict privacy and safety harms. *See* Tr., R.109, PageID#2150-51 (Ballard); *id.*, PageID#2188-90 (Steven Gentile, Executive Director, Tennessee Higher Education Commission).

Defendants now move to partially stay the district court's order granting preliminary relief. Defendants ask this Court to permit the Final Rule to take effect August 1, save only for two exceptions. *First*, Defendants do not contest a continued injunction of the so-called "de minimis harm" regulation—*i.e.*, the provision specifying that it is unlawful discrimination to divide intimate spaces by sex rather than gender identity. Stay Mot. 12. *Second*, Defendants accede to the district court's relief against any application of the sexual-harassment prohibition to gender identity. *See id.* Defendants otherwise seek to maintain the core provision implementing their *Bostock*-based position that Title IX "sex" discrimination includes discrimination based on gender identity and other sex-based characteristics. *See id.* at 14 (asserting 34 C.F.R. § 106.10 should take effect).

## LEGAL STANDARD

Entry of a stay pending appeal represents an "intrusion into the ordinary processes of administration and judicial review." *Kentucky v. Biden*, 23 F.4th 585, 593 (6th Cir. 2022) (citation omitted). Defendants thus must carry the "heavy burden of demonstrating that a stay is warranted," including by making a "*strong* showing that

[they are] likely to succeed on the merits." *Ohio State Conf. of NAACP v. Husted*, 769 F.3d 385, 389 (6th Cir. 2014) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).  Defendants also must show that they would suffer irreparable harm absent a stay, that a stay would not substantially injure the States, and that a stay would be in the public's interest.  Where, as here, a stay involves "the scope" of a district court's "temporary relief," this Court reviews the district court's "choices for an abuse of discretion." *Doster v. Kendall*, 54 F.4th 398, 441-42 (6th Cir. 2022) (citing *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017)), *vacated on mootness grounds*, 114 S. Ct. 481 (2023).

## ARGUMENT

### I.    The District Court Did Not Abuse Its Discretion by Entering Geographically Tailored, Interim Relief.

Defendants have opted not to seek a full stay of the district court's decision below.  Instead, they press a new argument regarding their preferred scope of preliminary relief.  But unlike in many scope-of-relief disputes, this case does not involve so-called "universal" relief "beyond plaintiffs." Stay Mot. 10 (citing *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024)).  The district court's geographically limited remedy—applying only to the Plaintiff States—was narrower than requested and narrower than the relief issued by other courts against the same Final Rule.  *Compare* Op., R.100, PageID#2088, *with* Mem. & Order 46, *Kansas v. U.S. Dep't of Educ.*,

No. 24-4041 (D. Kan. July 2, 2024) (enjoining enforcement in any school attended by members of plaintiff organizations, wherever located).

Still, Defendants contend (at 2) that the district court erred by entering preliminary relief against "the entire Rule within the plaintiff States." Under Defendants' preferred approach, certain aspects of the Final Rule—including the central provision implementing *Bostock*—would take effect on August 1, with further compliance clean up to come later. Defendants do not make a "*strong* showing" that the district court erred by rejecting that piecemeal-implementation approach, which flouts APA principles, ignores the proper scope of Title IX, and overlooks the equities at play in this case. *Ohio State Conf. of NAACP*, 769 F.3d at 389-90.

## A. APA Principles Support the District Court's Relief.

Defendants' argument that the district court should have run a front-end severability analysis fails under the APA. For starters, 5 U.S.C. § 705 permits courts to "postpone *the* effective date" of an agency action, singular—a textual grant of authority to act on and pause a rule in its entirety. *Cf.* Order, *Kentucky v. EPA*, No. 23-5343 (6th Cir. May 10, 2023) (staying entire rule). That statute also empowers courts to issue "all necessary and appropriate process" to "preserve" parties' "status or rights" pending review. 5 U.S.C. § 705. And the district court's order was

appropriate to preserve the States' pre-rule position by avoiding confusing and costly partial compliance pending review. *Supra* pp.5-6.

Section 705 aside, Defendants offer no APA-based support for saddling district courts with a sky-high severability burden at the preliminary-relief phase. *American Fuel & Petrochemical Manufacturers v. EPA*, 3 F.4th 373 (D.C. Cir. 2021) (cited at Stay Mot. 13), involved severance at final judgment. And severance there followed only for entirely "separate actions" by the rule that "operate[] independently from the other." *Id.* at 384 (citation omitted). Here, by contrast, the district court correctly concluded that *Bostock* does not apply to Title IX, full stop— rendering the Final Rule's cross-cutting implementation of *Bostock* in excess of Defendants' "statutory authority." Op., R.100, PageID#2023. Independently, the Final Rule's arbitrary-and-capricious reasoning rendered it "invalid in its entirety." *Id.*, PageID#2085; *see* Mem. & Order 40, *Kansas*, No. 24-4041 (concluding same).

In response, Defendants (at 12 n.4) "dispute that vacatur is an available remedy" under the APA. That "far-reaching" argument is both "novel and wrong." *See generally Corner Post, Inc. v. Board of Govs. of Fed. Reserve Sys.*, 603 U.S. ---, 2024 WL 3237691, at *15-23 (2024) (Kavanaugh, J., concurring). Defendants' outlier approach to limiting APA relief would be particularly inappropriate to adopt in

the context of this case, where the Final Rule's 400+ pages contain requirements that are both interrelated and vast.

Defendants critique (at 12) the district court's conclusion that the unlawful gender-identity mandate "permeates the remaining regulations." But examples show as much. Recipients' "notice and record-keeping obligations" require them to keep, for seven years, any records relating to the outcome of investigations for "each complaint of sex discrimination"; recipients also must maintain any notice to a Title IX coordinator of "information about conduct that reasonably may constitute sex discrimination." 34 C.F.R. § 106.8(f). Those obligations, and many more, turn on the meaning of "sex discrimination" or what "could constitute sex discrimination"—the disputed issue here.[4] Training on them now would thus raise more questions than answers. The meaning of sex discrimination likewise critically affects provisions about recipients' proper "response to sex discrimination" or "grievance procedures for claims of sex discrimination." 34 C.F.R. §§ 106.44-46. Asking educational staff to implement these obligations regarding "sex discrimination," without advising them what "sex discrimination" entails under Title IX, would not result in a regime

---

[4] *See, e.g.*, U.S. Dep't of Educ., *Resource for Drafting Nondiscrimination Policies* 5-6 (2024), https://perma.cc/TF49-9LTZ.

that "function[s] sensibly." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001).

Nor have Defendants demonstrated that any severability exercise would cut their way. Defendants exclusively rest (at 13) on the Final Rule's brief and boiler-plate severability discussion and provisions. But a "severability provision" cannot "solve[] the agency's problem" when a rule's remainder would function in an arbitrary and capricious or ill-explained manner. *Ohio v. EPA*, No. 23A349, 603 U.S. ---, 2024 WL 3187768, at *8 (2024). And here, the Final Rule justifies its significant costs in great part by referencing the benefits it claims from the broad gender-identity mandates. Rule, R.1-2, PageID#474-75. The Final Rule does not meaningfully "address" how that cost-benefit calculus could work if only one, or even a few, of the discrimination provisions remain in place. *Ohio*, 2024 WL 3187768, at *8. If anything, given the Final Rule's focus on implementing the Administration's view of what *Bostock* requires, *see* Op., R.100, PageID#2004, there is "substantial doubt" the Department would have adopted the rule's remaining portions "without the prohibition[]" on gender-identity discrimination. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 292 (4th Cir. 2020) (citation omitted). At a minimum, the district court did not err by declining to exercise the type of policy judgments required to remedy the Final Rule's pervasive flaws at this stage. *See* Op., R.100, PageID#2085.

12

**B.    The District Court Properly Addressed the *Bostock* and Hostile-Environment Regulations.**

Defendants next argue that the district court should have permitted the *Bostock* provision (34 C.F.R. § 106.10), as well as all non-gender-identity applications of the hostile-environment definition (34 C.F.R. § 106.02), to take effect August 1. That is wrong twice over, since both provisions are unlawful in their entirety.

1.    Defendants' claim (at 15-16) that Section 106.10 inflicts no harm on the States is baffling.  That provision, after all, is the one implementing Defendants' importation of *Bostock* into the Title IX context:  It instructs that "discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." The Final Rule's improper reliance on *Bostock* to rewrite Title IX was the central defect the States challenged and that the district court rejected.[5]

Defendants insist (at 15-16) that because the States do not wish to commit *certain* violations of § 106.10, that regulation should remain on the books.  But the States explained that Title IX, properly read, does not capture *any* of the "so-called 'sex-based' characteristics" § 106.10 identifies.  PI Br., R.19-1, PageID#864; *see also id.*, PageID#852 (critiquing Final Rule's extension to "gender identity" and

_____

[5] *See, e.g.*, PI Br., R.19, PageID#853; PI Reply, R.92, PageID#1826.

"other supposedly sex-based characteristics").  The district court correctly agreed.
Defendants' point that the States do not discriminate in ways that would violate
§ 106.10 cannot cure that provision's *ultra vires* extension to varied "sex character-
istics" Title IX nowhere mentions.  PI Reply, R.92, PageID#1833.

Nor does Defendants' no-harm argument work given their repeated attempts
to alter what Title IX "discrimination" means.  In recent years, federal officials have
advanced the position—across a number of avenues—that schools commit imper-
missible gender-identity or sex-stereotyping discrimination when they treat students
consistent with their sex rather than gender identities.  A small sampling[6]:

- **2016 Department of Education Dear Colleague Letter:** Schools must
  allow transgender students to access restrooms, locker rooms, shower fa-
  cilities, housing, and athletic teams consistent with their gender identity.

- **2021 Department of Education Fact Sheet:**  Discrimination based on
  "gender identity is a form of sex discrimination prohibited by federal law"
  and includes preventing "a transgender high school girl" from using "the
  girls' restroom" or failing to use a transgender student's preferred name or
  pronouns.

---

[6] *See* U.S. Dep't of Educ., Off. for Civ. Rights, *Dear Colleague Letter on
Transgender Students* 3-4 (May 13, 2016), https://perma.cc/G5VG-ZNV9; U.S.
Dep't of Justice and U.S. Dep't of Educ., Civ. Rights Div. & Off. for Civ. Rights,
*Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and
Families (Fact Sheet)* (June 23, 2021), https://perma.cc/F644-8GBC; U.S. Dep't of
Justice, Statement of Interest, *Roe v. Critchfield*, Case No. 1:23-cv-315, ECF No. 41
at 3 (D. Idaho Aug. 8, 2023); U.S. Dep't of Educ., Off. for Civ. Rights Letter (May
16, 2023), R.92-3.

- **2023 DOJ Statement of Interest:** State law prohibiting students from using restrooms and changing facilities consistent with their gender identity violated Title IX.

- **2023 Department of Education Arlington Community Schools (TN) Investigation:** Investigating school district for Title IX violations where student was not permitted to use restroom facilities matching student's gender identity.

This track record leaves no doubt that preserving § 106.10's *Bostock*-based directive would require the States, their schools, and their citizens to submit to the same unlawful gender-identity mandates the district court deemed plainly unlawful.

That leaves Defendants to argue (at 17-18) that the district court should not have paused § 106.10 because that provision properly applies *Bostock*'s reasoning to Title IX. But *Bostock* expressly refused to address "sex-segregated … bathrooms, locker rooms, or anything else of the kind" and disavowed reaching "other laws." 590 U.S. at 681. This Court's precedents have accordingly and repeatedly directed that *Bostock*'s "reasoning applies only to Title VII." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023), *cert. granted*, 2024 WL 3089532 (June 24, 2024); *accord Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *Meriwether*, 992 F.3d at 510 n.4. Defendants thus seek to "extend" *Bostock* "to new territory"—an ask that means any "strong" case on the merits "is missing" by definition. *L.W.*, 83 F.4th at 471.

Further, as the district court (and several others by now) reasoned, applying *Bostock* to Title IX "wreaks havoc on Title IX and produces results that Congress could not have intended." Op., R.100, PageID#2020. Among other problems, Defendants' interpretation renders "meaningless" much of Title IX's broader structure, which "explicitly authorize[s] institutions to treat males and females differently in certain situations" and presumes that "males and females will be separated on biological sex." *Id.*, PageID#2014. In response, Defendants claim that Title IX's carve-outs show Congress expressly *authorized* certain types of harmful discrimination against students. Rule, R.1-2, PageID#427, 432. But as the district court recognized, Op., R.100, PageID#2020-21, it "defies logic" to conclude that Congress went out of its way to allow discrimination in policies covering housing, "father-son or mother-daughter activities," and Boys and Girls State, but not bathrooms, choirs, and sexual education, *B.P.J. v. West Va. State Bd. of Educ.*, 98 F.4th 542, 579 (4th Cir. 2024) (Agee, J., concurring in part and dissenting in part); *compare* 20 U.S.C. §§ 1681(7)-(8), 1686, *with* 34 C.F.R. §§ 106.33, 106.34(a)(3)-(4).

In short, Defendants' fly-by arguments (at 17-18) do not support setting aside the district court's detailed analysis of Title IX's history, text, and broader structure. And Defendants' emergency request to review a sliced-and-diced version of the Final Rule's flawed interpretation should not hamper this Court's full statutory inquiry.

The partial stay posture does not erase the untenable structural defects—and radical practical consequences—of Defendants' reliance on *Bostock* to interpret the meaning of "sex discrimination" in Title IX.

2.     Last, the district court properly enjoined the entire hostile-environment-harassment definition.  While the States highlighted the "example" of compelled pronoun use in illustrating the definition's legal problems, the States' challenge extended beyond that provision's application to pronouns and gender-identity issues. *See* PI Br., R.19-1, PageID#867-68.  Among other things, the States argued that the harassment provision "goes beyond the Supreme Court's definition" in a way that risks overregulating students' speech. *Id.*; *accord* Compl., R.1, PageID#75-76.  The district court in turn reasoned that the hostile-environment regulation's "broad and vague" formulation both unlawfully compelled and chilled speech.  Op., R.100, PageID#2043-51.  Defendants' proposed partial stay would not remedy those legal problems.  Defendants (at 20) do not meaningfully argue otherwise, nor do they contest the district court's detailed legal analysis.  They thus provide no basis for overturning the district court's decision to maintain the status-quo definition (which the Department previously concluded aligns best with Supreme Court precedent, *see* Compl., R.1, PageID#26-27) pending review.

## C. The Equities Support the District Court's Relief.

Defendants insist that the district court should have allowed part of the Final Rule to take effect, rather than pause the entire Final Rule to maintain the status quo. But courts have "wide latitude when crafting the scope of … temporary relief to fit the equities of a case." *Doster*, 54 F.4th at 441 (citing *Trump*, 582 U.S. at 579). Such "status-quo relief might look broader than the ultimate relief." *Id.* at 442.

Here, the unrebutted evidence confirmed that Defendants' compliance two-step simply was not practical for the States and their school systems—and indeed would lead to significant wasted costs and confusion. *Supra* pp.5-6. The district court acted well within its "considerable discretion" to "mold its decree" in light of these realities. 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (3d ed. 2013); *Trump*, 582 U.S. at 580.[7] Defendants' assertion (at 11-12) that individual provisions might not "harm" the States in the abstract does not disprove that the district court's order appropriately reflected compliance realities. Much less do the "bedrock" cases Defendants cite (at 2, 12) require altering the status quo in a manner that makes parties *worse off* for having *won* a preliminary ruling.

---

[7] *See, e.g.*, *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (declining to limit injunctive relief when doing so would "prove unwieldy and would only cause more confusion"); *Gomez v. Trump*, 485 F. Supp. 3d 145, 203-04 (D.D.C. 2020) (same, when doing so would "result in widespread administrative confusion").

## II. A Partial Stay Would Substantially Injure the States.

Achieving even partial compliance by August 1 would involve "extraordinary" costs and efforts in a "short timeframe" made even shorter by Defendants' litigation delay. Op., R.100, PageID#2077; *see id.* PageID#2074-81 (recounting testimony). Such harms, the States' evidence showed, would flow directly from needing to implement the Department's redefinition of sex discrimination and the associated harassment provision (regulations Defendants' stay would largely maintain).[8] To put this "extremely difficult" challenge in context, Tr., R.109, PageID#2139 (Ballard), Defendants claim they cannot even *compile the administrative record* in this case by early August, *see* R.112, PageID#2334. Yet Defendants see no problem with requiring the States, schools, and districts to train untold numbers of personnel and alter swaths of policies by then.

Defendants' cursory assertion (at 21) that the States would "suffer no harm" from a partial stay defies the record evidence and clear, credible, and unrebutted testimony at the hearing. Phased compliance, the district court heard, would require "more time and more money spent training" and "could be incredibly confusing to districts." Tr., R.109, PageID#2142 (Ballard). The duplicative and increased

---

[8] *See, e.g.*, Tucker Decl., R.19-15, PageID#979; Hersey Decl., R.92-1, PageID#1845-50; Fulks Decl., R.92-2, PageID#1854-57.

"irrecoverable compliance costs" that a partial stay would cause are alone reason to reject such relief. *Kentucky*, 23 F.4th at 612.

Unrebutted testimony likewise explained that the States' and their schools' compliance would be hampered if it was not "very clear" what parts of the Rule districts would need to "implement[]" and "train[] on." Tr., R.109, PageID#2142 (Ballard). But Defendants' relief would produce uncertainty in spades by artificially divorcing certain portions and applications of the Final Rule's sex-discrimination provisions from others. It will be of little use to instruct school personnel that they must monitor, investigate, and assess relevant evidence of discrimination, all while advising that the meaning of discrimination remains in flux. These practical challenges—which Defendants nowhere acknowledge—cut definitively against a "piecemeal approach" to relief that would "cause confusion." *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp.3d 482, 504 (D. Md. 2020); *see Ohio State Conf. of NAACP*, 769 F.3d at 389-90 (rejecting stay that would "add to the confusion" among affected parties and potentially put regulated officials in a "position of trying to communicate" multiple, conflicting instructions).

## III. Denying a Partial Stay Would Not Meaningfully Harm Defendants or the Public Interest.

In the face of the States' documented injuries from a partial stay, Defendants devote only "a single . . . paragraph to [the] argument that [they] will be irreparably

harmed in the absence of a stay." *Memphis A. Philip Randolph Inst. v. Hargett*, 977 F.3d 566, 573 (6th Cir. 2020) (Moore, J., concurring in the denial of a stay). And the few points they do raise fall flat.

Defendants argue (at 20) that "[e]very time" the federal government is enjoined from enforcing even part of a rule, it automatically suffers irreparable injury. But the only case they cite—*Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)—involved a *state statute* that was *democratically adopted*. Here, by contrast, a federal agency unilaterally adopted a rule that fundamentally rewrites a law "enacted by representatives" of Congress. And that rule *displaces* droves of laws democratically enacted by the States. Op., R.100, PageID#2054-62, 2081-82; Compl., R.1, PageID#63-68.

Next, Defendants posit (at 21) ways the preliminary injunction allegedly "could impair the rights of individuals under provisions entirely unrelated to plaintiffs' claims." Speculation about harms does not suffice to support extraordinary stay relief. *Cf. Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Yet speculation is all Defendants offer: They did not include a declaration in support of their stay motion, either here or below; nor does their discussion of irreparable injury cite any record evidence that would bear on the stay they seek. Worse, Defendants' motion elsewhere acknowledges that the States are *not* discriminating against

21

students "simply for being transgender" (among other hypotheticals); having done so, Defendants cannot simultaneously assert that a partial stay is needed to stop such discrimination from occurring. *Compare* Stay Mot. 15-16, *with* 21. Nor have Defendants shown that leaving the preexisting grievance and harassment definitions—which the Department adopted via an extensive rulemaking in 2020—would cause them irreparable harm during the limited time this case proceeds.

Defendants' "discrimination" rationale moreover ignores the disconnect between the scope of Title IX and the Final Rule. Title IX covers discrimination on the basis of "sex," not gender-identity or the many other "sex characteristics" the Final Rule sweeps in. The "havoc" Defendants' misinterpretation "wreaks" on Title IX is why the States prevailed on the merits in the first place. Op., R.100, PageID#2020. The public interest lies "in the correct application of the law," *Kentucky*, 23 F.4th at 612, not in agencies reading statutory limits on "discrimination" to cover whatever characteristics and conduct they find "desirable" to regulate, *NFIB v. OSHA*, 595 U.S. 109, 120 (2022).

As for timeline, Defendants offer *no* substantiation for needing the Final Rule to take effect in tattered form starting August 1. That effective date, after all, was one Defendants unilaterally set in upending a fifty-year "status quo" to the contrary. Op., R.100, PageID#2083. Defendants' new push for pace moreover comes only

after they repeatedly delayed releasing the Final Rule over a span of *nearly two years* and despite a "political decision" to hold back the Title IX athletics rule until after the 2024 election.[9]  Defendants' choice to "delay" or shelve their discrimination rules for lengthy periods "undercuts [their] representations" that August 1 is the be-all and end-all date for effective enforcement.  *Kentucky*, 23 F.4th at 610.

Defendants' conduct in this case is of a piece.  First, Defendants repeatedly sought to delay the preliminary relief briefing.  *See* R.41, PageID#1303; R.64, PageID#1443.  Then, they waited *two weeks* to approach this Court for "emergency" relief—leaving the States with *two days* to file this response.  Defendants notably have not sought expedited appellate review of their core gender-identity mandate for facilities and programs.  Instead, Defendants confusingly tee up only a gerrymandered portion of the Final Rule's gender-identity discussion while sidestepping related problems that devastate the legality of their Title IX position.  *Supra* pp.15-16.

If Defendants' partial stay is granted, the sum of these litigation choices would leave the entire K-12 and higher educational school systems of six States with a mere two weeks to achieve compliance with regulations of unprecedented scope and only partial legal effect.  Then, States would need to spend yet another round of

---

[9] Laura Meckler, *Biden Title IX Rules on Trans Athletes Set for Election-Year Delay*, Washington Post (Mar. 28, 2024), https://perma.cc/SS4B-X85Z.

unrecoverable sums on final clarifications and changes following the litigation's conclusion. How is that inefficient use of public resources in the public interest? Defendants nowhere grapple with the undue fallout from their partial-stay position.

## CONCLUSION

For the reasons above, this Court should deny Defendants' motion for a partial stay of the district court's preliminary relief.

Dated: July 3, 2024

JONATHAN SKRMETTI
   Attorney General and Reporter

*/s/ Whitney D. Hermandorfer*
J. MATTHEW RICE
   Solicitor General
WHITNEY D. HERMANDORFER
   Director of Strategic Litigation
VIRGINIA N. ADAMSON
   Counsel for Strategic Litigation &
   Assistant Solicitor General
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3491
whitney.hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*

Respectfully submitted,

RUSSELL COLEMAN
   Attorney General

*/s/ Matthew F. Kuhn*
MATTHEW F. KUHN
   Solicitor General
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
matt.kuhn@ky.gov

*Counsel for the Commonwealth of Kentucky*

THEODORE E. ROKITA
  Attorney General

*/s/ James A. Barta*
JAMES A. BARTA
  Solicitor General
CORRINE L. YOUNGS
  Policy Director and Legislative Counsel
JOSHUA DAVID
  Deputy Attorney General - Policy
INDIANA ATTORNEY GENERAL'S OFFICE
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for the State of Indiana*

DAVE YOST
  Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
  Solicitor General
MATHURA SRIDHARAN
  Deputy Solicitor General
OFFICE OF THE OHIO ATTORNEY GENERAL
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for the State of Ohio*

JASON S. MIYARES
  Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER
  Principal Deputy Solicitor General
BRENDAN T. CHESTNUT
  Deputy Solicitor General
VIRGINIA ATTORNEY GENERAL'S OFFICE
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

PATRICK MORRISEY
  Attorney General

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS
  Solicitor General
OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
State Capitol, Bldg. 1, Room E-26
1900 Kanawha Blvd. E.
Charleston, West Virginia 25305
304-558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

**CERTIFICATE OF COMPLIANCE**

This motion response complies with the Court's type-volume limitations because it contains 5,181 words, excluding portions omitted from the Court's required word count. This motion response complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Times New Roman font.

/s/Whitney D. Hermandorfer
Whitney D. Hermandorfer

**CERTIFICATE OF SERVICE**

On July 3, 2024, I filed an electronic copy of this motion response with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under Sixth Circuit Rule 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

*/s/Whitney D. Hermandorfer*
Whitney D. Hermandorfer