

**U.S. Department of Justice**
Civil Division

Tel: 202-305-8648

July 10, 2024

Kelly L. Stephens, Clerk
United States Court of Appeals for the Sixth Circuit
540 Potter Stewart U.S. Courthouse
100 E. Fifth Street
Cincinnati, Ohio 45402-3988

RE: *Tennessee v. Cardona*, No. 24-5588

Dear Ms. Stephens:

On July 1, 2024, the federal government filed an emergency motion for a partial stay pending appeal of the district court's preliminary injunction. *See* Dkt. 19 (Mot.). At that time, the government's motion seeking identical relief from the district court had been pending since June 24, 2024. *See* Mot. for Partial Stay, RE 104, Page ID # 2096-2105.

The government's motion in this Court indicated that it would notify the Court if the district court acted. *See* Mot. 3 n.1. The government therefore notifies this Court that earlier today, the district court denied the government's partial stay motion in the attached opinion. *See* Mem. Op., RE 117, Page ID # 2380-2405. The government disagrees with that ruling for the reasons provided in our filings in this Court, including that the district court fails to distinguish between the operation of 34 C.F.R § 106.10 and 34 C.F.R. § 106.31(a)(2), fails to limit its relief to the specific provisions and applications that cause plaintiffs' asserted harms, and fails to give effect to the Rule's express severability determinations.

The government respectfully reiterates its request for a ruling by July 12 so that the Solicitor General may, if necessary, consider whether to seek relief from the Supreme Court in advance of the Rule's effective date of August 1, 2024.

Sincerely,

/s/ *Steven A. Myers*
Steven A. Myers

cc: all counsel (by ECF)

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2024, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Sixth

Circuit by using the appellate CM/ECF system.  Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.

*/s/ Steven A. Myers*
Steven A. Myers

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| STATE OF TENNESSEE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2: 24-072-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| MIGUEL CARDONA, in his Official | ) | **MEMORANDUM OPINION** |
| Capacity as Secretary of Education, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

## I. Introduction

On June 17, 2024, the Court enjoined enforcement of the Department of Education's (the "Department") newly promulgated rule implementing Title IX (the "Final Rule"). [*See* Record No. 100.] The Memorandum Opinion and Order entered that date outlined the substantive and procedural failings of the Final Rule while explaining how the plaintiffs had carried their burden of demonstrating the immediate and irreparable harm they would suffer in the absence of an injunction.

The Department filed a Notice of Appeal one week later and has moved this Court for a partial stay of the preliminary injunction pending the outcome of the Department's appeal to the United States Court of Appeals for the Sixth Circuit. [Record No. 104] The Department argues that the Court's injunction is overly broad, improperly enjoining provisions that were not challenged by the plaintiffs and for which no finding of harm was made. [*Id.* at 1] More specifically, it asserts that the allegations of harm raised in the motion for injunction concerned only two provisions—34 C.F.R. § 106.31(a)(2) and the definition of "hostile environment

- 1 -

harassment" within 34 C.F.R. § 106.2—and that the Court's injunction needlessly prevents the implementation of critical regulations that do not cause irreparable harm to the plaintiffs. [*Id.*] The Department, therefore, contends that the injunction should be limited to those specific provisions.

The preliminary injunction was issued after a comprehensive review of the Final Rule, which fundamentally alters the meaning of "discrimination on the basis of sex" under Title IX by improperly relying on the Supreme Court's holding in *Bostock v. Clayton County*, 590 U.S. 644 (2020). [1]  The undersigned found that the Final Rule's provisions and embedded interpretations would most likely to cause significant and irreparable harm to the plaintiffs by compelling immediate and potentially conflicting changes in policy and practice, leading to widespread confusion and an enormous waste of resources.  The Court further concluded that the Final Rule's severability clauses offered no remedy because the defects "permeate[]" the otherwise innocuous regulations—a position the Department refutes.  [*See* Record No. 100, p. 90; *see also* Record No. 113, p. 2.]

After thorough consideration of the Department's motion, responsive filings, and the relevant legal standards, the motion for a partial stay of the injunction pending appeal will be denied.  The injunction, as issued, is necessary to prevent immediate harm to the plaintiffs while the legality of the Final Rule is fully adjudicated.  The Department has not demonstrated

---

[1]      Throughout this Memorandum Opinion and Order, the phrase "discrimination on the basis of sex" may be referred to more broadly as "sex discrimination" or "sex-based discrimination." The use of these abbreviated phrases is not intended to suggest that the terms are inherently synonymous.  Any relevant terms of art will appear in quotation marks with an appropriate citation, where applicable.

a sufficient likelihood of success on the merits of its appeal, nor has it shown that the balance of harms and consideration of the public interest weigh in favor of granting the stay.

## II.  Legal Standard

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States,* 272 U.S. 658, 672 (1926)).  The decision to grant such a request is "an exercise of judicial discretion," *Virginian Ry. Co.,* 272 U.S. at 672, and "[t]he party requesting the stay bears the burden of showing that the circumstances justify an exercise of that discretion," *Nken*, 556 U.S. at 433–34.  Courts are accorded "wide latitude" in their discretion to grant or deny stays "to avoid piecemeal, duplicative litigation and potentially conflicting results."  *IBEW, Loc. Union No. 2020 v. AT&T Network Sys.*, 879 F.2d 864, 1989 WL 78212, at *8 (6th Cir. July 17, 1989) (table) (citing *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817–20 (1976)).

When evaluating a motion for a stay pending appeal, the Court evaluates four factors: "(1) the likelihood that the party seeking the stay will prevail on the merits; (2) the likelihood that the moving party will be irreparably harmed; (3) the prospect that others will be harmed by the stay; and (4) the public interest in the stay."  *Dalh v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 730 (6th Cir. 2021) (quoting *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016)).  The third and fourth factors—the likely harm to others and the public interest—"merge when the Government is the opposing party."  *Nken*, 556 U.S. at 435.

These factors are not prerequisites.  Instead, they are "interrelated considerations that must be balanced together."  *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).  While no one factor is dispositive, the Sixth Circuit has

recognized that "the likelihood of success on the merits often will be the determinative factor." *Thompson v. DeWine*, 959 F.3d 804, 807, 812 (6th Cir. 2020) (per curiam); *see Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006). This is particularly so where First Amendment concerns are implicated. *See Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012).

### III. Analysis

The standard for granting a stay pending appeal mirrors the considerations for issuing a preliminary injunction but is viewed through a lens that seeks to maintain the status quo. *See United States v. Texas*, 144 S. Ct. 797, 798 n.2 (U.S. 2024). The Court remains mindful of this principle while observing that it is the Court's injunction that maintains the status quo by preserving a half-century's worth of interpretive consensus regarding the mandate of Title IX. But even without that consideration, a review of the relevant factors reinforces the undersigned's belief that enjoining the Final Rule in full is necessary to maintain regulatory stability and prevent irreparable harm during the pendency of this litigation.

### A. Likelihood of Success on Appeal

The Department must put make a "strong showing" of its likelihood of success on the merits of its appeal to justify the requested stay. *Nken*, 556 U.S. at 434; *see Griepentrog*, 945 F.2d at 153 (requiring a stay applicant to "demonstrate more than the mere 'possibility' of success"). The Court addresses this factor by examining several key issues raised in the instant motion: the Department's case for maintaining 34 C.F.R. § 106.10, enjoining 34 C.F.R.

§ 106.2 in its entirety, enjoining "unchallenged" provisions of the Final Rule, and the effectiveness of the Final Rule's severability clauses.[2]

### 1. Section 106.10

The Department challenges the injunction regarding § 106.10, arguing that this provision, which redefines "discrimination on the basis of sex" to include sex-adjacent characteristics, does not harm the plaintiffs and should not be enjoined. [Record No. 104, pp. 5–6] It characterizes this provision as a straightforward application of the Supreme Court's reasoning in *Bostock*, further arguing that it "is not the cause of Plaintiffs' claimed harms." [*Id.* at 5] But the Department's contention ignores entirely the plaintiffs' underlying arguments, this Court's findings, and prior observations of the Supreme Court and Sixth Circuit.

### a. *Bostock*'s Inapplicability

The Department accepts that "sex is binary and assigned at birth." [*See* Motion Hearing Transcript, p. 129.] And it acknowledges that Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). But it fails to recognize is that *Bostock*'s holding is entirely irreconcilable with the text and purpose of Title IX. By relying so heavily on this *Bostock* reasoning, the Final Rule was constructed on a foundation of quicksand.

In *Bostock*, the Supreme Court began its analysis by noting that Title VII prevents discrimination "because of" an individual's sex. 590 U.S. at 656. The Court found that "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346, 360 (2013)). These three phrasal prepositions

---

[2]     While there is considerable overlap in some of these topics, the Court will address them separately to facilitate review on appeal.

express a straightforward relationship of cause-and-effect.  Expressed in legal terms, "Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* (quoting *Nassar*, 570 U.S. at 346, 360).

The majority opinion offers a useful illustration to help understand Title VII's but-for test in action.

> Consider an employer with a policy of firing any woman he discovers to be a Yankees fan.  Carrying out that rule because an employee is a woman *and* a fan of the Yankees is a firing "because of sex" if the employer would have tolerated the same allegiance in a male employee.  Likewise here.  When an employer fires an employee because she is homosexual or transgender, two causal factors may be in play—*both* the individual's sex *and* something else (the sex to which the individual is attracted or with which the individual identifies).

*Id.* at 661.  But, as outlined below, discrimination "because of such individual's sex" is not, and cannot, be the same as discrimination "on the basis of sex."[3]

Just as the Supreme Court did in *Bostock*, this Court begins by ascertaining the plain meaning of the words at issue: "on the basis of".  *See Garland v. Cargill*, 602 U.S. 406, 415–16 (2024).  The root word "basis" is of Latin origin, meaning "foundation" or "support." *Basis, Oxford Dictionary of English Etymology* 77 (C. T. Onions, ed., 1966); *see also Basis*, *Black's Law Dictionary* 185 (11th ed. 2019) ("A fundamental principle; an underlying fact or condition; a foundation or starting point."); *Basis, Mirriam-Webster's Dictionary of Law* 45 (Linda Picard Wood ed. 2016) ("1: something on which something else is established[;] . . . 2:

---

[3]     In the Memorandum Opinion and Order enjoining the Final Rule, the undersigned concluded that "on the basis of sex" was not ambiguous and that the Department was not entitled to *Chevron* deference.  [Record No. 100, p. 16 n.6]  While the undersigned's position has not changed, the Supreme Court's recent overruling of the *Chevron* doctrine further reinforces this Court's constitutional and statutory obligation to reject an agency interpretation at odds with the Court's independent judgment.  *See Loper Bright Enters. v. Raimondo*, No. 22-451, 2024 WL 3208360, at *22 (U.S. 2024).

a basic principle or method."); *Basis, Mirriam-Webster's Collegiate Dictionary* 72 (7th ed. 1973) ("1: Foundation; 2: the principal component of anything; 3: something on which anything is constructed or established; 4: the basic principle."). Rather than indicating cause-and-effect, "on the basis of" is a preposition that indicates a foundational criterion upon which distinctions are made. In the context of Title IX, that criterion is sex—male or female.

This reading is further reinforced by observing that Title VII's prohibition is victim-centric, whereas Title IX's makes a broad categorical distinction. Title VII bars discrimination "because of *such individual's*" sex—calling for a but-for analysis focused on the individual victim's sex. 42 U.S.C. § 2000e–2(a)(1) (emphasis added). Title IX imposes no such requirement, speaking instead in broad categorical terms: "*No person* in the United States shall, on the basis of sex, be excluded . . . ."[4] 20 U.S.C. § 1681(a) (emphasis added). This distinction reflects prior observations from the Supreme Court and Sixth Circuit that "Title VII . . . is a vastly different statute from Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005); *see also L.W. by and through Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (noting that *Bostock*'s "text-driven reasoning applies only to Title VII"); *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("Title VII differs from Title IX in important respects . . . Thus, it does not follow that principles announced in the Title VII context automatically apply in the Title IX context."). Giving meaning to these distinctions is

---

[4]     The Supreme Court has acknowledged that Title IX's meaning would be altered if it instead prohibited discrimination "on the basis of *such individual's* sex." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 179 (2005) (emphasis in original); *see also Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring) (noting in the context of Title VI and the Fourteenth Amendment: "That such differently worded provisions should mean the same thing is implausible on its face.").

necessary under Title IX's framework, where imposing Title VII's but-for test or victim-centric focus would entirely undermine the statute's purpose.

The Department acknowledges that "[s]ome courts have declined to extend the Supreme Court's reasoning in *Bostock* to Title IX by concluding that prohibitions on discrimination 'because of sex' and discrimination 'on the basis' of sex do not mean the same thing."  89 Fed. Reg. 33806.  But it simply "disagrees" with those determinations, instead concluding that "[b]oth phrases simply refer to discrimination motivated *in some way* by sex."  *Id.* (emphasis added).  As explained below, such a reading is unworkable.

The Final Rule proclaims that "sex separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination."  *Id.* at 33818.  However, when sex separation "denies a transgender student access to a sex-separate facility or activity consistent with that student's gender identity," it violates Title IX's general nondiscrimination mandate.  *Id.*  This is a necessary result of adopting *Bostock*'s but-for test. But such a reading would also require schools to permit a non-transgender student to access the locker room or shower facility of his or her choosing: *But for* the high school quarterback being male, he would be able to access the female showers.  Yet the Department would presumably reject such a claim, referring to the scenario as a "permissible sex separation or differentiation."  *Id.* at 33816 (citing 34 C.F.R. § 106.33).

The Department uses the *Bostock* holding as a rationale for its entirely new reading of Title IX—one which creates a series of new protected classes not contemplated by the drafters of Title IX.  The Department's "more than de minimis harm standard" serves as a clever, albeit transparent, attempt to neutralize the resulting absurdities—ensuring the new protections apply to some and not to others.  Take for example the Final Rule's declaration that it causes "more

than de minimis injury" to prevent a transgender student from using the sex-separate facility consistent with the student's gender identity. *Id.* at 33818. When commenters pointed out that this "elevates protections for transgender students over other students, especially cisgender girls and women," *id.* at 33817, the Department explained that it was "unaware of instances in which cisgender students excluded from facilities inconsistent with their gender identity have experienced the harms transgender students experience as a result of exclusion from facilities consistent with their gender identity," *id.* at 33820. So to clarify, yes; the Department's Final Rule expressly grants preferential treatment to transgender students.

Under Title IX's framework, the adoption of *Bostock*'s but-for test would be contrary to statute and entirely unworkable. The Department's apparent remedy was to create regulatory carveouts aimed at limiting *Bostock*'s reasoning to the select class of individuals the Department set out to protect. In doing so, it created an impermissible litmus test that discriminates against those that Title VII's but-for test would otherwise protect (e.g., the quarterback). But because Title VII and Title IX combat discrimination in textually distinct ways, the Department's integration of *Bostock* is fatally flawed.

### b.  Unauthorized Statutory Expansion

Another obvious flaw with § 106.10 is found in its drafting. Title IX expressly authorizes the promulgation of rules prohibiting discrimination "on the basis of sex." 20 U.S.C. §§ 1681(a), 1682. The Department relies on *Bostock* to argue that "on the basis of" is expansive of the term "sex," to include things "inextricably bound up with sex." [Record No. 73, p. 16] (quoting *Bostock*, 590 U.S. at 660–61). Therefore, the Department reasons that "discriminating against someone based on their gender identity necessarily constitutes

- 9 -

discrimination 'on the basis of' the sex that they were assigned at birth."  [*Id.*]  However, § 106.10 takes it one step further.

The Final Rule declares that discrimination "on the basis of sex" includes discrimination "*on the basis of* sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  89 Fed. Reg. 33886 (adding 34 C.F.R. § 106.10).  By preceding these new classifications with "on the basis of," a plain reading of § 106.10 coupled with the Department's *Bostock* interpretation would necessarily lead to the conclusion that Title IX also prohibits all things "inextricably bound up" with "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." The Department admits as much when it acknowledges that one's gender identity "may or may not be different from their sex assigned at birth."  *Id.* at 33809.  It also announces that it "interprets 'sex characteristics' to include 'intersex traits,'" and that "gender norms" and "gender expression" are "rooted in one or more of the bases already represented in § 106.10." *Id.* at 33803.

The Administrative Procedure Act ("APA") requires courts to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  The Department's interpretation of Title IX transforms the familiar prohibition of sex-based discrimination into a sweeping anti-discrimination mandate, capable of regulating conduct that neither implicates the male/female dichotomy nor relates to sex at all.  [*See* Record No. 100, p. 27.] After utilizing "all relevant interpretive tools," the undersigned concluded that the Department exceeded its legislative authority by expanding the plain meaning of discrimination "on the basis of sex." *See Loper Bright Enters. v. Raimondo*, No. 22-451, 2024 WL 3208360, at *16 (U.S. 2024).

This extraordinary departure from Title IX's purpose—equality of educational opportunity for girls and women—becomes even more evident when considering the following hypotheticals.

Section 106.10 of the Final Rule proscribes discrimination on the basis of *sex stereotypes*, which the Department concludes reaches "discrimination based on others' expectations regarding a person's pregnancy or related conditions and assumptions about limitations that may result." 89 Fed. Reg. 33756. Section 106.2's definition of "*Pregnancy or related conditions*" includes "medical conditions related to . . . lactation." *Id.* at 33883. Accordingly, the Department reads Title IX to prohibit discrimination based on others' expectations regarding a person's medical conditions related to lactation and assumptions about any limitations that may result. Would this provision be violated if a recipient failed to accommodate a biological male in his pursuit of lactation? The Final Rule notes that "being able to live consistent with one's gender identity is critical to the health and well-being of transgender youth." *See id.* at 33819 n.90 (citing World Professional Association for Transgender Health ("WPATH"), *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022)). The very authority cited in the Final Rule reports that "many" transgender biological males "express the desire to chest/breast feed." WPATH, *supra* at S161 (identifying a case in which a biological male was successful in "lactating and chest/breast feeding").

Similarly, § 106.10 bars discrimination on the basis of *sex characteristics*, which "is intended to refer to physiological sex-based characteristics," including, but not limited to "a person's anatomy, hormones, and chromosomes associated with [being] male or female." 89 Fed. Reg. 33811. The Final Rule announces that no "medical diagnosis" is required and that the provision covers discrimination "based on physiological sex characteristics that differ from

- 11 -

or align with expectations generally associated with male and female bodies." *Id.* Like the definition before, it is clear to see how this intentionally undefined definition could capture situations never remotely conceived by Title IX's authors. If a male with a high-pitched voice is denied the ability to sing a traditionally male part in the school choir, has the school's choir director impermissibly discriminated against him by assigning him to a traditionally female part that falls within his vocal range? The number of possible scenarios is limitless given the Department's refusal "to make definitive statements about examples." *Id.*

Given the way § 106.10 was written and the Department's insistence on using vague terms—often defined by their nested and equally undefined subterms—the provision far exceeds the that which is authorized under Title IX. The plaintiffs argue, and the undersigned agrees, that the Department's redefinition of sex discrimination in § 106.10 drastically and impermissibly alters the obligations of educational institutions under Title IX. [*See* Record Nos. 110, p. 3; 111, p. 4.] This expansive interpretation introduces considerable uncertainty and complexity, necessitating comprehensive changes in school policies, training, and enforcement mechanisms. The claim that this expansion "does not cause Plaintiffs any injury" is plainly without merit. [Record No. 113, p. 1]

### c. Procedural Defects

Aside from the substantive issues already addressed, the injunction identifies significant concerns about the procedural validity of § 106.10. [*See* Record No. 100, pp. 66–77.] The Department's redefinition of discrimination "on the basis of sex" appears to have been implemented without adequate notice and comment, raising substantial questions under the APA. [*See id.* at 76.] ("It is an inescapable conclusion based on the foregoing discussion that the Department has effectively ignored the concerns of parents, teachers, and

students . . . .").  The Department's responses to concerns of bias, vagueness, and overbreadth often fell woefully short of that demanded by the APA.  *See Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (requiring agencies to "examine the relevant data and articulate a satisfactory explanation for its action"); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[W]here the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.").

Given these substantial legal and procedural issues, the Department has not shown a strong likelihood of success on the merits regarding the Court's decision to enjoin § 106.10.  The provision's sweeping changes and the procedural deficiencies in its adoption support the decision to include it in the preliminary injunction.

### 2.  Enjoining Section 106.2 in its Entirety

The Department contends that the Court's injunction improperly enjoins § 106.2 of the Final Rule in its entirety, arguing that the plaintiffs only challenged its definition of "hostile environment harassment" as applied to gender identity discrimination.  It maintains that "hostile environment harassment" applies outside the context of gender identity and that the injunction improperly enjoined more than was necessary to mitigate the plaintiffs' alleged harms.  [*See* Record No. 104, p. 6.]

This argument fails to recognize the extent to which other applications of "hostile environment harassment," and in fact other definitions in § 106.2 more broadly, have been irreparably tainted by overarching procedural defects and *Bostock* reasoning.  This Court's Memorandum Opinion and Order explains, in some detail, how the Final Rule's definition of "hostile environment harassment" is likely to "compel[] speech and otherwise engage[] in

- 13 -

viewpoint discrimination." [Record No. 100, p. 48]  The opinion also clear explains that the provision's reliance on amorphous and undefined terms make it "vague and overbroad in a way that impermissibly chills protected speech." [*Id.* at 56]  Despite the Department's argument to the contrary, the plaintiffs' criticisms of the "hostile environment harassment" provision—and this Court's analysis—were not limited to the context of gender identity. [*See, e.g., id.* at 43 (discussing misgendering and compelled speech due to sex stereotyping).]  The definition itself suffers from both procedural defects under the APA and constitutional deficiencies that are implicated regardless of the metric being used to define sex-discrimination. [*See id.* at 54.]  The Court maintains that it is necessary to enjoin enforcement of the Final Rule's "hostile environment harassment" provision in its entirety.

The plaintiffs also have adequately demonstrated that other definitions and obligations found within § 106.2 are meaningless without first determining the meaning of sex discrimination. [*See* Record No. 110, p. 5.]  For example, § 106.2 defines "relevant" to mean "related to the allegations of sex discrimination under investigation as part of the grievance procedures under § 106.45, and if applicable § 106.46." 89 Fed. Reg. 33884.  This necessarily depends on the scope of sex discrimination and the applicability of *Bostock*.  Similarly, § 106.2's definition of "supportive measures" may or may not have to account for protections against discrimination based on gender identity and more.  Depending on the meaning of sex discrimination, these definitions will influence the obligations of the Title IX coordinators and the procedures they must follow, thereby affecting the entire grievance process outlined in §§ 106.44 and 106.45.  *See id.* at 33885.  These changes are directly tied to key definitions and cannot function independently without creating significant regulatory confusion or an extraconstitutional judicial rewrite.

The Supreme Court has consistently recognized that when a statutory or regulatory provision is fundamentally flawed, its interconnected provisions cannot be severed without causing substantial disruption. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (noting that invalid provisions may be dropped where the remainder "is left fully operative as law"). Here, the challenged importation of *Bostock*'s reasoning is so central to the Final Rule that severing expressly challenged provisions is not a viable option. The Department's suggested remedy would require this Court to scour the Final Rule's more than four-hundred pages of text and make sweeping cuts in a manner that would impermissibly depart from the Court's judicial function and wade into the realm of executive rulemaking. *See infra* Section III.A.3. Absent such an endeavor, the Final Rule would be incoherent.

Moreover, the procedural deficiencies identified in the adoption of these definitions, like those addressed above, raise significant questions under the APA. The lack of adequate reasoned response to these substantial changes undermines the validity of the entire provision. *See FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515–16 (2009) ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 981 (2005) ("Unexplained inconsistency . . . [may be] a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.").

In summary, the definitions within § 106.2 are integrally connected to the redefinition of sex discrimination derived from *Bostock*, appearing in § 106.10, and articulated in the Final Rule's stated "Purpose". *See* 89 Fed. Red. 33476 (purporting "to provide greater clarity regarding . . . the scope of sex discrimination, including recipients' obligations not to discriminate based on sex stereotypes, sex characteristics, pregnancy or related conditions,

- 15 -

sexual orientation, and gender identity").  The plaintiffs have convincingly argued that these definitions cannot be salvaged without causing significant disruption, regulatory confusion, and compliance cost.  Thus, the Court's decision to enjoin § 106.2 in its entirety is justified.

### 3.  Enjoining Other Sections of the Final Rule

The Department also challenges the injunction as it pertains to many other sections of the Final Rule, particularly those not expressly named by the plaintiffs.  It contends that these sections should not be enjoined as they "have nothing to do with gender identity," and plaintiffs have not demonstrated imminent injury absent the injunction.  [Record No. 104, p. 3] The Department provides the following examples:

> [P]rovisions regarding the role of Title IX coordinators, 89 Fed. Reg. at 33,885 (34 C.F.R. § 106.8(a)); recipients' notice and record-keeping obligations, *id.* at 33,885-86 (34 C.F.R. § 106.8(c), (f)); access to lactation spaces, *id.* at 33,888 (34 C.F.R. § 106.40(b)(3)(v)); a recipient's response to sex discrimination, *id.* at 33,888-91 (34 C.F.R. § 106.44); and grievance procedures for claims of sex discrimination, *id.* at 33,891-95 (34 C.F.R. §§ 106.45, 106.46).

[*Id.* at 3–4]

First, the Court must consider the broader context of these provisions and their interplay with the Final Rule's interpretive guidance and the provisions more directly at issue (i.e., §§ 106.2, 106.10, and 106.31(a)(2)).  As observed previously, the Department's adoption of *Bostock* alone necessarily embeds a new meaning of sex discrimination into the entire Final Rule.  *See, e.g.*, 89 Fed. Reg. 33802 (noting that the Department believes Title IX's prohibition on sex discrimination includes things which "necessarily involves consideration of a person's sex").  This impermissible expansion of Title IX's mandate is not confined to the creation of § 106.10—it directly flows from the Department's importation of *Bostock*'s Title VII-based reasoning.

- 16 -

For example, the Department suggests that provisions regarding the role of Title IX coordinators were improperly enjoined.  [Record No. 104, p. 3]  But this ignores the fact that the scope of these regulations is unascertainable without first resolving the central dispute arising under *Bostock*.  Section 106.8(a) currently requires that a Title IX Coordinator be designated "to coordinate [the recipient's] efforts to comply with its responsibilities under [Part 106]."  The Final Rule appears significantly more exacting, further insisting a Title IX Coordinator "ensure the recipient's consistent compliance with its responsibilities under Title IX and [Part 106]."  89 Fed. Reg. 33885.  But that mandate necessarily calls for "consistent compliance" with responsibilities that the Final Rule defines in light of *Bostock*.  *See, e.g.*, *id.* at 33569 (describing training obligations under § 106.8(d)(1), which require all employees to be trained "on the scope of conduct that constitutes sex discrimination under Title IX, including sex-based harassment").

The same issue presents itself when reviewing the recordkeeping obligations outlined in the Final Rule's § 106.8(f).  The Department acknowledges that "§ 106.8(f) broadens the existing scope of the recordkeeping requirements . . . because the final recordkeeping requirement applies to all notifications to the Title IX Coordinator about conduct that reasonably may constitute sex discrimination and all complaints of sex discrimination."  *Id.* at 33873 (estimating "that modifications to recipients' recordkeeping systems will cost approximately $13,022,034 in Year 1").  But this requirement is once again rendered meaningless without first determining the meaning of sex discrimination—the central focus of the plaintiffs' legal challenge.

The provisions identified by the Department as being captured in the Court's overbroad injunction impose new duties on recipients, all of which hinge on the Department's adoption

of an entirely new understanding of sex discrimination.   [*See* Record No. 104, pp. 3–4.] Allowing these provisions to take effect while enjoining the definitions and interpretations from which they derive their meaning would require educational institutions to guess as to the provisions' scopes, creating an inconsistent and unmanageable regulatory framework.

The Supreme Court has emphasized the importance of regulated parties knowing what is required of them.  *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."); *see also Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.").   The plaintiffs have convincingly argued that the Final Rule, *in its entirety*, fails to provide such clarity, and the piecemeal enforcement suggested by the Department would only exacerbate this problem.

Moreover, the potential constitutional issues raised by the plaintiffs similarly extend to these remaining provisions.   The Department's redefined sex discrimination standard and vague guidance implicates the same First Amendment protections on speech and religious expression that exist elsewhere.  *See, e.g.*, 89 Fed. Reg. 33493 (declaring that "Title IX's broad prohibition on sex discrimination encompasses, at a minimum, discrimination against an individual based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity").   If the remaining provisions are preserved, the viewpoint discrimination inherent in the Final Rule remains likely to impose an impermissible constraint on an individual's ability to freely express certain religious and/or philosophical

- 18 -

viewpoints.  [*See* Record No. 100, pp. 41–56.]  Enjoining § 106.2's definitions of "sex-based harassment" and/or "hostile environment harassment" still leaves the existing "sexual harassment" standard in full force.  *See* 34 C.F.R. § 106.30(a).  Permitting the Department's redefinition of "on the basis of sex" to act through existing regulations is no remedy at all.

The Department has not demonstrated a likelihood of success on the merits regarding the indirectly contested provisions of the Final Rule, which inherently impose the same harms as those challenged with more specificity.  This Court's injunction is not an overreach but a necessary measure to maintain regulatory coherence and prevent piecemeal implementation that could lead to significant administrative challenges and legal uncertainties.

### 4. Severability Clauses

Though sufficiently addressed in the preceding discussion, the undersigned will nonetheless directly address the Department's severability argument.  It argues that the preliminary injunction is overly broad because the contested provisions of the Final Rule were expressly severable and intended to operate independently of each other.[5]  [*See* Record No. 104, p. 4.  *See also supra* Section III.A.2–3.]  But "a severability clause is an aid merely; not an inexorable command."  *Reno v. ACLU,* 521 U.S. 844, 884–85, n.49 (1997); *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968) ("[T]he ultimate determination of severability will rarely turn on the presence or absence of such a clause.").  Severability clauses do not function

---

[5]    The Final Rule notes that "the severability clauses in part 106, . . . continue to be applicable," and identifies them by Subpart: § 106.9 (Subpart A—"Introduction"), § 106.16 (Subpart B—"Coverage"), § 106.24 (Subpart C—"Discrimination on the Basis of Sex in Admission and Recruitment Prohibited"), § 106.46 (Subpart D—"Discrimination on the Basis of Sex in Education Programs or Activities Prohibited"), § 106.62 (Subpart E—"Discrimination on the Basis of Sex in Employment in Education Programs or Activities Prohibited"), § 106.72 (Subpart F—"Retaliation"), and § 106.82 (Subpart G—"Procedures").  *See* 89 Fed. Reg. 33848.

as a get out of jail free card—redeemable by an Executive agency seeking to recruit the Court into the rulemaking process. *See Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 625 (2016) (quoting *Ayotte v. Planned Parenthood of N. New Eng.,* 546 U.S. 320, 329 (2006)) ("A severability clause is not grounds for a court to 'devise a judicial remedy that . . . entail[s] quintessentially legislative work.'").

Courts are not required "to proceed in piecemeal fashion," going "application by conceivable application" to effectively rewrite regulations in an effort to save them from their statutory and unconstitutional defects. *Id.* at 625–26. And even when severing a discrete provision is possible, "making distinctions in a murky constitutional context, or where line-drawing is inherently complex," may require an improper judicial excursion into the legislative domain. *Ayotte,* 546 U.S. at 330.

The doctrine of severability imposes a two-step inquiry on courts. First, a court must determine "whether the [regulation] will function in a *manner* consistent with the intent of [the agency]." *Alaska Airlines,* 480 U.S. at 685. *But see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 692 (2012) (Scalia, J., dissenting) ("Even if the remaining provisions will operate in some coherent way, that alone does not save the statute."). Second, the reviewing court must determine whether the agency would have promulgated the rule in the absence of the severed provisions. *Alaska Airlines,* 480 U.S. at 685.

Here, the challenged provisions and embedded interpretive guidance is so integral to the Final Rule that attempting to salvage provisions through severance would leave an incoherent regulatory framework. The Department's melding of Title VII jurisprudence with the Title IX framework is not something that can be severed as a discrete, isolated provision. Instead, it fundamentally redefines the scope and application of Title IX across multiple

- 20 -

contexts.  The inescapable interconnectedness of the Department's slew of new interpretations supports the undersigned's initial determination that a broad injunction is necessary to prevent irreparable harm and ensure regulatory coherence.

Because the Final Rule would fail to function in the absence of necessarily severed provisions, the Court need not determine whether the Department would have promulgated the Final Rule absent its glaring defects.[6]  The Department's argument that the Final Rule's provisions can be meaningfully severed does not hold up under scrutiny, and thus, the Department has not demonstrated a substantial likelihood of success on this point.

### B.  Likelihood of Irreparable Harm

The Department also contends that it will suffer irreparable harm if the preliminary injunction is not partially stayed pending appeal.  But to justify this assertion, it must demonstrate that the harm is "both certain and immediate, rather than speculative or theoretical."  *Griepentrog*, 945 F.2d at 154.

The Department argues that "[e]very time the federal government 'is enjoined by a court from effecting statutes enacted by representatives of its people, it suffers a form of irreparable injury.'"  [Record No. 104, p. 6] (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).  This is a most curious citation for the Department to lean on.  The full quotation recognizes the irreparable injury that occurs "any time a *State*" is prevented from effectuating statutes enacted *through the legislative process.  See New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).  And in this case, the Plaintiff States far more convincingly make that very claim.  [*See* Record No.

---

[6]     The Department makes quite clear its view that the severability provisions refute any suggestion to the contrary.  [Record No. 113, p. 3]

1, p. 68.]  They argue persuasively that the Final Rule undermines legislatively enacted State statutes with federal regulations imposed by unelected bureaucrats in Washington, D.C.  [*See id.* ¶ 22.]

The Department also suggests that the injunction prevents the Final Rule from effectuating "Title IX's twin goals of 'avoiding the use of federal resources to support discriminatory practices and providing individual citizens effective protection against those practices.'"  [Record No. 104, p. 7] (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979)) (cleaned up).  It goes on to suggest the injunction "*could* prematurely impair the rights of individuals" by preventing the Department from taking steps to ensure that, *inter alia*, "students are not being punished for being pregnant, gay, or transgender."  [*Id.*]  However, it offers no evidence or support that such acts are occurring and even acknowledges that the plaintiffs "nowhere suggest that they intend to engage in discrimination against students for being pregnant or gay at all."  [*Id.* at 5] In short, to the extent such delayed enforcement would constitute a harm to the Department, it is premised on the entirely theoretical notion that students within the Plaintiff States *are* being punished for being pregnant, gay, or transgender.

The Department also suggests a stay would restore provisions that prohibit things like "forcing a student to sit in the back of a classroom because he is gay, excluding a student from the lunchroom because he is transgender, sexually harassing a cisgender woman in a manner that meets the regulatory definition of hostile environment harassment, or requiring a breastfeeding student to express breastmilk in a bathroom stall."  [Record No. 113, p. 6]  But once again, the Department provides no evidence of such things occurring within the Plaintiff States' jurisdictions.

The Department's arguments are unpersuasive for two clear reasons.  First, the preliminary injunction does not eliminate protections against discrimination; it merely maintains the status quo pending a thorough judicial review of the Final Rule's legality.  As the Supreme Court noted in *Nken*: "A stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result.'"  556 U.S. at 427 (first quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'm,* 259 F.2d 921, 925 (D.C. Cir. 1958) (*per curiam*); and then quoting *Virginian Ry. Co.,* 272 U.S. at 672).

Second, the Department has not demonstrated that the delay in implementing the Final Rule will cause immediate and irreparable harm.  The protections under the *existing* regulatory framework remain in place, continuing to provide a mechanism for addressing discrimination.  The speculative nature of the Department's claimed harm is insufficient to meet the rigorous standard required for a stay.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (standing for the proposition that a stay pending appeal must be supported by more than "a possibility of irreparable harm").

The Department has not met its burden of demonstrating that, absent a stay, it will suffer irreparable harm.  The speculative nature of the claimed harms and the continued protection under existing regulations all weigh against the issuance of a stay.

### C.  Harm to Others and the Public

The third and fourth factors in determining whether to grant a stay pending appeal look to the potential harm that will be imposed upon others and the public if the stay is granted.  In this case, the Court considers the harm that the plaintiffs, other interested parties, and the public will likely suffer if the preliminary injunction is stayed, thereby allowing portions of the Final

Rule to take effect in less than one month's time. These considerations are weighed against any potential harm faced by the Department. *See Winter*, 555 U.S. at 20 (noting that the balance of equities must weigh in favor of the party suffering the greater harm).

The plaintiffs argue that, should a stay be granted, the immediate burdens placed on educational institutions and their staff will be considerable. First, the implementation of the Final Rule without a clear resolution of its legality will create substantial administrative and operational challenges for schools. [*See* Record No. 110, p. 7.] Requiring schools to comply with some provisions, including those which derive meaning from enjoined provisions, will require schools to embark on the highly speculative and costly endeavor of overhauling existing policies and training programs while attempting to predict the Final Rule's ultimate form. [*See id.* at 8.] The harm to schools, measured in terms of time and money, has been well established by the plaintiffs and is neither trivial nor speculative. [*See* Record No. 100, Part V.]

Second, the risk of legal conflict is considerable. A partial stay would force States to navigate a complex and potentially contradictory regulatory landscape, attempting to reconcile existing state laws and policies with the Final Rule's mandates. [*See* Record No. 19-1, p. 31.] This uncertainty would likely result in inconsistent enforcement and could expose schools to additional litigation risks, arising under both Title IX and state law. [*See* Record No. 100, p. 63.] Such a scenario undermines the very purpose of regulatory clarity and stability that Title IX aims to achieve.

Third, the potential harm extends to students and staff who would be directly affected by the immediate changes in policies and practices. This includes infringement on religious freedoms and free speech rights, either through compelled or chilled speech. *See Sorrell v.*

*IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("The First Amendment requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys.") (citation omitted); *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."). The plaintiffs have presented credible arguments that the Final Rule's enforcement will likely lead to violations of these constitutional rights. [*See* Record No. 100, pp. 41–56.]

Fourth, beyond students and staff, the public has a significant interest in the evenhanded application of laws and regulations. This requires they be drafted in such a way as to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). When a vague regulation "abuts upon sensitive areas of basic First Amendment freedoms," uncertainty will inevitably "inhibit the exercise of those freedoms." *Id.* at 109 (citations omitted). The Final Rule raises those very concerns.[7] Allowing the Final Rule to take effect while its legal validity is still in question will disrupt existing clarity and likely leading to inconsistent application and enforcement across different states and educational institutions. [*See* Record No. 100, Part VI.]

The immediate harm to the plaintiffs will likely be substantial if a stay is granted. The administrative burdens, legal uncertainties, and potential constitutional violations underscore the need for maintaining the injunction until a final decision is issued. The injunction maintains the status quo and prevents the immediate and significant harm that would result

---

[7] In the Final Rule, the term "vague" appears thirty-two times; "vagueness," fourteen times; "overbroad," twenty-one times; and "First Amendment," two hundred sixty-nine times. *See generally* 89 Fed. Reg. 33474.

from the Final Rule's premature enforcement.   The balance of equities clearly favors maintaining the preliminary injunction to prevent these significant harms while this matter is pending a final determination.

## IV.  Conclusion

The Department fails to demonstrate a substantial likelihood of success on the merits. Likewise, it fails to rebut the myriad substantive and procedural flaws with the Final Rule as discussed at length by the plaintiffs.  Next, the Department's purported claim of irreparable harm is speculative at best, especially in light of the existing protections which remain in place. Conversely, the plaintiffs have made a strong showing that granting a stay would result in substantial and immediate harm to the States, their educational institutions, and all those who rely on the services they provide.  Finally, the public interest in upholding regulatory clarity, protecting constitutional rights, and avoiding unnecessary upheaval in schools favors the plaintiffs.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** that the Motion for a Partial Stay Pending Appeal filed by the United States Department of Education and Miguel Cardona, Secretary of the U.S. Department of Education [Record No. 104] is **DENIED**.

Dated: July 10, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky