No. 24-5588

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

STATE OF TENNESSEE, et al.,
*Plaintiffs-Appellees,*

and

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL, et al.,
*Intervenors-Plaintiffs-Appellees,*

v.

MIGUEL CARDONA, in his Official Capacity as Secretary of Education, et al.,
*Defendant-Appellants.*

On Appeal from the United States District Court
for the Eastern District Of Kentucky
No. 2:24-cv-00072 (Hon. Danny C. Reeves)

# BRIEF OF STATUTORY INTERPRETATION AND EQUALITY LAW SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS

KATIE EYER
PROFESSOR OF LAW
RUTGERS LAW SCHOOL
217 N. 5th St., E429
Camden, N.J. 08102
Telephone: (856) 225-6960
katie.eyer@rutgers.edu

ROBERT NILES-WEED
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8651
robert.niles-weed@weil.com

*Counsel for Amici Curiae*

*Additional Amici Listed on Next Page*

## ADDITIONAL *AMICI* CURIAE

*Amici* submit this brief solely on their own behalf. Institutional affiliations are provided solely for purposes of identification.

**Kevin Barry**
Professor of Law
Quinnipiac University School of Law

**Maxine Eichner**
Graham Kenan Distinguished Professor Law
University of North Carolina School of Law

**Katie Eyer**
Professor of Law
Rutgers Law School

**Holning Lau**
Willie Person Mangum Distinguished Professor of Law
University of North Carolina School of Law

**Naomi Schoenbaum**
William Wallace Kirkpatrick Dean's Research Professor of Law
George Washington University Law School

**Brian Soucek**
Professor of Law and Chancellor's Fellow
University of California, Davis School of Law

**Deborah Widiss**
John F. Kimberling Professor of Law
Indiana University Bloomington, Maurer School of Law

**Ezra Ishmael Young**
Professor of Law
African American Policy Forum

# TABLE OF CONTENTS

Page

INTEREST OF *AMICI* CURIAE.................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT ............................................................................................................4

    I.    The Text of Title IX Prohibits Discrimination Based on an
Individual's Sexual Orientation or Gender Identity...............................4

    II.   Plaintiffs' Policy Arguments Cannot Overcome Title IX's Text. ......15

CONCLUSION ......................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bostock v. Clayton County*,
  590 U.S. 644 (2020)....................................................................................*passim*

*Burrage v. United States*,
  571 U.S. 204 (2014)................................................................................6, 7

*City of Los Angeles v. Manhart*,
  435 U.S. 702 (1978)....................................................................................11

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
  589 U.S. 327 (2020)................................................................................6, 7

*Doe v. Purdue Univ.*,
  928 F.3d 652 (7th Cir. 2019) ....................................................................12

*Gentry v. E.W. Partners Club Mgmt. Co.*,
  816 F.3d 228 (4th Cir. 2016) ....................................................................6

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009)................................................................................6, 7

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
  530 U.S. 238 (2000)....................................................................................5

*Kingdomware Techs. v. United States*,
  579 U.S. 162 (2016)....................................................................................5

*Louisiana v. U.S. Dep't of Educ.*,
  No. 3:24-CV-563, 2024 WL 2978786
  (W.D. La. June 13, 2024)............................................................................11

*Magwood v. Patterson*,
  561 U.S. 320 (2010)....................................................................................15

*Muldrow v. City of St. Louis*,
  144 S. Ct. 967 (2024)....................................................................................8

*Niz-Chavez v. Garland*,
  593 U.S. 155 (2021) .........................................................................15

*Oklahoma v. Castro-Huerta*,
  597 U.S. 629 (2022) .........................................................................15

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998) ...................................................................3, 12, 16

*Pa. Dep't of Corrections v. Yeskey*,
  524 U.S. 206 (1998) .........................................................................16

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ........................................................................2, 5, 6

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ...........................................................................7

*Tennessee v. Cardona*,
  No. 2:24-072-DCR, 2024 WL 3019146
  (E.D. Ky. June 17, 2024) ..........................................................11, 12, 13

## Statutes & Regulations

20 U.S.C. § 1681(a) ........................................................................*passim*

29 U.S.C. § 705(20)(F) .........................................................................14

34 C.F.R. § 106.10 ........................................................................4, 5, 10

34 C.F.R. § 106.12 ........................................................................13, 14

## Other Authorities

William N. Eskridge, Jr., et al., *The Meaning of Sex: Dynamic Words, Novel Applications, & Original Public Meaning*, 119 Mich. L. Rev. 1503 (2021) ...............................................................................8

Neil Gorsuch, *A Republic, If You Can Keep It* (2019)............................................17

*Merriam–Webster's Advanced Learner's English Dictionary* (2008) ......................6

Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* (1997) .........................................................................................16

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .............................................................17

Jeremy Waldron, *The Rule of Law and the Measure of Property* (2012) ..................................................................................................17

*Webster's New Collegiate Dictionary* (1975) ....................................2, 7, 8

*Webster's New Int'l Dictionary of the English Language* (2d ed. 1954) ..............2, 8

*Webster's New World Dictionary of the Am. Language, 2d Coll. Ed.* (1970) .................................................................................7, 8

## INTEREST OF *AMICI* CURIAE[1]

*Amici* are law professors who are experts in the area of statutory interpretation and/or equality law. Although *amici* have otherwise diverse views, they agree that a textualist analysis compels the conclusion that discrimination against individuals because of their lesbian, gay, bisexual, or transgender (LGBT) status is "discrimination" "on the basis of sex," 20 U.S.C. § 1681(a), within the meaning of Title IX.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Title IX of the Education Amendments of 1972 provides that "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to *discrimination* under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). Discrimination against individuals because of their sexual orientation or gender identity is "discrimination" "on the basis of sex." Because the statute's plain text compels this conclusion, the Court should reverse the District Court's opinion granting a Preliminary Injunction.

---

[1] Under Federal Rule of Appellate Procedure 29, *amici* state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici* or their counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

"Discrimination" "on the basis of sex" means adverse differential treatment in which a person's sex was a determinative cause. See, *e.g.*, *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63 (2007) ("In common talk, the phrase 'based on' indicates a but-for causal relationship . . . ."); *Webster's New Int'l Dictionary of the English Language* 745 (2d ed. 1954) (defining discriminate as: *"*To make a difference in treatment or favor (of one as compared with others)"); *Webster's New Collegiate Dictionary* 1062 (1975) (defining "sex" as "organisms distinguished respectively as male or female"). Thus, at a minimum, Title IX proscribes adverse differential treatment that would not have occurred but-for an individual's "biological" sex.[2]

Each and every instance of anti-LGBT discrimination is "discrimination" "on the basis of sex" in precisely this sense: it would not have occurred but-for the individual's biological sex. For example, a transgender girl[3] who is expelled from school for self-identifying as female would not have been expelled but-for her biological sex. If she had been assigned female at birth, the school would have found

---

[2] *Amici* have a diversity of views about the meanings of "sex" and "biological sex"—now and in 1972 (when Title IX was enacted). For the purposes of this brief, however, *amici* use as their starting point the definition of "sex" put forward by the Plaintiffs: "biological sex," *i.e.*, the sex an individual is assigned at birth.

[3] Throughout this brief, *amici* use the term "transgender girl" or "transgender woman" to refer to transgender people who have a female gender identity, but were assigned the male sex at birth. "Transgender boy" or "transgender man" are used to refer to transgender people who have a male gender identity, but were assigned the female sex at birth.

her self-identification wholly unobjectionable. So, too, a lesbian teacher who is disciplined for putting a picture of her female partner on her desk has been subjected to "discrimination" that would not have occurred but-for her biological sex—since a male teacher would not be disciplined for identical conduct.

Just four years ago, the Supreme Court reached this very conclusion in the context of Title VII's virtually identical statutory language. See *Bostock v. Clayton County*, 590 U.S. 644, 655-58 (2020) (concluding that anti-LGBT discrimination is necessarily "discriminat[ion] . . . because of . . . sex" under Title VII). There is no sound reason to reach a contrary result here. See, *e.g.*, *id.* at 650, 656 (using the terms "on the basis of" and "because of" as synonymous terms connoting but-for causation). Thus, both text and precedent compel the conclusion that sexual orientation and gender identity discrimination are prohibited by Title IX.

It is true, as Plaintiffs contend, that the primary intended *purpose* of Title IX was to address discrimination against women in education. But "it is 'the provisions of our laws rather than the principal concerns of our legislators by which we are governed.'" *Bostock*, 590 U.S. at 664 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)). And the *means* that Congress chose to achieve its goal was unmistakably individualized in nature—and extends to men and women alike. See 20 U.S.C. § 1681(a) ("*No person* in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to

*discrimination* under any education program or activity receiving Federal financial assistance . . . ." (emphasis added)). LGBT men and women are entitled to those individualized protections, just like all other people. Finally, while Congress included exceptions to the statute's broad coverage, nothing in Title IX's exceptions purports to carve LGBT people out of the protections of the law. See 20 U.S.C. § 1681(a)(1)-(9).[4]

In short, the Department of Education ("Department") regulation providing that "[d]iscrimination on the basis of sex includes discrimination on the basis of . . . sexual orientation and gender identity," 34 C.F.R. § 106.10, is not only "consistent with law"—it is compelled by Title IX's text. The Plaintiffs' and the District Court's policy arguments to the contrary cannot rewrite the statute's text. This Court should reverse the District Court's award of a Preliminary Injunction.

## **ARGUMENT**

### I.    **The Text of Title IX Prohibits Discrimination Based on an Individual's Sexual Orientation or Gender Identity.**

---

[4] The only one of Title IX's statutory limitations that Plaintiffs have even suggested may be relevant to this matter is § 1686 (allowing sex-separated living facilities). But § 1686 clearly does not categorically exclude LGBT people from Title IX. In the interest of space, *amici* restrict their discussion herein to the primary question of whether Title IX's textual prohibition on "discrimination" "on the basis of sex" in § 1681(a) reaches anti-LGBT discrimination, and do not address the question of how § 1686's proviso should be applied to LGBT students and stakeholders.

"In statutory construction, we begin with the language of the statute." *Kingdomware Techs. v. United States*, 579 U.S. 162, 171 (2016). "And where the statutory language provides a clear answer, [we] end[] there as well." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 254 (2000). This Court's analysis should begin and end with the clear text of Title IX.

Title IX provides that "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to *discrimination* under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). As set out below, each and every instance of sexual orientation and gender identity discrimination *is* "discrimination" "on the basis of sex"—because it is "discrimination" which would not have occurred but-for the individual's biological sex. See *Safeco*, 551 U.S. at 63 ("In common talk, the phrase 'based on' indicates a but-for causal relationship . . . ."). Contrary to the arguments of the Plaintiffs and the District Court, the text compels this conclusion *even if* the narrowest historical understanding of sex (as "biological sex" or "sex assigned at birth") is applied.

The Department thus properly concluded that—absent a statutory exception—such anti-LGBT discrimination violates Title IX. See 34 C.F.R. § 106.10 ("Discrimination on the basis of sex includes discrimination on the basis of . . . sexual orientation, and gender identity.").

1.     This conclusion—that anti-LGBT discrimination is proscribed by Title IX—follows ineluctably from the statutory language. Title IX's key operative phrase—"on the basis of"—plainly connotes but-for causation. See *Safeco*, 551 U.S. at 63 ("In common talk, the phrase 'based on' indicates a but-for causal relationship . . . ."); *Burrage v. United States*, 571 U.S. 204, 213 (2014) ("based on" connotes "but-for" causation); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (indicating that "based on," "because of," "by reason of" and other cognate terms are all plain-language ways of legislating but-for causation); see also *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 335 (2020) (describing the Supreme Court's *own* use of the phrase "on the basis of race" in a 1975 case as "strongly suggestive of a but-for causation standard"); see generally *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 236 (4th Cir. 2016) (defining "'on the basis of' as . . . [']based on'") (quoting *Merriam–Webster's Advanced Learner's English Dictionary* (2008)).

In fact, "on the basis of" is just one of a host of synonymous causal terms, including "because of," "based on," "by reason of," and "on the grounds of," that the Supreme Court has used interchangeably—all of which it has found to connote "but for" causation. See, *e.g.*, *Bostock*, 590 U.S. at 650, 656 (using "on the basis of . . . sex" as a synonym for "because of . . . sex" and describing both as "incorporat[ing] the simple and traditional standard of but-for causation") (internal

quotation marks omitted); *Burrage*, 571 U.S. at 213 ("because of," "based on," "results from" and "by reason of" all connote "but-for" causation); *Comcast*, 589 U.S. at 332, 335 (the phrase "on the basis of," including when used by the courts, connotes but-for causation); see also *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 289 (2023) (Gorsuch, J., concurring) ("'on the ground of' . . . means 'because of'" which "invoke[s] the simple and traditional standard of but-for causation") (internal quotation marks omitted).

Indeed, the Supreme Court has gone so far as to suggest that the "ancient and simple 'but for' common law causation test . . . supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated . . . includ[ing] when it comes to federal antidiscrimination laws." *Comcast*, 589 U.S. at 332. Title IX—which was enacted contemporaneously with statutes that that the Court has held incorporate the "but for" standard, and which uses synonymous causal language—supplies no reason for deviating from this presumption. See, *e.g.*, *Gross*, 557 U.S. at 176 (Age Discrimination in Employment Act, enacted in 1967); *Bostock*, 590 U.S. at 650, 656 (Title VII, enacted in 1964).

The second key term used by Title IX is "sex." At the time of Title IX's enactment—and today—"sex" was often defined as "either of two divisions of organisms distinguished respectively as male or female." *Webster's New Collegiate Dictionary* 1062 (1975); see *Webster's New World Dictionary of the Am. Language*,

*2d Coll. Ed.* 1305 (1970) (defining "sex" as "the character of being male or female"). The common understanding of sex thus connotes at least "biological sex," *i.e.*, an individual's classification as male or female at birth.[5] As set out below, contrary to Plaintiffs' attempts to muddy the waters on this issue, no more expansive understanding of sex is required in order to conclude that anti-LGBT discrimination is proscribed by Title IX.

Finally, the meaning of "discriminate" is similarly straightforward: "'Discriminate against' means treat worse, here based on sex." *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024) (citing *Bostock*, 590 U.S. at 657-658, 681); see also *Webster's New Int'l Dictionary of the English Language* 745 (2d ed. 1954) (defining discriminate as: "To make a difference in treatment or favor (of one as compared with others)"); *Webster's New Collegiate Dictionary* 326 (1975) (defining "discriminate" as: "to make a difference in treatment or favor on a basis other than individual merit").

---

[5] There is some evidence that, at the time that Title IX was adopted, "sex" was understood to include concepts such as sexual orientation and gender identity. See, *e.g.*, William N. Eskridge, Jr., et al., *The Meaning of* Sex*: Dynamic Words, Novel Applications, & Original Public Meaning*, 119 Mich. L. Rev. 1503, 1550-57 (2021). Because nothing turns on adopting such a broader definition, *amici* limit their arguments herein to the Plaintiffs' definition of sex: "biological" sex, *i.e.*, the sex assigned at birth.

Thus, it violates Title IX's core proscription on "discrimination" "on the basis of sex," 20 U.S.C. § 1681(a), to "make a difference in treatment" or "treat a person worse" than another based on that person's biological sex. Stated otherwise, if the person would have been subjected to more favorable treatment by an educational entity "but for" their biological sex, Title IX has been violated.

2.    In each and every instance of anti-LGBT discrimination, an individual has been subjected to "discrimination" (treated worse) "on the basis of" (in a manner that would not have occurred but-for) their "sex" in precisely this sense. As the Supreme Court recognized in *Bostock*, "it is impossible to discriminate against a person for being [gay] or transgender without discriminating against that individual based on sex." 590 U.S. at 660. This is because when an entity engages in anti-LGBT discrimination, it "intentionally treats a person worse because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex." *Id.* at 658.

Thus, for example, a transgender girl who is suspended for wearing a skirt to school has been subjected to discrimination "on the basis of sex," since the school would not have suspended a person assigned female at birth for wearing a skirt to school. So, too, a school that expels a student for self-identifying as a transgender boy has discriminated "on the basis of sex," since all of the actions the school objects

9

to—such as the student's identification as male or their masculine appearance—are actions that the school would not object to in an individual assigned male at birth.

Similarly, students who are subjected to discrimination because of their sexual orientation also necessarily experience discrimination "on the basis of sex." Thus, for example, a school that bars a boy from the prom for attempting to bring a boy as his date has engaged in discrimination "on the basis of sex," since the school would not bar a girl for identical conduct. So, too, a female teacher who is disciplined for putting a picture of her female partner on her desk at school has experienced discrimination "on the basis of sex" since a male teacher would not be disciplined for doing the same thing.

Importantly, and contrary to Plaintiffs' arguments, the statutory text mandates this conclusion *even if* the narrowest historical definition of sex (biological sex) is used. The Department did not need to—and, in fact, did not—*define* "sex" *to mean* "sexual orientation" or "gender identity." Rather, it simply recognized that students and other stakeholders who are subjected to anti-LGBT educational discrimination are subjected to discrimination "on the basis of *sex*," as that term was commonly defined at the time of Title IX's enactment. See 34 C.F.R. § 106.10 ("Discrimination on the basis of sex includes discrimination on the basis of . . . sexual orientation, and

gender identity."). That is, they are treated differently because of their status as a biological male or biological female.[6]

Thus, under Title IX's plain language, anti-LGBT discrimination is proscribed. When an educational entity discriminates against a person because of that person's sexual orientation or gender identity, the discrimination would not have occurred "but for that person's sex." *City of Los Angeles v. Manhart*, 435 U.S. 702, 711 (1978).

3.    The District Court in this matter offered no meaningful *textual* response to this straightforward reading of Title IX, other than to erroneously mischaracterize the Department's regulation as resting on the redefinition of the word "sex." See, *e.g.*, *Tennessee v. Cardona*, No. 2:24-072-DCR, 2024 WL 3019146, at *1 (E.D. Ky. June 17, 2024).

Instead, the District Court resorted to emphasizing the purpose of Title IX, which it (accurately, but unavailingly) suggested was to ensure equality for women.

---

[6] Some of the arguments made in this and related matters appear to imply that LGBT people have no biological sex at all and thus are not covered by Title IX. See, *e.g.*, *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-CV-563, 2024 WL 2978786, at *12 (W.D. La. June 13, 2024) (stating that Title IX prohibits only "discrimination against biological males and females" and treating this as conclusively refuting the possibility that anti-LGBT discrimination is proscribed). This claim is logically bizarre and obviously false. Just like all other people, LGBT people are assigned a sex at birth (what Plaintiffs refer to as "biological sex"). They are protected against "discrimination . . . on the basis of [biological] sex," just like non-LGBT people are.

See, *e.g.*, *Tennessee*, 2024 WL 3019146, at *3, *13. The District Court drew on this purpose to imply that the statute requires only *group*-level equality between the sexes, rather than individualized protection from sex-based discrimination, or perhaps extends to the protection of only biological women. See, *e.g.*, *Tennessee*, 2024 WL 3019146, at *3, *13.

But "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale*, 523 U.S. at 79. And here, Congress unequivocally selected an *individualized* rather than group-based means to remedy sex discrimination—and enacted a statute that protects men and women alike. Thus, Title IX's central anti-discrimination proscription specifies that: "No *person* . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a) (emphasis added). This language has an unmistakably individual-level focus, rather than a group-level focus, and protects *all* people (not only "biological women") from discrimination "on the basis of sex." *Id.*; see *Bostock*, 590 U.S. at 658-59 (rejecting virtually identical arguments regarding Title VII, and observing that Congress could have, but did not, use language connoting only group-level equality, or protecting only women); see also *Doe v. Purdue Univ.*, 928 F.3d 652, 669-70 (7th Cir. 2019) (Barrett, J.) (holding that an individual male student who allegedly was treated

differently than his female accuser in a sexual assault investigation had stated a Title IX claim).

Thus, Title IX's language adopts an individual guarantee against sex discrimination for all people, rather than group-level protections against inequality for women. See 20 U.S.C. § 1681(a). Its plain language mandates that *all* people—men and women, LGBT people and non-LGBT people alike—are entitled as *individuals* to be free from harmful treatment that would not have occurred but-for their biological sex. And this, as set out above, necessarily entails the conclusion that anti-LGBT discrimination is proscribed.

Moreover, contrary to the District Court's arguments, Title IX's exceptions *do not* override the statute's operative provision with respect to LGBT individuals. See, *e.g.*, *Tennessee*, 2024 WL 3019146, at *9-10. Title IX, like most anti-discrimination laws, does have a number of statutory exceptions. Thus, some conduct that would otherwise be prohibited by 20 U.S.C. § 1681(a) is expressly excluded from Title IX's anti-discrimination requirements. See, *e.g.*, 20 U.S.C. § 1681(a)(1)-(9). For LGBT people, as for all other people, these exceptions apply to permit some institutional conduct that would otherwise be unlawful under Title IX's individualized anti-discrimination mandate. *Id.*[7]

---

[7] One such statutory exception that Title IX includes is for "religious organization[s] if the application of [Title IX] would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3); see also 34 C.F.R. § 106.12 (2020)

Importantly, however, Title IX does not include any exclusion or exception specifically permitting anti-LGBT discrimination. See 20 U.S.C. § 1681(a)(1)-(9). Had Congress intended to create such an exception, it could have done so. Cf. 29 U.S.C. § 705(20)(F) (specifying that the *Rehabilitation Act's* anti-discrimination mandate "does not include . . . gender identity disorders not resulting from physical impairments"). Thus, the exceptions that apply to LGBT educational stakeholders are precisely the same as those that apply to all other individuals. See, *e.g.*, 20 U.S.C. § 1681(a)(1)-(9). For both LGBT and non-LGBT people alike, Title IX prohibits discrimination "on the basis of sex" unless such discrimination falls within one of Title IX's statutory exceptions. 20 U.S.C. § 1681(a).

In short, while Title IX's intended *purpose* may have been to remedy discrimination against women, the statutory *means* that Congress chose to adopt was individual protections for all "person[s]" against "discrimination" "on the basis of sex." 20 U.S.C. § 1681(a). LGBT "person[s]" are entitled to these protections, just like all other "person[s]." *Id.* As the Department's regulations properly recognize, nothing in Title IX's exceptions purports to categorically exclude LGBT people

---

(setting out in greater detail the procedure for seeking a religious exemption under section 1681(a)(3)). Thus, religious educational organizations are not subject to *any* Title IX requirements that conflict with their religious tenets—including Title IX's prohibition on sexual orientation and gender identity discrimination.

from these protections. See 20 U.S.C. § 1681(a)(1)-(9). Rather, LGBT people are subject to the same protections and limited exclusions as all others.

* * *

The text of Title IX unambiguously prohibits discrimination on the basis of sexual orientation and gender identity. Such discrimination is "discrimination" "on the basis of sex" within the meaning of those terms at the time of Title IX's enactment. 20 U.S.C. § 1681(a). As the Supreme Court has repeatedly reiterated, where the text of a statute is unambiguous, that is the end of the matter, and the courts must follow the words that Congress passed. See, *e.g.*, *Niz-Chavez v. Garland*, 593 U.S. 155, 160, 171-172 (2021). This Court should therefore reverse the District Court's opinion granting a Preliminary Injunction.

## II.    Plaintiffs' Policy Arguments Cannot Overcome Title IX's Text.

Plaintiffs—and the District Court below—lack any genuine text-based response to the straightforward textualist analysis set out above. Instead, their arguments center on policy concerns and speculation about how Congress would have imagined (or failed to imagine) Title IX applying to LGBT students and stakeholders. See Part I.3, *supra*. Neither of these are a basis for limiting a statute's plain text. See *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("The Court may not 'replace the actual text with speculation as to Congress' intent.'") (quoting *Magwood v. Patterson*, 561 U.S. 320, 334 (2010)). Indeed, the Supreme Court has

repeatedly made clear that it is impermissible to gerrymander broad statutory text in service of speculation that a particular disfavored group was an unintended or an undesirable recipient of rights. See, *e.g.*, *Bostock*, 590 U.S. at 677-78 (declining invitation to gerrymander LGBT people out of the textual protections of Title VII); *Oncale*, 523 U.S. at 79 (same, victims of same-sex harassment); *Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 211-12 (1998) (declining to gerrymander prisoners out of the broad textual protections of the Americans with Disabilities Act).

The reasons why the Supreme Court has rejected appeals to carve disfavored groups out of broad statutory text are simultaneously formal and straightforward, but also undergirded by deeply important rule of law values. As the Court has recognized, the text of a statute is the law—and thus courts are required to follow the text where it is clear. See *Castro-Huerta*, 597 U.S. at 642 ("Congress expresses its intentions through statutory text passed by both Houses and signed by the President (or passed over a Presidential veto)."); *Oncale*, 523 U.S. at 79 ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."); see also Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 22 (1997) ("The text is the law, and it is the text that must be observed."). If Congress did not adopt an exception to a broad rights law (like Title IX), it is improper for the Court to read one into the law. See

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 103-105 (2012) (citing both *Oncale* and *Yeskey* for the proposition that where Congress used a general phrase to implement a narrower objective, the general language must be given its full scope, and is not subject to judicially-created exceptions). Thus, arguments like those made by Plaintiffs—for this Court to gerrymander a disfavored group out of a textually broad law—are patently inconsistent with the textualist approach to statutory interpretation embraced by the federal courts.

This aspect of textualism flows ineluctably from respect for the text that Congress has actually enacted. But it also is the guardian of a critical, and much older, rule of law value: equality before the law. See, *e.g.*, Jeremy Waldron, *The Rule of Law and the Measure of Property* 78 (2012) (discussing the centrality of equal application of legal rules to the rule of law). *All* members of our society—even the most disfavored—ought to be assured that the law means the same thing when they seek its protections as when it is applied to all others. The content of a textually unlimited right should not change depending on who is claiming it. See generally Neil Gorsuch, *A Republic, If You Can Keep It* 139 (2019) (observing that textualism affords important protections to minorities and disfavored groups, since it ensures the equal application of the law).

As the Supreme Court put it in *Bostock* in responding to arguments for why LGBT people should not be understood to fall within Title VII's prohibition on "discrimination . . . because of . . . sex":

> As *Yeskey* and today's cases exemplify, applying protective laws to groups that were politically unpopular at the time of the law's passage—whether prisoners in the 1990s or [gay] and transgender employees in the 1960s—often may be seen as unexpected. But to refuse enforcement just because of that, because the parties before us happened to be unpopular at the time of the law's passage, would not only require us to abandon our role as interpreters of statutes; it would tilt the scales of justice in favor of the strong or popular and neglect the promise that all persons are entitled to the benefit of the law's terms.

*Bostock*, 590 U.S. at 677-78. This Court should decline Plaintiffs' invitation to rewrite Title IX and tilt the scales of justice here.

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should reverse the District Court's award

of a Preliminary Injunction.

Respectfully Submitted,

Dated:  August 13, 2024            */s/ Robert Niles-Weed*
                                               Robert Niles-Weed


Katie Eyer                              Robert Niles-Weed
Professor of Law                    WEIL, GOTSHAL & MANGES LLP
RUTGERS LAW SCHOOL           767 Fifth Avenue
217 N. 5th St., E429                New York, NY  10153
Camden, N.J.  08102              Telephone: (212) 310-8651
Telephone: (856) 225-3960    robert.niles-weed@weil.com
katie.eyer@rutgers.edu

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because it contains 4,426 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

Dated:  August 13, 2024              */s/ Robert Niles-Weed*
                                     Robert Niles-Weed

                                     *Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 13, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  August 13, 2024            */s/ Robert Niles-Weed*
                                    Robert Niles-Weed

                                    *Counsel for Amici Curiae*