No. 24-5588

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

STATE OF TENNESSEE, *et al.*,
*Plaintiffs-Appellees,*

and

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL, *et al.*,
*Intervenor-Plaintiffs-Appellees,*

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education, *et al.*,
*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Eastern District of Kentucky
(2:24-cv-00072)

---

## BRIEF OF NATIONAL WOMEN'S LAW CENTER AND 41 GENDER JUSTICE ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS

---

Anya Marino
Shiwali Patel
Emily Martin
Elizabeth Theran
Rachel Smith
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, DC 20005

Kaitlyn Golden
Madeline Gitomer
Sunu Chandy
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for* Amici Curiae

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 24-5588            Case Name: Tennessee et al. v. Cardona

Name of counsel: Democracy Forward Foundation

Pursuant to 6th Cir. R. 26.1, National Women's Law Center and other amici (see attached)
                                         *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the
      identity of the parent corporation or affiliate and the relationship between it and the named
      party:

> No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
      in the outcome? If yes, list the identity of such corporation and the nature of the financial
      interest:

> No.

---

### CERTIFICATE OF SERVICE

I certify that on August 13, 2024 the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Kaitlyn Golden

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

Additional amici:

| | |
|---|---|
| • A Better Balance | • National Women's Political Caucus |
| • American Federation of Teachers | • New York Lawyers for the Public Interest |
| • American Medical Women's Association | • Nurses for Sexual and Reproductive Health |
| • Autistic Self Advocacy Network | • People For the American Way |
| • Bend the Arc: A Jewish Partnership for Justice | • Planned Parenthood Federation of America |
| • Center for Women's Health & Human Rights | • Public Counsel |
| • Central Conference of American Rabbis | • Reproaction |
| • Clearinghouse on Women's Issues | • SIECUS: Sex Ed for Social Change |
| • Coalition of Labor Union Women, AFL-CIO | • SisterLove, Inc. |
| • Collective Power for Reproductive Justice | • SisterReach |
| • Desiree Alliance | • Stop Sexual Assault in Schools (SSAIS) |
| • Equality California | • The Trevor Project |
| • FORGE, Inc. | • The Womxn Project |
| • Gender Justice | • Tom Homann LGBTQ+ Law Association |
| • GLSEN | • Union for Reform Judaism |
| • If/When/How | • Virginia Sexual and Domestic Violence Action |
| • Men of Reform Judaism | • Women of Reform Judaism |
| • National Association of Social Workers | • Women's Bar Association of the District of Columbia |
| • National Network to End Domestic Violence | • Women's Law Project |
| • National Organization for Women Foundation | • Youth Pride, Inc. |
| • Lift Louisiana | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... 5

INTEREST OF *AMICI CURIAE* ............................................................ 1

INTRODUCTION ................................................................................... 2

BACKGROUND ..................................................................................... 5

ARGUMENT ........................................................................................... 8

I. The District Court's Decision Deviates from the Text, Purpose, and Legislative History of Title IX and Established Precedent. ..................................................................... 8

    A.  *The decision does not comport with the text and purpose of Title IX.* ............................................................ 8

    B.  *The district court deviated from established precedent in Title IX and analogous case law.* ............................................. 11

II.    Policies That Allow Transgender Students to Use Facilities that Align with Their Gender Identity Do Not Harm Cisgender Girls or Women, and Also Allow Transgender Girls and Women to Avoid Harm. ...................... 21

    A. *Research confirms that transgender-inclusive locker and restroom policies do not harm other students.* ......................... 22

    B. *Excluding transgender students from school facilities that align with their gender identity harms them.* ......................... 26

CONCLUSION ..................................................................................... 31

ii

**CERTIFICATE OF COMPLIANCE**......................................................... **33**

**CERTIFICATE OF SERVICE** ................................................................. **34**

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**
.............................................................................................................. **35**

**APPENDIX A: ADDITIONAL *AMICI*** ................................................. **35**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) ...................................................................... 12, 13, 14

*Adams ex rel. Kasper v. Sch. Bd. of St. John's Cnty.*, 57 F.4th 791 (11th Cir. 2022) ............................................................... 17

*Alabama, et al., v. Cardona, et al.,* No. 7:24-CV-533-ACA, 2024 WL 3607492 (N.D. Ala. July 30, 2024)............................................ 17

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)........................ 3, 9, 18, 19, 20

*Burrage v. United States*, 571 U.S. 204 (2014)........................................ 20

*Carcano v. McCrory*, 203 F.Supp.3d 615 (M.D.N.C. 2016) ...................... 27

*Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342 (6th Cir. 2020) ................................................................... 18

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327 (2020) ................................................................... 20

*Doe v. Boyertown Area Sch. Dist.,* 897 F.3d 518 (3d Cir. 2018) .......... 15, 16

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) ...................................... 9

*Gloucester Cnty. Sch. Bd. v. G.G.,* 580 U.S. 1168 (2017) .......................... 12

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167  (2005) ...................... 9

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ................................ 18

*Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150 (6th Cir. 1991)........................................................ 21

*Nelson v. Christian Bros. Univ.*, 226 F. App'x 448 (6th Cir. 2007)........... 19

*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982)............................. 9

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998)......................... 9

*Parents for Priv. v. Barr*, 949 F.3d 1210 (9th Cir. 2020) ........................... 16

*Tennessee v. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024) ...................... 17

*Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. Of Educ.*, 858 F.3d 1034
    (7th Cir. 2017) ............................................................. 12, 13, 15

**Statutes**

20 U.S.C. § 1681 ................................................................. 2, 8

20 U.S.C. § 1681(a) ............................................................. 5, 19

42 U.S.C. § 2000e–2 ................................................................. 19

**Rules**

34 C.F.R. § 106.44(f)(1) ............................................................. 23

**Regulations**

*Nondiscrimination on the Basis of Sex in Education Programs or
    Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474
    (Apr. 29, 2024) ................................................. 2, 3, 5, 6, 7, 25

**Other Authorities**

118 Cong. Rec. 5111 (1972) ....................................................... 10

Am. Med. Ass'n & GLMA, *Transgender individuals' access to public
    facilities* (2018), https://www.ama-assn.org/system/files/2019-
    03/transgender-public-facilities-issue-brief.pdf ...................... 23

Amber Jayanth, *Transgender Butler County man says group beat him up
    over restroom use*, Fox19 (July 8, 2022),
    https://www.fox19.com/2022/07/08/transgender-butler-county-man-says-
    group-beat-him-up-using-wrong-restroom .............................. 28

Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in
    Public Accommodations: a Review of Evidence Regarding Safety and
    Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16
    Sexuality Rsch. and Soc. Pol'y 70 (July 23, 2018),
    https://escholarship.org/content/qt4rs4n6h0/qt4rs4n6h0_noSplash_8740
    e92d7f24b6c89dbd4bd4d27fbbcb.pdf ...................................... 22

Christopher Wiggins, *Cis Woman Mistaken as Transgender Records Being Berated in Bathroom*, The Advocate (updated May 26, 2023), https://www.advocate.com/news/2022/11/01/cis-woman-mistaken-transgender-records-being-berated-bathroom ........................................ 31

Gabriel R. Murchison et al., *School Restroom/Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, Pediatrics (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8849575/. ................... 28

Jody L. Herman et al., The Williams Inst., UCLA Sch. of L., *Suicide Thoughts and Attempts Among Transgender Adults: Findings from the 2015 U.S. Transgender Survey* (Sept. 2019), https://williamsinstitute.law.ucla.edu/wpcontent/uploads/Suicidality-Transgender-Sep-2019.pdf ....................................................................... 29

Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65 (2013) ...................................................... 27

Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* (2020), https://www.glsen.org/sites/default/files/2020-10/NSCS-2019-Full-Report_0.pdf ................................................................. 26, 29, 30

Julie Moreau, *No link between trans-inclusive policies and bathroom safety, study finds,* NBC News (Sept. 19, 2018), https://www.nbcnews.com/feature/nbc-out/no-link-between-trans-inclusive-policies-bathroom-safety-study-finds-n911106 ...................... 22

Kiara Alfonseca, *Transgender student alleges assault after using bathroom, family calls for charges*, ABC News (June 7, 2024), https://abcnews.go.com/US/transgender-student-assaulted-after-bathroom-family-calls-charges/story?id=110927216 .............................. 27

Lou Chibbaro Jr., *Predictions of trans bathroom harassment unfounded*, Washington Blade (March 31, 2016), https://www.washingtonblade.com/2016/03/31/predictions-of-trans-bathroom-harassment-unfounded/ ......................................... 23

Matt DeRienzo, *Woman mistaken for transgender harassed in Walmart bathroom*, News Times (May 16, 2016);

https://www.newstimes.com/local/article/Woman-mistaken-for-transgender-harassed-in-7471666.php ................................................... 30

Melanie Springer Mock, *I'm a Woman Who Got Kicked Out of Women's Bathrooms*, Christianity Today Int'l (June 7, 2016), https://www.christianitytoday.com/women/2016/june-web-only/im-woman-who-got-kicked-out-of-womens-bathrooms.html ....................... 30

Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth & School Facilities* 4 (2017), https://www.glsen.org/sites/default/files/2019-11/Separation_and_Stigma_2017.pdf ...................................................... 5

Nat'l Task Force to End Sexual and Domestic Violence Against Women, *National Consensus Statement of Anti-Sexual Assault and Domestic Violence Organizations in Support of Full and Equal Access for the Transgender Community* (updated Apr. 29, 2016), https://endsexualviolence.org/wp-content/uploads/2017/09/STATEMENT-OF-ANTI-SEXUAL-ASSAULT-AND-DOMESTIC-VIOLENCE-ORGANIZATIONS-IN-SUPPORT-OF-EQUAL-ACCESS-FOR-THE-TRANSGENDER-COMMUNITY.pdf ..... 24

Ryan Thoreson, *Shut Out: Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools*, Hum. Rts. Watch (Sept. 14, 2016), www.hrw.org/report/2016/09/15/shut-out/restrictions-bathroom-and-locker-room-access-transgender-youth-us ................ 23, 27

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey*, https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf ......................................................................... 26, 27

Susan Etta Keller, *Gender-Inclusive Bathrooms: How Pandemic-Inspired Design Imperatives and the Reasoning of Recent Federal Court Decisions Make Rejecting Sex-Separated Facilities More Possible*, 23 Geo. J. Gender & L. 35 (2021), https://www.law.georgetown.edu/gender-journal/wp-content/uploads/sites/20/2022/03/Gender-Inclusive-Bathrooms.pdf ......................................................................... 12

## INTEREST OF *AMICI CURIAE*[1]

This brief is filed by *Amici* National Women's Law Center and 41 additional organizations committed to gender justice, including both the rights of survivors and LGBTQI+ people.

National Women's Law Center (NWLC) is a nonprofit legal organization dedicated to advancing and protecting women's legal rights and the right of all to be free from sex discrimination. Since 1972, NWLC has worked to secure equal opportunity in education for women and girls through enforcement of Title IX, the Constitution, and other laws. NWLC has led briefs in numerous cases affirming that protections against sex discrimination include protections for LGBTQI+ students. NWLC is also committed to ensuring all women and girls, including transgender women and girls, are protected from sexual violence. Additional *amici* are listed in Appendix A.

*Amici* have a shared interest in ensuring that protections against sex discrimination are properly interpreted to include protections against

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund this brief, and no person other than amici curiae, their members, and their counsel contributed money to fund this brief. All parties have consented to the filing of this brief.

1

discrimination based on sexual orientation and gender identity.

## INTRODUCTION

Title IX is clear: "No person" should be subject to sex discrimination in an education program or activity. 20 U.S.C. § 1681. For over 50 years, Title IX has required educational environments to be free of sex discrimination, including from harassment and limitations tied to sex-based stereotypes. This case threatens to undermine these critical federal protections against sex discrimination.

The Department of Education (the "Department") promulgated the final rule at issue to "fulfill Title IX's protection for students, teachers, and other employees in federally funded elementary schools and secondary schools and postsecondary institutions against all forms of sex discrimination, including sex-based harassment and sexual violence." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474, 33476 (Apr. 29, 2024) (the "Rule"). Specifically, the Rule clarifies the scope of prohibited discrimination under Title IX, recognizing that discrimination because of sex necessarily includes discrimination because of sexual orientation and gender identity. Among other things, the Rule clarifies that schools cannot discriminate on the basis of sex by treating students in

a manner inconsistent with their gender identity. Thus, schools must permit transgender students to use school facilities, such as locker rooms and restrooms, consistent with their gender identity. 89 Fed. Reg. at 33820.

The Rule is consistent with the statutory text of Title IX and aligns with the statute's history and core purpose. It also comports with numerous federal court decisions regarding the scope of sex discrimination under Title IX—decided both before and after the Supreme Court's ruling in *Bostock v. Clayton County*, 590 U.S. 644 (2020), which held that discrimination against transgender employees was sex discrimination under an analogous federal workplace civil rights law, Title VII. In promulgating the Rule, the Department thoroughly considered the text and history of the statute, concerns from commenters, and a lengthy record.

Despite this consideration, Plaintiffs-Appellees and Intervenor-Plaintiffs-Appellees (collectively, Appellees) challenged the Rule, alleging incorrectly that Title IX's mandate to prevent sex discrimination does not encompass discrimination based on sexual orientation and gender identity. Appellees also argued erroneously that the Rule infringes on the privacy and safety interests of cisgender students. The district court wrongly

3

agreed and granted Plaintiffs preliminary injunctive relief. A divided panel of this Court repeated those errors when it refused to stay the injunction pending appeal.

The district court's decision—like other recent decisions addressing the Rule—is wrong, both on the law and on the facts, and deviates from established precedent. Before the Rule's promulgation, courts had overwhelmingly concluded both that: discrimination against transgender individuals is sex discrimination and that policies permitting transgender students to use facilities that align with their gender identity do not harm other students. Multiple circuit courts have found that a school's refusal to adopt transgender-inclusive policies violates Title IX. The decision below failed to give due weight to existing precedent and evidence-based research. The decision is based instead on generalized allegations of harm, tied to baseless fears.

No credible evidence supports allegations that transgender students' use of restrooms or locker rooms consistent with their affirmed gender injures *any* student. To the contrary, research shows that denying transgender students access to restrooms aligned with their gender increases *transgender students'* risk for a range of harms, including sexual violence. And hundreds of school districts have adopted non-

discrimination policies that allow transgender students to use restrooms aligned with their gender identity while maintaining the privacy and safety of all students.[2]

The lower court has wrongfully forestalled Title's IX broad promise to protect all persons from sex discrimination. *See* 20 U.S.C. § 1681(a). *Amici* urge this Court to reverse the decision below and allow the Rule to take effect.

## BACKGROUND

In developing the Rule, the Department carefully evaluated a range of views related to "Participation Consistent With Gender Identity," 89 Fed. Reg. at 33817-18. These included allegations that nondiscrimination policies could impact some students' privacy or safety interests. *See id.* at 33818. The Department addressed the comments in depth, including discussion of relevant research and case law. *Id.* at 33818-21. The Department considered Appellees' concerns, explaining in detail why protections against sexual orientation- and gender identity-related

---

[2] Movement Advancement Project & GLSEN, *Separation and Stigma: Transgender Youth & School Facilities* 4-5 (2017), https://www.glsen.org/sites/default/files/2019-11/Separation_and_Stigma_2017.pdf.

discrimination fits with Title IX's purpose, *see, e.g.*, *id.* at 33804-06, 33809-10.  The Department also correctly concluded that "the mere presence of a transgender person in a single-sex space" does not compromise "anyone's legitimate privacy interest" and that the presence of transgender students does not pose a safety risk to cisgender students.  *Id.* at 33820.

Additionally, despite a lack of evidence that violence would increase if facilities are available to transgender students align with their gender identity, the Department nonetheless identified potential nondiscriminatory measures that could address safety and privacy concerns.  *Id.*  First, the Department highlighted that sex harassment, including sexual violence, is already illegal and protections against these harms exist for all students.  Second, the Department noted that recipients could offer "single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason."  *Id*

The Department also considered experts' views, including from medical organizations, and reviewed prior legal decisions which similarly concluded that transgender students are the ones who could face serious harms if they are excluded from facilities that align with their gender identity.  *Id.* at 33819.

Finally, the Department considered comments submitted by experts

regarding sexual-violence prevention that urged the Department to confirm that transgender students should not be excluded from school facilities based on their gender identity. *Id.* at 33808-09.

After the Rule was finalized, a group of states filed this lawsuit, seeking preliminary injunctive relief. *See generally* Compl., RE 1. Among other things, Appellees argued that the Rule exceeded the Department's authority by including gender identity discrimination within sex discrimination and that the Department failed to offer a reasoned explanation or to respond to comments addressing the inclusion of gender identity. *Id.*, PageID #69-81. Shortly after the suit was filed the Christian Educators Association International and A.C. sought to intervene, arguing, among things, that the Rule infringed on the privacy and religious rights of students and teachers. *See* Intervenors' Compl., RE 72. The district court granted that request to intervene.

The district court then granted Appellees' preliminary injunction request, erroneously finding the Department exceeded its authority in defining sex discrimination to include discrimination based on gender identity. The decision rested on the incorrect premise that under Title IX, "sex" only means "the character of being male or female." Mem. Op. and Order, RE100, PageID #2015. Notably, in so ruling, the court relied

heavily on the *dissent* in *Bostock*. *Id.*, PageID #2016-18. The court likewise concluded that Plaintiffs were likely to prevail on the merits of their claim that the Rule was arbitrary and capricious, suggesting that the Department did not adequately address alleged "potential risks posed to student and faculty safety" raised during the notice and comment period. *Id.*, PageID #2061-72.

## ARGUMENT

## I. The District Court's Decision Deviates from the Text, Purpose, and Legislative History of Title IX and Established Precedent.

*A. The decision does not comport with the text or purpose of Title IX.*

The district court's opinion is largely premised on the idea that Title IX is a narrow statute enacted solely to protect cisgender women and that its protections against sex discrimination are limited to discrimination against sex as assigned at birth. Mem. Op. and Order, RE100, PageID #1997-2003. But such a reading of Title IX is unmoored from its text and intent. In fact, the statute provides that "[n]o person" should be subject to sex discrimination in an education program or activity. 20 U.S.C. § 1681. It is not limited to women and girls, let alone cisgender women and girls. This expansive language has the broad purpose of eradicating all forms of invidious sex discrimination in educational programs.

The Supreme Court has repeatedly recognized the expansive nature of Title IX's text. More than forty years ago, in *North Haven Board of Education v. Bell*, the Court recognized that, to "give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language." 456 U.S. 512, 521 (1982) (quotation omitted); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Congress gave the statute a broad reach.").

The Supreme Court has acknowledged that sweeping language in "statutory prohibitions often go[es] beyond the principal evil [that prompted their enactment] to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998). As Justice Scalia wrote for a unanimous Court, even though "[m]ale-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII," Title VII's broad language extended to that "reasonably comparable evil[]." *Id.*; *see also Bostock*, 590 U.S. at 717. Indeed, male students can and do bring claims under Title IX. *See, e.g.*, *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018) (male student stated plausible Title IX claim). Thus, the "broad reach" of Title IX's proclamation that

9

"[n]o person" be subject to sex discrimination encompasses discrimination against transgender students.

The district court does not point to anything within the text or legislative history of Title IX to suggest the term sex was meant to refer only to "biological sex"—because it could not. Nothing in the text or legislative history supports this reading. For example, the court pointed to definitions it claimed suggested sex means "the character of being either male or female," Mem. Op. and Order, RE100, PageID #2013, but these definitions made no reference to any sort of "biology." The district court also ignored the text in favor of the legislative debate, which, it said, centered on "the fixed biological dichotomy between males and females," *id.*, PageID #2001, but again the court pointed to no supporting authority.

The legislative history likewise confirms Congress intended Title IX to offer sweeping protections. In introducing Title IX, Senator Birch Bayh, its principal sponsor, articulated that the "impact of this amendment" was meant to be "far-reaching," 118 Cong. Rec. 5111, 5808 (1972), as it was "designed to root out, as thoroughly as possible at the present time, the social evil of sex discrimination in education." *Id.* at 5804. Congress was specifically concerned with eradicating pernicious sex stereotyping—Senator Bayh expressly recognized that sex discrimination in education is

based on "stereotyped notions," like that of "women as pretty things who go to college to find a husband, . . . marry, have children, and never work again." *Id*. Title IX was therefore necessary to "change [these] operating assumptions" and to combat the "vicious and reinforcing pattern of discrimination" based on these myths. *Id*.

The district court opinion misconstrues this history to reach its flawed conclusions. The decision ignores the focus on eradicating discrimination based on sex stereotypes and instead suggests that the original legislative intent relied on a very narrow understanding of sex and was only to safeguard cisgender female students, Mem. Op. and Order, RE100, PageID #1997-2001. Here, discrimination against transgender students is like the sex stereotyping discussed by Congress at the time of Title IX's passage—and thus fits well within the statute's sweeping language.

> *B. The district court deviated from established precedent in Title IX and analogous case law.*

Federal courts have routinely rejected Title IX claims alleging that "the mere presence of transgender students [i]s invasive and harmful."[3]

---

[3] Susan Etta Keller, *Gender-Inclusive Bathrooms: How Pandemic-Inspired Design Imperatives and the Reasoning of Recent Federal Court Decisions*

Likewise, courts of appeal have repeatedly concluded that transgender-inclusive policies in schools do not violate Title IX, nor do they create harms for other students. Indeed, courts have found that it violates Title IX to prevent a student from using a restroom consistent with their gender identity.

For example, the Seventh Circuit has *twice* rejected policies barring transgender students from using bathrooms aligning with their gender identity on grounds the policies violated Title IX. *A.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024); *Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. Of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017). In *Whitaker*, the Seventh Circuit concluded—pre-*Bostock*—that "a policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn

---

*Make Rejecting Sex-Separated Facilities More Possible*, 23 Geo. J. Gender & L. 35, 50 (2021), https://www.law.georgetown.edu/gender-journal/wp-content/uploads/sites/20/2022/03/Gender-Inclusive-Bathrooms.pdf. These claims echo the unfounded fears historically used to justify discrimination against other groups; courts have rejected similar arguments in the context of racial segregation. *See, e.g.*, Br. of NAACP Legal Defense & Educational Fund, Inc. and Asian American Legal Defense & Education Fund as *Amici Curiae* in Supp. of Resp't at 4, *Gloucester Cnty. Sch. Bd. v. G.G.,* 580 U.S. 1168 (2017).

violates Title IX." *Whitaker*, 858 F.3d at 1049. The court recognized that "a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth," and therefore the plaintiff was likely to prevail on a sex-stereotyping claim under Title IX. *Id* at 1048. The decision further explained that a transgender-exclusive policy "does nothing to protect the privacy rights of each individual student vis-à-vis students who share similar anatomy," and noted the transgender plaintiff had "used the boys' bathroom . . . without incident or complaint from another student." *Id.* at 1052.

Six years later, the Seventh Circuit had the opportunity to reconsider *Whitaker* following *Bostock*. In *A.C.*, the court affirmed a preliminary injunction under Title IX in favor of three transgender boys who were prohibited from using the boys' restrooms at their schools. *A.C.*, 75 F.4th at 764. The court confirmed its holding in *Whitaker*, namely that "discrimination against transgender students is a form of sex discrimination." *Id.* at 769. Thus, the court rejected the defendants' argument that sex under Title IX meant "biological sex," finding that the 1972 dictionary definitions of sex, the text of Title IX, and the statute's regulations did not establish such a definition. *Id.*

The court also found it "telling" that *Bostock* held "that

13

discrimination based on transgender status is a form of sex discrimination," and thus provided "useful guidance." *Id* at 768. Accordingly, the court rejected arguments that *Bostock*'s language refraining from addressing "sex-segregated bathrooms, locker rooms, and dress codes" demanded a different result. The court recognized that this language said, "in essence, 'we aren't reaching this point,'" a practice in which courts engage regularly. *Id.* Applying *Bostock*'s reasoning, the court asked, "whether our three plaintiffs are suffering negative consequences (for Title IX, lack of equal access to school programs) for behavior that is being tolerated in male students who are not transgender." The answer was yes. *Id.* at 772-73.

In *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), the Fourth Circuit likewise found a Title IX violation when a school denied a transgender boy the use of the boys' restroom. *Id.* at 613-14. The court observed that the plaintiff—a transgender boy—was treated worse than similarly situated students.[4] "Unlike the other boys, he had to use either

---

[4] The Fourth Circuit correctly rejected the school board's argument that the discriminatory treatment of Grimm should be compared to "biological girls," recognizing that doing so "would only vindicate the Board's own misconceptions, which themselves reflect stereotypic notions." *Grimm*, 972 F.3d at 610 (internal quotations omitted).

14

the girls['] restroom or a single-stall option." *Id.* at 618. The court also recognized that the policy had no relation to protecting students' privacy interests. *Id.* at 613-14. Although the Fourth Circuit acknowledged that students maintain privacy interests, it stressed that the "bodily privacy of cisgender boys using the boys['] restrooms did not increase" when Gavin Grimm, a transgender boy, was prohibited from entering. *Id.* at 614. According to the court, the policy ignored how transgender students use restrooms aligning with their gender identity: "'by entering a stall and closing the door.'" *Id.* at 613 (quoting *Whitaker*, 858 F.3d at 1052).

In *Doe v. Boyertown Area Sch. Dist.,* 897 F.3d 518 (3d Cir. 2018), *reh'g en banc denied*, 897 F.3d 515 (3d Cir. 2018, the Third Circuit found that a policy allowing all students to use bathrooms and locker rooms that align with their gender identity did not discriminate based on sex, and "therefore does not offend Title IX." *Id.* at 535. The court was "unpersuaded . . . that the appellants' asserted privacy interest requires protection from the risk of encountering students in a bathroom or locker room whom appellants identify as being members of the opposite sex." *Id.* at 531. Rejecting arguments that an inclusive policy violated cisgender students' rights, the court determined that "the presence of transgender students in the locker and restrooms is no more offensive to constitutional or [state] law privacy

15

interests than the presence of the other students who are not transgender. Nor does their presence infringe on the plaintiffs' rights under Title IX." *Id.* at 521. Moreover, the court stated, "barring transgender students from restrooms that align with their gender identity would itself pose a potential Title IX violation." *Id.* at 533.

Finally, the Ninth Circuit found that a policy allowing transgender students to use restrooms and locker rooms consistent with their gender identity did not violate Title IX, nor did it violate cisgender students' Fourteenth Amendment privacy rights. *Parents for Priv. v. Barr*, 949 F.3d 1210, 1229 (9th Cir. 2020). The court recognized that Title IX's authorization of sex-segregated facilities did not mean they "must be segregated based only on biological sex and cannot accommodate gender identity." *Id.* at 1227. The policy treated "both male and female students the same," which the court concluded "suggest[ed] an absence of gender/sex animus." *Id.* at 1228. And the court held that "the use of facilities for their intended purpose, without more, does not constitute an act of harassment simply because a person is transgender." *Id.* at 1229. "A policy that allows transgender students to use school bathroom and locker facilities that match their self-identified gender in the same manner that cisgender students utilize those facilities does not infringe Fourteenth Amendment

privacy [rights]." *Id.* at 1240.

Here, the district court's decision deviated from this clear line of precedent. Indeed, until the recent spate of rulings addressing the Rule, all but one appellate court had concluded that transgender students should be permitted to use school facilities that align with their gender identity.[5] There have been no intervening changes in law that justify a different result.[6] The decision is incorrect under this substantial body of precedent detailed above, as well as the Supreme Court's applicable reasoning in *Bostock*.[7] *Bostock* held that workplace discrimination against transgender

---

[5] The district court relied heavily on that outlier case, *Adams ex rel. Kasper v. Sch. Bd. of St. John's Cnty.*, 57 F.4th 791 (11th Cir. 2022). As Defendants-Appellants set forth in their brief, *Adams* should not govern here, and *amici curiae* join those arguments for all the reasons provided above. *See* Dkt. 49, at 29. The Northern District of Alabama, a court within the Eleventh Circuit, likewise recognized that *Adams* does not govern the interpretation of the Rule. *Alabama, et al., v. Cardona, et al.,* No. 7:24-CV-533-ACA, 2024 WL 3607492, at *16 (N.D. Ala. July 30, 2024). This decision has been paused by an "administrative injunction" from the Eleventh Circuit. Order of the Court, *Alabama, et al., v. Cardona, et al.,* No. 24-1244 (11th Cir. July 31, 2024).

[6] This Court's previous decision on the Department's guidance does not change the result. *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 584 (6th Cir. 2024). There, the Court only was considering whether the Department's guidance documents addressing Title IX were lawfully promulgated. *Id.* at 607-13. The decision explicitly does not address any "substantive merits questions," *id.* at 610, and is therefore not applicable here.

[7] The Supreme Court's recent decision in *Loper Bright* does not change the analysis here. The district court did not defer to the Department's

employees was discrimination "because of sex" under Title VII. 590 U.S at 655-58. The decision recognized that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660. When an employer fires an employee who is a transgender woman but tolerates the same conduct by an employee who is a cisgender woman, "the individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.*; *see also id.* at 669 ("[A]s we've seen, discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second.").

The Supreme Court's reasoning in *Bostock* should extend to Title IX. This Court has confirmed: "In crafting our framework for analyzing Title IX claims, we have looked to the Title VII landscape for guidance, as both statutes prohibit discrimination on the basis of sex." *Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 349–50 (6th Cir. 2020). While Title VII principles do not "automatically apply in the Title IX context," *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021), this Court has

---

interpretation under *Chevron*, Mem. Op. and Order, RE100, PageID #2011n.6, and as Defendants-Appellants have explained, the Rule relies on the plain meaning of the statute. *See* Dkt. 49, at 18-20.

repeatedly acknowledged that "[g]enerally, courts have looked to Title VII … as an analog for the legal standards in both Title IX discrimination and retaliation claims." *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007) (citing cases). Title VII and *Bostock* serve as appropriate analogs for interpreting Title IX given the similarities in the respective statutes' language and purpose.  Both Title VII and Title IX include protections for rooting out discrimination because of sex.  *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity … ."); 42 U.S.C. § 2000e–2 ("It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual … because of such individual's  … sex[.]").  And when students are not permitted to use school facilities, such as restrooms, consistent with their gender identity, they are facing discrimination because of their sex.  *See Bostock*, 590 U.S. at 660 ("[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex.").

The district court wrongly concluded that *Bostock* should not be extended to Title IX, stating that "Title IX is rife with instances in which

males and females may be separated." Mem. Op. and Order, RE100, PageID #2020. But the Rule does not require schools to do away with sex-separated spaces. Rather, it merely permits students to use the sex-separated restroom or locker room that aligns with their gender identity.

To be sure, there are minor variations in the statutory language of Title VII and Title IX, but they by no means suggest that *Bostock* is inapposite to Title IX. In evaluating whether to stay the district court decision here, a divided panel of this Court wrongly concluded that Title VII and Title IX differ in meaning because Title VII prohibits discrimination "because of sex," while Title IX does so "on the basis of sex." See Dkt. 41 at 5. But the Court gave no explanation why the distinction between "because of" and "on the basis of" made a difference here—nor could it. *Bostock* itself used these terms interchangeably. *See, e.g.*, *Bostock*, 590 U.S. at 650 ("There, in Title VII, Congress outlawed discrimination in the workplace on the basis of race, color, religion, sex, or national origin[.]"); *id.* at 656 ("Most notably, the statute prohibits employers from taking certain actions 'because of' sex"). And the Supreme Court has routinely recognized both terms can be used interchangeably to signal "but for" causation. *See, e.g.*, *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 335 (2020) (recognizing "on the basis of"

20

connotes "but for" causation); *Burrage v. United States*, 571 U.S. 204, 213 (2014) ("because of," "based on," and "by reason of" all indicate "but for" causation). The only reasonable conclusion is that these phrases, "on the basis of" and "because of," are interchangeable in the context of federal civil rights protections against sex discrimination.

## II. Policies That Allow Transgender Students to Use Facilities that Align with Their Gender Identity Do Not Harm Cisgender Girls or Women, and Also Allow Transgender Girls and Women to Avoid Harm.

The district court's analysis was based, in part, on an alleged harm to the safety of Appellees' populations. Mem. Op. and Order, RE100, PageID #2082. As explained herein, this is speculative and is not a basis to support injunctive relief. *See Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (recognizing "the harm alleged must be both certain and immediate, rather than speculative or theoretical"). Moreover, the decision disregarded the serious harm the Rule was meant to mitigate, namely the harm transgender students experience when forced to use restrooms and locker rooms inconsistent with their gender identity. There is abundant data, and lived experience, confirming that policies permitting transgender individuals to use school facilities aligning with their gender identity do not harm other

students.  But barring transgender students from facilities that align with their gender identity has potentially catastrophic consequences for the physical and mental health of transgender students.

   *A. Research confirms that transgender-inclusive locker and restroom policies do not harm other students.*

   As studies confirm, "fears of increased safety and privacy violations" because of nondiscrimination laws regarding restrooms and locker rooms "are not empirically grounded."[8]  Indeed, it is "exceedingly rare" that criminal incidents take place in public restrooms, locker rooms, and changing rooms.[9]  Specifically, results from a 2018 study revealed "the passage of such nondiscrimination laws is not related to the number or frequency of criminal incidents in such public spaces."[10]

   Law enforcement officials in cities and states with nondiscrimination policies that protect transgender individuals agree.  Officials in two

---

[8] Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. and Soc. Pol'y 70, 81 (July 23, 2018), https://escholarship.org/content/qt4rs4n6h0/qt4rs4n6h0_noSplash_8740e 92d7f24b6c89dbd4bd4d27fbbcb.pdf; *see also* Julie Moreau, *No link between trans-inclusive policies and bathroom safety, study finds,* NBC News (Sept. 19, 2018), https://www.nbcnews.com/feature/nbc-out/no-link-between-trans-inclusive-policies-bathroom-safety-study-finds-n911106.
[9] Hasenbush et al., *supra* note 8, at 79.
[10] *Id.* at 81.

jurisdictions with nondiscrimination policies "could not identify a single case in which a transgender person ha[d] been charged with assaulting or harassing women in a public bathroom."[11]  A report from Human Rights Watch also found no evidence that transgender students' use of restroom or locker room facilities "correspond[ing] to their gender identity puts other students at risk."[12]  As the American Medical Association put it in one report, "no evidence exists" to support claims that those engaging in sexual violence" will take advantage of public accommodation laws" to target women and children.[13]

Title IX and its corresponding regulations already require schools to maintain safe educational environments and respond promptly and effectively to sex harassment, including sexual assault.  The Rule clarifies that this includes investigations of reports of sex harassment, taking other

---

[11] Lou Chibbaro Jr., *Predictions of trans bathroom harassment unfounded*, Washington Blade (March 31, 2016), https://www.washingtonblade.com/2016/03/31/predictions-of-trans-bathroom-harassment-unfounded/.

[12] Ryan Thoreson, *Shut Out: Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools*, Hum. Rts. Watch (Sept. 14, 2016), www.hrw.org/report/2016/09/15/shut-out/restrictions-bathroom-and-locker-room-access-transgender-youth-us.

[13] Am. Med. Ass'n & GLMA, *Transgender individuals' access to public facilities* (2018), https://www.ama-assn.org/system/files/2019-03/transgender-public-facilities-issue-brief.pdf.

steps to end harassment, preventing its recurrence, and remedying its effects.   34 C.F.R. § 106.44(f)(1). A*mici* include advocates and service providers for survivors of sexual violence, including student survivors, and they would never support a policy that could increase risk of sexual assault or harassment.  Indeed, experts who are advocates for survivors of sexual assault, like *amici*, routinely support transgender-inclusive locker and restroom policies; that is because Plaintiffs' claims that such policies harm others are false.[14]

Plaintiffs-Appellees' asserted concerns also consistently fail to consider available mitigating measures or ones already in place.  For example, restroom stalls enable all students to use facilities discreetly to protect their privacy. *A.C.*, 75 F.4th at 773 (observing that a student's presence behind the door of a restroom stall does not threaten student privacy).  Schools can also install other privacy strips and screens. *See, e.g.*, *Grimm*, 972 F.3d at 614. And cisgender students may use available

---

[14] Nat'l Task Force to End Sexual and Domestic Violence Against Women, *National Consensus Statement of Anti-Sexual Assault and Domestic Violence Organizations in Support of Full and Equal Access for the Transgender Community* (updated Apr. 29, 2016), https://endsexualviolence.org/wp-content/uploads/2017/09/STATEMENT-OF-ANTI-SEXUAL-ASSAULT-AND-DOMESTIC-VIOLENCE-ORGANIZATIONS-IN-SUPPORT-OF-EQUAL-ACCESS-FOR-THE-TRANSGENDER-COMMUNITY.pdf.

single-occupancy facilities, as the Rule states.[15]  *See, e.g., Parents for Priv.*, 949 F.3d at 1225 (holding alleged right to privacy mitigated by "alternative options and privacy protections" for those who did not want to share a facility with a transgender student, even if alternatives "appear[ed] inferior or less convenient").

In promulgating the Rule, the Department engaged in a thorough consideration of the factual record—including Appellees' concerns—and correctly concluded that the Rule would not infringe on the privacy and safety rights of cisgender students.  *See* Dkt. 49, at 30-32; 89 Fed. Reg. at 33820.  The district court erred in concluding otherwise.  The opinion points to no evidence in support, Mem. Op. and Order, RE100, PageID #2068-69, because it cannot.  As set forth above, the social science data confirms transgender-inclusive policies create no actual harms to cisgender students.

---

[15] The Rule ensures the privacy of all students, whether cisgender, transgender, or nonbinary, by allowing students to choose whether to use sex-separated restrooms that match their gender identity or to use a single-user restroom if they prefer. 89. Fed. Reg. at 33820.  No student is forced to use either a sex-separated restroom that does not match their gender identity or a single-user restroom, which ensures that every student can pick the facility where they feel safest. *Id.* ("[N]othing in Title IX or the final regulations prevents a recipient from offering single occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason.").

*B. Excluding transgender students from school facilities that align with their gender identity harms them.*

Transgender students, on the other hand, suffer significant harms when barred from using facilities that align with their gender identity, a fact the district court ignored. These harms can have long-lasting impacts on students' health and educational outcomes. Because of transgender students' heightened risk of experiencing sex-based discrimination, the Department's changes to the Rule are critical for three reasons.

*First*, a majority of transgender students report having avoided school facilities because of safety concerns. One survey of K-12 students shows 82.1% of transgender students avoid using the restroom and 69.1% of transgender students avoid using the locker room at school because they felt unsafe or uncomfortable.[16] Research suggests transgender students excluded from the restrooms matching their gender identity may avoid restrooms all together while they are at school, leading to serious health risks, including kidney damage and urinary tract infections.[17]

---

[16] Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, 97 (2020), https://www.glsen.org/sites/default/files/2020-10/NSCS-2019-Full-Report_0.pdf.

[17] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of*

Transgender students may also avoid drinking or eating throughout the school day to avoid restroom use.[18]

*Second*, students who are not cisgender are more susceptible to violence in these settings and "at risk of physical, verbal, or sexual assault from other students or adults."[19] For example, cisgender boys broke seventeen-year-old nonbinary student Cobalt Sovereign's jaw after Cobalt used the restroom that aligned with their sex assigned at birth.[20] The

---

*the 2015 U.S. Transgender Survey* 224-30 (Dec. 2016) ("2015 Survey"), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf (citing Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65, 75 (2013)). *See also Grimm*, 972 F.3d at 593 (transgender student plaintiff developed urinary tract infections due to bathroom avoidance).

[18] *See, e.g., Doe*, 897 F.3d at 523 (forcing transgender students to use restrooms that do not match their gender identity causes students to "avoid going to the bathroom by fasting, dehydrating, or otherwise forcing themselves not to use the restroom throughout the day"); *Whitaker*, 858 F.3d at 1041 (transgender student denied restroom access "restricted his water intake to ensure that he did not have to utilize the restroom at school"); *Carcano v. McCrory*, 203 F.Supp.3d 615, 650 (M.D.N.C. 2016) (transgender student plaintiffs "limit their fluid intake and resist the urge to use a bathroom whenever possible"); 2015 Survey, *supra* note 16, at 229 (nearly 32% of transgender adult responders avoided eating or drinking to avoid using the restroom).

[19] Thoreson, *supra* note 12.

[20] Kiara Alfonseca, *Transgender student alleges assault after using bathroom, family calls for charges*, ABC News (June 7, 2024), https://abcnews.go.com/US/transgender-student-assaulted-after-bathroom-family-calls-charges/story?id=110927216; *see also* Amber

assault occurred after a *cisgender* boy violated Cobalt's privacy and peered over Cobalt's stall while they were using the facility.[21]

Transgender students who face locker or restroom restrictions are significantly more likely to experience sexual assault than transgender students whose facility use is not restricted.[22]  One study showed that 25.9% of transgender and nonbinary U.S. adolescents experience sexual assault—substantially higher than rates of 15% for cisgender high school girls and 4% for cisgender boys.[23]  However, transgender and nonbinary youth subjected to locker or restroom restrictions experienced an even higher prevalence of sexual assault: 36%.[24]

*Third*, policies precluding transgender students from using restrooms and locker rooms aligning with their gender identity also cause psychological harm.  "When transgender students face discrimination in

---

Jayanth, *Transgender Butler County man says group beat him up over restroom use*, Fox19 (July 8, 2022), https://www.fox19.com/2022/07/08/transgender-butler-county-man-says-group-beat-him-up-using-wrong-restroom (noting a group of cisgender men battered Noah Ruiz after a campground owner forced him to use the women's restroom.

[21] *Id.*

[22] Gabriel R. Murchison et al., *School Restroom / Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, Pediatrics (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8849575/.

[23] *Id.* at 7.

[24] *Id.* at 6.

schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening." *Doe*, 897 F.3d at 529. The pervasive discrimination that too many transgender students experience at school often results in adverse mental health outcomes. LGBTQI+ students who encounter hostility and discrimination in K-12 educational settings—such as verbal harassment, physical attacks, or sexual assault—report higher levels of depression and lower levels of self-esteem than students who have not experienced victimization.[25] More severe experiences of victimization are tied to higher levels of depression and lower self-esteem.[26] The consequences of discrimination can be catastrophic: transgender students who encounter violence or verbal harassment have a "higher prevalence of lifetime and past-year suicide thoughts and attempts" than respondents who did not have such experiences.[27]

Hostility or discrimination in schools—whether in the form of verbal or physical assault—can negatively impact the attendance, academic

---

[25] Kosciw, *supra* note 16, at 52-54.

[26] *Id.*

[27] Jody L. Herman et al., The Williams Inst., UCLA Sch. of L., *Suicide Thoughts and Attempts Among Transgender Adults: Findings from the 2015 U.S. Transgender Survey* 22 (Sept. 2019), https://williamsinstitute.law.ucla.edu/wpcontent/uploads/Suicidality-Transgender-Sep-2019.pdf.

29

achievement, and educational aspirations of transgender students.  When students experience harassment or hostility at school, they may be less likely to attend to avoid hurtful experiences.[28]  In one study, LGBTQ students "were nearly three times as likely to have missed school in the past month" if the student had experienced a "higher level[] of victimization" because of their sexual orientation or gender identity.[29] LGBTQ students experiencing victimization also report lower GPAs and lower aspirations for secondary education than those not experiencing victimization.[30]

Notably, cisgender girls who do not conform to specific standards of femininity are likewise harmed by anti-transgender locker and restroom policies, as such policies invoke enforcement of sex-based stereotypes to determine who is a "real" woman or girl.  There are numerous examples of gender-nonconforming women being harassed or ejected from women's restrooms, an experience that is both humiliating and harmful.[31]  One

---

[28] Kosciw, *supra* note 16, at 48.

[29] *Id.*

[30] *Id.*

[31] *See, e.g.*, Melanie Springer Mock, *I'm a Woman Who Got Kicked Out of Women's Bathrooms*, Christianity Today Int'l (June 7, 2016), https://www.christianitytoday.com/women/2016/june-web-only/im-woman-who-got-kicked-out-of-womens-bathrooms.html;  Matt  DeRienzo,

twenty-four-year-old cisgender woman who had cut her hair very short reported being harassed in a women's restroom.[32]  While in a stall, a stranger made accusations that she was transgender and said she "better not come out of there."[33]  The district court's injunction will also make some cisgender women and girls more susceptible to this sort of gender policing and risks serious emotional or physical harm to them in school facilities.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below.

Respectfully submitted,

*/s/ Kaitlyn Golden*
Kaitlyn Golden
Madeline Gitomer
Sunu Chandy
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043

---

*Woman mistaken for transgender harassed in Walmart bathroom*, News Times (May 16, 2016); https://www.newstimes.com/local/article/Woman-mistaken-for-transgender-harassed-in-7471666.php.
[32] Christopher Wiggins, *Cis Woman Mistaken as Transgender Records Being Berated in Bathroom*, The Advocate (updated May 26, 2023), https://www.advocate.com/news/2022/11/01/cis-woman-mistaken-transgender-records-being-berated-bathroom.
[33] *Id.*

Anya Marino
Shiwali Patel
Emily Martin
Elizabeth Theran
Rachel Smith
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, DC 20005


*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b), this document contains 6,426 words according to the word count function of Microsoft Word 365.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and 6th Cir. R. 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

*/s/ Kaitlyn Golden*

Date: August 13, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2024, a true and accurate copy of the foregoing proposed brief was electronically filed with the Court using the CM/ECF system. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

*/s/ Kaitlyn Golden*

Date: August 13, 2024

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| RE | Description | PageID |
|---|---|---|
| 1 | Complaint | 1-83 |
| 72 | Intervenors' Complaint | 1486-1541 |
| 100 | Memorandum Opinion and Order | 1997-2088 |

## APPENDIX A: Additional *Amici*

- A Better Balance

- American Federation of Teachers

- American Medical Women's Association

- Autistic Self Advocacy Network

- Bend the Arc: A Jewish Partnership for Justice

- Center for Women's Health & Human Rights

- Central Conference of American Rabbis

- Clearinghouse on Women's Issues

- Coalition of Labor Union Women, AFL-CIO

- Collective Power for Reproductive Justice

- Desiree Alliance

- Equality California

- FORGE, Inc.

- Gender Justice

- GLSEN

- If/When/How

- Lift Louisiana

- Men of Reform Judaism

- National Association of Social Workers

- National Network to End Domestic Violence

- National Organization for Women Foundation

- National Women's Political Caucus

- New York Lawyers for the Public Interest

- Nurses for Sexual and Reproductive Health

- People For the American Way

- Planned Parenthood Federation of America
- Public Counsel
- Reproaction
- SIECUS: Sex Ed for Social Change
- SisterLove, Inc.
- SisterReach
- Stop Sexual Assault in Schools (SSAIS)
- The Trevor Project
- The Womxn Project
- Tom Homann LGBTQ+ Law Association
- Union for Reform Judaism
- Virginia Sexual and Domestic Violence Action
- Women of Reform Judaism
- Women's Bar Association of the District of Columbia
- Women's Law Project
- Youth Pride, Inc.