No. 24-5588

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

—————————

STATE OF TENNESSEE et al.,
PLAINTIFFS-APPELLEES,

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL et al.;
INTERVENORS-PLAINTIFFS-APPELLEES,

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education, et al.,
DEFENDANTS-APPELLANTS.

—————————

On Appeal from the United States District Court
for the Eastern District of Kentucky
Case No. 2:24-cv-00072

—————————

**BRIEF OF AMICI CURIAE CALIFORNIA, NEW JERSEY, PENNSYLVANIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAIʻI, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

—————————

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*
JESSICA L. PALMER
ANDREW H. YANG
AMANDA I. MOREJÓN
GIANCARLO G. PICCININI
LAUREN E. VAN DRIESEN
  *Deputy Attorneys General*
25 Market Street
Trenton, NJ 08625
(609) 376-3377


MICHELLE A. HENRY
  *Attorney General of Pennsylvania*
KIRSTEN HEINE
  *Chief Counsel to the Attorney
General*
LISA E. EISENBERG
  *Deputy Attorney General*
1600 Arch St., Suite 300
Philadelphia, PA 19103
(215) 560-2980

ROB BONTA
  *Attorney General of California*
MICHAEL L. NEWMAN
  *Senior Assistant Attorney General*
LAURA FAER
  *Supervising Deputy Attorney General*
EDWARD NUGENT
CHRISTINA RIEHL
  *Deputy Attorneys General*
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 229-0113


*Attorneys for Amicus Curiae*

(*Additional counsel listed on signature pages.*)

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................1

Interests of Amici Curiae ...............................................................2

Argument .......................................................................................4

I.   AMICI STATES' EXPERIENCE CONFIRMS THAT THE FINAL RULE WILL YIELD BROAD BENEFITS WITHOUT COMPROMISING STUDENT PRIVACY OR SAFETY, OR IMPOSING SIGNIFICANT COSTS ON STATES ........................................4

    A.   The Final Rule Will Foster Positive Health Outcomes for Students. ...............................................................5

    B.   The Final Rule's Benefits Will Not Compromise Student Privacy or Safety. ..............................................9

    C.   The Final Rule Will Not Impose Significant Compliance Costs ........13

II.   THE FINAL RULE'S CLARIFICATION OF THE SCOPE OF SEX-BASED DISCRIMINATION AND HARASSMENT IS CONSISTENT WITH TITLE IX. ..................................................15

    A.   The Final Rule's Clarification of the Scope of Sex Discrimination Aligns with the Text and Numerous Judicial Interpretations of Title IX. ...............................15

    B.   The Final Rule Defines "Sex-Based Harassment" in a Way That Effectuates Title IX Without Burdening or Surprising the States .........................................................20

III.   THE FINAL RULE DOES NOT VIOLATE THE SPENDING CLAUSE OR OTHER CONSTITUTIONAL PROVISIONS. ......................23

Conclusion ...................................................................................27

# TABLE OF AUTHORITIES

**Page**

CASES

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*
   75 F.4th 760 (7th Cir. 2023) ...................................................17

*Bennett v. Ky. Dep't of Educ.*
   470 U.S. 656 (1985)...............................................................23

*Benning v. Georgia*
   391 F.3d 1299 (11th Cir. 2004) .............................................24

*Bostock v. Clayton County*
   590 U.S. 644 (2020).........................................................*passim*

*Boyden v. Conlin*
   341 F. Supp. 3d 979 (W.D. Wis. 2018) ..................................25

*Brown v. Bd. of Educ.*
   347 U.S. 483 (1954)..........................................................9, 13

*Chisholm v. St. Mary's City Sch. Dist. Bd. of Educ.*
   947 F.3d 342 (6th Cir. 2020) .................................................16

*Cutter v. Wilkinson*
   423 F.3d 579 (6th Cir. 2005) .................................................24

*Davis v. Monroe Cnty. Bd. of Educ.*
   526 U.S. 629 (1999).........................................................20, 21

*Dodds v. U.S. Dep't of Educ.*
   845 F.3d 217 (6th Cir. 2016) .................................................17

*Doe v. Miami Univ.*
   882 F.3d 579 (6th Cir. 2018) .................................................22

*Feminist Majority Found. v. Hurley*
   911 F.3d 674 (4th Cir. 2018) .................................................20

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Fennell v. Marion Indep. Sch. Dist.*
804 F.3d 398 (5th Cir. 2015) ...............................................................20

*Gebser v. Lago Vista Indep. Sch. Dist.*
524 U.S. 274 (1998)............................................................................21

*Grabowski v. Ariz. Bd. of Regents*
69 F.4th 1110 (9th Cir. 2023) .............................................................17

*Grace v. Bd. of Trs.*
85 F.4th 1 (1st Cir. 2023).....................................................................17

*Grimm v. Gloucester Cnty. Sch. Bd.*
972 F.3d 586 (4th Cir. 2020) ...............................................17, 19, 24

*J.A.W. v. Evansville Vanderburgh Sch. Corp.*
396 F. Supp. 3d 833 (S.D. Ind. 2019)..................................................24

*Jackson v. Birmingham Bd. of Educ.*
544 U.S. 167 (2005)...................................................................1, 15, 24

*L.W. v. Skrmetti*
83 F.4th 460 (6th Cir. 2023) ...............................................................17

*Mahanoy Area Sch. Dist. v. B.L.*
594 U.S. 180 (2021)..............................................................................4

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*
584 U.S. 617 (2018)............................................................................23

*Meritor Sav. Bank, FSB v. Vinson*
477 U.S. 57 (1986)..............................................................................22

*Meriwether v. Hartop*
992 F.3d 492 (6th Cir. 2021) ..............................................................18

*Olmstead v. L.C. ex rel. Zimring*
527 U.S. 581 (1999)........................................................................1, 16

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Oncale v. Sundowner Offshore Servs.*
523 U.S. 75 (1998)................................................................23

*Pelcha v. MW Bancorp, Inc.*
988 F.3d 318 (6th Cir. 2021) ..........................................17, 18

*Pennhurst State Sch. and Hosp. v. Halderman*
451 U.S. 1 (1981)................................................................24

*Price Waterhouse v. Hopkins*
490 U.S. 228 (1989)............................................................19

*Roberts v. U.S. Jaycees*
468 U.S. 609 (1984)............................................................13

*Runyon v. McCrary*
427 U.S. 160 (1976)............................................................23

*Smith v. City of Salem*
378 F.3d 566 (6th Cir. 2004) ..............................................17

*Soule v. Conn. Ass'n of Schs., Inc.*
57 F.4th 43 (2d Cir. 2022) ..................................................17

*Tennessee v. U.S. Dep't of Agric.*
665 F. Supp. 3d 880 (E.D. Tenn. 2023)...............................25

*Tovar v. Essentia Health*
342 F. Supp. 3d 947 (D. Minn. 2018)..................................25

FEDERAL STATUTES

20 U.S.C.
§ 1681 ................................................................................1
§ 1681(a) ......................................................................1, 20
§ 1682 ..............................................................................21
§ 1686 ..............................................................................13

# TABLE OF AUTHORITIES
## (continued)

**Page**

**FEDERAL REGULATORY MATERIALS**

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024)....................................................................*passim*

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) ...............................................................*passim*

Off. of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe & Supportive Schools* (May 30, 2023)....................................................11

Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994) ...................................................................................21

S. Rep. No. 100-64 (1987) ......................................................................15

Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties, 62 Fed. Reg. 12,034, 12,038 (Mar. 13, 1997) ..............................................................................21, 23

U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Delaware Valley Administrative Office* 2 (Mar. 1, 2016) ...................................25

U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Dorchester County School District Two* (June 21, 2016)...................25

U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Downey Unified School District* 1-2 (Oct. 14, 2014), ...................................25

U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Taft College* (Oct. 19, 2023)........................................................................25

U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017, rescinded Aug. 2020)..............................................................................21

# TABLE OF AUTHORITIES
## (continued)

**Page**

U.S. Dep't of Educ., Revised Sexual Harassment Guidance:
Harassment of Students by School Employees, Other Students, or
Third Parties (Jan. 2001)...............................................................................19, 21

U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: Sexual
Violence in K-12 Schools* 5 (Oct. 2020) .............................................................14

**STATE STATUTES AND REGULATORY MATERIALS**

53 Pa. Bull. 3188 (June 17, 2023)...........................................................................26

16 Pa. Code
§ 41.206......................................................................................................26

Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and
Gender Nonconforming Students, Privacy, Programs, Activities &
Facilities 2 (2014) ................................................................................................12

Colo. Ass'n of Sch. Bds. et al., Guidance for Educators Working with
Transgender and Gender Nonconforming Students 4-5 (n.d.) ...........................12

D.C. Pub. Schs., Transgender and Gender-Nonconforming Policy
Guidance 9 (2015) ...............................................................................................13

Ill. State Bd. of Educ., Non-Regulatory Guidance: Supporting
Transgender, Nonbinary and Gender Nonconforming Students 10-
11 (2020)..............................................................................................................12

Iowa Code
§ 216.2(10)................................................................................................14
§ 216.7......................................................................................................14
§ 216.8......................................................................................................14
§ 216.9......................................................................................................14

Mass. Dep't of Elementary & Secondary Educ., Guidance for
Massachusetts Public Schools: Creating a Safe and Supportive
School Environment (Oct. 28, 2021)....................................................................12

# TABLE OF AUTHORITIES
## (continued)

**Page**

Md. State Dep't of Educ., Providing Safe Spaces for Transgender and
Gender Non-Conforming Youth: Guidelines for Gender Identity
Non-Discrimination 13-14 (2015) ...................................................................12

Mich. Dep't of Educ., State Board of Education Statement and
Guidance on Safe and Supportive Learning Environments for
Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ)
Students 5-6 (2016) ........................................................................................12

Minn. Dep't of Educ., A Toolkit for Ensuring Safe and Supportive
Schools for Transgender and Gender Nonconforming Students 10
(2017) ...............................................................................................................12

N.H. Rev. Stat. Ann.
§ 354-A:2(XIV-e) .............................................................................................14
§ 354-A:6 .........................................................................................................14
§ 354-A:16 .......................................................................................................14
§ 354-A:27 .......................................................................................................14

N.J. State Dep't of Educ., Transgender Student Guidance for School
Districts 7 (2018) ............................................................................................12

N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming
School Environment for Transgender and Gender Expansive
Students: 2023 Legal Update and Best Practices 22-24 (June 2023).................12

Or. Dep't of Educ., Supporting Gender Expansive Students: Guidance
for Schools 24-26 (2023) ................................................................................12

Susanne Beauchaine et al., *Prohibiting Discrimination in Washington
Public Schools* 30-31 (Wash. Off. of Superintendent of Pub.
Instruction 2012) ............................................................................................11

## COURT RULES

Federal Rules of Appellate Procedure
Rule 29(a)(2) .....................................................................................................4

# TABLE OF AUTHORITIES
## (continued)

**Page**

OTHER AUTHORITIES

Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappa (Sept. 1, 2016) .........................................11

Alexa Ura, *For Transgender Boy, Bathroom Fight Just Silly*, Tex. Trib. (June 14, 2016)......................................................................10

Assemb. B. 1266, 2013-2014 Sess. (Cal. 2013) ........................................10

Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1, 8 (Mar. 31, 2021) ............................................................................11

Br. of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in Supp. of Resp't at 4, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 137 S. Ct. 1239 (2017) ......................................................9, 11

Christy Mallory et al., Williams Inst., *Impact of Stigma and Discrimination (Michigan)* 56 (2019) ...............................................14

Crosby Burns et al., Ctr. for Am. Progress & AFSCME, *Gay and Transgender Discrimination in the Public Sector: Why It's a Problem for State and Local Governments, Employees, and Taxpayers* 18 (2012) ...................................................................14

Ctrs. For Disease Control, Youth Risk Behavior Survey: Data Summary & Trends Report 2011-2021 72 (2023)................................22

Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* 25-27 (2009)...................7

Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (2023) ......................6

Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemp. Sch. Psych. 3 (Aug. 2020)...........................22

# TABLE OF AUTHORITIES
## (continued)

**Page**

Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* xviii-xix, 41-45, 48-49 (2016) ................................................................................................. 8

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xv-xvi, 83, 93 (2022) ..................................................... 6, 7, 8

Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223, at 5-7 (Mar. 2016) ................................................................... 8, 9

Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Dev. Sci. 97, 97-98 (Feb. 17, 2019) ........................................... 5, 9, 22

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students-19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 69 (2019) ........................................................... 6

Movement Advancement Project, *Local Nondiscrimination Ordinances* ........................................................................... 14

Nat'l Ctr. for Educ. Stat., *Digest of Education Statistics*, tbls. 235.20, 203.40, 304.15 (2023) ............................................................ 2

Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* 1-2 (Apr. 2017) ............................................................................. 23

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 132-34 (Dec. 2016) ............... 6, 7

*Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 3-4 (2017) .................... 6

# TABLE OF AUTHORITIES
## (continued)

**Page**

Stephanie Dutchen, *The Body, the Self*, Harvard Medicine (2022) .........................19

Stephen Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health 503 (2018) .........................8

Toomey et al., *Gender-Affirming Policies Support Transgender and Gender Diverse Youth's Health*, Soc'y for Rsch. in Child Dev. (Jan. 27, 2022) .........................................................................................26

The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* 16 (2023) ...............................................7, 10

The Trevor Project, *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces* (Dec. 2020) ...............................................8

World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, Int'l J. of Transgender Health S107 (Sept. 2022) ..............................8

**INTRODUCTION**

In clarifying that sex discrimination includes discrimination based on sexual orientation or gender identity, the U.S. Department of Education's ("ED") new final rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) [hereinafter Final Rule], is consistent with the plain text of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, Supreme Court precedent, decisions in at least seven circuits, and Title IX's congressional purpose.

Title IX broadly prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005) (emphasizing "repeated holdings construing 'discrimination' under Title IX broadly"). There is no distinction between the term "because of sex" used in Title VII and the term "on the basis of sex" used in Title IX. *See Bostock v. Clayton County*, 590 U.S. 644, 650, 680 (2020) (using "because of" and "on the basis of" interchangeably). Accordingly, the Supreme Court, and many circuit courts, interpret Title IX in light of Title VII. *E.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) (citing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992)). Thus, given "the straightforward application of legal terms with plain and settled meanings," the prohibition of sex discrimination under Title IX likewise covers discrimination based on one's lesbian, gay, bisexual,

1

transgender, or queer ("LGBTQ") identity or expression. *See Bostock*, 590 U.S. at 660.

Because the Final Rule comports with Title IX and the U.S. Constitution, and better enables states to advance their compelling interests in preventing harassment and discrimination and protecting students from harm, Amici Curiae States ("Amici States") submit this brief in support of Appellants and urge the Court to reverse the preliminary injunction.

## INTERESTS OF AMICI CURIAE

Amici States have compelling governmental interests in the robust enforcement of Title IX to ensure that our schools operate in a manner that is free from sex discrimination. As sovereign jurisdictions charged with enforcing state antidiscrimination laws and shaping school policies that foster safe and supportive environments for all students, Amici States take the implementation of Title IX regulations seriously. Amici States, which all accept federal funding subject to Title IX, are home to tens of millions of students attending tens of thousands of public elementary, secondary, and postsecondary schools.[1] Amici States also have numerous private and charter schools, vocational and technical training programs, and private postsecondary institutions that may accept federal educational funding.

---

[1] *See* Nat'l Ctr. for Educ. Stat., *Digest of Education Statistics*, tbl. 235.20 (2023), https://tinyurl.com/43aaxkz4; *id.*, tbl. 203.40, https://tinyurl.com/2p95z9s9; *id.*, tbl. 304.15, https://tinyurl.com/48raka46.

Amici States thus have concrete, compelling interests in Title IX's prompt and full enforcement.

In Amici States' experience, sex discrimination and harassment based on sexual orientation or gender identity, and sex stereotypes imposed on LGBTQ individuals, cause direct economic, physical, and emotional harm to students. To prevent these tangible injuries, Amici States have adopted laws and policies that combat sex discrimination against students on the basis that they appear, act, and identify as a sex different from their sex assigned at birth, or that they are attracted to someone of the same sex. The Final Rule validly effectuates the plain text of Title IX and Congress's nondiscrimination mandate, ensuring strong protections against sex discrimination for all students.

As Amici States' experience demonstrates, preventing sex-based discrimination, protecting against sexual harassment, and ensuring equal access to educational opportunities for all students confer wide societal benefits, without imposing substantial costs on schools or compromising student privacy or safety. The same is true under the Final Rule, which includes explicit protections for LGBTQ students and rectifies the harm caused to our schools and communities through ED's prior rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) [hereinafter 2020 Rule]. The 2020 Rule undermined Title IX's

3

nondiscrimination mandate by arbitrarily narrowing Title IX's sexual harassment protections. A return to the 2020 Rule would reduce protections for students and reintroduce the harms associated with its implementation.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), Amici States submit this brief to demonstrate, in our sovereign states' unique experience, how discrimination and exclusion on the basis of sex can cause direct economic, physical, and emotional harms to our students, their communities, and society as a whole, and that the balance of equities and public interest cut against the extraordinary relief the district court granted to Appellees. This Court should therefore reverse the preliminary injunction.

## ARGUMENT

### I.  AMICI STATES' EXPERIENCE CONFIRMS THAT THE FINAL RULE WILL YIELD BROAD BENEFITS WITHOUT COMPROMISING STUDENT PRIVACY OR SAFETY, OR IMPOSING SIGNIFICANT COSTS ON STATES.

States' responsibility to provide public education encompasses a concomitant duty to protect students from harm. *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 189 (2021); *id.* at 201 (Alito, J., concurring) (noting that "the school has a duty to protect students while in school"). The Final Rule will promote states' efforts to protect students from harms of all kinds—in part by clarifying that Title IX prohibits sex discrimination against LGBTQ students—and will thus provide significant benefits to LGBTQ students nationwide. As Amici States' experiences establish, the

4

Final Rule achieves those important benefits without compromising student privacy or safety, and without imposing substantial costs on schools.

### A.    The Final Rule Will Foster Positive Health Outcomes for Students.

The equities and public interest advanced by the Final Rule are clear. Beyond straightforwardly following the language of Title IX and *Bostock*, *see infra* at 15-19, the Final Rule protects LGBTQ students from discrimination—in turn protecting their well-being and health.

Amici States' experience provides significant evidence of these benefits. LGBTQ students suffer concrete harms when they are denied Title IX's protections against discrimination and harassment—including greater risk of mental health issues and worse educational outcomes. A child's social, emotional, and academic development is closely related to their educational environment,[2] and the negative effects of discrimination and harassment can impede a child's cognitive development, disrupt the learning process, and endanger psychological well-being.

In a recent study, almost 90% of LGBTQ students reported hearing homophobic slurs from their peers, while more than 68% reported feeling unsafe in

---

[2] Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Dev. Sci. 97, 97-98 (Feb. 17, 2019) [hereinafter Darling-Hammond], https://tinyurl.com/5f97nkbx.

schools due to their gender identity, gender expression, or sexual orientation.[3] In a 2022 survey of LGBTQ teenagers, 56.9% of LGBTQ youth reported being verbally or physically harassed at least once in the past thirty days.[4] Of students known or perceived to be transgender, 77% reported negative experiences at school, including harassment and physical assault.[5] And as many as 75% of transgender students surveyed in 2017 felt unsafe at school as a result of their gender identity or gender expression.[6] As a group, transgender students are up to five times more likely than cisgender students to report being bullied at school, threatened or injured with a weapon at school, and being sexually assaulted.[7] Another 2022 survey found that 64% of transgender and nonbinary youth reported being discriminated against

---

[3] Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xv-xvi, 83, 93 (2022), https://tinyurl.com/2aabcfe4 [hereinafter Kosciw 2021].

[4] Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (2023), https://tinyurl.com/2zrnav26.

[5] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 132-34 (Dec. 2016), https://tinyurl.com/46fkp2th [hereinafter James].

[6] *Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 3-4 (2017), https://tinyurl.com/ukvkv8tf.

[7] Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 69 (2019), https://tinyurl.com/5bpxzvfy.

because of their gender identity.[8] In the largest survey of transgender people to date, 17% of respondents reported that they left K-12 school because of the mistreatment they suffered as a result of their gender expression.[9] And a 2009 study found that 40% of students who experienced frequent verbal harassment because of their gender expression did not plan to continue on to college.[10]

Policies can have a direct impact on those statistics. The evidence shows that discriminatory policies cause LGBTQ students to feel less connected to their schools and fellow students, and exacerbate harms to their education.[11] For example, one 2021 survey showed that LGBTQ students who experienced discrimination in their schools were almost three times as likely (43.3% versus 16.4%) to have missed school because they felt unsafe or uncomfortable.[12] LGBTQ students who experienced discriminatory policies and practices also had lower grade point averages, lower levels of educational achievement and aspiration, lower self-esteem,

---

[8] The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* 16 (2023), https://tinyurl.com/mvbmabrw [hereinafter Trevor Project 2023 National Survey].

[9] James, *supra* note 5, at 135.

[10] Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* 25-27 (2009), https://tinyurl.com/3bpt9py5.

[11] Kosciw 2021, *supra* note 3, at xviii-xix, 36.

[12] *Id.* at 36.

and higher levels of depression than other students who had not encountered such discrimination.[13]

But the converse is also true: LGBTQ students who are supported by school staff are less likely to feel unsafe, miss school, or say that they may not graduate high school because of their sexual orientation or gender expression, and are more likely to have higher GPAs and feel a greater sense of belonging to their school community.[14] When transgender youth are protected from discrimination on the basis of their gender identity, their mental health outcomes mirror those of their cisgender peers: they experience reduced suicidal ideation, fewer suicide attempts, and enhanced well-being and functioning.[15]

---

[13] *Id.* at 35-36, 41-45; Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* xviii-xix, 41-45, 48-49 (2016), https://tinyurl.com/5av274d3 [hereinafter Kosciw 2015].

[14] Kosciw 2015, *supra* note 13, at xx-xxi.

[15] Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223, at 5-7 (Mar. 2016), https://tinyurl.com/47fuas7h [hereinafter Olson]; *see also* World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, Int'l J. of Transgender Health S107 (Sept. 2022), https://tinyurl.com/y86j5jnp; Stephen Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health 503 (2018), https://tinyurl.com/465z8reh; The Trevor Project, *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces* (Dec. 2020), https://tinyurl.com/2c2p7zkf.

While discriminatory environments that cause fear and anxiety weaken a child's cognitive capacity and disrupt effective learning, safe and supportive school environments allow students to develop positive relationships, regulate their emotions and behavior, and maintain their physical, psychological, and academic well-being. [16] Accordingly, transgender students, when allowed to use school bathroom and locker room facilities consistent with their gender identity, experience better mental health outcomes that are more comparable to their cisgender peers.[17] Providing equal access to facilities that align with one's gender identity—in accordance with the Final Rule—promotes these positive outcomes and helps reduce the harms that LGBTQ students face. This, in turn, benefits society as a whole, since equal education better prepares students to contribute to society, both culturally and economically. *Cf. Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

### B.     The Final Rule's Benefits Will Not Compromise Student Privacy or Safety.

Although Appellees have argued that the Final Rule must still be preliminarily enjoined because it undermines the privacy and safety of other students and imposes costs on the States, Appellees are wrong.

---

[16] *See* Darling-Hammond, *supra* note 2, at 97-98, 102.

[17] *See* Olson, *supra* note 15, at 5-7; Br. of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in Supp. of Resp't [hereinafter Br. of Amici Curiae Sch. Adm'rs] at 4, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 137 S. Ct. 1239 (2017).

Amici States' experiences show that the Final Rule will not compromise privacy or safety. Appellees focus myopically on the Final Rule's treatment of sex-separated facilities and LGBTQ students—just one piece of the overall protections against sex discrimination and harassment. But even accepting their narrow focus, the record shows that policies that allow transgender students to use facilities consistent with their gender identity significantly benefit those students without risking the privacy or safety of others. For example, allowing students to use bathrooms consistent with their gender identity helps safeguard against harms common to transgender students, such as forgoing drinking or eating during the school day to avoid using the restroom for fear of exclusion, reprimand, or bullying.[18]

Research also indicates that allowing transgender students to access facilities that correspond with their gender identity does not result in increased privacy or safety concerns in public schools or any reported instances of transgender students harassing cisgender students when using restrooms or locker rooms consistent with

---

[18] *See* Assemb. B. 1266, 2013-2014 Sess. (Cal. 2013); Alexa Ura, *For Transgender Boy, Bathroom Fight Just Silly*, Tex. Trib. (June 14, 2016), https://tinyurl.com/mtpescst; *see also* Trevor Project 2023 National Survey, *supra* note 8, at 5 (approximately half of transgender and nonbinary youth reported having seriously considered suicide in the past twelve months).

their gender identity.[19] The documented experience of school administrators in thirty-one states and the District of Columbia demonstrates that sex-based protections for gender identity in bathroom- and locker room-use policies result in no safety or privacy risks, nor is there evidence that cisgender students pose as transgender to gain improper restroom access.[20]

The Final Rule also affords ample flexibility for schools to implement policies that address privacy concerns, and Amici States have already increased privacy options for all students in a cost-effective manner without singling out any one student. For example, schools in Washington must provide any student "who has a need or desire for increased privacy, regardless of the underlying reason," with "access to an alternative restroom," "a reasonable alternative changing area, such as the use of a private area (e.g., a nearby restroom stall with a door), or a separate changing schedule."[21] At least twelve other states and the District of Columbia offer

---

[19] *See* Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappa (Sept. 1, 2016), https://tinyurl.com/224mzep4; Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1, 8 (Mar. 31, 2021), https://tinyurl.com/2s2ucz9t.

[20] *See* Br. of Amici Curiae Sch. Adm'rs, *supra* note 17, at 14-16; Off. of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe & Supportive Schools* (May 30, 2023), https://tinyurl.com/yv397h94.

[21] *See* Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* 30-31 (Wash. Off. of Superintendent of Pub. Instruction 2012), https://tinyurl.com/yk26eb96.

11

comparable guidance to ensure that school districts can comply with nondiscrimination policies and address privacy concerns.[22] Solutions range from offering privacy curtains to separate restroom and changing rooms to all who desire them, none of which requires costly construction or remodeling.

Maintaining sex-separated spaces while allowing transgender students to use facilities that align with their gender identity results in positive educational and health outcomes for students and promotes Amici States' compelling interest in "removing the barriers to economic advancement and political and social integration

---

[22] *See, e.g.*, **California**: Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities 2 (2014). **Colorado**: Colo. Ass'n of Sch. Bds. et al., Guidance for Educators Working with Transgender and Gender Nonconforming Students 4-5 (n.d.). **Illinois**: Ill. State Bd. of Educ., Non-Regulatory Guidance: Supporting Transgender, Nonbinary and Gender Nonconforming Students 10-11 (2020). **Maryland**: Md. State Dep't of Educ., Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination 13-14 (2015). **Massachusetts**: Mass. Dep't of Elementary & Secondary Educ., Guidance for Massachusetts Public Schools: Creating a Safe and Supportive School Environment (Oct. 28, 2021). **Michigan**: Mich. Dep't of Educ., State Board of Education Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students 5-6 (2016). **Minnesota**: Minn. Dep't of Educ., A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students 10 (2017). **New Jersey**: N.J. State Dep't of Educ., Transgender Student Guidance for School Districts 7 (2018). **New York**: N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices 22-24 (June 2023). **Oregon**: Or. Dep't of Educ., Supporting Gender Expansive Students: Guidance for Schools 24-26 (2023).

that have historically plagued certain disadvantaged groups." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984). Ensuring equal access to facilities that align with gender identity is therefore consistent with not only Title IX's provision for sex-separated facilities, 20 U.S.C. § 1686, but also the constitutional guarantee that education be "made available to all on equal terms," *Brown*, 347 U.S. at 493.

### C. The Final Rule Will Not Impose Significant Compliance Costs.

Although the district court found that the expense of updating policies and procedures, conducting training, and addressing a modest 10% increase in Title IX complaints will inflict irreparable harm on the states and their school systems, *Tennessee v. Cardona*, No. 2:24-cv-00072, slip op. at 79-82 (E.D. Ky. June 17, 2024), ECF No. 100, Amici States' experience confirms that the alleged harms are unfounded, and that the harm in not addressing sex discrimination in all its forms is far more costly. Every state in the Union is already required to prohibit discrimination based on LGBTQ identity for all employees in its school districts under Title VII. *See Bostock*, 590 U.S. at 659-62. Training staff members and implementing policies, so that the same protections extend to all students at risk of discrimination or harassment on the basis of sex under Title IX, is not a "significant expenditure[]," and would not require any "construction of new facilities or creation of new programs." Final Rule, 89 Fed. Reg. at 33,876; *see also id.* at 33,862-77 (noting benefits "far outweigh" costs). Further, at least twenty-three states and the

District of Columbia, and at least 374 municipalities,[23] already offer express protections against discrimination based on LGBTQ identity in areas such as education, housing, public accommodations, and employment—all demonstrating that the Final Rule's protections are entirely feasible.

By contrast, a return to the 2020 Rule would result in tens of thousands of student complaints of sexual harassment going unaddressed each year—by ED's own estimation at the time, a shocking 50% fewer complaints would be investigated in K-12 schools alone.[24] When students experience unremedied incidents of discrimination and harassment, the costs are weighty. Students who are denied protections under Title IX are likely to experience absenteeism, dropout, lost income, unemployment, and increased healthcare needs; Amici States who serve them face lost revenue and added costs of healthcare services.[25] *See* 2020 Rule, 85 Fed. Reg.

---

[23] *See, e.g.*, Iowa Code § 216.2(10) (definition); *id.* § 216.7 (public accommodations); *id.* § 216.8 (housing); *id.* § 216.9 (education); N.H. Rev. Stat. Ann. § 354-A:2(XIV-e) (definition); *id.* § 354-A:6 (employment); *id.* § 354-A:16 (public accommodations); *id.* § 354-A:27 (education); Movement Advancement Project, *Local Nondiscrimination Ordinances*, https://tinyurl.com/59p55bap (current as of Jan. 1, 2023).

[24] 85 Fed. Reg. at 30,551-52, 30,565-68; *see also* U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: Sexual Violence in K-12 Schools* 5 (Oct. 2020), https://tinyurl.com/CRDC2020 (finding 14,938 "documented sexual violence allegations" in public K-12 schools during 2017-2018 school year).

[25] Discrimination against LGBTQ individuals directly threatens the interests of States. *See, e.g.*, Christy Mallory et al., Williams Inst., *Impact of Stigma and Discrimination (Michigan)* 56 (2019), https://tinyurl.com/4jut8zr8; Crosby Burns et

at 30,538-48 (acknowledging harms and declining to include them in regulatory impact analyses). The Final Rule remedies the 2020 Rule's shortcomings and does so without requiring significant implementation costs for states.

## II.   THE FINAL RULE'S CLARIFICATION OF THE SCOPE OF SEX-BASED DISCRIMINATION AND HARASSMENT IS CONSISTENT WITH TITLE IX.

### A.   The Final Rule's Clarification of the Scope of Sex Discrimination Aligns with the Text and Numerous Judicial Interpretations of Title IX.

While the district court concluded that ED exceeded its statutory authority by clarifying that discrimination "on the basis of sex" includes discrimination against a student who identifies, appears, or presents as a sex different than their sex assigned at birth, *Cardona*, slip op. at 28, the Final Rule is consistent with Title IX's plain text, Supreme Court precedent, decisions in at least seven circuits (including the Sixth Circuit), and congressional purpose.

Congress intended Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), to "be broadly interpreted to provide effective remedies against discrimination," S. Rep. No. 100-64 (1987). The Supreme Court has consistently reaffirmed the "broad reach" of Title IX. *Jackson*, 544 U.S. at 174-75. The Final

al., Ctr. for Am. Progress & AFSCME, *Gay and Transgender Discrimination in the Public Sector: Why It's a Problem for State and Local Governments, Employees, and Taxpayers* 18 (2012), https://tinyurl.com/22knbxuh.

Rule's prohibition of discrimination based on sexual orientation or gender identity effectuates that intended reach of Title IX's plain text.

The Supreme Court "look[s] to its Title VII interpretations of discrimination" when interpreting Title IX. *Olmstead*, 527 U.S. at 616 n.1 (Thomas, J., dissenting) (citing *Franklin*, 503 U.S. at 75). The Sixth Circuit and many other circuits also interpret Title IX in light of Title VII, given the "parallels between sex discrimination in the educational setting . . . and sex discrimination in the workplace." *E.g.*, *Chisholm v. St. Mary's City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 349-50 (6th Cir. 2020). In *Bostock*, through "the straightforward application of legal terms with plain and settled meanings," the Supreme Court held that Title VII's protections against sex discrimination apply to LGBTQ individuals because an employer who discriminates based on sexual orientation or gender identity necessarily "intentionally discriminate[s] against individual men and women in part because of sex." 590 U.S. at 662; *see also id.* at 660. The Supreme Court's textual analysis is clear: protections "on the basis of sex" or "because of sex" include protections based on sexual orientation and gender identity.[26]

---

[26] Indeed, *Bostock* uses both Title VII's phrase "because of sex" and Title IX's "on the basis of sex" interchangeably. *E.g.*, 590 U.S. at 650 ("Congress outlawed discrimination in the workplace *on the basis of* . . . sex . . . ." (emphasis added)); *id.* at 680 ("[E]mployers are prohibited from firing employees *on the basis of* homosexuality or transgender status . . . ." (emphasis added)).

16

Numerous circuit cases—in a majority of the federal courts of appeal—have held that Title IX's prohibition on sex discrimination covers gender identity discrimination. The Sixth Circuit has observed that discrimination based on gender nonconformity, which includes transgender identity, is barred by "settled" precedent and "the language of federal civil rights statutes." *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016); *Smith v. City of Salem*, 378 F.3d 566, 572-74 (6th Cir. 2004). The First, Second, Third, Fourth, Seventh, and Ninth Circuits have similarly concluded that federal law generally prohibits "discrimination based on transgender status." *E.g.*, *Soule v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43, 55-56 (2d Cir. 2022) (collecting cases), *rev'd on other grounds by* 90 F.4th 34 (2d Cir. 2023) (en banc); *Grace v. Bd. of Trs.*, 85 F.4th 1, 5-7, 10-14 (1st Cir. 2023).[27]

The district court's reliance on *L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, No. 23-477, 2024 WL 3089532 (U.S. June 24, 2024), and *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021), was misplaced. *L.W.* merely observed in dicta that *Bostock* "declin[ed] to prejudge

---

[27] The First, Second, Fourth, Seventh, and Ninth Circuits have likewise held that Title IX prohibits discrimination based on a student's sexual orientation, either directly, or impliedly by applying the Court's reasoning in *Bostock* to the Title IX context. *See, e.g.*, *Grace*, 85 F.4th at 5-7, 10-14; *Soule*, 57 F.4th at 55; *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023).

other discrimination laws" and did not extend *Bostock* to the equal protection context because of "the differences in language between [Title VII] and the Constitution." 83 F.4th at 484-85. In *Pelcha*, the Sixth Circuit did not apply *Bostock* to an Age Discrimination in Employment Act claim because that statute requires age to be the "determinative reason" for a plaintiff's firing. 988 F.3d at 324. But Title IX, like Title VII, textually requires a showing of discrimination "on the basis of sex."[28] Thus, following the plain text of Title IX and numerous decisions interpreting Title VII and Title IX, the Final Rule correctly includes gender identity in its definitions of sex and sex-based discrimination.

References to "one sex," "the other sex," and "both sexes" in Title IX do not exclude transgender students from Title IX's protections. The Final Rule simply provides that transgender students may access the sex-separate bathrooms, activities, and organizations that match their gender identity, if denying access would cause more than "de minimis" harm (and when no other exception applies). 89 Fed. Reg.

---

[28] The district court also relied on *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021), to conclude that *Bostock* cannot guide the interpretation of Title IX. *Cardona*, slip op. at 24. But the footnote in *Meriwether* did not hold that *Bostock* could not extend to Title IX. Instead, it noted two differences between Titles VII and IX: the allowance in Title IX for consideration of sex in "athletic scholarships" and "living facilities." 992 F.3d at 510 n.4. But these differences do not reflect that "discrimination" in the Title IX context can never apply to discrimination based on gender identity. Indeed, the Final Rule expressly provides that it does not change existing statutory and regulatory provisions allowing for sex-separate housing and athletics. 89 Fed. Reg. at 33,816.

at 33,814, 33,816. Appellees may not substitute their "own discriminatory notions of what 'sex' means" for the plain meaning of Title IX to exclude transgender students from its protections.[29] *See Grimm*, 972 F.3d at 618.

Moreover, the 2020 Rule already prohibits gender-based harassment. 85 Fed. Reg. at 30,146 (explaining that 2020 Rule covered "gender harassment"); *id.* at 30,179 ("These [2020] regulations include sexual harassment. . . [which] may consist of unwelcome conduct based on sex or sex stereotyping. The Department will not tolerate sexual harassment . . . against any student, including LGBTQ students."). So too have decades of ED's policy and practice. *E.g.*, U.S. Dep't of Educ., Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (Jan. 2001) [hereinafter 2001 Guidance], at v; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion) (Title VII forbids gender-based discrimination).

---

[29] Discrimination based on an individual's nonbinary gender identity is also a form of sex discrimination. *See Bostock*, 590 U.S. at 659-60. And as a factual matter, there are, conservatively, tens of thousands of Americans whose anatomy is neither typically "male" nor "female." Stephanie Dutchen, *The Body, the Self*, Harvard Medicine (2022), https://tinyurl.com/24c2j92u (estimating "between 66,000 and 3.3 million [intersex] people in the United States"). The Final Rule rightly prohibits discrimination against such individuals on the basis of "sex characteristics," which include intersex traits. 89 Fed. Reg. at 33,803, 33,886.

**B.    The Final Rule Defines "Sex-Based Harassment" in a Way That Effectuates Title IX Without Burdening or Surprising the States.**

The Final Rule's definition of sex-based harassment as conduct that "is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity," 89 Fed. Reg. at 33,884, comports with the text and purpose of Title IX and enables affected individuals to prohibit harassment and redress hostile environments. In Amici States' experience, sex-based harassment need not be severe *and* pervasive to create tangible injury to a student's education. For example, a teacher's repeated inappropriate sexual comments and intrusions of personal space may not be "severe," but could be so pervasive that a student feels unsafe and avoids classes, and is effectively excluded from education. *See, e.g.*, *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (noting that "offensive remarks made every few months over three years" raised genuine dispute regarding Title VII hostile environment); *Feminist Majority Found. v. Hurley,* 911 F.3d 674, 680-82, 687-89, 693 (4th Cir. 2018) (series of harassing social media posts sent over campus wireless network could support Title IX harassment claim).

By covering both severe *or* pervasive forms of harassment, the Final Rule also effectuates the breadth of 20 U.S.C. § 1681(a), and advances Congress' objectives, because "the scope of the behavior that Title IX proscribes" is not limited to "severe, pervasive, and objectively offensive" conduct. *See Davis v. Monroe Cnty. Bd. of*

*Educ.*, 526 U.S. 629, 639, 652 (1999). Congress established an administrative scheme authorizing ED "to give effect to" Title IX. *Davis*, 526 U.S. at 638-39; *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280-81 (1998); 20 U.S.C. § 1682.[30] The Final Rule protects students from both severe incidents of harassment, as well as a series of lesser, unwelcome incidents that become pervasive.

Amici States' experience also reflects that no sovereign jurisdiction would be burdened or surprised by the Final Rule's return to the "severe or pervasive" standard. For more than thirty years, ED defined harassment as conduct that was "sufficiently severe, pervasive or persistent" to *interfere with, limit, or adversely affect*, rather than *deny*, a student's ability to participate in or benefit from an education program or activity, and consistently applied this definition to address harassment under Title IX and Title VI.[31] Amici States have long understood that this definition

---

[30] Below, Appellees mistakenly relied on *Davis* to argue that harassment must be "severe, pervasive, *and* objectively offensive." But *Davis* makes clear that its rule applies only to private damages claims, 526 U.S. at 652; *see also Gebser*, 524 U.S. at 283-84, 287, and does not otherwise limit ED's regulatory authority, *see Gebser*, 524 U.S. at 292.

[31] *See, e.g.*, Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994); Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties, 62 Fed. Reg. 12,034, 12,038 (Mar. 13, 1997) ("[S]exual harassment must be sufficiently severe, persistent, or pervasive that it adversely affects a student's education . . . ."); 2001 Guidance, at v, 6 (harassment that "den[ies] or limit[s]" student's education, and single "sufficiently severe" incident of sexual harassment can create hostile environment); U.S. Dep't of Educ., *Q&A on*

applies to their schools, and the Final Rule correctly returns to ED's longstanding definition and provides appropriate baseline protections against sexual harassment in our schools. *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (protecting employees, including student employees, from sexual harassment that is "sufficiently severe or pervasive to alter the conditions of the victim's employment"); *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018) (applying "severe or pervasive" standard to Title IX harassment).

Finally, a definition of harassment that encompasses both severe harassment and pervasive forms of harassment is essential to ensure the safety and sense of belonging that students need in order to learn and thrive. Safe and supportive school climates foster improvements in academic achievement and healthy development, and such schools are more effective at preventing violence and retaining teachers.[32] (*See also supra* at 5-9.) On the other hand, ED itself estimated that the 2020 Rule's narrow interpretation of Title IX's protections would reduce investigations of sexual harassment by 50% in K-12 schools,[33] exacerbating the effects of severe

---

*Campus Sexual Misconduct* (Sept. 2017, rescinded Aug. 2020) (applying "severe, persistent, or pervasive" and "deny or limit" standards).

[32] *See, e.g.*, Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemp. Sch. Psych. 3 (Aug. 2020); Darling-Hammond, *supra* note 6., at 97-98; see also Ctrs. For Disease Control, Youth Risk Behavior Survey: Data Summary & Trends Report 2011-2021 72 (2023), https://tinyurl.com/2p6w6yrv.

[33] 85 Fed. Reg. at 30,551-52, 30,565-68.

underreporting of sexual harassment and assault. For example, more than 20% of girls between the ages of fourteen and eighteen have been kissed or touched without their consent, but no more than 3% reported the incidents to police or school administrators.[34] The Final Rule's definition of harassment reasonably protects students from severe or pervasive sexual harassment, and its devastating impacts on emotional, physical, and academic well-being.[35]

## III.  THE FINAL RULE DOES NOT VIOLATE THE SPENDING CLAUSE OR OTHER CONSTITUTIONAL PROVISIONS.

The district court also agreed with Appellees that the Final Rule likely violates the Spending Clause's clear-statement rule. *Cardona*, slip op. at 30-32.[36] This holding runs contrary to Amici States' actual experience.

The clear-statement rule does not require perfect clarity on the applicability of a condition in every conceivable circumstance. *See Bennett v. Ky. Dep't of Educ.*,

---

[34] Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* 1-2 (Apr. 2017), https://tinyurl.com/u53eawk2.

[35] 62 Fed. Reg. at 12,034 ("[P]reventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn.").

[36] Supreme Court precedent also forecloses Appellees' First and Fourteenth Amendment challenges. *See, e.g.*, *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 82 (1998) (Title VII can prohibit verbal harassment); *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 631 (2018) (Free Exercise Clause does not allow discrimination in violation of "neutral and generally applicable . . . law"); *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (narrowly limiting parental rights in school context).

470 U.S. 656, 665-66 (1985) (Congress need not "specifically identif[y] and proscrib[e]" each condition on funding); *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005); *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004). It only requires that states have clear notice of the conditions, such that recipients "voluntarily and knowingly" accept them. *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The Supreme Court has consistently held that Congress intended Title IX to prohibit "a wide range of intentional unequal treatment," and has repeatedly affirmed that "Congress gave the statute a broad reach." *Jackson*, 544 U.S. at 175. Because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," *Bostock*, 590 U.S. at 660, states can hardly claim to be surprised that Title IX's prohibition against sex discrimination is broad enough to protect LGBTQ students.

Many federal courts have already held that discrimination based on LGBTQ identity is sufficiently ascertainable from Title IX's prohibition against sex discrimination, such that the clear-statement rule is satisfied. *See, e.g.*, *Grimm*, 972 F.3d at 619 n.18; *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 842 (S.D. Ind. 2019) (finding adequate notice to support suit for damages under

Title IX).[37] Additionally, for many years before the adoption of the Final Rule, ED has consistently found that Title IX protects transgender students from sex-based discrimination in school districts across the nation.[38]

Moreover, a number of states that have adopted express protections for LGBTQ students have taken such steps, at least in part, in order to bring their state laws into conformity with states' understanding of federal law. The Pennsylvania Human

---

[37] *See also Tennessee v. U.S. Dep't of Agric.*, 665 F. Supp. 3d 880, 916 (E.D. Tenn. 2023) (concluding rule prohibiting sex discrimination for SNAP-Ed funding recipients "unambiguous[ly]" prohibited gender identity discrimination, "and always has"); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018) ("[t]he plain language of Section 1557 [of the Patient Protection and Affordable Care Act] incorporates Title IX and its prohibition on sex discrimination" and "[d]efendants were on notice that Section 1557's nondiscrimination requirements encompassed gender-identity discrimination."); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 998-99 (W.D. Wis. 2018) (Title IX provided sufficient notice to states that gender identity discrimination is prohibited to effectuate a waiver of Eleventh Amendment sovereign immunity).

[38] *See, e.g.*, U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Downey Unified School District* 1-2 (Oct. 14, 2014), https://tinyurl.com/2s37a8am ("[T]ransgender students and students who do not conform to sex stereotypes, are protected from sex-based discrimination under Title IX."); U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Delaware Valley Administrative Office* 2 (Mar. 1, 2016), https://tinyurl.com/4smhxm9t ("[T]ransgender students[] are protected from sex-based discrimination under Title IX."); U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Dorchester County School District Two* (June 21, 2016), https://tinyurl.com/mvfjkkv2 (finding school district violated Title IX by subjecting transgender student to different treatment on the basis of sex when student was required to use separate restrooms); U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Taft College* (Oct. 19, 2023), https://tinyurl.com/2rha64md (finding that sex-based harassment due to transgender student being referred to by their previous name and pronouns were covered under Title IX).

Relations Commission, for instance, updated its regulations under the Pennsylvania Human Relations Act and the Pennsylvania Fair Educational Opportunities Act[39] in 2023 to clarify that discrimination on the basis of sex includes discrimination based on LGBTQ identity. In doing so, the Pennsylvania Human Relations Commission stated its intent to provide "clarity regarding the definition of 'sex' which is consistent with the manner in which the term 'sex,' as used in Title VII and Title IX, has been interpreted by Federal courts." 53 Pa. Bull. 3188 (June 17, 2023).

The Final Rule does not require any state to establish any new programs; rather, it clarifies that established programs must also protect LGBTQ students from discrimination on the basis of sex, using the Title IX framework that funding recipients already have in place. Many Amici States have already implemented these protections, and have incurred *de minimis* costs in doing so, while conferring significant benefits to students. [40] The Final Rule does not transgress the constitutional limitations on federal spending conditions. It requires funding recipients to do only what Title IX has always required: to refrain from

---

[39] 16 Pa. Code § 41.206.

[40] School-based gender-affirming policies are linked to dramatic decreases in depression, anxiety, and suicidal ideation among transgender and nonbinary students. *See* Toomey et al., *Gender-Affirming Policies Support Transgender and Gender Diverse Youth's Health*, Soc'y for Rsch. in Child Dev. (Jan. 27, 2022), https://tinyurl.com/ms6eubb7.

discriminating against students on the basis of sex, and to remedy any discrimination

that arises. No state should be surprised at the need to perform this longstanding duty.

## CONCLUSION

This Court should reverse the preliminary injunction.

Dated:  August 13, 2024

Respectfully submitted,

ROB BONTA
*Attorney General*
*State of California*

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*

/s/ Edward Nugent
EDWARD NUGENT
CHRISTINA RIEHL
Deputy Attorneys General
LAURA L. FAER
Supervising Deputy Attorney General
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 229-0113
Edward.Nugent@doj.ca.gov

*Attorneys for Amicus Curiae State of*
*California*

/s/ Jessica L. Palmer
JESSICA L. PALMER
ANDREW H. YANG
AMANDA I. MOREJÓN
GIANCARLO G. PICCININI
LAUREN E. VAN DRIESEN
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street, P.O. Box 080
Trenton, NJ 08625
(609) 376-3377
Jessica.Palmer@law.njoag.gov

*Attorneys for Amicus Curiae State of*
*New Jersey*

MICHELLE HENRY
*Attorney General*
*Commonwealth of Pennsylvania*

 */s/ Lisa E. Eisenberg*
LISA E. EISENBERG
Deputy Attorney General
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(215) 560-2980
leisenberg@attorneygeneral.gov

*Attorney for Amicus Curiae*
*Commonwealth of Pennsylvania*

### ADDITIONAL COUNSEL

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, Hawaiʻi, 96813

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street N.W., Suite 8100
Washington, DC 20001

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333-0006

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA  02108

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, Vermont 05609-1001

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,500 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

_/s/ Edward Nugent_
Edward Nugent

## CERTIFICATE OF SERVICE

I certify that on August 13, 2024, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.  I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

_/s/ Joelma Sissov_
Joelma Sissov