No. 24-5588

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

STATE OF TENNESSEE; COMMONWEALTH OF KENTUCKY; STATE OF OHIO; STATE OF INDIANA; COMMONWEALTH OF VIRGINIA; and STATE OF WEST VIRGINIA,

*Plaintiffs-Appellees,*

and

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL; A.C., by her next friend and mother, Abigail Cross,

*Intervenors-Plaintiffs-Appellees,*

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education; and UNITED STATES DEPARTMENT OF EDUCATION,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Kentucky
Case No. 2:24-cv-00072-DCR-CJS

## BRIEF FOR INTERVENORS-APPELLEES

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

James A. Campbell
Jonathan A. Scruggs
Jacob P. Warner
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jcampbell@ADFlegal.org
jscruggs@ADFlegal.org
jwarner@ADFlegal.org

*Counsel for Intervenors-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1(a), Intervenor-Appellees state that Christian Educators Association International has no parent corporation, does not issue stock, is not a subsidiary or an affiliate of a publicly owned corporation, and there is no publicly owned corporation or its affiliate, not a party to this appeal, that has a financial interest in the outcome of this case.

# TABLE OF CONTENTS

Corporate Disclosure Statement.................................................................i

Table of Authorities.............................................................................iv

Statement in Support of Oral Argument..................................................1

Statement of the Issue ..........................................................................2

Introduction......................................................................................3

Statement of the Case ............................................................................5

Summary of the Argument ....................................................................12

Standard of Review ............................................................................16

Argument..........................................................................................17

I.    Intervenors will likely succeed on the merits..............................17

    A.    The Rule is contrary to Title IX..........................................17

        1.    Title IX forbids treating one sex worse than the other. ........................................................................18

        2.    Title IX does not forbid all sex distinctions................21

        3.    Title IX sometimes requires sex distinctions. ............27

        4.    *Bostock* cannot apply to Title IX.................................30

        5.    The de-minimis harm standard subverts Title IX's sex-based protections..........................................35

        6.    The Rule sinks under federalism canons. ...................38

    B.    The Rule is contrary to constitutional rights. ......................40

        1.    The Rule is vague and overbroad. ..............................40

        2.    The Rule compels and restricts speech based on content and viewpoint as applied. ...............................49

3.     The Rule violates the right to bodily privacy. ............ 50

C.     The Rule is arbitrary and capricious. ................................. 51

II.     Intervenors will suffer irreparable harm. .................................... 53

III.     The public interest and balance of equities favor a stay .............. 55

IV.     The current injunction is not overbroad. ..................................... 56

Conclusion ........................................................................................... 57

Certificate of Compliance ...................................................................... 59

Certificate of Service ............................................................................. 60

Designation of Relevant District Court Documents .............................. 61

# TABLE OF AUTHORITIES

## Cases

*Adams ex rel. Kasper v. School Board of St. Johns County*,
    57 F.4th 791 (11th Cir. 2022)................................................. passim

*Alabama v. United States Secretary of Education*,
    No. 24-12444, slip op. (11th Cir. Aug. 22, 2024)............... 35, 44, 46

*Alexander v. Choate*,
    469 U.S. 287 (1985) .......................................................27

*AMG Capital Management, LLC v. FTC*,
    593 U.S. 67 (2021) .........................................................26

*Andrus v. Charlestone Stone Products Company*,
    436 U.S. 604 (1978) ........................................................23

*Arkansas v. DOE*,
    2024 WL 3518588 (E.D. Mo. July 24, 2024) ...................................5

*Bostock v. Clayton County*,
    590 U.S. 644 (2020) ............................................................. passim

*Boulahanis v. Board of Regents*,
    198 F.3d 633 (7th Cir. 1999) .......................................................31

*Brannum v. Overton County School Board*,
    516 F.3d 489 (6th Cir. 2008) .................................................27, 50

*Brenay v. Schartow*,
    709 F. App'x 331 (6th Cir. 2017) .....................................................56

*Cannon v. University of Chicago*,
    441 U.S. 677 (1979) .................................................................22, 24

*Cape v. Tennessee Secondary School Athletic Association*,
    563 F.2d 793 (6th Cir. 1977) ........................................................28

*Carroll Independent School District v. DOE*,
    2024 WL 3381901 (N.D. Tex. July 11, 2024) ...................................5

*Chalenor v. University of North Dakota,*
    291 F.3d 1042 (8th Cir. 2002) ....................................................... 30

*Clark ex rel. Clark v. Arizona Interscholastic Association,*
    695 F.2d 1126 (9th Cir. 1982) ................................................ 23, 28

*Clark v. Martinez,*
    543 U.S. 371 (2005) ....................................................................... 29

*Cohen v. Brown University,*
    101 F.3d 155 (1st Cir. 1996) ........................................ 5, 22, 23, 30

*Cohen v. Brown University,*
    991 F.2d 888 (1st Cir. 1993) ................................................... 25, 26

*Commonwealth v. Biden,*
    57 F.4th 545 (6th Cir. 2023) ......................................................... 55

*CSX Transportation, Inc. v. Alabama Department of Revenue,*
    562 U.S. 277 (2011) ....................................................................... 20

*Dambrot v. Central Michigan University,*
    55 F.3d 1177 (6th Cir. 1995) ......................................................... 49

*Davis ex rel. LaShonda D. v. Monroe County Board of Education,*
    526 U.S. 629 (1999) .............................................................. passim

*Davis v. Michigan Department of Treasury,*
    489 U.S. 803 (1989) ....................................................................... 21

*DeAngelis v. El Paso Municipal Police Officers Association,*
    51 F.3d 591 (5th Cir. 1995) ........................................................... 46

*Déjà Vu of Nashville, Inc. v. Metropolitan Government of Nashville*
    *& Davidson County,*
    274 F.3d 377 (6th Cir. 2001) ......................................................... 40

*Department of Education v. Louisiana,*
    2024 WL 3841071 (U.S. Aug. 16, 2024) ............................ 11, 35, 57

*Doe v. Luzerne County,*
    660 F.3d 169 (3d Cir. 2011) .......................................................... 50

*Dubin v. United States,*
    599 U.S. 110 (2023) ........................................................ 22

*Entertainment Productions, Inc. v. Shelby County,*
    588 F.3d 372 (6th Cir. 2009) ........................................ 40

*FCC v. AT&T Inc.,*
    562 U.S. 397 (2011) ........................................................ 19

*Fischer v. United States,*
    144 S. Ct. 2176 (2024) .............................................. 22, 23

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992) ........................................................ 48

*Fry v. Napoleon Community Schools,*
    580 U.S. 154 (2017) ........................................................ 27

*Gebser v. Lago Vista Independent School District,*
    524 U.S. 274 (1998) ........................................................ 34

*Grove City College v. Bell,*
    465 U.S. 555 (1984) ........................................................ 25

*Horner v. Kentucky High School Athletic Association,*
    206 F.3d 685 (6th Cir. 2000) ........................................ 34

*Jackson v. Birmingham Board of Education,*
    544 U.S. 167 (2005) .................................................. 20, 31

*Janus v. American Federation of State, County, & Municipal*
    *Employees, Council 31,*
    585 U.S. 878 (2018) ........................................................ 44

*John Hancock Mutual Life Insurance Company v. Harris Trust &*
    *Savings Bank,*
    510 U.S. 86 (1993) ........................................................ 36

*Kansas v. DOE,*
    2024 WL 3273285 (D. Kan. July 2, 2024) ........................ 5

*Kelley v. Board of Trustees*,
    35 F.3d 265 (7th Cir. 1994) ........................................................ 25

*Kent v. Johnson*,
    821 F.2d 1220 (6th Cir. 1987) .................................................... 50

*Knox County v. M.Q.*,
    62 F.4th 978 (6th Cir. 2023).........................................................27

*L.M. v. Town of Middleborough*,
    677 F. Supp. 3d 29 (D. Mass. 2023) ............................................ 42

*L.W. ex rel. Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023).................................................. 32, 53

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024) .......................................................... 33, 44

*Louisiana v. DOE*,
    2024 WL 2978786 (W.D. La. June 13, 2024) .................................5

*Louisiana v. DOE*,
    2024 WL 3452887 (5th Cir. July 17, 2024).....................................5

*Maryland v. King*,
    567 U.S. 1301 (2012) ...................................................................55

*Mayerova v. Eastern Michigan University*,
    346 F. Supp. 3d 983 (E.D. Mich. 2018) ....................................... 54

*McBoyle v. United States*,
    283 U.S. 25 (1931) ...................................................................... 18

*McCormick ex rel. McCormick v. School District of Mamaroneck*,
    370 F.3d 275 (2d Cir. 2004).................................................. 22, 26

*McPherson v. Kelsey*,
    125 F.3d 989 (6th Cir. 1997) ...................................................... 56

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ............................................... passim

*Miami University Wrestling Club v. Miami University,*
   302 F.3d 608 (6th Cir. 2002) .................................................. 23, 30

*Muldrow v. City of St. Louis,*
   601 U.S. 346 (2024) .............................................................. 35, 36

*National Park Producers Council v. Ross,*
   598 U.S. 356 (2023) ..................................................................... 31

*Neal v. Board of Trustees of California State Universities,*
   198 F.3d 763 (9th Cir. 1999) ................................................. 29, 31

*Niz-Chavez v. Garland,*
   593 U.S. 155 (2021) ..................................................................... 18

*North Haven Board of Education v. Bell,*
   456 U.S. 512 (1982) .............................................................. 24, 25

*Ohio v. Becerra,*
   87 F.4th 759 (6th Cir. 2023)........................................................ 55

*Ohio v. Nuclear Regulatory Commission,*
   812 F.2d 288 (6th Cir. 1987) ................................................. 16, 17

*Oklahoma v. Cardona,*
   2024 WL 3609109 (W.D. Okla. July 31, 2024).............................. 5

*Overstreet v. Lexington-Fayette Urban County Government,*
   305 F.3d 566 (6th Cir. 2002) ....................................................... 54

*Parents Defending Education v. Olentangy Local School District
   Board of Education,*
   109 F.4th 453 (6th Cir. 2024)................................................. 45, 47

*Pelcha v. MW Bancorp, Inc.,*
   988 F.3d 318 (6th Cir. 2021) ....................................................... 32

*Pennhurst State School & Hospital v. Halderman,*
   451 U.S. 1 (1981) ........................................................................ 39

*Pilot Life Insurance Company v. Dedeaux,*
   481 U.S. 41 (1987) ...................................................................... 21

*Poloceno v. Dallas Independent School District,*
   826 F. App'x 359 (5th Cir. 2020) ...................................................34

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992) .......................................................................50

*Rapanos v. United States,*
   547 U.S. 715 (2006) .......................................................................26

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
   592 U.S. 14 (2020) .........................................................................53

*Rosenberger v. Rector & Visitors of University of Virginia,*
   515 U.S. 819 (1995) .......................................................................49

*Speech First, Inc. v. Cartwright,*
   32 F.4th 1110 (11th Cir. 2022)...............................................46, 48

*Speech First, Inc. v. Schlissel,*
   939 F.3d 756 (6th Cir. 2019) .........................................................49

*Stryker Employment Company, LLC v. Abbas,*
   60 F.4th 372 (6th Cir. 2023)...........................................................16

*Students for Fair Admissions, Inc. v. President & Fellows of*
   *Harvard College,*
   600 U.S. 181 (2023) .......................................................................24

*Tennessee v. Cardona,*
   2024 WL 3019146 (E.D. Ky. June 17, 2024)...................................5

*Tennessee v. Cardona,*
   2024 WL 3453880 (6th Cir. July 17, 2024) ....................................5

*Texas Department of Housing & Community Affairs v. Inclusive*
   *Communities Project, Inc.,*
   576 U.S. 519 (2015) .......................................................................26

*Texas v. Johnson,*
   491 U.S. 397 (1989) .......................................................................49

*Texas v. United States,*
   2024 WL 3405342 (N.D. Tex. July 11, 2024) ...................................5

*Threat v. City of Cleveland,*
   6 F.4th 672 (6th Cir. 2021) ............................................................ 19

*United Savings Association of Texas v. Timbers of Inwood Forest*
   *Associates, Ltd.,*
   484 U.S. 365 (1988) ................................................................ 20, 21

*United States Forest Service v. Cowpasture River Preservation*
   *Association,*
   590 U.S. 604 (2020) ....................................................................... 39

*United States v. Fitzgerald,*
   906 F.3d 437 (6th Cir. 2018) ............................................. 19, 36, 37

*United States v. Lopez,*
   514 U.S. 549 (1995) ....................................................................... 39

*United States v. Riverside Bayview Homes, Inc.,*
   474 U.S. 121 (1985) ....................................................................... 25

*United States v. Underhill,*
   812 F.2d 105 (6th Cir. 1987) ......................................................... 37

*United States v. Virginia,*
   518 U.S. 515 (1996) ......................................................... 23, 27, 50

*Virginia v. American Booksellers Association, Inc.,*
   484 U.S. 383 (1988) ....................................................................... 54

*Vlaming v. West Point School Board,*
   895 S.E.2d 705 (Va. 2023) ............................................................ 44

*Ward v. Polite,*
   667 F.3d 727 (6th Cir. 2012) ......................................................... 49

*Weinberger v. Hynson, Westcott & Dunning, Inc.,*
   412 U.S. 609, (1973) ...................................................................... 21

*West Virginia v. E.P.A.*,
    597 U.S. 697 (2022) ................................................................ 39, 40

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) ........................................................................ 21

*Williams v. School District of Bethlehem*,
    998 F.2d 168 (3d Cir. 1993) ............................................................ 29

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) .............................................................................. 17

*Wisconsin Central Ltd v. United States*,
    585 U.S. 274 (2018) ........................................................................ 18

*Yellow Springs Exempted Village School District Board of
    Education v. Ohio High School Athletic Association*,
    647 F.2d 651 (6th Cir. 1981) ..................................................... 28, 29

## Statutes

20 U.S.C. § 1681 ...................................................................... passim

20 U.S.C. § 1686 ............................................................... 12, 21, 37

20 U.S.C. § 1687 ................................................................................ 26

5 U.S.C. § 705 .................................................................................... 17

Pub. L. No. 93-380, § 844, 88 Stat. 484 (1974) ...................................... 24

Tenn. Code Ann. § 49-2-805(a) ..................................................... 9

Tenn. Code Ann. § 49-6-5102(b)(1) ........................................... 9, 42

## Other Authorities

117 Cong. Rec. 30,407 (1971) ........................................................ 23

118 Cong. Rec. 5807 (1972) .............................................................. 23

Antonin Scalia & Bryan A. Garner, *Reading Law: The
    Interpretation of Legal Texts* (2012) ........................................... passim

Antonin Scalia, *A Matter of Interpretation* (1997) ................................. 18

*Bathroom bill*, Wikipedia ....................................................... 40

John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387
    (2003) ........................................................................ 37

John F. Manning, *What Divides Textualists from Purposivists?*,
    106 Colum. L. Rev. 70 (2006) ......................................... 24

*The U.S. Department of Education Releases Proposed Changes to
    Title IX Regulations, Invites Public Comment*, U.S. Dep't of
    Educ. (June 23, 2022) ....................................................... 5

U.S. Bureau of Labor Statistics, *A look at women's education and
    earnings since the 1970s*, TED: The Economics Daily (Dec.
    27, 2017) ......................................................................... 5

Webster's Third New International Dictionary (1966) ................... 19, 20

Women's Sports Found., *50 Years of Title IX* at 12 (May 2022) .............. 6

## Regulations

34 C.F.R. § 106.10 ........................................................... 10, 30

34 C.F.R. § 106.11 ............................................................... 37

34 C.F.R. § 106.14–41 ......................................................... 25

34 C.F.R. § 106.2 ......................................................... 7, 10, 41

34 C.F.R. § 106.31 ............................................................... 6

34 C.F.R. § 106.32 ............................................................. 32

34 C.F.R. § 106.33 ............................................................. 32

34 C.F.R. § 106.34 ............................................................. 33

34 C.F.R. § 106.37 ............................................................. 33

34 C.F.R. § 106.41 ............................................................. 32

Nondiscrimination on the Basis of Sex in Educ. Programs or
    Activities Receiving Fed. Fin. Assistance, 85 Fed. Reg.
    30,026 (May 19, 2020) .................................................................... 43

Nondiscrimination on the Basis of Sex in Educ. Programs or
    Activities Receiving Fed. Fin. Assistance, 89 Fed. Reg.
    33,474 (Apr. 29, 2024) .......................................................... passim

Nondiscrimination on the Basis of Sex in Education Programs and
    Activities Receiving or Benefiting from Federal Financial
    Assistance, 40 Fed. Reg. 24,128 (June 4, 1975) ...................... 22, 25

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

The Court has indicated that it will hear oral argument in this case. Intervenors-Appellees agree that oral argument is appropriate and would facilitate the Court's consideration of this case.

## STATEMENT OF THE ISSUE

Title IX says, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). As its words and history show, this statute allows and sometimes requires sex distinctions to ensure equal educational opportunities. But in April 2024, the Department of Education issued a new rule that reinterprets Title IX to (i) regulate new forms of discrimination, (ii) prohibit sex distinctions in private spaces like restrooms and showers when applied to individuals who identify as transgender, and (iii) expand the definition of sex-based harassment to censor and compel speech. The district court preliminary stayed and enjoined the rule under the Administrative Procedures Act as contrary to Title IX and arbitrary and capricious. This Court denied the Department's application for a partial stay pending appeal, as did the U.S. Supreme Court.

The question presented is whether the district court correctly stayed and enjoined the Department's enforcement of this new Title IX rule under the APA while this case proceeds.

## INTRODUCTION

Fifty years ago, Congress passed Title IX to help close the gap between women and men, promising equal educational opportunities for both. The law has been a great success. American women have greater and better opportunities than ever. But in April, the Department of Education published a new rule that reimagines sex discrimination to cover distinctions Title IX never mentions and Congress never intended, adding concepts like gender identity and even prioritizing these concepts over sex. So now, Title IX's primary beneficiaries—women—are denied the very benefits Title IX has given them for 50 years.

This rule turns Title IX upside down, swapping a well-established, biological, and binary concept of sex for a recent, subjective, and fluid concept of identity. This snubs Congress, enlarges agency power, and renders Title IX incoherent. For example, under the new rule, women must share showers (but not dorm rooms) with some men; women (except Girl Scouts troops) must share overnight accommodations with some men; and women must share restrooms with some men (but not those who identify as male or nonbinary). None of this is justified.

This change will harm many, including girls like Intervenor A.C. When a male student began competing on the girls' track team at A.C.'s middle school, this male soon beat almost 300 different girls, displacing them over 700 times, and taking A.C.'s spot in a state championship

3

meet. This male also shared a locker room with A.C. and sexually harassed her there, using graphic, sexual language about her. The new rule would *authorize* some of this harm by allowing males into girls' locker rooms. So girls must choose privacy or opportunity—not both.

The new rule also violates the Constitution. For example, Christian Educators Association International members believe sex is immutable, and they want to live and speak consistently with this belief. But the rule forces them to silence those views, to speak inaccurate pronouns, and to share restrooms with individuals of the opposite sex. At the same time, the new rule claims to override state laws that protect Intervenors' rights to speak and to privacy. None of this is allowed.

As for the equities, violating constitutional rights always inflicts irreparable harm. And it benefits the public to correctly apply the law. Intervenors face the imminent violation of their constitutional rights to free speech and privacy. A.C., for example, wants to participate in band and track this year. But she is reluctant because she fears her school will assign boys to overnight hotel rooms with girls, allow boys into the girls' restrooms and locker rooms, and permit boys to compete on the girls' track team. The current injunction offers critical relief.

To date, seven federal district courts and one appellate court have enjoined the Department's entire Title IX rewrite, staying its effect. Two other appellate courts (including this one) affirmed the scope of two

such injunctions, and the U.S. Supreme Court already rejected the Department's efforts to undo those injunctions.[1] This overwhelming judicial consensus is correct. This Court should affirm the injunction here, deny the Department's request, and preserve the status quo.

## STATEMENT OF THE CASE

*Title IX.* Congress passed Title IX to ensure equal educational opportunities for "women." *Cohen v. Brown Univ.*, 101 F.3d 155, 165 (1st Cir. 1996) (*Cohen II*). The Act has greatly succeeded. As the Department has said, Title IX "paved the way for millions of girls and women to access equal opportunity in … schools."[2] In 1970, for example, only 66% of working women had high-school diplomas; in 2016, it was 94%.[3]

---

[1] *See Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024); *Louisiana v. DOE*, No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024); *Oklahoma v. Cardona*, No. CIV-24-00461-JD, 2024 WL 3609109 (W.D. Okla. July 31, 2024); *Arkansas v. DOE*, No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024); *Carroll Indep. Sch. Dist. v. DOE*, No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. July 11, 2024); *Texas v. United States*, No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024); *Kansas v. DOE*, No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024); *Tennessee v. Cardona*, No. 2:24-072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024); *Louisiana v. DOE*, No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. June 13, 2024).

[2] *The U.S. Department of Education Releases Proposed Changes to Title IX Regulations, Invites Public Comment*, U.S. Dep't of Educ. (June 23, 2022), https://tinyurl.com/27h37a3c.

[3] U.S. Bureau of Labor Statistics, *A look at women's education and earnings since the 1970s*, TED: The Economics Daily (Dec. 27, 2017), https://tinyurl.com/mrrjr75a.

In 1972, only 7% of high-school varsity athletes were women; in 2018, it was 43%.[4] Title IX achieved this success by consistently defining its protection based on *sex*.

*The New Rule*. Now, a big change threatens that success. The Department has reinterpreted Title IX, citing *Bostock v. Clayton County*, 590 U.S. 644 (2020), as cover. Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the "Rule"). The Rule redefines sex discrimination to include distinctions based on "gender identity," "sex stereotypes," and other conduct. 89 Fed. Reg. at 33,886 (codified at 34 C.F.R. 106.10). Such distinctions violate Title IX, the Rule says, because they "necessarily" require noticing "a person's sex," even if "sex" means the "physiological or 'biological distinctions between male and female,' as the Supreme Court assumed in *Bostock*." *Id.* at 33,802 (quoting *Bostock*, 590 U.S. at 655). Read with other Rule provisions, this change imposes multiple new mandates.

For example, the Rule reimagines Title IX to allow some sex distinctions and forbid others based on whether they cause "more than de minimis harm," *id.* at 33,887 (codified at 34 C.F.R. 106.31(a)(2)), a concept nowhere found in Title IX. Unless the Rule expressly exempts it, any policy or "practice that prevents a person from participating in" a

---

[4] Women's Sports Found., *50 Years of Title IX* at 12 (May 2022), https://perma.cc/TN74-PJ4S.

covered "activity consistent with [their] gender identity" causes more than de minimis harm. *Id.* at 33,820. Together, § 106.10 and § 106.31(a)(2) require student access to sex-specific activities "consistent with [their] gender identity." *Id.* at 33,818.

The Rule also reinvents hostile-environment claims. *Id.* at 33,498. Harassment now need only be "severe *or* pervasive." *Id.* at 33,884 (emphasis added). Complainants need not allege "any particular harm" or show that they were denied access to an educational program. *Id.* at 33,511. Harassment can be anything the student considers "unwelcome" or that "limits" the student's ability to benefit from an educational program. *Id.* at 33,884 (codified at 34 C.F.R. 106.2). The Department admits that this standard is "broader" than this Court's interpretation of Title IX in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). 89 Fed. Reg. at 33,498. So together, § 106.10 and § 106.2 impose a new mandate—forcing teachers and students to use incorrect pronouns and avoid saying sex is binary or immutable.

These are just two examples. The Rule's new definition of sex discrimination affects how *many* provisions will apply.

*Intervenors*. A.C. is a female athlete and high-school student. Decl. of A.C., R.21-5, PageID #1091. She runs track, throws shot put and discus, and plays in the marching band. *Id.* at PageID #1091, 1100. When

7

A.C. was in middle school, B.P.J., a male who identifies as a girl, competed on A.C.'s school track team. *Id.* at PageID #1092. B.P.J. regularly beat A.C. and the other girls. *Id.* at PageID #1092–96. So far, B.P.J. has beat nearly 300 girls in over 700 individual instances. Decl. of Rachel Rouleau, R.63-2, PageID #1424–25. B.P.J. has also changed in the girls' locker room and sexually harassed A.C. and her teammates. A.C. Decl., R.21-5, PageID #1096–99. A.C. doesn't want to compete with or share private spaces with any male, no matter how he identifies. *Id.* at PageID #1100–01. But the new Rule threatens her right to privacy and exposes her to other harm, including denial of opportunities to participate and succeed on girls' athletics teams.

Christian Educators Association International is a membership group of Christian educators. Decl. of David Schmus, R.21-7, PageID #1167. Some of its members want to express their religious belief that sex is immutable. Decl. of Brett Campbell, R.21-8, PageID #1184–90; Decl. of Michelle Keaton, R.21-9, PageID #1192–99; Decl. of Amy McKay, R.21-10, PageID #1201–08; Decl. of Silvia Moore, R.21-11, PageID #1210–15; Decl. of Joshua Taylor, R.21-12, PageID# 1217–23. The new Rule compels members to speak inaccurate pronouns, and they fear the Rule will also forbid them from expressing their religious beliefs. *Id.* Some also object to sharing restrooms at their school with members of the opposite sex, including adult male teachers who do not want to share these spaces with young female students. Campbell Decl., R.21-8,

PageID #1187–88; Taylor Decl., R.21-12, PageID #1221–22. The group seeks to protect its members' constitutional and statutory rights to freedom of speech and to use single-sex restrooms without the opposite sex. Schmus Decl., R.21-7, PageID #1178–79; *see* Tenn. Code Ann. § 49-6-5102(b)(1) (pronouns); § 49-2-805(a) (restrooms).

*Procedural Background.* Six states—Tennessee, Kentucky, Ohio, Indiana, Virginia, and West Virginia—challenged the Rule, claiming it violates the APA because it is inconsistent with law, beyond statutory authority, contrary to the Constitution, and arbitrary and capricious. Compl., R.1, PageID #1–83. A.C. and Christian Educators intervened. Intervenors' Compl., R.72, Page ID #1529–39. All plaintiffs moved to stay and preliminarily enjoin the Rule. States' Mot. for Prelim. Inj., R.19, PageID #838–844; Intervenors' Mem. in Supp. of Their Motion for Stay & Prelim. Inj., R.63-1, PageID #1389–1422.

The district court granted that motion. Op., R.100, PageID #2088. It held that the Rule's redefinition of sex discrimination was contrary to law because it improperly transferred *Bostock*'s logic into Title IX. *Id.* at PageID #2011–23, 2088. The court also held that the Rule's new de-minimis harm standard was contrary to law and arbitrary and capricious because of its inconsistent applications and the Department's failure to consider significant risks the change would bring. *Id.* at PageID #2020–23, 2065–72. Finally, the court held that the Rule's new harassment definition likely violated the First Amendment because it would compel

and restrict speech about gender identity. *Id.* at PageID #2036–51.
After holding that the States and Intervenors will likely succeed on the
merits, the court concluded that the equities favored enjoining enforce-
ment of the Rule while this case proceeds. *Id.* at PageID #2088; Order,
R.117, PageID #2380–2405.

The Department appealed and moved to partially stay the injunc-
tion. The Department did not seek to stay the injunction as it applied to
the Rule's new de-minimis harm standard, 34 C.F.R. 106.31(a)(2), or its
new definition of "hostile environment harassment" for discrimination
based on gender identity, *id.* § 106.2. Instead, it moved to allow every
other part of the Rule, including the Department's new definition of sex-
based discrimination, 34 C.F.R. § 106.10, and every other application of
the new hostile environment harassment definition. Motion to Stay,
R.104, PageID #2096–2104.

Both the district court and this Court denied that request. Order,
R.117, PageID #2380–2405; 07/17/2024 Order, Doc. No. 41-1. The panel
unanimously held that the Department likely exceeded its power by
misreading *Bostock* to redefine sex discrimination in Title IX because
Title VII and Title IX (1) "use materially different" text, (2) serve "dif-
ferent goals," and (3) "have distinct defenses." 07/17/2024 Order 5. In
addition, because Title IX is spending legislation, Congress "must speak
with a clear voice before it imposes new mandates on the States." *Id.*
For these reasons, the panel refused to "export" *Bostock*'s logic outside

10

Title VII, consistent with this Court's precedent. *Id.* The panel also fully retained the district court's injunction because the Department had not shown the Rule is severable. *Id.* at 6.

The Department appealed. The U.S. Supreme Court affirmed the panel decision, saying the Department did not give a "sufficient basis" to disturb the conclusion that the provisions found "unlawful are intertwined with and affect other provisions of the rule," nor has the Department "adequately identified which particular provisions, if any, are sufficiently independent of the enjoined definitional provision…." *Dep't of Educ. v. Louisiana*, No. 24A78, 2024 WL 3841071, at *1 (U.S. Aug. 16, 2024) (per curiam). What's more, the Supreme Court rejected the Department's request to stay the injunction against § 106.10. All nine justices agreed that "plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule, including [§ 106.10]," which redefined sex discrimination. *Id.* at *1; *id.* at *4 (Sotomayor, J, dissenting in part).

This Court should affirm the judgment below and preserve the status quo while this case proceeds.

## SUMMARY OF THE ARGUMENT

The new Rule redefines sex discrimination in Title IX to cover new forms of discrimination, such as discrimination based on "gender identity" and "sex stereotypes"; it deploys a new de-minimis harm test allowing gender identity to supersede sex; and it reinterprets sex-based harassment to compel and censor speech, such as forcing teachers and students to speak incorrect pronouns or preventing them from saying men cannot become women. This Court should affirm the ruling below because Intervenors will likely succeed on the merits and the other injunction factors favor preserving the status quo.

Start with the merits. Intervenors will likely succeed because the Department's Rule contradicts Title IX, defies the Constitution, and is arbitrary and capricious.

*First*, the Rule is contrary to law. Title IX's original public meaning prohibited individuals of one sex from being treated worse than individuals of the other sex to ensure equal educational opportunities. Title IX is unlike Title VII. It covers only "sex." It ties multiple, complementary, phrases together in its prohibition to ensure that men and women have equal opportunities. And it applies to the educational context, which differs from employment.

Importantly, Title IX *allows* sex distinctions. Congress has specified that courts and agencies must construe Title IX to allow sex-specific spaces, including "living facilities." 20 U.S.C. § 1686. This is a

rule of construction, not an exception. At times, the Department accepts as much, saying its regulations allowing men's and women's bathrooms are based on Title IX's nondiscrimination mandate. DOE Br. 29.

*Bostock* cannot apply to Title IX for at least five reasons. First, *Bostock* said "sex is not relevant to" employment decisions, and Title VII treats sex like many other protected traits. 590 U.S. at 660 (citation omitted). But Title IX covers *only* sex, which often *is* relevant to promoting educational opportunities. Second, Title IX allows schools to treat males and females comparably as groups. Third, Title IX's rule of construction shows its nondiscrimination mandate allows sex distinctions. Fourth, *Bostock*'s logic contradicts distinctions drawn by the Rule. Fifth, *Bostock* said gender-identity discrimination is a form of sex-based discrimination; *Bostock* did not say all sex distinctions are a form of gender-identity discrimination. The Department's misapplication of *Bostock* would thus expand liability under Title IX by allowing disparate-impact claims contrary to law.

Because *Bostock* cannot apply to Title IX, the Department manufactures a new de-minimis-harm standard to achieve its policy goals. It argues (1) that Title IX doesn't punish de minimis harms and (2) that sex distinctions *always* cause more than de minimis harm, but only when applied to individuals who identify as transgender. Title IX never mentions, much less justifies, any of this. And this invented construct elevates gender identity over sex. After all, if sex-specific locker room

policies cause mere de minimis harm when applied to men who identify as men but more than de minimis harm when applied to men who identify as women, that means gender identity supersedes sex.

Nothing justifies the Department's attempt to revolutionize Title IX contrary to the statute. And that conclusion is even more clear under federalism principles and clear-statement rules. Congress must provide clear direction when imposing conditions in a Spending Clause context. For over 50 years, everyone, including the Department, accepted that Title IX allows sex distinctions to ensure equal educational opportunities for men and women. It is unreasonable to insist that Title IX unambiguously elevated gender identity over sex through a de-minimis-harm exception no one knew about until April 2024. The Department has no authority to decide this major political question.

*Second*, the Rule violates the Constitution. It compels and restricts speech through vague and overbroad standards. And it does so based on content and viewpoint. First, § 106.10 expands sex discrimination to include subjective concepts like "gender identity" and "sex stereotypes" but never defines them. Second, the Rule expands liability for hostile-environment claims. Harassment need only be severe *or* pervasive. And complainants need not show any particular harm. The Rule fails because it forces people to speak inaccurate pronouns and to avoid saying sex is binary or immutable. This imposes viewpoint-based discrimination through an unconstitutionally broad and vague rule.

The Rule also infringes students' and teachers' right to bodily privacy. This Court has recognized a fundamental right to be free from forced exposure of one's body to individuals of the opposite sex. This right applies in intimate spaces like restrooms, showers, and locker rooms. The Rule burdens this right by requiring schools to admit people to such spaces by gender identity rather than sex. This harms teachers and students who use restrooms or locker rooms that will be accessed by individuals of the opposite sex. Title IX, properly understood, both stops sex discrimination and protects bodily privacy for men and women in intimate spaces. The Rule upends all this.

*Third*, the Rule is also arbitrary and capricious. The Rule's new definition of sex discrimination irrationally hinges on *Bostock* even though *Bostock* interpreted a different statute with different text covering a different context. The Rule also causes absurd results. On the Department's logic, Congress cared more about ensuring the Girl Scouts remain women-only than protecting girls' privacy in showers and locker rooms. And while the Department says the Rule doesn't cover sports, its logic inevitably does. Consider also that the Rule's new definition of sex discrimination applies equally to nonbinary students, but the Department fails to show how a recipient can provide them access to sex-specific facilities without violating the Rule.

Turn now to the equities. Intervenors will suffer irreparable harm if the Rule goes into effect. They will lose valuable free-speech and privacy rights. Indeed, if the Rule goes live, some Christian Educators' members will self-censor their speech, and Intervenors will be forced to share intimate spaces with individuals of the opposite sex. These results violate Intervenors' free-speech and privacy rights. And the loss of these freedoms always constitutes irreparable injury. In contrast, the Department suffers no harm when it is stopped from acting illegally. The public interest lies in correctly applying the law.

The district court got it right. While the Department says the current injunction is overbroad because the Rule is severable, the Department waived this argument below, making just two passing references in briefing. What's more, the U.S. Supreme Court has already rejected it. This Court should uphold the current injunction. Nothing warrants disturbing the status quo while this case proceeds.

## STANDARD OF REVIEW

A district court's "decision to grant or deny a preliminary injunction is reviewed for an abuse of discretion," with its "legal conclusions" reviewed "de novo and its factual findings for clear error." *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 380 (6th Cir. 2023) (cleaned up); *see Ohio v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987).

16

## ARGUMENT

The APA allows a district court to "postpone the effective date of an[y] agency action" to prevent irreparable injury. 5 U.S.C. § 705. To obtain a stay under § 705 or a preliminary injunction, the movant must show the same factors: (I) likely success on the merits, (II) irreparable harm, and (III) the balance of equities and public interest favoring movants. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Ohio*, 812 F.2d at 290. Each factor supports the district court's ruling.

## I.    Intervenors will likely succeed on the merits.

Intervenors will likely succeed because the Rule contradicts Title IX, defies the Constitution, and is arbitrary and capricious.

### A.    The Rule is contrary to Title IX.

Title IX forbids schools from treating one sex worse than the other but does not forbid all sex distinctions. Sometimes, Title IX requires them. Even the Department accepts that Title IX allows sex distinctions—except as applied to individuals who identify as transgender. That makes *Bostock* inapposite. And while the Department correctly accepts that Title IX allows sex distinctions, its new de-minimis-harm standard that favors gender identity over sex is contrary to law. Nothing in Title IX's text or history suggests that gender identity supersedes sex.

### 1.    Title IX forbids treating one sex worse than the other.

The Department misinterprets Title IX, believing *Bostock*'s analysis in the employment context automatically transfers to Title IX. DOE Br. 18–24. It doesn't. Title IX uses *different text* to regulate a *different context* where noticing sex is "relevant"—and crucial—to ensuring equal opportunities for men and women. *Bostock*, 590 U.S. at 660. Those differences convey a different meaning. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018).

Statutory interpretation begins with the text. Courts give "terms their ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021). When terms have more than one possible meaning, courts choose the "everyday" one. *McBoyle v. United States*, 283 U.S. 25, 26 (1931); *see* Antonin Scalia, *A Matter of Interpretation* 24 (1997) ("[T]he good textualist is not a literalist."). And they do not "add to, remodel, update, or detract from old statutory terms" to fit their "own imaginations." *Bostock*, 590 U.S. at 654–55.

Title IX states: "No person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving" federal assistance. 20 U.S.C. § 1681(a). This text forbids treating one sex worse than the other.

Start with "on the basis of sex." No one disputes that "sex" means the "physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655); *see* DOE Br. 20 (accepting this definition); Op., R.100, PageID #1997–2005.

Next, consider the word "discrimination." Sometimes, it means "to make a distinction," Webster's Third New International Dictionary 648 (1966) ("Webster's Third"), or to treat someone "differently," *Threat v. City of Cleveland*, 6 F.4th 672, 677 (6th Cir. 2021) (citing Webster's Third 648). But to "be subjected to discrimination," 20 U.S.C. § 1681(a), conveys a distinction for the wrong reason: "a difference in treatment or favor on a class or categorical basis in disregard of individual merit." Webster's Third 648. Here, "precedent and dictionaries row in the same direction." *Threat*, 6 F.4th at 677. To "discriminate" means "to treat similarly situated individuals differently." *Id.*

Title IX also prohibits "exclud[ing] from participation in" or "den[ying] the benefits of" an educational program. 20 U.S.C. § 1681(a). These nearby terms help clarify discrimination. *United States v. Fitzgerald*, 906 F.3d 437, 442 (6th Cir. 2018) ("consider[ing] not only the bare meaning of [a] word but also its placement and purpose in the statutory scheme") (citation omitted); *FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011) (multiple "words together may assume a more particular meaning than those words in isolation"); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195–98 (2012)

(explaining associated-words canon). To "exclude" means to "bar from participation, enjoyment, consideration, or inclusion." Webster's Third 793. And to "deny" means "to turn down or give a negative answer." *Id.* 603. These words reinforce that discrimination is not merely "differential" treatment, but "less favorable" treatment based on sex, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005), where nothing justifies "the difference in treatment," *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 287 (2011).

Finally, these words must be understood within the context of an "education program," like classrooms, locker rooms, and sports. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision … is often clarified by" its "context."); Scalia & Garner, *supra*, 167–69 (explaining whole-text canon). Though considering sex isn't "relevant to the selection, evaluation, or compensation of employees," *Bostock*, 590 U.S. at 660 (citation omitted), noticing sex is critical to ensuring equal opportunities for men and women *in education*.

Putting the parts together, Title IX forbids differential treatment that disfavors, denies, or treats one sex worse than the other when it comes to the full and equal enjoyment of educational opportunities. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022).

### 2.    Title IX does not forbid all sex distinctions.

What dictionaries establish, "statutory and historical context" confirms. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). While Title IX prohibits sex *discrimination*, it does not forbid all sex *distinctions*.

a. Start with statutory context. Section 1681(a) cannot be read "in a vacuum." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Its words "must be read in … context" and construed to fit "the overall statutory scheme." *Id.* Here, a nearby provision states: "[N]othing … [in Title IX] shall be construed to prohibit any educational institution … from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. This rule of construction shows that § 1681(a) *itself* allows sex distinctions, including to ensure comparable living facilities. *See United Sav.*, 484 U.S. at 371 (courts will accept meaning that is "compatible with the rest of the law"); *e.g. Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987); *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631–32, (1973); *see also* Scalia & Garner, *supra*, 167–69.

The Department calls this rule one of Title IX's "exceptions." DOE Br. 4. But the rule isn't listed among the statutory exceptions, 20 U.S.C. § 1681(a)(1)–(9); its text forbids § 1681(a) from being "construed" to prohibit a sex distinction, 20 U.S.C. § 1686; and Congress called the rule an "[i]nterpretation" principle in its section title. *Id.* So the provision's title "reinforces what the text's nouns and verbs independently suggest"—

§ 1681(a)'s nondiscrimination mandate allows sex distinctions. *Dubin v. United States*, 599 U.S. 110, 121 (2023) (citation omitted); *see also* Scalia & Garner, *supra*, 221–24 (explaining title-and-headings canon). The Department accepts this, saying its regulations allow sex-specific bathrooms because of § 1681(a). DOE Br. 29.

If § 1686 were a mere exception from § 1681(a)'s non-discrimination rule, then the 1975 regulations could not have provided for sex-specific "toilet, locker room, and shower facilities" *unless* these private facilities count as "living facilities"—and the Department insists they do not. Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 40 Fed. Reg. 24,128, 24,139–43 (June 4, 1975) ("1975 rulemaking"); *contra Adams*, 57 F.4th at 803 & n.6. Section 1686 is not an exception, but an interpretive command.

b. Historical context confirms Title IX's plain meaning. *See Fischer v. United States*, 144 S. Ct. 2176, 2186 (2024) (looking to "history of the provision" to discern meaning, including that it was passed in response to "Enron accounting scandal"). Everyone knows that "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 & n.36 (1979); *Cohen v. Brown Univ.*, 101 F.3d 155, 164–65 (1st Cir. 1996) (detailing same

historical goal). That means "Title IX's remedial focus is, quite properly, not on the overrepresented gender, but on the underrepresented gender"—women. *Cohen II*, 101 F.3d at 175; *see Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002). And it's no surprise that sex distinctions are often necessary to ensure equal educational opportunities because men and women are different. Their "[p]hysical differences" are "enduring." *United States v. Virginia* (*VMI*), 518 U.S. 515, 533 (1996).

As Title IX's principal sponsor understood, the Act must respect relevant differences between men and women. 117 Cong. Rec. 30,407 (1971) (statement of Sen. Bayh) (noting Title IX would not require co-ed sports teams or locker rooms); 118 Cong. Rec. 5807 (1972) (statement of Sen. Bayh) (noting Title IX would respect personal privacy in athletic facilities). When it comes to privacy, for example, "biological sex is the sole characteristic" that determines whether individuals are similarly situated for purposes of restrooms. *Adams*, 57 F.4th at 803 n.6. The same is true for sports. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982).

Thus, Title IX's text, "context," and "history" all agree. *Andrus v. Charlestone Stone Prods. Co.*, 436 U.S. 604, 616 (1978). Sex distinctions are allowed; otherwise, Title IX cannot achieve its goal to stop denials of "benefits" in educational programs "on the basis of sex." 20 U.S.C. § 1681(a). *Cf. Fischer*, 144 S. Ct. at 2185 (looking to the "distinct purpose

23

of each provision" to discern meaning based on their "evident purpose") (cleaned up); Scalia & Garner, *supra*, 63–65 (explaining presumption against ineffectiveness).[5]

c. What's more, the Supreme Court has interpreted Title IX's "postenactment developments" as "authoritative expressions concerning [its] scope and purpose." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (citation omitted). When Congress acquiesces to a statute's settled interpretation, courts assume this interpretation is correct. *See Cannon*, 441 U.S. at 686 n.7, 702–03. "One might even say that the body of law of which a statute forms a part … is part of the statute's context." Scalia & Garner, *supra*, 322–26 (explaining prior-construction canon).

Start with Title IX's implementing regulations born out of the Javits Amendment. *See* Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974). Those regulations are codified throughout 34 C.F.R. § 106.

---

[5] While some amici ask this Court to ignore this history and purpose, mislabeling them policy arguments, Br. of Statutory Interpretation & Equality Law Scholars, Doc. No. 52, amici ignore that Title IX's purpose comes from its text and that "textualists" can and must consider "the relevant context for a statutory text includ[ing] the mischiefs the authors were addressing." John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70, 84 (2006). What's more, "no party asks [this Court] to reconsider" the many precedents identifying Title IX's purpose. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023). So this Court may take them as given. *Id.*

*Compare* 40 Fed. Reg. 24,128, 24,139–43 *with* 34 C.F.R. § 106.14–41. They permit sex-specific spaces like physical-education classes, restrooms, showers, locker rooms, and sports teams. Congress required the Department's predecessor to submit the rules to Congress for review. 1975 rulemaking, 40 Fed. Reg. 24,128. After six days of hearings on whether the rulemaking was "consistent with the law" and congressional intent, Congress allowed the regulations to take effect. *N. Haven*, 456 U.S. at 531–32 (citation omitted).

Courts and federal administrations (including this one) have long believed these regulations "accurately reflect congressional intent." *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *see also* 89 Fed. Reg. at 33,817. And they do. Unlike situations where Congress merely fails to act, refusing "to overrule an agency's construction" that Congress was aware of—and specifically asked to review—provides "evidence of the reasonableness of that construction." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985). It's more probative still because Congress mandated its review of the regulations before they took effect, which is why courts have given Title IX's implementing regulations a "high" degree of deference. *E.g., Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) (*Cohen I*); *Kelley v. Bd. of Trs.*, 35 F.3d 265, 270 (7th Cir. 1994).

25

Congress ratified this construction and widespread judicial under-standing when it amended Title IX through the 1987 Civil Rights Restoration Act, 20 U.S.C. § 1687(2)(A). That Act reversed *Grove City College* to ensure that Title IX applied to all education programs at federally funded schools, including programs like sports. *Id.* Congress did this to ensure "equal opportunities for female athletes." *McCormick*, 370 F.3d at 287; *Cohen I*, 991 F.2d at 894. This amendment was not unrelated to sex distinctions. *See AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 81 (2021) (dismissing "isolated amendments" that "tell [the Court] nothing about the words" in question). Rather, Congress considered "the '*precise* issue' presented" here. *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (plurality) (citation omitted). That is "convincing" evidence that Congress adopted this statutory understanding. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 537–38 (2015) (amendments to Fair Housing Law that "assume[d] the existence of disparate-impact claims" showed "that Congress ratified disparate-impact liability"); *see* Scalia & Garner, *supra*, 322–23 (explaining prior-construction canon). Congress thus adopted the legal consensus since 1972 that Title IX allows schools to consider sex to ensure equal opportunities based on sex.

### 3.    Title IX sometimes requires sex distinctions.

Title IX not only allows some sex distinctions, it requires others. Again, start with the text. "Students are not only protected from discrimination, but also specifically shielded from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity.'" *Davis*, 526 U.S. at 650 (quoting 20 U.S.C. § 1681(a)). That may be harassment that keeps "female students from using … an athletic field." *Id.* at 650–51. Or it may be action "that unintentionally results in exclusion," *Knox Cnty. v. M.Q.*, 62 F.4th 978, 1002 (6th Cir. 2023), or precludes "meaningful access" to a desired benefit, *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

"[T]he adequacy of the education that a school offers" depends on reality and results. *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 167 (2017). Take showers and locker rooms. Students retain "a significant privacy interest in their unclothed bodies," including "the right to shield [their] body from exposure to viewing by the opposite sex." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008) (citation omitted). As Justice Ginsburg explained, integrating Virginia Military Institute "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *VMI*, 518 U.S. at 550 n.19. But the new Rule requires schools to permit some males into girls' showers and locker rooms. That result

27

cannot be squared with Title IX. Students do not have equal educational benefits if forced to shower or share intimate spaces with the opposite sex. A.C. illustrates why. She lost educational benefits when she had to avoid the girls' locker room to keep from changing in front of a male student. A.C. Decl., R.21-5, PageID #1096–98. Worse, that student made vulgar sexual comments in the locker room. *Id.* at PageID #1098–99. Allowing this strips women of equal educational opportunities.

Similarly, for "equal opportunity" in sports, "relevant differences cannot be ignored." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). While the Department objects that its rule carved out sports, DOE Br. 26 n.3, that is wrong (*infra* §I.A.4) but also irrelevant. The Department must still square its sex-blind interpretation of § 1681(a) with the fact that § 1681(a) allows sex distinctions in sports and that women would lose opportunities without sex-specific sports. That cannot be done.

Because of the "average physiological differences" between men and women, "males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark*, 695 F.2d at 1131. Indeed, most "females would quickly be eliminated from participation and denied any *meaningful* opportunity for athletic involvement" without sex-specific teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam) (emphasis added).

Equal opportunity in theory doesn't count. "[T]he mere opportunity for girls to try out" for a team is not enough if they don't stand a realistic chance of making the roster because of competition from men. *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993). And the mere chance to participate on a team is not enough if women cannot realistically win scholarships or "enjoy the thrill of victory" in sports dominated by men. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999).

A.C.'s situation underscores the point. The male athlete at her school deprived hundreds of females of meaningful athletic competition. That athlete consistently beat A.C. during her 8th-grade year, took her spot at her school's conference championships, and displaced nearly 300 other female athletes. A.C. Decl., R.21-5, PageID #1094–96; *see* Rouleau Decl., R.63-2, PageID #1424–25. "When males and females are not in fact similarly situated and when the law is blind to those differences, there may be as much a denial of equality as when a difference is created which does not exist." *Yellow Springs*, 647 F.2d at 657. Title IX's promise of equal opportunity means little if the statute ignores reality. The Act cannot be read to defeat itself. *See Clark v. Martinez*, 543 U.S. 371, 380 (2005) (accepting "limiting construction called for by one of the statute's applications" when broader construction possible).

#### 4.    *Bostock* cannot apply to Title IX.

The Rule revolutionizes Title IX. Misusing *Bostock*, the Department redefines "sex discrimination" in Title IX to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 34 C.F.R. § 106.10; *see* 89 Fed. Reg. at 33,802; DOE Br. 18 (exporting *Bostock*'s logic). *Bostock* doesn't require this for at least five reasons.

*First*, *Bostock* held that "sex is not relevant to the selection, evaluation, or compensation of employees" under Title VII, which treats sex like race, national origin, and other protected classifications. 590 U.S. at 660 (cleaned up). But Title IX covers *only* sex, which often *is* relevant to promoting equal educational opportunities.

Take sports or physical-education classes. Under *Bostock*, employers cannot consider sex when hiring or firing employees. For sports and physical-education classes, that logic would mean schools cannot create sex-specific teams or gym class. But "athletics programs *necessarily* allocate opportunities separately for male and female students." *Cohen II*, 101 F.3d at 177; *see* DOE Br. 26 n.3 (Title IX permits sex-specific "athletic teams").

Indeed, when some schools began cutting men's sports teams to comply with Title IX, male athletes sued for sex discrimination. *E.g.*, *Miami Univ. Wrestling Club*, 302 F.3d at 615; *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1049 (8th Cir. 2002) (collecting cases). Like the

Department here, those athletes said any action "taken 'but for' the sex of the participants" facially violated Title IX. *Boulahanis v. Bd. of Regents*, 198 F.3d 633, 636 (7th Cir. 1999); 89 Fed. Reg. at 33,807 (incorporating "but-for … test"). But Title IX does not forbid schools "from making gender-conscious decisions" in the sports and physical-education context. *Neal*, 198 F.3d at 765.

This shows Title VII "vastly" differs from "Title IX." *Jackson*, 544 U.S. at 175. Even the Department accepts that Title IX allows sex distinctions. In fact, the Department says its longstanding regulation allowing sex-specific "toilet, locker room, and shower facilities" arose from § 1681(a)'s "general nondiscrimination mandate." DOE Br. 29. And it says Congress recognized that Title IX permits sex-specific "athletic teams." DOE Br. 26 n.3. Yet the Department insists that *Bostock*'s interchangeable use of "on the basis of" with "because of" shows *Bostock* covers Title IX. DOE Br. 22. This "read[s] too much into too little." *Nat'l Park Producers Council v. Ross*, 598 U.S. 356, 373 (2023). Courts do not parse "[t]he language of an opinion" as though they are "dealing with language of a statute." Indeed, "opinions dispose of discrete cases and controversies[,] and they must be read with a careful eye to context." *Id.* at 373–74 (citation omitted). *Bostock* doesn't work in the educational context.

*Bostock* dealt with employment, while Title IX concerns educational opportunities. No one thinks Title VII allows business owners to hire

only male accountants or to assign men to the top floor while relegating women to a lower one. But sex distinctions are common in schools. The "school is not the workplace." *Adams*, 57 F.4th at 808. As this Court has held, *Bostock*'s "text-driven reasoning applies only to Title VII." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023); *see Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021); *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).

The Department seeks to dismiss these prior holdings as dicta. *See* DOE Br. 23. But elsewhere, it acknowledges that they are holdings. *See* Pet. for a Writ of Cert. at 14, *Skrmetti*, 83 F.4th 460 (No. 23-477), https://perma.cc/X5Q6-73FJ ("[T]he Sixth Circuit *held* that *Bostock*'s 'reasoning applies only to Title VII.'") (emphasis added) (citation omitted); *see also id.* at 23, 30. The motions panel got it right. This Court has repeatedly refused to "export Title VII's expansive meaning" elsewhere. 07/17/2024 Order 5. *Bostock* doesn't apply.

*Second*, Title IX's initial regulations allow schools to "treat[] males and females comparably as groups." *Bostock*, 590 U.S. at 665 (rejecting this reading of Title VII). Housing for each sex must be "[c]omparable in quality and cost to the student." 34 C.F.R. § 106.32 (b)(2)(ii); *see id.* § 106.32(c)(2) (similar). "[T]oilet, locker room, and shower facilities" must be comparable. 34 C.F.R. § 106.33. And schools must "provide equal athletic opportunity for members of both sexes," *id.* § 106.41 (c), though they need not provide the same sports or teams for both sexes,

*id.* § 106.41(b). The list goes on. *E.g.*, *id.* § 106.31(c); *id.* § 106.34(b)(2); *id.* § 106.37(c). Under the Department's *Bostock*'s logic, all these regulations violate Title IX. But courts should not discount regulations "issued roughly contemporaneously with [Title IX's] enactment" that have "remained consistent over time." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2258 (2024).

*Third*, the Department ignores that Title IX's nondiscrimination mandate—not just its "exceptions"—allows sex distinctions. DOE Br. 23. Section 1686 is a rule of construction. It shows that § 1681(a)'s nondiscrimination mandate allows sex distinctions, including to ensure comparable living facilities. § I.A.2. Misapplying *Bostock* to Title IX would contradict this rule of construction and invalidate regulations allowing sex distinctions that the Department has justified based on § 1681(a)'s nondiscrimination mandate. *Cf.* DOE Br. 29 (justifying rules allowing sex-specific "toilet, locker room, and shower facilities" based on § 1681(a)).

*Fourth*, *Bostock*'s logic contradicts the very distinctions drawn by the Rule. For instance, the Rule allows sex-specific bathrooms except as applied to individuals who identify as transgender. 89 Fed. Reg. at 33,818. But according to the Rule, even facilities assigned by gender identity still discriminate based on sex: "it is impossible to discriminate against a person because of their … gender identity without discriminating against that individual based on sex." *Id.* at 33,816 (cleaned up). So

33

per the Department, the Rule draws distinctions forbidden by Title IX's general nondiscrimination provision. That can't be right.

*Fifth*, *Bostock* did not change the meaning of "sex" in Title VII or Title IX. *See* DOE Br. 20. Nor do the new rules purport to equate gender identity and "sex." *E.g.*, 89 Fed. Reg. at 33,807. That's fatal because *Bostock* said *gender-identity discrimination* is a form of sex-based discrimination; *Bostock* did not say all *sex-based distinctions* are a form of gender-identity discrimination. *Adams*, 57 F.4th at 808. The Department's misapplication of *Bostock* would expand liability under Title IX contrary to statute. Title IX claims must "be based on intentional discrimination, not disparate impact." *Poloceno v. Dallas Indep. Sch. Dist.*, 826 F. App'x 359, 363 (5th Cir. 2020) (per curiam); *see Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 692 (6th Cir. 2000). *Bostock* doesn't fit here.

Indeed, the Department asked the Supreme Court to stay the district court's injunction against § 106.10, saying it reflects "a straightforward application of" *Bostock*. Appl. for Partial Stay at 5, *Cardona v. Tennessee*, No. 24A79 (U.S. July 22, 2024). But the Court refused. "[A]ll Members of the Court" agreed that the "plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule, including the central provision that newly defines sex discrimination to include dis-

crimination on the basis of sexual orientation and gender identity." *Louisiana*, 2024 WL 3841071, at *1; *id.* at *4 (Sotomayor, J, dissenting in part). Thus, the Department did not show it will likely succeed in defending § 106.10's redefinition of sex. *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, slip op. at 2–3 n.1 (11th Cir. Aug. 22, 2024).

### 5. The de-minimis harm standard subverts Title IX's sex-based protections.

Because *Bostock* cannot apply to Title IX, the Department manufactures a new de-minimis-harm standard to achieve its policy goals. 89 Fed. Reg. at 33,887 (codified at 34 C.F.R. § 106.31(a)); DOE Br. 25–32. The Department says this standard is just another way to say "legally cognizable injury." *Id.* at 25. It's not. And rather than upholding Title IX's sex-based protections, this new standard subverts them.

Again, start with the text. Title IX never mentions de minimis harm. It prohibits schools from excluding, denying benefits, or discriminating—meaning to "treat worse." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024); *see* § I.A.1. But nothing in Title IX "says anything about how much worse." *Muldrow*, 601 U.S. at 355.

Moving from text to logic, the de-minimis-harm rule creates big inconsistencies. The Department says sex distinctions *always* cause more than de minimis harm, but only when applied to persons with certain gender identities. *E.g.*, 89 Fed. Reg. at 33,887; *see also id.* at 33,815 (saying "stigmatic injuries" are per se harmful); DOE Br. 27. So

sex-specific locker room policies cause de minimis harm when applied to men who identify as men but more than de minimis harm when applied to men who identify as women. 89 Fed. Reg. at 33,820—even though women (whose harms the Department dismisses) have their unclothed bodies exposed to a male in both cases. On this logic, gender identity supersedes sex—the very thing that Title IX protects. *Adams*, 57 F.4th at 814.

That "add[s] words" and "impose[s] a new requirement" that Title IX does not. *Muldrow*, 601 U.S. at 355. And far from employing an "objective standard," the Rule says harm is cognizable only if it implicates a person's "subjective, deep-core sense of self." *Compare* 89 Fed. Reg. at 33,815, *with id.* at 33,809; *see Muldrow*, 601 U.S. at 254–55.

Worse, the Rule's bias against sex undermines Title IX's statutory and historical purpose. The new standard makes it harder for students, particularly women and girls, to "participat[e] in" or receive "the benefits of" educational programs. 20 U.S.C. § 1681. Courts prefer constructions that "serve, rather than frustrate, the statute's manifest purpose." *Fitzgerald*, 906 F.3d at 443; *see John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 94–95 (1993) (interpreting text consistent with statute's "object"). Scalia & Garner, *supra*, 63–65. The de-minimis-harm standard fails on this point.

By elevating gender identity over Title IX's sex-based protections, the Rule leads to bizarre results. On the Department's logic, Congress

*meant* to license widespread harm. DOE Br. 25–26. It was apparently content to permit "more than de minimis harm," 34 C.F.R. § 106.31(a)(2), throughout educational "living facilities" across the country, 20 U.S.C. § 1686. And Congress supposedly cared more about distinguishing "Boy Scouts" from "Girl Scouts" than preserving student privacy in showers and locker rooms. This Court does not "construe a statute to 'produce an absurd result that … Congress did not intend.'" *Fitzgerald*, 906 F.3d at 447 (quoting *United States v. Underhill*, 812 F.2d 105, 112 (6th Cir. 1987)); *see* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2458–59 (2003) (explaining absurdity doctrine).

The Rule also threatens women's sports. While the Department says it "does not implicate" athletics, DOE Br. 26 n.3, the Rule inevitably affects athletics regardless of the exemption in § 106.31(a)(2). First, § 106.10 redefines sex discrimination generally. Second, § 106.11 says this new definition "applies … to *all* sex discrimination occurring under a recipient's education program or activity" (emphasis added). That includes athletics. 89 Fed. Reg. at 33,528 (interpreting "'program or activity' broadly …"). Third, § 106.31(a)(1) repeats that § 106.10 covers "other education program[s] or activit[ies]…." Again, that includes athletics. Fourth, § 106.31(a)(2) only exempts § 106.41(b); it does not exempt § 106.41(a), which bans sex discrimination "in any interscholastic, intercollegiate, club or intramural athletics…." And § 106.31(a)(2)

37

doesn't limit § 106.10 or § 106.11's broad scope covering athletics. *See* DOE Br. 26 n.4. The result: § 106.10's redefinition of sex discrimination applies to educational programs generally via § 106.11, *and* specifically to sports through § 106.41(a). The Rule thus covers athletics in two ways—threatening women's sports.

The Department accepts that "courts may not 'disregard [a statute's] plain terms based on some extratextual consideration.'" DOE Br. 28 (quoting *Bostock*, 590 U.S. at 673–74). But its new de-minimis-harm standard violates that principle. The Department is using that standard to enforce its gender-identity mandate contrary to Title IX's text, history, and tradition. And even if a de-minimis harm standard applied, the Department has defined de minimis harm in an ideologically driven way—picking and choosing which injuries matter, usurping Congress's right to identify specific statutory violations, and inflicting new harms on women and girls in the process. In so doing, the Department has turned Title IX into something it is not. The Court should reject the Department's effort to rewrite Title IX.

### 6.    The Rule sinks under federalism canons.

The Rule is contrary to law. Moreover, the Rule violates multiple federalism canons and clear-statement rules.

First, Congress must "speak with a clear voice," imposing conditions "unambiguously" in a Spending Clause context. *Pennhurst State*

*Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18 (1981). For over 50 years, everyone, including the Department, accepted that Title IX allowed sex distinctions to ensure equal educational opportunities for men and women. It is unreasonable to hold that Title IX "unambiguously" elevated gender identity over sex when no federal court or official so construed the Act until now.

Second, Supreme Court "precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621–22 (2020). Education is a context "where States historically have been sovereign." *United States v. Lopez*, 514 U.S. 549, 564 (1995). Yet here, the Department wants to override school policies covering a vast array of topics like locker rooms, restrooms, physical education, and speech on a controversial issue like gender identity. Such a deep incursion into states' traditional power over education needs clear approval from Congress that is absent here.

Third, "clear congressional authorization" is needed when agencies purport to resolve questions of vast "economic and political significance." *West Virginia v. E.P.A.*, 597 U.S. 697, 721–23 (2022). The Rule attempts to settle, among other things, the important political issue whether states can protect student privacy in schools. That is a

major question. Indeed, over half of the states have passed or proposed laws ensuring privacy in men's and women's restrooms.[6]

In short, the new Rule threatens to change Title IX "from one sort of scheme of regulation into an entirely different kind." *West Virginia*, 597 U.S. at 728 (cleaned up). It would displace many state laws, affect millions of students, and jeopardize billions in school funding. No clear statement allows this.

## B.    The Rule is contrary to constitutional rights.

Besides contradicting Title IX, the Rule also violates the Constitution. It compels and restricts speech through vague and overbroad standards. And it does so based on content and viewpoint. The Rule also infringes on students' and teachers' right to bodily privacy.

### 1.    The Rule is vague and overbroad.

A law is overbroad if it "chills speech outside the purview of its legitimate regulatory purpose." *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 387 (6th Cir. 2001). And a law is too vague if it "fail[s] to give the person of ordinary intelligence a reasonable opportunity to know what" it forbids. *Ent. Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 379 (6th Cir. 2009) (cleaned up).

---

[6] *Bathroom bill*, Wikipedia, https://tinyurl.com/asjve6bn.

The Rule is overbroad and vague for two reasons. First, § 106.10 expands the definition of "sex" to include subjective concepts like "gender identity" and "sex stereotypes." 89 Fed. Reg. at 33,886. The Rule does not define "gender identity," except to say it "describe[s] an individual's sense of their gender." *Id.* at 33,809. Second, the Rule creates an amorphous, "broader standard" for hostile-environment claims. *Id.* at 33,498. Harassment need only be severe *or* pervasive. Complainants need not show "any particular harm" or exclusion from an educational program. *Id.* at 33,511. Harassment can be anything that the student considers "unwelcome" or that "limits" the student's ability to benefit. *Id.* at 33,884 (codified at 34 C.F.R. § 106.2). And this harassment provision covers speech online or outside the country. *Id.* at 33,535, 33,886.

The Rule fails because it forces teachers to speak inaccurate pronouns and to avoid saying sex is binary or immutable. It requires schools to treat people according to their gender identity or they will inflict "more than de minimis harm." 89 Fed. Reg. at 33,887. This means failing to use someone's chosen pronouns causes more than de minimis harm. So it's no wonder that the Department says "misgendering" can be harassment. *Id.* at 33,516. Severe or not, pervasiveness is enough to trigger liability. And pronoun use is pervasive given its ubiquity in conversation. *Id.* at 33,498. The Rule also praised punishing a student for wearing a t-shirt saying, "THERE ARE ONLY TWO GENDERS,"

because that speech "invades the rights of others." *Id.* at 33,504 (citing *L.M. v. Town of Middleborough*, 677 F. Supp. 3d 29 (D. Mass. 2023)).

a. This puts Christian Educators members at risk. Some members believe sex is binary and immutable. *E.g.* Campbell Decl., R.21-8, Page-ID #1186; Keaton Decl., R.21-9, PageID #1195; Taylor Decl., R.21-12, PageID #1218. They want to speak consistent with this belief by avoiding inaccurate pronouns and by sharing their religiously informed views during informal conversations at school. *E.g.* Campbell Decl., R.21-8, PageID #1187–89; Keaton Decl., R.21-9, PageID #1196–97; Taylor Decl., R.21-12, PageID #1219–20. But they fear their speech will lead to harassment complaints. Indeed, one colleague accused a Christian Educators member of "hate speech" just because the member told someone in the hallway that she supported a Tennessee law banning drag shows for minors. Keaton Decl., R.21-9, PageID #1196–97. Some have also received requests to use inaccurate pronouns in the past and will likely receive more. *E.g.*, *id.* at PageID #1194–95. These teachers fear the Rule will override their statutory free-speech rights, force them to use inaccurate pronouns, and prevent them from sharing their views on gender identity. Campbell Decl., R.21-8, PageID #1189; Keaton Decl., R.21-9, PageID #1198; Taylor Decl., R.21-12, PageID #1220–21; *see* Tenn. Code Ann. § 49-6-5102(b)(1); *e.g. Meriwether*, 992 F.3d at 499–502 (exemplifying threat to educators).

42

The Department downplays these fears because, in its view, the Rule made only a "handful of changes" to the prior standard. DOE Br. 33. The Department also says the new standard "mirrors" the one that applies to "Title VII." *Id.* at 34. And it says the Rule does not force anyone to "affirm any particular view on any issue," *id.* at 35 (citation omitted); rather, it requires "schools to address sex-based harassment," *id.* at 36. But this obscures the Department's major overhaul, which (1) changes Title IX's harassment standard contrary to law, (2) requires a broader standard that will inevitably censor and compel more speech, and (3) prompts fears reinforced by what the Department has said elsewhere. *Davis*, 526 U.S. at 648–52.

First, the Rule changes Title IX's harassment standard contrary to law. It starts by disregarding *Davis*, which holds that harassment must be "severe, pervasive, *and* objectively offensive" to violate Title IX. 526 U.S. at 650 (emphasis added). In 2020, the Department itself adopted the *Davis* standard and recognized that the First Amendment demands a "narrowly tailored" harassment definition to avoid censoring protected speech. Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance, 85 Fed. Reg. 30,026, 30,142 (May 19, 2020); *accord id.* at 30,033 ("Including the *Davis* definition of sexual harassment for Title IX purposes … helps ensure that Title IX is enforced consistent with the First Amendment."). And *Davis* warned

43

against "impos[ing] more sweeping liability than" it "read Title IX to require." 526 U.S. at 652. The new standard is far lower.

In response, the Department says *Davis* arose in the context of a "private" lawsuit rather than an administrative suit. DOE Br. 34 n.7. But the Court was interpreting "the same word in the same statute to address the same legal question: the meaning of 'discrimination' under Title IX." *Alabama*, slip op. at 15. The statute's words don't change meaning based on the type of claim. *Loper Bright*, 144 S. Ct. at 2266 (statutes "have a single, best meaning"). This alone dooms the new standard.

The standard also restricts certain speech about gender identity— a matter "of profound value and concern to the public" that "merits special protection." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913–14 (2018) (cleaned up). Words like "[p]ronouns … convey a powerful message implicating a sensitive topic of public concern." *Meriwether*, 992 F.3d at 508; *see Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 740 (Va. 2023). As do statements about what defines men and women and whether sex can be chosen or changed. Some may consider these statements offensive. But *Davis* gave "very real limitations" to Title IX's definition of harassment. 526 U.S. at 652. It does not cover "teas[ing]," "name-calling," or isolated incidents. *Id*. Again, "schools" are not the "workplace." *Id*. at 651. They require more expressive freedom. *Id*. at 651–52.

44

Second, while the Department says it only requires schools to "address sex-based harassment" and doesn't tell "students and staff 'what they must say,'" DOE Br. 36 (citation omitted), schools still must apply *some* standard to avoid violating Title IX. The Department has now broadened that standard. And given that the Department says "misgendering" someone can be harassment, 89 Fed. Reg. at 33,516, celebrates punishing students for saying there are two only genders, *id.* at 33,504, and believes schools may prohibit the "intentional use of non-preferred pronouns" without violating free speech, DOE Br. 36 (citing *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 109 F.4th 453 (6th Cir. 2024) (*PDE*)), teachers and students have much to fear. Their speech must conform to the Department's new standard, or they risk investigation and discipline for sex-based harassment.

Third, the Government's prior statements validate this fear. The Government has said that a school policy requiring teachers to use gender-neutral titles like "teacher" or "coach," but not honorifics and pronouns based on gender identity, creates a hostile environment under Title VII. Statement of Interest of the U.S. of Am., *Wood v. Fla. Dep't of Educ.*, No. 4:23-cv-00526, 2024 WL 3380723 (N.D. Fla. June 27, 2024); *see* 89 Fed. Reg. at 33,500 (Title VII standard "aligns closely with the definition of hostile environment sexual harassment" the Rule applies to Title IX). To be sure, the Department says these statements concern

only "Title VII," DOE Br. 37 (attempting to distinguish similar statement in *Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 21-2475 (7th Cir. Nov. 8, 2021), 2021 WL 5405970 (U.S. Amicus)), but it also argues that the Title VII standard "mirrors" the Rule's, DOE Br. 34. So the Department's assurances are cold comfort to students and staff.[7]

b. Because the Rule chills too much speech on controversial subjects, it is unconstitutionally overbroad. *Alabama*, slip op. at 15–16. It is nearly identical to a policy the Eleventh Circuit recently struck down on that basis. *Id.* (comparing Rule to unlawful policy in *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114–15 (11th Cir. 2022)). Such policies likely violate the First Amendment, the court said, because they "restrict[ ] political advocacy and cover[ ] substantially more speech than the First Amendment permit[s]." *Alabama*, slip op. at 16. While the Department accepts that the Rule may "occasionally" restrict speech, DOE Br. 40, pronoun use is ubiquitous; the Rule compels individuals to speak only one viewpoint; and it covers conversations online and around the world. That restricts "substantially more speech" than allowed. *Alabama*, slip op. at 16.

To be sure, *PDE* upheld a school harassment policy covering K-12 students, but *PDE* doesn't justify the Department's Rule for at least

---

[7] Even Title VII can violate the First Amendment. *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995).

three reasons. First, the policy in *PDE* covered only conversations between students. 109 F.4th at 459. Here, the Rule covers conversations among both students and teachers, and it applies to conversations *everywhere*, including online. Second, unlike the *PDE* policy, the Rule covers not just pronoun use but also expressing views about gender identity by other means, including saying things like, "males should not compete in women's sports." *See id.* at 459; 89 Fed. Reg. at 33,504. Third, in *PDE*, the school provided evidence that using correct pronouns would cause disruption and harm students who identify as transgender and plaintiffs even admitted that; none of that is true here. *PDE*, 109 F.4th at 463–64.[8]

And while the Department says *Meriwether* "nowhere suggested that" a "harassment standard" like the Rule's "conflicts with the First Amendment," DOE Br. 38, the Rule violates *Meriwether* in two ways. First, *Meriwether* held that declining to use a student's chosen pronouns does not "have the systemic effect of denying the [student] equal access to an educational program or activity." 992 F.3d at 511 (quoting *Davis*, 526 U.S. at 652). The Rule would overrule *Meriwether* on that point. 89 Fed. Reg. at 33,498. Second, as *Meriwether* explained, compelling pronouns violates the First Amendment. 992 F.3d at 511–12. The

---

[8] The Sixth Circuit has been asked to review *PDE* en banc. Parents Defending Education's Pet. for Reh'g En Banc, *PDE*, No. 23-3630 (Aug. 26, 2024), Doc. No. 92.

government's interest in such compulsion is "comparatively weak" to teachers' and students' substantial interest in "remain[ing] free to inquire, … to evaluate, [and] to gain new maturity and understanding." *Id.* at 510 (citation omitted). The Rule would likewise erase that part of *Meriwether*.

c. The Rule is vague for the same reasons. It fails to explain what teachers and students can or can't say. For example, can athletes say it's unfair for males to compete in women's sports without having "some impact" on students who identify as transgender? *E.g.* McKay Decl., R.21-10, PageID #1205–06. Can teachers express support for laws on drag shows without being accused of "hate speech"? Keaton Decl., R.21-9, PageID #1196–97. Can teachers explain in casual conversation what they believe the Bible teaches about the immutability of sex? Taylor Decl., R.21-12, PageID #1219–20. The Department won't say. The Rule's "imprecision exacerbates its chilling effect." *Speech First*, 32 F.4th at 1121, 1125. That creates an "impermissible risk" that the Rule will suppress "ideas." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129–30 (1992).

What's more, § 106.31(a)(2) says failing to accommodate a person's gender identity automatically causes harm. And given that "gender identity" means an individual's subjective "sense of their gender," 89 Fed. Reg. at 33,809, this would deter a reasonable teacher from expressing the view that sex is objectively determined and fixed. As would the

Rule's express support of cases punishing students for speaking their minds. *Id.* at 33,504. The Rule's vague "some impact" standard would do the same. *Id.* at 33,511. This imprecision is antithetical to a school environment where people can "voice ideas and opinions without fear of repercussion." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 761 (6th Cir. 2019). The Rule lacks sufficient clarity.

Finally, the Department's insistence that it will comply with the First Amendment can't save the Rule. 89 Fed. Reg. at 33,503; DOE Br. 37; *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995) (disregarding savings clause in harassment policy). So both the breadth and vagueness of the Rule violate the Constitution.

### 2. The Rule compels and restricts speech based on content and viewpoint as applied.

The Rule also fails because it compels and restricts speech based on viewpoint. Viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Schools may not forbid "the expression of an idea simply because" the government believes the expression is "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012). Here, the Rule forces teachers and students to speak inaccurate pronouns and to avoid saying sex is

binary or immutable. § I.B.1. It allows teachers and students to champion "one side of a debate," but not the other. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992). The First Amendment forbids this. *Id.*

### 3.    The Rule violates the right to bodily privacy.

This Court has recognized a fundamental right "to be free from forced exposure of one's person to strangers of the opposite sex." *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987). This right applies in intimate spaces like school restrooms, showers, and locker rooms where students appear in their "underwear." *Brannum*, 516 F.3d at 495; *see Doe v. Luzerne Cnty.*, 660 F.3d 169, 175–76 n.5 (3d Cir. 2011) (noting Fourteenth Amendment right to bodily privacy from persons of the opposite sex); *Adams*, 57 F.4th at 805 (collecting cases).

The Rule burdens this right by requiring schools to admit students to intimate spaces by gender identity rather than sex. *See* 89 Fed. Reg. at 33,820–21. This harms Intervenors who use restrooms or locker rooms that will be accessed by individuals of the opposite sex. *See* A.C. Decl., R.21-5, PageID #1097–98; Campbell Decl., R.21-8, PageID #1187–88; Taylor Decl., R.21-12, PageID #1221–22.

The government has no compelling interest to justify this. It can stop sex discrimination without denying individuals bodily "privacy from the other sex" in places like locker rooms. *VMI*, 518 U.S. at 550 n.19. In fact, preserving sex-specific intimate spaces "*advances* [an]

important governmental objective": protecting people's interests in "using the bathroom away from the opposite sex and shielding one's body from the opposite sex." *Adams*, 57 F.4th at 804–07 (emphasis added).

### C.    The Rule is arbitrary and capricious.

Besides being contrary to Title IX and the Constitution, the Rule is also arbitrary and capricious for eight reasons.

*First*, the Rule's new definition of sex discrimination irrationally hinges on *Bostock* even though *Bostock* interpreted a different statute with different text covering a different context. § I.A.

*Second*, the Rule's new definition of sex discrimination applies irrationally. It allows biology-based standards for beauty pageants, girls and boys clubs, living facilities, and admissions, but not for restrooms, showers, locker rooms, or physical-education classes where biological differences play at least an equal role. The Rule's distinction between living facilities and locker rooms or overnight school trips is particularly irrational, especially considering the Department's recognition that its "longstanding regulation regarding 'toilet, locker room, and shower facilities' was promulgated" under Title IX's "general nondiscrimination mandate." DOE. Br. 29.

*Third*, the Rule fails to accept its impact on sports—a key part of Title IX's purpose. While the Department insists that the Rule doesn't

cover sports, DOE 26 n.3, it inevitably does, § I.A.5. Unless the Department accepts that Title IX allows sex distinctions—regardless of gender identity and contrary to its position on *Bostock*—it may not allow a biology-based distinction for sports because "there is no statutory exception." DOE Br. 30. Per the Rule, such a distinction *always* causes more than de minimis harm. *E.g.*, 89 Fed. Reg. at 33,887.

*Fourth*, the Rule is vague and fails to adequately explain the who, what, when, where, or why of how it applies in different contexts. For example, the Rule says the new definition of sex discrimination "applies with equal force to … nonbinary students," but fails to show "how a recipient must provide access to sex-separate facilities for students who do not identify as male or female." 89 Fed. Reg. at 33,818. The Rule does not even explain how *Bostock*'s "but-for test" can apply to students who identify as neither male nor female. *Bostock*, 590 U.S. at 656.

*Fifth*, the Rule is internally inconsistent and incoherent. Consider what the Rule says about restrooms. Though the Rule claims that its protections apply equally to "transgender and nonbinary students," 89 Fed. Reg. at 33,818, it opens restrooms to transgender students based on gender identity but doesn't do the same for nonbinary students, 89 Fed. Reg. at 33,818. So, on its own terms and without justification, the Rule treats nonbinary students worse than transgender students, discriminates against these nonbinary students based on gender identity, and inflicts de minimis harm on them. *Contra* 89 Fed. Reg. at

33,807 (concluding that *Bostock*'s consideration-of-sex logic includes nonbinary students).

*Sixth*, the Rule disregards the biological differences between men and women that justify certain sex distinctions, including the protection of bodily privacy interests. On the Department's read, the statute allows sex-specific "toilet, locker room, and shower facilities" to preserve bodily privacy but forbids such a distinction as applied to gender identity, inflicting the very harm the statute means to avoid. DOE Br. 29. So Title IX protects women from being exposed to males except when the male identifies as transgender. That's an arbitrary reading of the statute. Op., R.100, PageID #2066.

*Seventh*, the Rule applies its new definition of sex discrimination to cover discrimination based on sex stereotypes, even though "[r]ecognizing and respecting biological sex differences does not amount to stereotyping." *Skrmetti,* 83 F.4th at 486.

*Eighth*, the Rule fails to meaningfully respond to comments. *See* Op., R.100, PageID #2067–72.

## II.    Intervenors will suffer irreparable harm.

Violating constitutional freedoms always constitutes irreparable injury. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam); *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*,

305 F.3d 566, 578 (6th Cir. 2002). The Rule threatens Christian Educators' free-speech rights by attempting to deprive its members of state laws and school policies that protect their free-speech rights. § I.B.1–2; Compl., R.72, PageID #1525. If the Rule goes into effect, some members will self-censor their speech. This harm isn't "speculative." DOE Br. 48. It's imminent. *Cf. Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("self-censorship" is a "harm that can be realized even without an actual prosecution").

The Department disregards other irreparable harm that Intervenors face. A.C. and Christian Educators face the imminent violation of their constitutional right to bodily privacy. § B.3; Compl., R.72, PageID #1521–22. What's more, courts have said the "lost opportunity to participate in … athletics" is a form of irreparable harm. *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 997 (E.D. Mich. 2018) (collecting cases). A.C. wants to participate in marching band this fall and in track next season. A.C. Decl., R.21-5, PageID #1100. But she is "reluctant" to continue with band or track because she fears her school will assign boys to overnight hotel rooms with girls, admit boys into the girls' restrooms and locker room, and allow boys to compete on the track team. *Id.*; *see* 89 Fed. Reg. at 33,821 (saying carveout for "living facilities" applies only to housing). Intervenors need relief while this case proceeds.

54

## III. The public interest and balance of equities favor a stay.

The balance of equities and public interest inquiries "merge when the government is the defendant." *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). The Department says any time the "federal government 'is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" DOE Br. 49 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). But the Department omits key text from its source: "[A]ny time *a State* is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King*, 567 U.S. at 1303 (emphasis added; citation omitted). The Department isn't a State. Nor is it effectuating a duly enacted statute. It is an agency trying to rewrite a statute contrary to law. There is no sovereign harm if the Rule is enjoined.

The Department also says an injunction injures its "compelling public interest" in preventing "sex discrimination." DOE Br. 49. But the Department redefines "sex discrimination" inconsistent with Title IX. § I. Nothing justifies enforcing this change. The "public interest lies in correctly applying the law." *Ohio v. Becerra*, 87 F.4th 759, 783 (6th Cir. 2023). And on the Department's logic, the statute has *always* prohibited gender-identity discrimination anyway, DOE Br. 19, so the Rule's new definition in § 106.10 does no work. Either way, the balance of equities favors Intervenors, not the Department. No one will be harmed if the

Department is correct about what § 106.10 requires (though it's not), but Intervenors will imminently suffer harm if the Department is wrong (and it is).

## IV.  The current injunction is not overbroad.

This Court should retain the current injunction. While the Department says the injunction is overbroad because the Rule can be severed, DOE Br. 49–53, this argument has been waived and rejected.

First, the Department forfeited its severance argument below, making just two passing references in briefing. Defs.' Opp'n to Intervenor-Pls.' Mot. for a § 705 Stay & Prelim. Inj., R.91, PageID #1818. To preserve an argument, a party must do more than cursorily mention it. Issues noted "in a perfunctory manner," without a developed argument, are "waived." *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997); *see Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017) ("[I]t is not for the court to search the record and construct arguments. Parties must do that for themselves."). The Department never specified in sufficient detail how the Rule could partially apply yet still protect Plaintiffs. In a challenge to a 1500-page regulation, the agency must do *something* to show the district court how its injunction could be narrowed.

Second, the Supreme Court has rejected the exact severance argument the Department makes here. After a panel of this Court refused to stay the injunction pending appeal, the Department made the same

request to the Supreme Court. The Court rejected that request, saying the Department did not provide a "sufficient basis" to disturb the conclusion that the unlawful provisions "are intertwined with and affect other provisions of the rule," nor has the Department "adequately identified which particular provisions, if any, are sufficiently independent of the enjoined definitional provision…." *Louisiana*, 2024 WL 3841071, at *1.

## CONCLUSION

The district court properly ordered preliminary relief to preserve the status quo just like the U.S. Supreme Court held earlier this month. This Court should affirm the district court's judgment below.

Dated: August 26, 2024

Respectfully submitted,

*s/John J. Bursch*

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

James A. Campbell
Jonathan A. Scruggs
Jacob P. Warner
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jcampbell@ADFlegal.org
jscruggs@ADFlegal.org
jwarner@ADFlegal.org

*Counsel for Intervenors-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,886 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: August 26, 2024

*s/John J. Bursch*
John J. Bursch
*Counsel for Intervenors-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*s/John J. Bursch*
John J. Bursch
*Counsel for Intervenors-Appellees*

# DESIGNATION OF RELEVANT
# DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rules 28(b)(1)(A)(i) and 30(g), Intervenors-Appellees Christian Educators Association International and A.C. by her next friend and mother, Abigail Cross designate the following district court documents as relevant:

| Record Entry | Description | Page ID # Range |
|---|---|---|
| RE 1 | Complaint | 1-799 |
| RE 19 | States' Motion for Preliminary Injunction | 838-984 |
| RE 21 | Motion to Intervene | 992-1223 |
| RE 50 | Order Granting Intervention | 1350-1351 |
| RE 63 | Intervenor's Motion for a § 705 Stay and Preliminary Injunction | 1383-1436 |
| RE 72 | Intervenors' Complaint | 1486-1541 |
| RE 73 | Defendants' Opposition to States' Motion for a § 705 Stay and Preliminary Injunction | 1542-1575 |
| RE 91 | Defendants' Opposition to Intervenors' Motion for a § 705 Stay and Preliminary Injunction | 1791-1819 |

| RE 92 | Reply in Support of States' Motion for a § 705 Stay and Preliminary Injunction | 1820-1860 |
|---|---|---|
| RE 99 | Intervenors' Reply in Support of Motion for a § 705 Stay and Preliminary Injunction | 1974-1995 |
| RE 100 | Memorandum Opinion and Order Granting Motion for Preliminary Injunction | 1996-2088 |
| RE 103 | Notice of Appeal | 2093-2095 |
| RE 104 | Defendants' Motion for Partial Stay Pending Appeal | 2096-2104 |
| RE 109 | Transcript of Motion for Preliminary Injunction Hearing | 2121-2310 |
| RE 110 | States' Opposition to Defendants' Motion for Partial Stay Pending Appeal | 2311-2322 |
| RE 111 | Intervenors' Response in Opposition to Defendants' Motion for Partial Stay Pending Appeal | 2323-2331 |
| RE 117 | Memorandum Opinion and Order Denying Motion for Partial Stay | 2380-2405 |