No. 24-5588

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

STATE OF TENNESSEE; COMMONWEALTH OF KENTUCKY; STATE OF OHIO;
STATE OF INDIANA; COMMONWEALTH OF VIRGINIA; STATE OF WEST VIRGINIA,

*Plaintiffs-Appellees*

and

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL; A.C., by her next friend
and mother Next Friend, Abigail Cross,

*Intervenors-Plaintiffs-Appellees*

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education;
U.S. DEPARTMENT OF EDUCATION,

*Defendants-Appellants.*

*On appeal from the United States District Court*
*for the Eastern District of Kentucky - No. 2:24-cv-00072*

———————

## Plaintiffs-Appellees' Response Brief

———————

JONATHAN SKRMETTI
   *Attorney General of Tennessee*
J. MATTHEW RICE
   *Solicitor General*
WHITNEY D. HERMANDORFER
   *Director of Strategic Litigation*
HARRISON GRAY KILGORE
VIRGINIA N. ADAMSON
   *Strategic Litigation Counsel and*
   *Assistant Solicitors General*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL
  P.O. Box 20207
  Nashville, Tennessee 37202
  (615) 741-8726
  Whitney.Hermandorfer@ag.tn.gov

RUSSELL COLEMAN
   *Attorney General of Kentucky*
MATTHEW F. KUHN
   *Solicitor General*
JOHN H. HEYBURN
   *Principal Deputy Solicitor General*
OFFICE OF THE KENTUCKY
ATTORNEY GENERAL
  700 Capital Avenue, Suite 118
  Frankfort, Kentucky 40601
  (502) 696-5300
  Matt.Kuhn@ky.gov

  *Additional counsel listed in signature
block*

# TABLE OF CONTENTS

STATEMENT RESPECTING ORAL ARGUMENT ............................................1

INTRODUCTION .....................................................................................2

STATEMENT OF THE ISSUES ...............................................................4

STATEMENT OF THE CASE ...................................................................5

    A. Congress passes Title IX to remedy discrimination against women. ......5

    B. Title IX for decades allows sex-separated programs and facilities. .........7

    C. The Department shifts its stance on what "sex" means in Title IX. .........8

    D. The Department finalizes a rule revolutionizing Title IX. ......................9

    E. The States secure preliminary relief against the entire Rule. ................14

    F. This Court and the Supreme Court affirm the States' relief..................15

SUMMARY OF ARGUMENT.................................................................16

ARGUMENT............................................................................................19

   I. The Supreme Court's Stay Analysis Dictates Affirmance. ........................19

   II. The States Will Likely Succeed on the Merits........................................20

    A. The sex-discrimination provisions (§§ 106.10, 106.31) are unlawful....20

      1. Title IX exclusively bars male-female discrimination while allowing some sex separation. ...........................................................................21

      2. *Bostock* does not extend to Title IX's education regime....................26

      3. Even if *Bostock* applies, the Rule's sex-discrimination provisions are invalid. ..............................................................................................37

    B. The expanded harassment definition (§ 106.2) is unlawful...................41

    C. The Rule is arbitrary and capricious. ....................................................48

   III. The Remaining Factors Favor Preliminary Relief. ......................................52

    A. The Rule will inflict significant irreparable harm on the States............52

    B. The equities and public interest favor preliminary relief.......................54

   IV. Enjoining the Entire Rule Was Not an Abuse of Discretion. .................55

CONCLUSION ........................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. v. Metro. Sch. Dist. of Martinsville*,
   75 F.4th 760 (7th Cir. 2023) ...............................................................28

*Alabama v. Cardona*,
   No. 24-12444, slip op. (11th Cir. Aug. 22, 2024) ....................*passim*

*B.P.J. v. W.Va. Bd. of Educ.*,
   98 F.4th 542 (4th Cir. 2024) ...............................................10, 29, 33

*Banner Health v. Price*,
   867 F.3d 132 (D.C. Cir. 2017)...............................................................48

*Bostock v. Clayton County*,
   590 U.S. 644 (2020)......................................................................*passim*

*Cape v. TSSAA*,
   563 F.2d 793 (6th Cir. 1977) ........................................................24, 32

*Childers v. Casey Cnty. Sch. Dist. Bd. of Educ.*,
   2024 WL 3623527 (6th Cir. Aug. 1, 2024) .......................................28

*Chisholm v. St. Marty's City Sch. Dist. Bd. of Educ.*,
   947 F.3d 342 (6th Cir. 2020) .............................................................28

*Corner Post, Inc. v. Bd. of Gov'rs of Fed. Rsrv. Sys.*,
   144 S. Ct. 2440 (2024)......................................................................22

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
   562 U.S. 277 (2011)...........................................................................22

*Dambrot v. Central Mich. Univ.*,
   55 F.3d 1177 (6th Cir. 1995) .............................................................47

*Davis v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999)......................................................................*passim*

iii

*Delek US Holdings, Inc. v. United States*,
  32 F.4th 495 (6th Cir. 2022) ................................................................26

*Dep't of Educ. v. Louisiana*,
  2024 WL 3841071 (U.S. Aug. 16, 2024) ..................................*passim*

*Dodds v. U.S. Dep't of Educ.*,
  845 F.3d 217 (6th Cir. 2016) ...............................................................39

*Doster v. Kendall*,
  54 F.4th 398 (6th Cir. 2022) ................................................................57

*Gazeli v. Session*,
  856 F.3d 1101 (6th Cir. 2017) .............................................................22

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1998) ...............................................................................6

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ........................................................28, 29

*Gross v. FBL Fin. Serv., Inc.*,
  557 U.S. 167 (2009) .............................................................................30

*Grove City Coll. v. Bell*,
  465 U.S. 555 (1984) .............................................................................23

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) ...............................................................................46

*Hawkins v. Anheuser-Busch, Inc.*,
  517 F.3d 321 (6th Cir. 2008) ...............................................................46

*Hazen Paper Co. v. Biggins*,
  507 U.S. 604 (1993) .............................................................................33

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) .............................................................................36

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  585 U.S. 878 (2018) .............................................................................47

*In re Juntoff,*
    76 F.4th 480 (6th Cir. 2023) ................................................................43

*Kansas v. Dep't of Educ.,*
    2024 WL 3273285 (D. Kan. July 2, 2024). ......................................26

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
    57 F.4th 791 (11th Cir. 2022) ...................................................*passim*

*Kent v. Johnson,*
    821 F.2d 1220 (6th Cir. 1987) ............................................................49

*Kentucky v. Biden,*
    23 F.4th 585 (6th Cir. 2022) ...............................................21, 29, 54

*Kentucky v. Biden,*
    571 F. Supp. 3d 715 (E.D. Ky. 2021) ................................................52

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2022) ........................................................35, 36

*Kisor v. Wilkie,*
    588 U.S. 558 (2019)............................................................................24

*Kluge v. Brownsburg Cmty. Sch. Corp.,*
    No. 21-2475 (7th Cir.) .......................................................................45

*Kollaritsch v. Mich. State. Univ. Bd. of Trs.,*
    944 F.3d 613 (6th Cir. 2019) .............................................................28

*Ky. Riverkeeper, Inc. v. Rowlette,*
    714 F.3d 402 (6th Cir. 2013) .............................................................50

*L.M. v. Middleborough,*
    677 F. Supp. 3d 29 (D. Mass. 2023).............................................14, 46

*L.W. v. Skrmetti,*
    83 F.4th 460 (6th Cir. 2023) ....................................................*passim*

*Loper Bright Enter. v. Raimondo,*
    144 S. Ct. 2244 (2024)...............................................................24, 43

*Louisiana v. Dep't of Educ.*,
  2024 WL 3452887 (5th Cir. July 17, 2024) ......................................................54

*Maryland v. King*,
  567 U.S. 1301 (2012).........................................................................................54

*Mayor of Baltimore v. Azar*,
  973 F.3d 258 (4th Cir. 2020) ..............................................................................56

*Meister v. U.S. Dep't of Agric.*,
  623 F.3d 363 (6th Cir. 2020) .......................................................................39, 48

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) .....................................................................*passim*

*Million v. Warren County*,
  856 F. App'x 1 (6th Cir. 2021) ...........................................................................31

*N. Haven Bd. of Educ. v. Bell*,
  456 U.S. 512 (1982).............................................................................................5

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012).........................................................................................36

*Ohio v. EPA*,
  144 S. Ct. 2040 (2024).....................................................................................56

*Parents Defending Educ. v. Oletangy Local Sch. Dist. Bd. of Educ.*,
  2024 WL 3565635 (6th Cir. July 29, 2024) ......................................................44

*Pelcha v. MW Bancorp, Inc.*,
  988 F.3d 318 (6th Cir. 2021) .......................................................................27, 33

*Rowles v. Curators of the Univ. of Mo.*,
  983 F.3d 345 (8th Cir. 2020) ..............................................................................47

*Saxe v. State Coll. Area Sch. Dist.*,
  240 F.3d 200 (3d Cir. 2001) .........................................................................46, 47

*South Dakota v. Dole*,
  483 U.S. 203 (1987).....................................................................................36, 48

vi

*Speech First, Inc. v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) ..................................................................46

*Speech First v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) .....................................................13, 46

*Tennessee v. Cardona*,
   2024 WL 3453880 (6th Cir. July 17, 2024) ................................*passim*

*Tennessee v. Dep't of Educ.*,
   104 F.4th 577 (6th Cir. 2024) .....................................................*passim*

*Texas v. Cardona*,
   2024 WL 3658767 (N.D. Tex. Aug. 5, 2024) .......................10, 21, 26

*Texas v. Johnson*,
   491 U.S. 397 (1989) .............................................................................47

*Texas v. United States*,
   201 F. Supp. 3d 810 (N.D. Tex. 2016) ..................................................8

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) .......................................................................23, 33

*Vernonia Sch. Dist. 47J v. Acton*,
   515 U.S. 646 (1995) .............................................................................32

*Virginia Uranium, Inc. v. Warren*,
   587 U.S. 761 (2019) .............................................................................37

*Wallace v. FedEx Corp.*,
   764 F.3d 571 (6th Cir. 2014) ..............................................................27

*West Virgina v. EPA*,
   597 U.S. 697 (2022) .......................................................................40, 41

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist.*
   *No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017)............................28

*Will v. Mich. Dep't of State Police*,
   491 U.S. 58 (1989) ...............................................................................36

*Williams v. Sch. Dist. of Bethlehem*,
  998 F.2d 168 (3d Cir. 1993) ...............................................................26

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972)...........................................................................36

**Constitution & Statutes**

U.S. Const. art. I, § 8, cl. 1...............................................................5, 35, 42

U.S. Const. amend. I ........................................................................*passim*

15 U.S.C. § 1681m(a) .............................................................................30

Title IX of the Educational Amendments Act of 1972,
  20 U.S.C. § 1681 *et seq.*. ................................................................*passim*

  20 U.S.C. § 1681(a) .......................................................................*passim*

  20 U.S.C. § 1681(a)(5) .......................................................................6, 25

  20 U.S.C. § 1681(a)(6) .......................................................................6, 25

  20 U.S.C. § 1681(a)(7) .....................................................................25, 32

  20 U.S.C. § 1681(a)(8) .......................................................................6, 25

  20 U.S.C. § 1681(a)(9) .......................................................................6, 25

  20 U.S.C. § 1682............................................................................7

  20 U.S.C. § 1686............................................................................*passim*

  20 U.S.C. § 1687............................................................................6

  20 U.S.C. § 1689(a)(6) ........................................................................26

Title VII of the Civil Rights Act of 1964,
  42 U.S.C. § 2000e *et seq.*................................................................*passim*

  42 U.S.C. § 2000e-2(e) .......................................................................30

  42 U.S.C. § 2000e-2(m)........................................................................33

  42 U.S.C. § 2000e-5(g)(2) .....................................................................33

Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ...........................33

88 Stat. 484 (1974)..................................................................................................7

**Regulations and Administrative Materials**

34 C.F.R. § 106.2 (proposed 2024)....................................................*passim*

34 C.F.R. § 106.10 (proposed 2024)..................................................*passim*

34 C.F.R. § 106.31(a)(2) (proposed 2024) .........................................*passim*

34 C.F.R. part 106 (2023)

      § 106.32 ..........................................................................................23

      § 106.33 ..............................................................................7, 23, 32

      § 106.34(a)(3)-(4) ..............................................................7, 23, 24

      § 106.34(a)(1) .........................................................................23, 32

      § 106.34(a)(4) ..............................................................................24

      § 106.34(b)...................................................................25, 26, 40

      § 106.41 .............................................................8, 23, 26, 32

      § 106.44 ..........................................................................................42

39 Fed. Reg. 25,667 (July 12, 1974)..................................................24

40 Fed. Reg. 24,127 (June 4, 1975) ...................................................7

U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in
   Education Programs or Activities Receiving Federal Financial
   Assistance, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020)...................7

      85 Fed. Reg. at 30,036 ...............................................................41

      85 Fed. Reg. at 30,037 ...............................................................43

      85 Fed. Reg. at 30,151-52..........................................................46, 51

      85 Fed. Reg. at 30,161-65..........................................................13

85 Fed. Reg. at 30,177-78.................................................................8

87 Fed. Reg. 41,390 (July 12, 2022)................................................10

    87 Fed. Reg. at 41,394............................................................35

U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in
    Education Programs or Activities Receiving Federal Financial
    Assistance: Sex-Related Eligibility Criteria for Male and Female
    Athletic Teams, 88 Fed. Reg. 22,860 (Apr. 13, 2023) ......................10

    88 Fed. Reg. 22,860-61 ..........................................................10

U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in
    Education Programs or Activities Receiving Federal Financial
    Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024)......................*passim*

    89 Fed. Reg. at 33,474............................................................56

    89 Fed. Reg. at 33,476............................................................56

    89 Fed. Reg. at 33,492............................................................45

    89 Fed. Reg. at 33,498........................................................41, 46

    89 Fed. Reg. at 33,516........................................................13, 45

    89 Fed. Reg. 33,516...............................................................51

    89 Fed. Reg. at 33,528............................................................27

    89 Fed. Reg. at 33,541-43........................................................53

    89 Fed. Reg. at 33,542........................................................37, 53

    89 Fed. Reg. at 33,756............................................................38

    89 Fed. Reg. at 33,559-62....................................................53, 56

    89 Fed. Reg. at 33,859-62........................................................56

    89 Fed. Reg. at 33,883............................................................38

    89 Fed. Reg. 33,802-09........................................................27, 29

89 Fed. Reg. at 33,809 ........................................................37, 38

89 Fed. Reg. at 33,811 ........................................................*passim*

89 Fed. Reg. at 33,814-15 ........................................................39

89 Fed. Reg. at 33,814-21 ........................................................32

89 Fed. Reg. at 33,819 ........................................................50, 51

89 Fed. Reg. 33,819 n.90 ........................................................37

89 Fed. Reg. at 33,820 ........................................................49, 50

89 Fed. Reg. at 33,821 ........................................................8, 50

89 Fed. Reg. at 33,822 ........................................................51

89 Fed. Reg. at 33,851 ........................................................52, 53

89 Fed. Reg. at 33,859-60 ........................................................56

89 Fed. Reg. at 33,884 ........................................................42, 43

89 Fed. Reg. at 33,885-86 ........................................................48

89 Fed. Reg. at 33,886 ........................................................*passim*

89 Fed. Reg. at 33,887 ........................................................44

89 Fed. Reg. at 33,888-89 ........................................................42, 48

U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., Dear
    Colleague Letter on Gender Identity Guidance (Feb. 22, 2017) .............8, 10, 33

**Other Authorities**

117 Cong. Rec. 30,407 (1971) ........................................................6, 24

118 Cong. Rec. 5,807 (1972) ........................................................6, 32

*American Heritage Dictionary of the English Language*
    (rev. ed. 1976) ........................................................21, 22

*Random House College Dictionary* (rev. ed. 1975) ........................................................21

## STATEMENT RESPECTING ORAL ARGUMENT

It is the position of Plaintiff-Appellee States that the U.S. Supreme Court's decision in the stay phase of this matter, *see Dep't of Educ. v. Louisiana*, 2024 WL 3841071 (Aug. 16, 2024), resolves the principal issues in this appeal. To the extent there are any issues outstanding, the States agree with the federal government that oral argument would aid the Court's consideration of the case.

## INTRODUCTION

The U.S. Supreme Court unanimously agreed that Plaintiff-Appellee States "were entitled to preliminary injunctive relief as to three provisions of the rule"—the definition of sex discrimination (§ 106.10), the de minimis provision (§ 106.31(a)(2)), and the expanded harassment definition (§ 106.2). *Dep't of Educ. v. Louisiana*, 2024 WL 3841071, at *1 (U.S. Aug. 16, 2024) (per curiam); *id.* at *2 (Sotomayor, J., dissenting). The majority further determined that the Department failed to show how a court could sever those unlawful provisions. *Id.* at *1. That binding holding should end this appeal.

All thirteen jurists to review the States' challenge concluded the Rule's central provisions should not take effect now. (The Rule is enjoined in all twenty-six States to mount a challenge.) This consensus dispels any illusion (at 12, 18) that the Rule merely "clarifies" Title IX's longstanding limit on "sex" discrimination. Instead, the Rule adopts a controversial worldview about "gender identity," orders schools in every State to conform their policies to that view, and threatens dissenters with billions in lost funding. *See* 89 Fed. Reg. 33,474 (Apr. 29, 2024). Under the Rule, schools can violate Title IX if they do not:

- let males into female restrooms,
- let males shower and undress in female locker rooms,
- let males box and wrestle females in gym class,
- let males share a room with females on overnight trips,

- punish students and teachers who refuse to use "preferred pronouns,"
- punish students and teachers who express "offensive" views on same-sex marriage, abortion, gender identity, or other controversial topics,

and more. But Congress passed Title IX with strong bipartisan majorities in 1972 to equalize educational opportunities for women, not undermine them. Nothing in that statute warns States that taking federal money means consenting to the Rule's radical changes. Yet the Department seeks to impose them nationwide—vitiating students' and educators' privacy, risking their safety, and forfeiting the hard-won progress of women to appease certain men's subjective "sense" of gender.

The Department's defense of the Rule cannot overcome the Supreme Court's holding and fails on its own terms. On the merits, the Department exclusively advances (at 11-12, 18-20) an "apply-*Bostock*" mantra. But this Court's cases stress that *Bostock*'s Title VII holding is no glide path to rewriting laws with distinct text, structures, histories, and purposes. And here, Title IX bars only male-female discrimination while expressly allowing schools to separate the sexes in certain places and programs. The Rule's sex-discrimination definition distorts Title IX's meaning by covering grounds distinct from sex; the de minimis provision does the same by invalidating sex separation Title IX has always authorized. The expanded harassment definition compounds these flaws by policing pronouns and other controversial speech, jumping the Supreme Court's deliberate liability guardrails.

The district court—in reasoning the stay panel and Supreme Court

approved—correctly held that the States' irreparable harm and the balance of equities favored geographically limited interim relief.  The Rule triply harms the States by saddling them with "onerous" burdens and unrecoverable costs, threatening significant funding losses for following existing state policies, and overriding duly enacted laws that protect privacy, safety, and educational success.  *See Tennessee v. Cardona*, 2024 WL 3453880, at *4 (6th Cir. July 17, 2024).  Meanwhile, preliminary relief would not meaningfully harm the Department, which took some three years to adopt the Rule and has no interest in enforcing unlawful mandates.

The Department's ask to impose part of the Rule now remains unwarranted.  The Rule's boilerplate severability language cannot sustain provisions that make no sense standing alone; nor can it defeat the district court's holding that the Rule's illogic rendered it "invalid in its entirety."  Op., R.100, PageID#2085.  Much less has the Department overcome, on an abuse-of-discretion standard, the district court's extensive findings that partial compliance could compound the States' unrecoverable costs and cause confusion.  This Court should affirm.

## STATEMENT OF THE ISSUES

Departing from fifty years of practice, the Department adopted a Final Rule that reinterprets Title IX to impose sweeping gender-identity mandates.  The district court, a panel of this Court, and the Supreme Court agreed the States "were entitled to preliminary injunctive relief," *Louisiana*, 2024 WL 3841071, at *1, and held the

entire Rule should remain enjoined pending appeal.  The issues presented are:

1.    Whether the Rule is likely unlawful because it impermissibly alters the meaning of Title IX's prohibition on "sex" discrimination and harassment and rests on arbitrary-and-capricious reasoning.

2.    Whether the district court abused its discretion by concluding that the States' "extraordinary" harm and the equities support preliminary relief.

3.    Whether the district court and a panel of this Court correctly held that the Rule's defects warrant temporarily enjoining the entire Rule.

## STATEMENT OF THE CASE

### A.    Congress passes Title IX to remedy discrimination against women.

Well into the twentieth century, women and girls found themselves excluded from many "invaluable" educational opportunities.  *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 821 (11th Cir. 2022) (en banc) (Lagoa, J., concurring).  In the early 1970s, congressional committees convened to study this problem.  *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523 & n.13 (1982).  Congress's solution, Title IX, passed with large margins in 1972.

Title IX is a Spending-Clause statute.  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999).  It conditions schools' federal funding on their following Title IX's directives.  The core command: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

This nondiscrimination mandate applies across educational programs.  20 U.S.C. § 1687.  But Title IX explicitly permits several sex-based practices.  Public colleges with "traditional and continuing" policies of admitting "only students of one sex" can maintain those policies.  *Id.* § 1681(a)(5).  Schools can subsidize social fraternities and sororities and other groups "limited to persons of one sex" like Boys and Girls State and Boy Scouts and Girl Scouts.  *Id.* § 1681(a)(6)-(7).  Also permitted are scholarships for "beauty" pageants open to "one sex only."  *Id.* § 1681(a)(9).  And schools can sponsor father-son or mother-daughter activities if they provide "reasonably comparable activities" for "the other sex."  *Id.* § 1681(a)(8).

Section 1686 instructs that Title IX's sex-discrimination ban cannot be "construed" to prohibit "separate living facilities for the different sexes."  As Title IX's co-sponsor noted, this provision aims to "preserve[]" students' "personal privacy."  Title IX thus does not "desegregate" the sexes across all spaces and activities.  117 Cong. Rec. 30,407 (1971); 118 Cong. Rec. 5,807 (1972) (statements of Sen. Bayh).

Title IX also prohibits sexual harassment of students by teachers and other students.  *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998); *Davis*, 526 U.S. at 632-33.  But in *Davis*, the Supreme Court placed "very real limitations" on actionable student-on-student harassment to curtail constitutional

6

concerns.  526 U.S. at 652.  A school must be "deliberately indifferent" to harassment.  *Id.* at 647.  And the harassment must be "so severe, pervasive, and objectively offensive" that it "denies" its victims an equal education.  *Id.* at 650-52.

Title IX immediately prompted questions about college sports.  In response, Congress enacted the Javits Amendment.  That law directed the Department's predecessor (HEW) to propose regulations "implementing" Title IX's central "prohibition," including as to "intercollegiate athletic activities," through "reasonable provisions considering the nature of particular sports."  88 Stat. 484, 612 (1974).

### B.    Title IX for decades allows sex-separated programs and facilities.

Following Congress's direction, *id.*; 20 U.S.C. § 1682, HEW quickly adopted Title IX regulations, 40 Fed. Reg. 24,127 (June 4, 1975).

Then and now, these regulations treat sex as binary and "expressly acknowledge[] physiological differences between the male and female sexes." Dep't of Educ., Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,178 (May 19, 2020).  One regulation clarifies that schools can have sex-separated "toilet, locker room, and shower facilities."  34 C.F.R. § 106.33.  Others allow sex separation in physical-education classes, classes dealing with "human sexuality," and choruses "based on vocal range or quality."  *Id.* § 106.34(a)(3), (4).  And schools can generally separate after-school sports involving contact or selection based on

7

"competitive skill." *Id.* § 106.41(b). The Department agrees that these regulations interpret Title IX's general discrimination provision and permit sex-separated programs. 89 Fed. Reg. at 33,821; PI Opp'n, R.73, PageID#1560; *see also Tennessee v. Dep't of Educ.*, 104 F.4th 577, 610 (6th Cir. 2024).

### C.    The Department shifts its stance on what "sex" means in Title IX.

After decades of reading "sex" in Title IX to encompass only the male-female binary, the Department changed course with 2016 guidance that read Title IX to cover "gender identity." DOJ & Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Title IX and Transgender Students, at 2 (May 13, 2016), R.132-2, PageID#3876 [hereinafter 2016 Dear Colleague Letter]. Reasoning that "sex" in Title IX unambiguously *excludes* "gender identity," a federal court enjoined that guidance and the Trump Department rescinded it. *See Texas v. United States*, 201 F. Supp. 3d 810, 831-34 (N.D. Tex. 2016); DOJ & U.S. Dep't of Educ., Off. for Civ. Rts., Dear Colleague Letter on Gender Identity Guidance, at 1 (Feb. 22, 2017), https://perma.cc/H6E3-YBEZ.

Current Title IX rules, as amended in 2020, align with Title IX's text, *Davis*, and distinctions between Title IX and Title VII. The 2020 rule did not import "gender identity" into Title IX since "Title IX and its implementing regulations … presuppose sex as a binary classification." 85 Fed. Reg. at 30,177-78. The rule also prohibited "harassment" for the first time via regulation by "adopt[ing]" *Davis*'s

definition of sexual harassment "verbatim" and shunning broader definitions that had "infringed on constitutionally protected speech." *Id.* at 30,036, 30,151-52, 30,162-65 & nn.738-39.

One month after the 2020 rule's publication, the Supreme Court decided *Bostock v. Clayton County*, 590 U.S. 644 (2020). The Department concluded that *Bostock* did not affect Title IX rules, however, because "Title IX['s] text is very different from Title VII['s]." DOJ, Off. for Civ. Rts., Memorandum re: Bostock v. Clayton Cnty., at 1 (Jan. 8, 2021), perma.cc/CJE3-GH52 [hereinafter *Bostock* Mem.]. Unlike Title VII, Title IX has "statutory and regulatory text permitting or requiring biological sex to be taken into account in an educational setting" and often treats "biological sex" as "relevant." *Id.* at 6-7.

### D.     The Department finalizes a rule revolutionizing Title IX.

On his first day in office, President Biden directed every agency to adopt the position that "laws that prohibit sex discrimination" also "prohibit discrimination on the basis of gender identity." Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 20, 2021). This mandate expressly included "Title IX." *Id.*

The Department first attempted to impose this view via guidance. But this Circuit agreed with enjoining that guidance as procedurally invalid since it "extend[ed] Title IX's protections to new forms of sex discrimination" in "conflict[]" with the Department's current regulations." *Tennessee*, 104 F.4th at 609-10; *accord*

9

*Texas v. Cardona*, 2024 WL 3658767, at \*43-45 (N.D. Tex. Aug. 5, 2024). Unde-terred, the Department has filed amicus briefs arguing that Title IX's coverage of gender identity requires invalidating the Department's *own* regulation allowing sex-separate sports. *See, e.g.*, U.S. Br. at 24-27, *B.P.J. v. W.Va. Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024), *petition for cert. filed* (U.S. July 16, 2024) (No. 24-43). And it has enforced its novel view of Title IX as barring so-called "misgendering" and re-quiring access to bathrooms based on gender identity. *E.g.*, Arlington (TN) OCR Compl., R.92-3, PageID#1859. The Department has made the same claim about student "housing." 2016 Dear Colleague Letter, at 4, R.132-2, PageID#3878.

Eventually, the Department proposed a rule that would amend the Title IX regulations to reflect its gender-identity positions. *See* 87 Fed. Reg. 41,390 (July 12, 2022). It followed this with a second rule proposing that schools would typically violate Title IX by enforcing "sex-related eligibility criteria" to deny access to sports teams. *See* 88 Fed. Reg. 22,860, 22,860-61 (Apr. 13, 2023). The Department has delayed finalizing that rule.

Both proposals generated hundreds of thousands of comments in opposition—including filings led by Tennessee, Indiana, and Ohio. *See* R.1-3, R.1-4, R.1-5. Among other things, commenters argued the rule contravened Title IX and constitu-tional limits and presented risks to students' safety. Tenn. Comment, R.1-3, PageID#512-15, 519-22. In support, Tennessee detailed nearly a dozen examples of

10

attacks on women in intimate facilities like bathrooms.  *Id.* at PageID#519-20.

Two years later, the Department finalized the rule governing schools' general Title IX obligations.  *See* R.1-2, 89 Fed. Reg. 33,474.  Though the Final Rule imposes a slew of new procedural and training requirements, the Department gave schools mere months over the summer to comply.  *Id.* at 33,476.  Three of its provisions are most relevant here: § 106.10's definition of sex discrimination, § 106.31's de minimis provision, and § 106.2's definition of harassment.

**Definition of sex discrimination (§ 106.10).**  The Rule redefines sex discrimination to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  *Id.* at 33,886 (proposed 34 C.F.R. § 106.10).  Even that list is "not exhaustive."  *Id.* at 33,512.  The Rule does not dispute that "sex" means "biological sex."  It contends that *Bostock clarifies* that, "even assuming 'sex' means 'biological sex,'" Title IX's "prohibition on sex discrimination encompasses discrimination on the basis of … gender identity" and § 106.10's other bases.  *Id.* at 33,493, 33,807.

The Rule declines to define "gender identity," except to call it an internal, subjective "sense."  *Id.* at 33,809.  Yet attempting to verify a person's subjective "gender identity"—by requesting "documentation," for instance—violates Title IX under the Rule.  *Id.* at 33,819.  And the Rule's protections cover anyone "participating or attempting to participate" in a recipient's program or activity; this includes

11

students from other schools, visiting lecturers, and members of the public attending on-campus events.  *Id.* at 33,809 (emphasis added).

**De minimis provision (§ 106.31(a)(2)).**  Title IX and its implementing regulations *allow* schools to separate spaces by sex.  So merely adding "gender identity" to § 106.10's new definition of sex discrimination wouldn't satisfy all the Department's gender-identity aims.  Enter § 106.31(a)(2), which introduces "de minimis harm."  Under that standard, even when Title IX allows "different treatment or separation on the basis of sex," a school may violate Title IX if such treatment imposes "more than de minimis harm" on any student based on "sex."  *Id.* at 33,887.  And preventing individuals from participating in covered programs "consistent with their gender identity," the Rule explains, *always* imposes "more than de minimis harm on the basis of sex."  *Id.*

The de minimis provision divides Title IX's exceptions for sex differentiation into two classes.  If an exception appears in a regulation interpreting Title IX's sex-discrimination ban, then schools must allow students to participate based on gender identity.  *See id.* at 33,821.  But if the exception appears in the statute or a regulation interpreting a statutory exception, then schools can require participation based on sex, not gender identity.  *Id.* at 33,816-17, 33,821.  In the latter cases, the Rule posits, Congress authorized schools to inflict more than de minimis discriminatory harm on students whose sex and gender identities differ.  *Id.* at 33,816-17.  Citing the Javits

12

Amendment and the athletics regulation's "longstanding" nature, the Rule also says "harm"-causing separation is kosher in after-school sports, even though the Javits Amendment did not address sex separation and the Department's gym-class and bathroom regulations are just as "longstanding." *Id.*

**Redefinition of sexual harassment (§ 106.2).** The Rule also redefines actionable harassment under Title IX. The Rule not only expands the scope of harassment to include all bases—including gender identity—set out in the new § 106.10; it also replaces the 2020 rule's *Davis* standard with something "broader." *Id.* at 33,498. Under proposed § 106.2, schools can be liable for student-on-student harassment that is "severe *or* pervasive" and that "limits *or* denies" the victim's education. *Id.* at 33,884 (emphases added). Thus, the Rule rejects *Davis*'s construction of "discrimination" in Title IX.

The Rule disputes that this broader harassment definition will force schools (and public universities especially) to violate the First Amendment. *But see, e.g., Meriwether v. Hartop*, 992 F.3d 492, 509-11 (6th Cir. 2021); *Speech First v. Cartwright*, 32 F.4th 1110, 1125-27 (11th Cir. 2022). The Department's 2020 rule said the opposite in aligning harassment with *Davis*. 85 Fed. Reg. at 30,161-65 & nn.738-39. The Rule agrees its view of harassment might dictate speech about preferred pronouns and related controversial topics. *See* 89 Fed. Reg. at 33,516

13

(misgendering); *id.* at 33,504 (citing with approval *L.M. v. Middleborough*, 677 F. Supp. 3d 29 (D. Mass. 2023)).

### E.    The States secure preliminary relief against the entire Rule.

The Rule gave schools until August 1 to comply.  The States sued and sought preliminary relief to stave off impending harm, *see* Compl., R.1, which they substantiated with sixty-plus pages of declarations, *see* R.19-2-16; R.92-1-2.

At a hearing, the States presented live testimony from three witnesses that further detailed the immense compliance efforts and expenses the Rule would require.  *See* Tr., R.109, PageID#2131-42.  The looming risk of lost funding inflicted independent budgetary and operational harms.  *Id.* at PageID#2156-68.  And implementing the Rule "in part" "could be incredibly confusing to districts" and "might require" incurring double costs and time to "train[] again later."  *Id.* at PageID#2142. Defendants offered no contrary evidence.

The district court's ninety-three-page opinion granted preliminary relief.  Op., R.100, PageID#2088.  In reasoning adopted by several other courts, *see* Dep't. Br. 8 n.1, the district court concluded that the Rule transgressed Title IX, the U.S. Constitution, and the APA.  Op., R.100, PageID#2011-74.  It also found that the States' and Intervenors' impending harms and the equities weighed in favor of maintaining the "longstanding" Title IX status quo.  *Id.* at PageID#2074-83.  The district court "limited" its injunction "to the plaintiff-States" but agreed that enforcement of the

14

whole Rule should be temporarily enjoined. *Id.* at PageID#2083-86, 2088. The district court reaffirmed the scope of its relief in an opinion denying the Department's partial-stay request. *See* Stay Op., R.117, PageID#2392-2400.

### F. This Court and the Supreme Court affirm the States' relief.

This Court also denied the government's partial-stay request. *Tennessee v. Cardona*, 2024 WL 3453880, at *5. Chief Judge Sutton explained that the panel all "agree[d] that th[e] central provisions of the Rule" relevant here "should not be allowed to go into effect on August 1." *Id.* at *3. The majority explained that "the Rule's definition of sex discrimination" likely "exceeds the Department's authority" under Title IX. *Id.* at *2-3. And it declined to sever these provisions because their defects "appear to touch every substantive provision." *Id.* at *3-4.

The U.S. Supreme Court likewise denied a partial stay. Both the majority and dissent noted that *all* Justices "accept that the plaintiffs *were entitled to preliminary injunctive relief* as to three provisions of the rule"—*i.e.*, the same provisions now on appeal. *Supra* p.2 (quoting opinions) (emphasis added). The majority further concluded that the Department had not provided "a sufficient basis to disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule." *Louisiana*, 2024 WL 3841071, at *1. The "difficulty that schools would face in determining how to apply

15

the rule for a temporary period with some provisions in effect and some enjoined" also supported maintaining the injunction as-is.  *Id.*

This Court expedited consideration of the preliminary-injunction appeal *sua sponte* and scheduled oral argument for the October sitting.  Meanwhile, the case has moved apace in district court; the parties are set to complete summary-judgment briefing by September 13.  Order, R.121, PageID#2424-25.

## SUMMARY OF ARGUMENT

This Court should affirm entry of preliminary relief against the Department's unprecedented Title IX Rule.

I.  All nine Justices agreed that the States are "entitled to preliminary relief" as to the three provisions at issue.  *See Louisiana*, 2024 WL 3841071, at *1.  And the Supreme Court majority approved enjoining the whole Rule, citing the stay panel's analysis.  Those conclusions control this appeal.

II.  Supreme Court holding aside, the States are likely to succeed on the merits of their challenge because the Rule flouts statutory, constitutional, and APA limits.

A.  Both the Rule's sex-discrimination definition (§ 106.10) and de minimis provision (§ 106.31(a)(2)) are unlawful.

1.  Title IX's prohibition on "sex" discrimination has a clear and settled meaning: It bars schools from unjustly differentiating between males and females when providing facilities, programs, and activities.   Contrary to the Rule's sex-

16

discrimination definition, Title IX does not permit the Department to police bases other than sex.  Nor does Title IX authorize the de minimis provision's rejection of longstanding sex-separation policies that promote students' educational safety, privacy, and success.

2.  The Rule rests exclusively on *Bostock*.  But *Bostock* directs that its reasoning does not extend "beyond Title VII."  590 U.S. at 681.  Nor should this Court take that step itself given the significant differences between Title VII's and Title IX's regimes.  If doubt remained, applying *Bostock* runs aground on "important[]" interpretive canons that apply uniquely to Title IX.  *Tennessee*, 2024 WL 3453880, at *3.

3.  Even if *Bostock* applied, it would not justify the Rule's sweeping mandates.  *Bostock*'s switch-the-sex reasoning does not support § 106.10's coverage of traits that do not change depending on sex or that are divorced from sex entirely.  And *Bostock* disavows requiring § 106.31(a)(2)'s unprecedented gender-identity accommodations in bathrooms and the like.

B.  The Rule's expanded harassment definition (§ 106.2) is also invalid.

1.  The harassment definition incorporates § 106.10's bases and thus its legal flaws.  Separately, the Department concedes that its new harassment definition is "broader" than the scope of Title IX "harassment" the Supreme Court recognized in *Davis*, 526 U.S. at 650-52.  But the Department lacks authority to override the Supreme Court's interpretation.

17

2. *Davis* and the 2020 rule's similar "limitations" on harassment reflected grave First Amendment concerns about a broader regime. 526 U.S. at 652. The Rule's harassment expansion unconstitutionally compels, chills, and favors viewpoints of speech. The Rule's disclaimer that the harassment definition complies with the First Amendment doesn't make that so. Particularly where the Rule itself, and the Department's recent history, confirms the new harassment definition will require preferred-pronoun use, among other controversial speech infringements.

C. The Rule exemplifies arbitrary-and-capricious decisionmaking. It divides single-sex spaces in illogical ways, shirks commenters' significant privacy, safety, and constitutional concerns, and asks schools to restructure around an undefined and unverifiable "sense" of gender that can shift day to day.

III. The remaining factors support entry of preliminary relief.

A. The States will suffer irreparable compliance, funding-loss, and sovereignty harms should the Rule take effect. Each provides an independent basis for relief and has ample support in the district court's detailed findings.

B. Temporarily maintaining the longstanding Title IX rules would not meaningfully prejudice the Department's or the public's interests. The Department has no interest in enforcing an unlawful rule that supplants the States' duly enacted statutes. And its push for pace fails after delaying the Rule for years and then declining to defend two of three challenged provisions at the stay phase.

18

IV.  The stay panel and Supreme Court approved the scope of the district court's interim relief based on evidence about the costs and confusion a partial-rule rollout would inflict.  The Department nowhere addresses those equities, which the district court had latitude to weigh.  The Department's other arguments distort the States' positions or downplay the effect of the Rule's legal flaws.

## ARGUMENT

## I.    The Supreme Court's Stay Analysis Dictates Affirmance.

The Supreme Court's stay decision in this case dashes any hope the Department had for reversal.  The Court didn't just deny the Department's partial-stay request.  All Justices approved the propriety of entering preliminary relief:

> Importantly, all Members of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule, including the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity.

*Louisiana*, 2024 WL 3841071, at *1 (emphasis added).  The dissent reiterates that "[e]very Member of the Court agrees [the States] are entitled to interim relief as to three provisions of th[e] Rule."  *Id.* at *2 (Sotomayor, J., dissenting) (citing §§ 106.10, 106.31(a)(2), and 106.2's "hostile environment harassment" definition).

Those provisions were before the Court—with the Department's *Bostock* defense of § 106.10 featuring most prominently.  U.S. App. for Partial Stay 21-22, 28-38, *Louisiana*, 2024 WL 3841071, No. 24A79 (U.S. July 22, 2024); *accord* States'

19

Opp'n 9-14, 30-32, *id.* (U.S. July 26, 2024) (discussing §§ 106.31(a)(2) and 106.2). And the Court's statement means it "had to have found" that the States "met" "all" the preliminary injunction requirements. *Alabama v. Cardona*, No. 24-12444, slip op. at 3 n.1 (11th Cir. Aug. 22, 2024). So the States' right to relief here is settled.

The Court only disagreed about severability. And on that score, the majority approved enjoining the whole rule. The Department, the majority wrote, failed to rebut this Court's conclusion that "the new definition of sex discrimination is intertwined with and affects many other provisions of the new rule" and that schools would face "difficulty" partially implementing the Rule. *Louisiana*, 2024 WL 3841071, at *1. But the Department only recycles those same arguments here—and again fails to overcome the stay panel and district court's conclusion that the entire Rule should remain enjoined pending review. *Id.* at *1; *Alabama*, slip op. at 21. The Supreme Court's decision thus dictates affirmance outright.

## II.    The States Will Likely Succeed on the Merits.

All nine Justices agreed for good reason: The district court's "thorough" merits analysis was correct on all counts. *Tennessee*, 2024 WL 3453880, at *2.

### A.    The sex-discrimination provisions (§§ 106.10, 106.31) are unlawful.

The Rule radically alters the scope of "sex discrimination" in two ways. Section 106.10 redefines the term "sex discrimination" to include a suite of so-called "sex-based characteristics" including "sex stereotypes, sex characteristics,

pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886, 33,811. Section 106.31(a)(2) then specifies that a school usually discriminates when it requires that persons access sex-separated facilities and programs consistent with their sex rather than gender identity.

Neither provision obeys Title IX's ordinary meaning. Nor does *Bostock* support the Department's contrary position.

### 1. Title IX exclusively bars male-female discrimination while allowing some sex separation.

*Text.* Title IX directs that no student shall "be subjected to discrimination" "on the basis of sex." 20 U.S.C. § 1681(a). The "ordinary, contemporary, common meaning" of this phrase forecloses the Rule's broader reading. *Kentucky v. Biden*, 23 F.4th 585, 603 (6th Cir. 2022) (citation omitted).

As used with "subjected to," the term "discrimination" most naturally refers to "treatment or distinction not based on individual merit in favor of or against a person[ or] group." *The Random House College Dictionary* 379 (rev. ed. 1975).[1] The prohibition's use of two similar phrases—"excluded from participation in" and "denied the benefits of"—confirms this meaning. *See Texas*, 2024 WL 3658767, at *32 (citing associated-words canon). In interpreting a contemporary statute, the

---

[1] *See also* "Subject," *The American Heritage Dictionary of the English Language* 1282 (rev. ed. 1976) ("1. To subjugate; subdue. … 5. To cause to experience or undergo.").

21

Supreme Court likewise applied the definition of "discrimination" to mean "the 'failure to treat all persons equally when'" the differentially treated groups or individuals are "similarly situated" and "there is no justification for the difference in treatment." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 280, 286-87 (2011).

The Department now accepts (at 19, 21) that the term "sex" refers to "biological sex, i.e., discrimination between males and females." *Adams*, 57 F.4th at 815.

That leaves "on the basis of." As the district court explained, the "root word 'basis'" means "'foundation' or 'support.'" Stay Op., R.117, PageID#2385 (quoting *Basis, Oxford Dictionary of English Etymology*, 77 C. T. Onions, ed., 1966)); *see also American Heritage Dictionary*, *supra*, at 111 ("1. A foundation upon which something rests. 2. The chief or most stable component of anything: fundamental ingredient."); Stay Op., R.117, PageID#2385-86 (collecting definitions). Together with the definite article "*the*," this language shows that Title IX's "text focuses on a specific" basis for unlawful discrimination—"sex." *See Corner Post, Inc. v. Bd. of Gov'rs of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2455 (2024); *see also Gazeli v. Session*, 856 F.3d 1101, 1107 (6th Cir. 2017) (similar).

The upshot: Title IX, best read, prohibits "treating an individual *worse* than others who are similarly situated" "'based on biological sex'"—not based on any other characteristic that might (or might not) relate to sex. Op., R.100, PageID#2013-14 (quoting *Texas*, 2024 WL 2947022, at *32).

*Statutory and regulatory structure.* Congress's "structural choices" confirm that Title IX prohibits only discriminatory differentiation between males and females. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). The same goes for the Department's regulations, which "accurately reflect" Title IX's original meaning. *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984).

*First*, Title IX and the 1975 regulations rest on the binary meaning of "sex." *See supra* p.6-8 (collecting examples); *Tennessee*, 104 F.4th at 610.

*Second*, Title IX specifies that not all sex separation constitutes discrimination. Chief among relevant provisions is 20 U.S.C. § 1686, which allows schools to "maintain[] separate living facilities for the different sexes." Contra the Department (at 23), § 1686 does not except sex-separation that would otherwise be "discrimination." Quite the opposite: Section 1686 expressly instructs that "nothing" in Title IX, including the discrimination prohibition, "shall be construed to prohibit" sex-separated living facilities—full stop.

Since 1975, regulations have also allowed sex-separated housing, bathrooms, locker rooms, and showers, as well as sex-ed classes and choirs. 34 C.F.R. §§ 106.32-33, 106.34(a)(3)-(4). Permitted too is sex separation in all competitive after-school sports and in contact sports like "wrestling" and "boxing" during school. *Id.* §§ 106.34(a)(1), 106.41(b). These "longstanding," "consistent interpretation[s]" of Title IX provide "powerful *evidence*" that Title IX allows schools to maintain

23

some sex differentiation. *Kisor v. Wilkie*, 588 U.S. 558, 594 (2019) (Gorsuch, J., concurring); *accord Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244, 2258 (2024).

These provisions track broader discrimination principles. Physiological differences mean males and females are not "similarly situated" when it comes to "living facilities," like bathrooms, dorms, showers, and locker rooms, and programs, like sexual-education courses, that implicate students' "personal privacy." 117 Cong. Rec. 30,407 (1971) (Sen. Bayh); *accord* 39 Fed. Reg. 25,667 (July 12, 1974) (clarifying sex-ed classes can be "conducted separately" for "privacy"). The same goes for sports, where the sexes' physiological differences create distinct issues of fairness, access, and safety. *Cape v. TSSAA*, 563 F.2d 793, 795 (6th Cir. 1977); *Adams*, 57 F.4th at 818-21 (Lagoa, J., concurring). And the same is true for choirs, where the sexes have differing "vocal range[s]." 34 C.F.R. § 106.34(a)(4). Separating the sexes in such contexts does not treat similarly situated persons differently. It is simply not discrimination to regulate in light of the sexes' "enduring" physiological differences. *L.W. v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (collecting cases and quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)), *cert. granted* 2024 WL 3089532 (U.S. June 24, 2024).

*Third*, Title IX preserves sex separation in certain traditional contexts to ensure students retain access to important programs. Title IX directs that schools may operate or associate with programs traditionally open to members of only one sex,

24

like historically single-sex schools (§ 1681(a)(5)), Young Men's and Young Women's Christian Associations (§ 1681(a)(6)), Boy Scouts and Girl Scouts (*id.*), Greek life (*id.*), tax-exempt "voluntary youth service organizations … traditionally … limited to persons of one sex" (*id.*), and Boys and Girls State (§ 1681(a)(7)). The statute thereby safeguards valuable programs that cultivate social bonds among male or female youths and promote personal development and leadership. Another provision permits "'beauty' pageants" open to "one sex only," thus protecting a historical "scholarship" source for women in line with Title IX's aim. *See id.* § 1681(a)(9).

Still other statutory and regulatory exceptions allow certain sex-specific programs, so long as males and females are generally treated equally on a group level. Schools may for instance sponsor father-son and mother-daughter activities if students of "the other sex" are offered "reasonably comparable activities." *Id.* § 1681(a)(8). Schools may also offer nonvocational "single-sex classes" or activities if (i) doing so serves an "important objective," like "improv[ing] educational achievement" and the "single-sex nature … is substantially related to achieving that objective," and (ii) if the recipient provides a "substantially equal coeducational class" or activity. 34 C.F.R. § 106.34(b). And the athletics regulation allows sex-separate teams but requires recipients to provide "equal athletic opportunity for members of both sexes," as measured by group-level considerations like "[s]cheduling of games," "[p]rovision of … competitive facilities," "compensation of

25

coaches," and "[p]ublicity." *Id.* § 106.41(b)-(c).

*Fourth*, Congress knows how to legislate about sexual orientation and gender identity. Title IX provisions adopted in 2022 refer to "consideration of … lesbian, gay, bisexual, or transgender (commonly referred to as 'LGBT') status." 20 U.S.C. § 1689(a)(6). "Congress' use of 'explicit language'" in § 1689(a)(6) "cautions against inferring" coverage of the same traits "in another provision." *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 501 (6th Cir. 2022) (citation omitted).

*History.* History reveals that Title IX's purpose was "to root out … unequal treatment between men and women for admissions opportunities, scholarships, and sports." *Kansas v. Dep't of Educ.*, 2024 WL 3273285, at *9 (D. Kan. July 2, 2024). Thus, Title IX's text and structure direct that "the opposite biological sex" cannot be "treated worse with respect to full and equal enjoyment of educational opportunities" but allow "sex-specific programs" that don't violate that command. *Texas*, 2024 WL 3658767, at *33. There is no evidence, by contrast, that Congress enacted Title IX to address sexual orientation or gender identity—let alone in a way that would cause the very "exclusion of" women Title IX aimed to remedy. *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175-76 (3d Cir. 1993). Indeed, Congress has declined to add those bases to Title IX. *See* Op., R.100, PageID#2024-25.

## 2. *Bostock* does not extend to Title IX's education regime.

The Department has advanced no first-principles case for reading the Rule's

novel mandates into Title IX.  Instead, the Department insists (at 19, 24) with little analysis that the Rule merely "clarifies" Title IX's "unambiguous" meaning following *Bostock*.  *See, e.g.*, 89 Fed. Reg. at 33,528, 33,802, 33,804-05.  But both *Bostock* and this Court's cases decline to read that decision "beyond Title VII."  590 U.S. at 681.  And a deeper dive shows the Department got *Bostock* right the first time: That case does not bear on Title IX's distinct treatment of "sex" in the educational context.  *See supra* p.9.

### a.    This Court's decisions preclude applying *Bostock*.

The Department's apply-*Bostock* playbook clashes with this Court's cases. As the panel noted, 2024 WL 3453880, at *3, this Court has instructed that "principles announced in the Title VII context" do not "automatically apply in the Title IX context," *Meriwether*, 992 F.3d at 510 n.4.  The panel's Title IX analysis "receive[s] some measure of deference."  *Wallace v. FedEx Corp.*, 764 F.3d 571, 583 (6th Cir. 2014) (cited at 24).  Other cases establish "the narrow reach of [*Bostock*] and how it was limited only to Title VII itself."  *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).  This Court's *Bostock* precedents "make clear" that *Bostock*'s "text-driven reasoning applies only to Title VII."  *L.W.*, 83 F.4th at 484; *see* U.S. Pet. for Cert. at 30, *id.* (U.S. Nov. 6, 2023) (citing *L.W.* Court's "holding that *Bostock*'s 'reasoning applies only to Title VII'" as basis for certiorari).  The Eleventh Circuit recently agreed in enjoining the Rule.  *Alabama*, slip op. at 12-13.

27

The Department's counter-authorities do not compensate. One (cited at 19-20) addresses how the *Davis* standard applies to particular patterns of harassment—not the meaning of Title IX more generally. *Kollaritsch v. Mich. State. Univ. Bd. of Trs.*, 944 F.3d 613, 622-24 (6th Cir. 2019). The other (cited at 22) notes that the "Title VII landscape" may sometimes provide "guidance" when interpreting Title IX. *Chisholm v. St. Marty's City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 350 (6th Cir. 2020). But that follows only when adopting Title VII principles is "appropriate," *Childers v. Casey Cnty. Sch. Dist. Bd. of Educ.*, 2024 WL 3623527, at *2 (6th Cir. Aug. 1, 2024)—and incorporating the Department's *Bostock* reading is not.

Nor should this Court follow the Department's favored out-of-circuit cases. The ones the brief cites apply *Bostock* to Title IX as uncritically as the Rule. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) (cited at 20). Others rely on the flawed sex-means-gender-identity reasoning the Department now disavows. *See A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769-70 (7th Cir. 2023) (cited at 20); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049-50 (7th Cir. 2017) (discussed at 89 Fed. Reg. 33,802-09). Dissents and other separate writings have persuasively

highlighted these analytical shortcomings.[2]

### b.    Statutory differences foreclose applying *Bostock*.

"Title VII differs from Title IX in important respects." *Meriwether*, 992 F.3d at 510 n.4.  Comparing the two regimes confirms that *Bostock* is an ill fit for Title IX.  This conclusion does not misread the Rule's treatment of "sex" or improperly consider "extra-textual" material as the Department claims (at 20-22).  It instead reflects that Title IX's sex-discrimination prohibition "has meaning only in context,'" *Kentucky v. Biden*, 23 F.4th at 603, and that this context confirms the Department's interpretive missteps.

*Text.*  Title VII and Title IX employ "materially different language: discrimination 'because of' sex in Title VII and discrimination 'on the basis of' sex in Title IX."  *Tennessee*, 2024 WL 3453880, at *3 (citing 42 U.S.C. § 2000e-2(a)(1); 20 U.S.C. § 1681(a)).  *Bostock* read "because of" in Title VII to require that sex merely be "one but-for cause of [the challenged] decision … to trigger the law."  590 U.S. at 656.  But the ordinary meaning of Title IX's phrase "on the basis of" indicates that sex must be more than "one" cause, *id.*; it must be *the* cause.  *See supra* p.22.  These textual differences resemble those *Bostock* accepted might "indicate that the

---

[2] *See, e.g.*, *B.P.J. ex rel. Jackson v. W.V. State Bd. of Educ.*, 98 F.4th 542, 565-580 (4th Cir. 2024) (Agee, J., concurring in part and dissenting in part); *Grimm*, 972 F.3d at 627-35 (Niemeyer, J., dissenting); *A.C.*, 75 F.4th at 775 (7th Cir. 2023) (Easterbrook, J., concurring in the judgment only).

prohibited factor had to be the main cause" of the challenged action.  590 U.S. at
656-57 ("primarily because of").  The district court correctly prioritized the best
meaning of Title IX, not *Bostock*'s discussion of language with key differences.  Op.,
R.100, PageID#2012-14, 2019-23.

The Department's proffered "textual analysis" points out (at 22) that cases
have sometimes used "on the basis of" and "because of" interchangeably in casual
dicta covering "other contexts."  Absent is any case ruling on the meaning of Title
IX's and Title VII's distinct text.  The Department's reliance on *Gross v. FBL Fin.
Serv., Inc.*, 557 U.S. 167 (2009), cuts against it.  That case involved the ADEA's
"because of" standard—text this Court declined to read through *Bostock*, even
though *identical* to Title VII's language.  And the statute *Gross* cited as in line with
"because of" used "based in whole or in part on." 557 U.S. at 176 (citing *Safeco Ins.
Co. of America v. Burr*, 551 U.S. 47, 63-64 (2007) (interpreting 15 U.S.C.
§ 1681m(a)).  The language "on *the* basis of" is different, just as many other features
divorce Title IX from Title VII.

*Structure.*  Reading *Bostock* into Title IX's discrimination prohibition makes
a hash of Title IX's broader regime.  *Bostock*'s premise is that sex, "homosexuality,
or transgender status *is not relevant*"—in whole or "in part"—for hiring and firing
(outside the rare contexts where employers can satisfy the affirmative bona-fide-
occupational-qualification defense, *see* 42 U.S.C. § 2000e-2(e)).  590 U.S. at 660

30

(emphasis added).  In contrast, "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Adams*, 57 F.4th at 811.  Those carveouts confirm that it is often *not* discrimination for schools to take sex into account when providing facilities, programs, and activities.

The Department tries and fails (at 22-23) to explain away these differences. First, it notes that Title VII also has "statutory exceptions."  But unlike in Title IX, Title VII's sex-based exception is an "affirmative defense" that presumes taking sex into account is *always* "overt discrimination."  *Million v. Warren County*, 856 F. App'x 1, 11 (6th Cir. 2021) (citation omitted).  Then, the Department claims (at 23) that Title VII allows "sex-segregated bathrooms, locker rooms, and dress codes.'" But EEOC guidance the Rule cites (and the Department of Justice is defending) reads *Bostock* to dictate the opposite.  *See generally* Compl., *Tennessee v. EEOC*, No. 3:24-cv-224-CEA (E.D. Tenn. May 13, 2024), R.1.

Nor can the Department square (at 21) *Bostock*'s switch-the-sex logic with Title IX's structure.  For *Bostock* not to blow up all Title IX's sex-separation provisions, the Department must treat § 1681(a)'s exceptions and § 1686's living-facilities provision as cases where Congress implausibly *authorized sex discrimination* against students whose sex and gender identities differ.  *See* 89 Fed. Reg. at 33,814-21.  The Department never explains why Congress would require schools to let males, for example, share a hotel room with females on school trips but not a dorm

room (20 U.S.C. § 1686), play contact sports against females in gym class (34 C.F.R. § 106.34(a)(1)) but not after school (*id.* § 106.41(b)), or shower in front of females (*id.* § 106.33) but not attend Girls State (20 U.S.C. § 1681(a)(7)). That's because Title IX's reference to "sex" does not implausibly authorize gender-identity discrimination at random; it excludes gender-identity discrimination, period.

*Statutory context.* Title IX's and Title VII's "different goals" help explain why Title IX does not fit with the Department's broader *Bostock* reasoning. *Tennessee*, 2024 WL 3453880, at *3. "[T]he school is not the workplace." *Adams*, 57 F.4th at 808. Protecting "the safety and health" of minors implicates issues that Title VII's "adult-centered employment" focus does not. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995) (citations omitted); *L.W.*, 83 F.4th at 485.

Title IX embodies Congress's recognition that differentiation by sex is sometimes "necessary to the success" of a school's "program." 118 Cong. Rec. 5,807 (1972) (statement of Sen. Bayh); *cf. Virginia*, 518 U.S. at 550 n.19 (acknowledging such necessity in "living arrangements" and "physical training"). Absent sex separation in sports, for example, "the great bulk of females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape*, 563 F.2d at 795. And sports and other sex-separated activities uniquely "impart[] … valuable traits" like "teamwork … and leadership, as well as … discipline[] and grit." *Adams*, 57 F.4th at 821 (Lagoa, J., concurring) (citation omitted). A

holding that *Bostock* governs Title IX would explode this balance across the board. The proof: The Department has long insisted that *Bostock*'s reasoning bars *any* allowance for sex differentiation as a statutory matter—in housing, showers, sports, and otherwise. *See* U.S. Br. at 24-27, *B.P.J.*, 98 F.4th 542; 2016 Dear Colleague Letter, at 3-4, R.132-2, PageID#3877-78. So any *Bostock*-based holding would have spillover beyond the Rule.

*Liability principles.* *Bostock* acknowledges that alternative statutory schemes might counsel a different "approach" than its view of but-for causation. 590 U.S. at 656; *accord Nassar*, 570 U.S. 338. Thus, in *Pelcha*, this Court rejected applying *Bostock* to the ADEA given that statute's distinct history and liability structure, which requires a plaintiff to show that the protected characteristic—age—was "*the* determinative reason" for a private employer's challenged decision. 988 F.3d at 323-24. *Cf.* 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B). That was so even though the two statutes use *identical* "because of" language. *Id.*; *cf. Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612 (1993) (holding it did not violate ADEA to "take account of" an employee's length of service even when "correlated" with age).

The "principles" of Title VII liability vary meaningfully from Title IX's. *Meriwether*, 992 F.3d at 510 n.4. For one, *Bostock* agrees that statutes conditioning liability on acting "solely" or "primarily" because of a protected trait might be different. 590 U.S. at 656, 659. After all, sex might be a logical necessity for deciding

to terminate a male employee for identifying as a female—and thus "*one* but-for cause" under *Bostock*—but sex would not be the "primary" factor since the employer would not have fired the employee for being male standing alone. *See id.* at 656. Here, though, Title IX's distinct "on *the* basis of" language connotes the type of predominant- or lone-cause analysis *Bostock* distinguishes. *See supra* p.22.

For two, *Bostock* does not work for statutes that "require [courts] to consider … treatment of groups rather than individuals, to see how a policy affects one sex as a whole versus the other as a whole." *Id.* at 658. In such cases, it *is* a "defense" to an individual claim to show that the sexes are treated equally "as groups." *Id.* at 659. So treating a particular "woman worse in part because of her sex" (or vice versa) does not resolve the liability question. *Id.* But Title IX brims with provisions focusing on "treatment of groups" writ large, rather than harms to individual students. *See supra* p.25-26 (collecting provisions). Assessing "sex discrimination" in Title IX thus often requires more than asking *Bostock*'s question whether a "particular" student was treated differently based on sex; it turns on whether the sexes receive parity as a whole. Title VII's "distinct defenses" do not leave this path. *Tennessee*, 2024 WL 3453880, at *3.

**c.    Interpretive canons foreclose applying *Bostock* via the Rule.**

Applicable canons require clarity that compels rejecting the Rule's reliance on *Bostock*.

34

*Spending Clause.* Title IX is a Spending-Clause statute, so any funding condition must appear "unambiguously" in provisions "Congress *itself*" passed. *Kentucky v. Yellen*, 54 F.4th 325, 347-48, 353-54 (6th Cir. 2022) (citation omitted). "The same is not true of Title VII." *Tennessee*, 2024 WL 3453880, at *3. This difference is "[n]o less important[]" than the statutes' other distinctions. *Id.*

The Department does not dispute (at 24) that the Spending Clause clear-statement rule applies. But it says notice is clear because the Rule implements Title IX's "unambiguous" prohibition on gender-identity discrimination per *Bostock*. But *Bostock* does not redefine Title IX "sex" discrimination in this manner, let alone clearly. And the Department has elsewhere claimed it is "simply wrong" that the de minimis provision flows from § 106.10 and *Bostock*. U.S. App. for Partial Stay 31, *Louisiana*, 2024 WL 3841071, No. 24A79 (U.S. July 22, 2024). So even the Department's implausible argument that *Bostock* provides clear notice of gender-identity discrimination cannot support the de minimis provision.

*Bostock* aside, for four decades the Department has advised schools they could maintain certain sex-separation policies. *See* 87 Fed. Reg. at 41,394 (admitting as much). So applying *Bostock* would "'substantially change[] the experience' for all regulated entities." *Tennessee*, 104 F.4th at 613 (citation omitted). Put simply, "[i]t can't be that sexual orientation and gender identity have always been protected given the clear evidence of prior contrary agency positions." *Id.* at 612. That the Rule

"encroach[es] upon a traditional state power," *Yellen*, 54 F.4th at 354 (citation omitted); *infra* p.36-37, is further reason it fails Spending-Clause scrutiny.

*Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005) (cited at 24), is not to the contrary. As the district court explained, *Jackson* did not read Title IX to cover characteristics "distinct" from sex, as the Department's "new" *Bostock*-driven reading does. *Tennessee*, 104 F.4th at 613; *see* Op., R.100, PageID#2026-27. *Jackson* instead stresses the *States'* point that Title VII "is a vastly different statute from Title IX." 544 U.S. at 175.

The Rule causes other Spending-Clause problems. It is impermissibly coercive, *cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-78, 580-82 (2012) (opinion of Roberts, C.J.), perverts Title IX's purpose, *cf. South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987), and requires unconstitutional First Amendment infringements, *cf. id.* at 210-11; *infra* p.43-48. The States' reading avoids these pitfalls.

*Federalism.* Under the federalism canon, Congress must "make its intention" to displace States' traditional authority "'unmistakably clear.'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (quotations omitted). Here, reading Title IX as the Rule does would infringe States' "historic[] … sovereign[ty]" in administering education—a task "at the very apex of the function of a State." Op., R.100, PageID#2024 (quoting *United States v. Lopez*, 514 U.S. 549, 564 (1995)); *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972). The Rule also purports to preempt state laws

36

aimed at protecting students' safety, privacy, and opportunities in schools. 89 Fed. Reg. at 33,542; *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 773 (2019) (op. of Gorsuch, J.). No "clear congressional command" empowers that ouster. *Virginia Uranium*, 587 U.S. at 773.

### 3. Even if *Bostock* applies, the Rule's sex-discrimination provisions are invalid.

The Rule's sex-discrimination definition and de minimis provision violate the law in ways even *Bostock* could not salvage.

*Sex-discrimination definition (§106.10).* *Bostock* does not support § 106.10's scope. *Bostock* said its reasoning rested on a link to "sex." 590 U.S. at 662. But the Rule is "capable of regulating conduct that neither implicates the male/female dichotomy nor relates to sex at all." Stay Op., R.117, PageID#2389. That reflects the Rule's defining gender identity to include any subjective "sense" of one's gender. 89 Fed. Reg. at 33,809. The result: the Rule's bar on gender-identity discrimination stretches beyond *Bostock* by covering boundless gender identities—like nonbinary, agender, neutrois, or eunuch—divorced from sex entirely. *See* WPATH Guidelines, SOC 8, at S80, S88 (cited at 89 Fed. Reg. 33,819 n.90).

*Bostock*'s reasoning likewise fails for other scenarios the Rule covers like bisexual status. Discrimination on this basis will result in action against bisexual males and female alike since both are "attracted to men [and women]"; unlike in *Bostock*, switching out an individual's sex doesn't change the calculus. *Cf.* 590 U.S.

37

at 660.   Section 106.10 also protects gender-identity preferences delinked from sex—like a male's asking to be called by a different, "hypermasculine" name.  Op., R.100, PageID#2022; 89 Fed. Reg. at 33,809.  And its expansive categories cover differential treatment rooted in physiology.  Consider a high-voiced male objecting to choir assignments inconsistent with his "sex characteristics," Stay Op., R.117, PageID#2390-91; *cf.* 89 Fed. Reg. at 33,811, or a male who identifies as transgender requesting access to lactation rooms to "chest/breast feed" as a pregnancy-"related condition[]," Stay Op., R.117, PageID#2390; *cf.* 89 Fed. Reg. at 33,756, 33,883— the Rule requires accommodation of both.

*De minimis provision (§ 106.31(a)(2)).*  The Department's stay-phase choice to jettison the de minimis provision speaks volumes about its problems.

*First*, the de minimis provision far exceeds the Department's authority to implement Title IX's prohibition on "discrimination."  As explained, males and females are not "similarly situated" for accessing places and programs the de minimis provision covers, *supra* p.24, so sex separation thus does not implicate "discrimination" as *Bostock* defined it, 590 U.S. at 657-58.  The de minimis provision thus inverts *Bostock* by positing that longstanding separation based on sex always entails discrimination based on gender identity.  The Department does that by plucking (at 25) one "element" needed to prove discrimination—cognizable "injury"—and making injury alone sufficient to invalidate non-discriminatory policies.  *Accord* 89

38

Fed. Reg. at 33,814-15.  But Title IX does not mandate gender-identity-based *accommodations* where policies treat all members of the same sex, and both sexes comparatively, equally.  *See* Stay Op., R.117, PageID#2388.[3]

*Second*, the de minimis provision conflicts with Title IX's statutory and regulatory provisions *authorizing* sex separation.  Op., R.100, PageID#2020-21.  This Court recognized as much in deeming the Department's gender-identity guidance inconsistent with "existing Title IX regulations," which have permitted schools to "solely use[] biological sex as a classification method for decades."  *Tennessee*, 104 F.4th at 610-11.  The Department's counter (at 26-27)—that schools can *have* sex-separated faculties, just not *enforce* sex separation over an objection—would render sex separation "meaningless" and "functionally redefine[]" Title IX's use of "sex" to mean "gender identity."  *Alabama*, slip op. at 13 (quoting *Adams*, 57 F.4th at 814 n.7); *Carroll Indep. Sch. Dist.*, 2024 WL 3381901, at *4-6.  The Department disputes (at 29) that § 1686 itself creates this conflict versus its bathroom regulation.  But agency rules cannot contradict in-force regulations either.  *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2020).

---

[3] Nor do policies recognizing "inherent differences between" the sexes discriminate based on sex stereotypes.  *Adams*, 57 F.4th at 819 (Lagoa, J., specially concurring); *see Tennessee*, 104 F.4th at 614 (discussing *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016)).  *L.W.* instructed that the Circuit's sex-stereotyping analysis is limited to "dress [and] appearance" and does not "create a new rule for transgender discrimination."  83 F.4th at 486.

*Third*, the de minimis provision enshrines the gender-identity discrimination it purports to prohibit.  *See* Stay Op., R.117, PageID#2387-88; Op., R.100, PageID#2022-23.  Consider the two groups who would be able to access female facilities "but for" their biological sex—males who identify as male and males who identify as female.  The Department's gerrymandered conception of harm requires schools to allow only the latter group to use female facilities while excluding the former group *based on those students' gender identity*.  This "arguably reflect[s] discrimination on the basis of gender identity, which *would* result in a violation of the new regulations."  Op., R.100, PageID#2022; *see also Adams*, 57 F.4th at 814 (rejecting reading of Title IX that would "provide more protection" based on transgender status than on sex).  But the Department says (at 27) that "cisgender [students] suffer[] no sex-based harm" in such cases, so the de minimis provision doesn't protect them.  The same reasoning would presumably bless exclusion of males—but not female-identifying males—from female-only STEM programs and females—but not male-identifying females—from male-only choirs.  *Cf.* 34 C.F.R. § 106.34(b).  That "preferential treatment" confirms the de minimis provision violates its own anti-discrimination mandate.  Stay Op., R.117, PageID#2388.

*Fourth*, the de minimis provision violates the major-questions doctrine, which requires that an agency have "clear congressional authorization" before adopting novel mandates of "vast … political significance."  *West Virginia v. EPA*, 597 U.S.

40

697, 716, 723 (2022) (citation omitted).  Requiring intimate exposure to members of the opposite sex in all schools nationwide is "major" in any sense, Op., R.100, PageID#2023-25, as hundreds of thousands of opposing comments confirm, Compl., R.1 ¶ 117, PageID#35.  Compliance with this mandate moreover affects millions of students and educators in Plaintiff States alone, *e.g.*, Thompson Decl., R.19-3, PageID#887; Coons Decl., R.19-11, PageID#961, as well as many billions in federal funding on which States critically rely, *see, e.g.*, Bryson Decl., R.19-2, PageID#881-82.  *Bostock* does not solve the Department's major-questions problem, *cf.* Dep't Br. 24, having *disclaimed* any application to "bathrooms, locker rooms, or anything else of the kind," 590 U.S. at 681.

## B.    The expanded harassment definition (§ 106.2) is unlawful.

The Department concedes (at 34 & nn.6-7) that its new definition of "hostile environment harassment" is "broader" than the 2020 rule's.  89 Fed. Reg. at 33,498. But the 2020 rule tracked "verbatim" the Supreme Court's definition of Title IX "harassment" in *Davis*, 526 U.S. at 652.  85 Fed. Reg. at 30,036.  And the *Davis* definition was deliberately calibrated to ensure Title IX harassment respects First Amendment limits.  *See supra* p.6-7.  The Department lacks authority to override the Supreme Court's definition of "harassment," particularly with a new test that tramples First Amendment protections.  Op., R.100, PageID#2027-51.

41

### 1. The harassment definition exceeds the Department's Title IX authority.

The definition of "harassment" incorporates the Rule's unlawful sex-discrimination definition, *see* 89 Fed. Reg. at 33,884, and thus fails for that reason alone. But the flaws go further. Central is *Davis*, where the Supreme Court interpreted Title IX "harassment" to require three limits. The relevant behavior: must (i) stem from a school's "deliberate indifference" and (ii) be "so severe, pervasive, *and* objectively offensive" that (iii) it "*denies* its victims the equal access to education that Title IX is designed to protect." *Davis*, 526 U.S. at 644-45, 652 (emphases added).

*Davis*'s "limitations" were no accident. *Id.* at 652. They reflect Title IX's statutory requirement that discrimination must "occur '*under* any education program or activity'" and be attributable to a "recipient." *Id.* (emphasis added) (quoting 20 U.S.C. § 1681(a)). And they were necessary to ensure harassment does not infringe protected speech or the Spending Clause's notice requirement, *id.* at 652-53—concerns Justice Kennedy's dissent raised vigorously, *see id.* at 657, 661, 667-68.

The Rule "flies in the face of *Davis*." *Alabama*, slip op. at 14. It deletes *Davis*'s "deliberate indifference" requirement. *Compare* 89 Fed. Reg. at 33,888-89 (§ 106.44), *with* 526 U.S. at 650-51. It changes *Davis*'s "severe *and* pervasive" requirement to a "severe *or* pervasive" requirement. *Compare* 89 Fed. Reg. at 33,497-99 33,884, *with* 526 U.S. at 652. And it reduces *Davis*'s "denies" requirement to a "limits" requirement. *Compare* 89 Fed. Reg. at 33,884, *with* 526 U.S. at 652.

The Department lacked authority to swap the Supreme Court's definition of "harassment" for its own.  It is no out that *Davis* dealt with "a private damages claim."  Dep't Br. 34 n.7.  The Supreme Court was interpreting "the same word in the same statute to address the same legal question: the meaning of 'discrimination' under Title IX."  *Alabama*, slip op. at 14.  Its interpretation necessarily assigned that provision a "single" meaning.  *Loper Bright*, 144 S. Ct. at 2266.  That text "should retain one meaning" across contexts, not "change depending on the presence or absence of constitutional concerns" in a given case.  *In re Juntoff*, 76 F.4th 480, 485 (6th Cir. 2023); *cf.* Dep't Br. 34 n.7.

## 2.  The harassment definition violates the First Amendment.

The Department rejects (at 33-42) any First Amendment problem with the new harassment definition.  But in the 2020 rule, the Department warned that importing a more lenient harassment definition may "cause recipients to chill [their speech] and infringe upon the First Amendment freedoms of students, teachers, and faculty by broadening the scope of prohibited speech and expression."  85 Fed. Reg. at 30,037; *see also id.* at 30,033, 30,151-52, 30,162-65 & nn.738-39.  *Davis* too "warned against courts 'impos[ing] *more sweeping liability than we read Title IX to require*.'"  *Alabama*, slip op. at 15 (quoting *Davis*, 526 U.S. at 652).

The Rule's unprecedentedly broad harassment definition presents constitutional concerns in spades.  Among the many problems the district court detailed, *see* Op.,

R.100, PageID#2036-51; *accord Alabama*, slip op. at 15-17, the Rule compels schools to require, and thus students and teachers to use, "preferred" rather than accurate pronouns, 89 Fed. Reg. at 33,887 (§ 106.31(a)(2)); *see also id.* at 33,516 (suggesting harassment includes "misgendering").  The Department nowhere disputes that because pronouns "communicate a message," requiring them would implicate "speech subject to the First Amendment's protections." *Parents Defending Educ. v. Oletangy Local Sch. Dist. Bd. of Educ.*, 2024 WL 3565635, at *7 (6th Cir. July 29, 2024) (cited at Dep't Br. 36-37); *accord Meriwether*, 992 F.3d at 508-09.  And while the Rule seems to think such policies would pass strict scrutiny, this Court's decision in *Meriwether* at a minimum instructs the opposite at the university level.  *See* 992 F.3d at 507, 510-11; Op., R.100, PageID#2035-36.

Contra the Department (at 38-39), *Meriwether* did not suggest Title IX compliance would justify this "conflict[] with the First Amendment"; it instead concluded Title IX "harassment" had not occurred.  992 F.3d at 511.  Nor is the supposed "option[]" for students and faculty to "us[e] no pronouns at all" a panacea.  *See* Dep't Br. 36 (quoting *Parents Defending Educ.*, 2024 WL 3565635, at *7-8).  This Court has recognized that "eliminating pronouns altogether [is] next to impossible, especially when teaching." *Meriwether*, 992 F.3d at 499.  Thus, whatever resonance this "compromise" has in the context of pronoun use in elementary schools, *see Parents Defending Educ.*, 2024 WL 3565635, at *7-8, it cannot save the Final Rule, which

44

applies to a broader array of topics and all levels of schooling.

The Department cannot escape the pronoun issue with after-the-fact evasions. It claims (at 35-37) not to know whether or how preferred pronouns will come under the Rule. This is a "paper tiger." Op., R.100, PageID#2041. A bevy of prior guidance and enforcement confirms that the Department's view of Title IX requires use of gender-identity-based pronouns. *See, e.g.*, Compl., R.1, PageID#24-25, 31-32, 54 (collecting guidance examples); Arlington (TN) OCR Compl., R.92-3, PageID#1859-60. So does the Rule itself. *E.g.*, 89 Fed. Reg. at 33,516 (relying on EEOC Title VII guidance so stating to define hostile environment). The amicus brief in *Kluge v. Brownsburg Community School Corp.*, No. 21-2475 (7th Cir.) (discussed at Dep't Br. 37), was just one piece of the broader pattern and practice on pronouns.

From the other direction, the Rule's many "vague" expansions combine to chill protected speech on a range of topics. Op., R.100, PageID#2044-51. Lowering liability to anything that "limits" a student's educational experience provides little more than a heckler's veto for "offensive" speech on subjective concepts like "gender identity" and "sex stereotypes." 89 Fed. Reg. at 33,492; *see id.* at 33,505, 33,516, 33,493 (conceding definition reaches "verbal" acts and "speech"). Female students who once question a man's presence in their bathroom may face Title IX sanctions, since the "harassment" need not be pervasive, severity is subjective, and offensiveness is measured from the complainant's view. 89 Fed. Reg. at 33,498. Other

45

controversial speech will likewise find itself verboten, like rejection of gender ideology. *See id.* at 33,504 (approving a school's decision (in *L.M. v. Town of Middleborough*) to punish a student for wearing a t-shirt saying, "THERE ARE ONLY TWO GENDERS"). The Department cannot credibly discount (at 40-41) the amount of protected speech § 106.2 affects after the 2020 rule acknowledged parallel concerns. *See, e.g.*, 85 Fed. Reg. at 30,151-52.

The harassment definition's combination of factors differentiates it from other "proscriptions on hostile environment harassment," like Title VII's, that the Supreme Court has upheld and the Department's scholar *amici* defend. Dep't Br. 34 (citation omitted). Moreover, alleged Title VII harassment is actionable only if it "alter[s] the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *accord Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008). Under the Rule, however, harassment can be anything that "limits" students' benefits from a program—requiring only "some impact on their ability to participate." 89 Fed. Reg. at 33,511, 33,884. And even if Title VII permits more stringent speech regulation, *Davis* presumes that "schools are unlike the adult workplace" so warrant additional free-expression leeway. 526 U.S. at 651.

It is unsurprising that multiple courts have held that policies like § 106.2 are unconstitutionally chilling. *See, e.g.*, *Cartwright*, 32 F.4th at 1114-15, 1120; *Speech First, Inc. v. Fenves*, 979 F.3d 319, 323, 336-37 & n.16 (5th Cir. 2020); *Saxe v. State*

*Coll. Area Sch. Dist.*, 240 F.3d 200, 215-17 (3d Cir. 2001) (Alito, J.).  The "contrary" cases the Department cites (at 40) either do not discuss overbreadth (*e.g.*, *Harris*, *Meriwether*, *Doe*, and *Waldo*), or involved policies that did not "target speech," *see Rowles v. Curators of the Univ. of Mo.*, 983 F.3d 345, 358-59 (8th Cir. 2020).

The Department's remaining responses are unpersuasive.  The Rule's boiler-plate First Amendment disclaimer (cited at 35) cannot speak constitutional conflict out of existence.  *Cf. Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995) (similar disclaimer did "nothing to ensure the University will not violate First Amendment rights").  Particularly so since the government bears a "heav[ier] bur-den" to justify a regulation that compels speech.  *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 907 (2018) (citation omitted).  The De-partment's disclaimer does not solve compelled-speech defects any more than it could insulate a requirement that Title IX recipients prohibit flag burning.  *See Texas v. Johnson*, 491 U.S. 397, 414 (1989).

The Department's attempt (at 35-37) to distance itself from compelled speech also fails.  The Department claims (at 36) that requiring schools to "address sex-based harassment" involving speech in no way "tell[s] individual students and staff what they must say."  But the Rule collapses that distinction by informing schools that addressing harassment requires adhering to students' preferred pronouns.  Just ask Professor Meriwether, whose failure to use a student's preferred pronouns

prompted a protracted Title IX "harassment" investigation that ended with a formal warning. *Meriwether*, 992 F.3d at 498-502. Or ask school employees, who under the Rule must receiving training on and report all conduct that "may constitute sex discrimination"—including students' and colleagues' speech. 89 Fed. Reg. at 33,885-86, 33,888. The Rule's policy changes can play out only through personnel.

The Department responds (at 36) that the States and their school systems generally enforce harassment schemes, rather than the Department directly. This makes no difference. Federal funds may not be used to "induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. The Department thus cannot conscript States to do the Rule's speech-harming bidding.

### C.    The Rule is arbitrary and capricious.

The Department's request (at 29) for deference cannot sustain the Rule's "entirely arbitrary" reasoning. *Meister*, 623 F.3d at 374; Op., R.100, PageID#2061-72.

*Irrational distinctions.* The Rule arbitrarily treats "like cases differently" and advances "internally inconsistent" logic. *Banner Health v. Price*, 867 F.3d 132, 1350 (D.C. Cir. 2017) (citations omitted). Congress reviewed and allowed the sex-separated places and programs in the Department's original regulations. Yet the de minimis provision now draws illogical distinctions that defy the long-understood justification for Title IX's sex-separation rules.

48

Worse, the Rule abandons its own statute-versus-regulation reasoning by classifying after-school sports on the "statutory" side of the line—even though a regulation, not Title IX or the Javits Amendment, addresses sex separation in after-school sports. The Department's other justification—that sex-separated sports are "longstanding"—equally covers other regulations the Rule subjects to its gender-identity mandate. The Rule does not acknowledge, much less explain, this "contradictory" approach. Op., R.100, PageID#2065-66.

*Disregard of key comments and regulatory problems.* The Rule sidesteps "significant" regulatory issues. Op., R.100, PageID#2071 (citation omitted).

*First*, the Rule does not answer—let alone "thoroughly," Dep't Br. 30—commenters' grave privacy and safety concerns. The Rule rejects that *anyone* has a "*legitimate* privacy interest" in avoiding intimate exposure to members of the opposite sex. 89 Fed. Reg. at 33,820 (emphasis added). But a mountain of authority recognizes that exposure to "the other sex may be especially demeaning and humiliating." *E.g.*, *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987) (citation omitted); Op., R.100, PageID#2068-70 (collecting cases). Dismissing these privacy concerns as "cisgender students[']" bigoted "preferences" or "unconstitutional discrimination" is not sound reasoning. 89 Fed. Reg. at 33,820.

The Rule's "disagree[ment]" that transgender individuals "pose a safety risk" skirted the States' point. Dep't Br. 31 (quoting 89 Fed. Reg. at 33,820). Private

49

spaces provide opportunity for attacks on women by men; yet the Rule's permissive gender-identity-based regime provides men more cover to enter women's private spaces. Rather than address commenters' evidence of such attacks, Op., R.100, PageID#2067-68 (discussing Tenn. Comment, R.1-3, PageID#519-21), the Rule "disagrees" it heightens such harms without explaining *why*. 89 Fed. Reg. at 33,820. Such "say-so" responses defeat the point of notice and comment. *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 413 (6th Cir. 2013). Nor does schools' purported ability (at 31 & n.5) to offer "single-occupancy facilities" mitigate the fallout. The Rule agrees that step would carry "significant cost implications," yet declined to account for such costs. 89 Fed. Reg. at 33,820. So the Department can't rely on that potential solution now. Op., R.100, PageID#2071.

*Second*, the Rule disregards the severe challenges with structuring school operations around gender-identity rules that may play out differently day-by-day and location-by-location. *See* Op., R.100, PageID#2065. Answers to other compliance issues—like whether a communal dormitory restroom counts as "housing" or "bathrooms" and "showers," 89 Fed. Reg. at 33,821—remain anyone's guess.

Inability to verify persons' "sense" of gender worsens the problem. The Department's claim (at 32) that schools can seek "documentation" contradicts the Rule's statement that "burdensome documentation requirements" "impose[] more than de minimis harm." 89 Fed. Reg. at 33,819. That some schools have been

provided "written confirmation" of gender identity does not authorize schools to seek such information. Dep't Br. 32; 89 Fed. Reg. at 33,819. Nor does it clarify how—or whether—schools can verify sex to enforce the statutory exceptions. *See* Op., R.100, PageID#2065; 89 Fed. Reg. at 33,819. And there's no way for schools to assess internal gender identity for campus visitors who seek on-the-spot access; yet denying them access violates Title IX nonetheless.

*Third*, the Department's First Amendment reasoning is riddled with inconsistencies. The Rule claims to be free-speech compliant while simultaneously setting mandates—like use of preferred pronouns—that violate free speech on their face, *see* 89 Fed. Reg. 33,516 (citing EEOC guidance). The 2020 rule's recognition that expanded harassment definitions present First Amendment problems underscores the point. *See, e.g.*, 85 Fed. Reg. at 30,151-52. Nor can the Rule punt resolving those here-and-now problems by claiming a need for more "specific" facts later. 89 Fed. Reg. at 33,512. Especially when the Rule has no trouble opining on specific "examples" elsewhere. *E.g.*, *id.* at 33,803, 33,813.

*Fourth*, the Rule would drive schools to accommodate gender-identity preferences even over parental opposition, lest liability arise. Op., RE100, PageID#2058-61. The Department's responsive passage (at 43) repeats that the Rule will implicate parental involvement on a "case-by-case" basis at most. 89 Fed. Reg. at 33,822.

51

## III.    The Remaining Factors Favor Preliminary Relief.

The States' irreparable harms and the equities "clearly" support preliminary relief.  R.100, PageID#2074-83; Stay Op., R.117, PageID#2405.

### A.    The Rule will inflict significant irreparable harm on the States.

*Nonrecoverable compliance costs.*  The district court's detailed discussion of the Rule's "extraordinary" costs belies the Department's critique (at 16) that the compliance-cost "finding" was inadequate.  *See* R.100, PageID#2074-77; *accord* Stay Op., R.117, PageID#2402-05.  This Court agreed the Rule's "wide swath of new obligations" will impose "onerous burden[s]." 2024 WL 3453880, at *4.  These are no "garden-variety expenses." Dep't Br. 45.  The Rule's policies are "more onerous than those of a typical update" since schools typically need not digest "hundreds of pages of a rule" requiring expertise they lack "in-house."  Op., R.100, PageID#2075-76 (discussing Tr., R.109, PageID#2134-35).

The Department's quantification requirement (at 45) doesn't exist—as confirmed by *Biden*, 57 F.4th at 556, which found irreparable harm based on declarations less specific than the States'.  *Cf.* Niknejad Decl. ¶ 12, *Kentucky v. Biden*, 571 F. Supp. 3d 715 (E.D. Ky. 2021) (No. 3:21-cv-55), R.12-1, PageID#271 (noting "logistical and financial burdens").  Regardless, *the rule itself* instructs that the challenged re-definition of "sex discrimination" and harassment will alone cause a minimum 10% spike in complaints and investigations.  *See* 89 Fed. Reg. at 33,851.  The

resulting "significant increase" in required state resources alone justifies relief.[4]  *Id.*

*Funding losses.*  *Tennessee v. Department of Education* already rejected the Department's funding-loss counter (at 46) by holding that the States' risk of "revocation of federal funds" was an "imminent" enough injury to show standing and irreparable harm in the Title IX guidance challenge.  104 F.4th at 589-90, 613.  Imminence followed because the guidance "threaten[ed] the States' educational institutions with financial penalties" for failure to comply and the States intended to "continue" enforcing policies that the guidance "prohibit[ed]."  *Id.* at 589-90.  So too with the Rule, which overrides several state laws and repeatedly confirms its power to terminate funding.  *See, e.g.*, 89 Fed. Reg. at 33,542, 33,560.

*Sovereign and quasi-sovereign harms.*  The Department notes (at 47) "disagreement" with this Court's sovereignty-harm holding in *Tennessee v. Department of Education*.  But that discussion controls, because here as there the Department's mandates would override or "pressure" States to change conflicting state laws.  *Tennessee*, 104 F.4th at 613; *see* 89 Fed. Reg. at 33,541-43; *id.* at 33,885 (§ 106.6(b)).  Such "[i]nvasions of state sovereignty … constitute irreparable harm."  *Tennessee*, 104 F.4th at 613 (citation omitted); *accord Alabama*, slip op. at 18.  Even if these injuries "overlap[] with individual citizens' injuries" (*cf.* Dep't Br 48), the Rule's

---

[4] *E.g.*, Hersey Decl., R. 92-1, PageID#1850; Fulks Decl., R.92-2, PageID#1855.

derogation of the States' quasi-sovereign and sovereign interests in their residents' "health and well-being" and in regulating education is an "injury to the state *itself*." *Kentucky v. Biden*, 23 F.4th at 599; *Tennessee*, 104 F.4th at 593.

**B.    The equities and public interest favor preliminary relief.**

The Department cannot overcome the "high hurdle" it faces to defeat relief on the equities. *Biden*, 57 F.4th at 556; *see also* Stay Op., R.117, PageID#2405.

Preliminary relief seeks to preserve the status quo. That favors maintaining schools' "longstanding" practices and existing Title IX regulations, *Alabama*, slip op. at 19; *see also Tennessee v. Cardona*, 2024 WL 3453880, at *4, especially given the Department's delays in promulgating the Rule, *Louisiana v. Dep't of Educ.*, 2024 WL 3452887, at *3 (5th Cir. July 17, 2024).

The Department's continued reliance (at 49) on *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers), for its harm remains "curious," since that case involved a *state statute* that was *democratically adopted*. Stay Op., R.117, PageID#2400. The Department does not "have the same claim to irreparable harm" when it seeks to enforce a unilateral rule that *displaces* state laws. *Louisiana*, 2024 WL 3452887, at *3; Op., R.100, PageID#2054-62, 2081-82.

The Department's claimed need (at 49) to "effectuate[] Title IX's goals" falls flat since the Rule requires gender-identity discrimination. Nor can the Department or its *amici* credibly posit (at 18, 50) that schools will discriminate against students

"for being" gay or transgender given the Department elsewhere disavows that prospect. *See* Stay Op., R.117, PageID#2401. And no matter how "compelling" the Rule's Title IX rewrite to the Department (at 49) and its *amici* as a policy matter, "the public's *true* interest lies in the correct application of the law," *Tennessee*, 104 F.4th at 614 (citation omitted), and in reserving education regulation to "[e]lected representatives and their constituents," not administrative fiat. *L.W.*, 83 F.4th at 491.

## IV.   Enjoining the Entire Rule Was Not an Abuse of Discretion.

The Department's scope argument has been thrice rejected for good reason.

The Department reups (at 50-51) its revisionist view of the States' challenge by insisting they lack "any harm" from § 106.10 and § 106.2's application to harassment beyond gender identity. Yet again, the Department "ignores entirely" the States' arguments and the district court's findings that the sex-discrimination and harassment definitions inflict harm in their entirety. *See* Stay Op., R.117, PageID#2384, 2391; *see*, *e.g.*, R.92-1, PageID#1845-50. The Supreme Court's conclusion that the States were "entitled to preliminary injunctive relief as to [these] provisions" confirms as much. *Louisiana*, 2024 WL 3841071, at *1.

The Department further contends (at 51-54) that the challenged provisions are "unrelated" to the rest of the Rule. The States showed why this was wrong with an exhaustive provision-by-provision exercise the Department has never attempted. *See* Doc. 37 at 5-19. The Department's relatedness argument instead posits (at 52)

that the Rule can go into effect with "sex" discrimination carrying its "text"-based meaning rather than § 106.10's redefinition. This distinction obliterates its contention (at 24) that Title IX's coverage of gender-identity discrimination is "unambiguous." And it ignores the district court's finding that the Rule's arbitrary-and-capricious reasoning rendered it "invalid in its entirety." Op., R.100, PageID#2085.

Nor can the Rule's "severability provision" "solve[] the agency's problem" when the Rule's remainder would function in an arbitrary and capricious and ill-explained manner. *Ohio v. EPA*, 144 S. Ct. 2040, 2054-55 (2024). The Rule substantially justifies its significant costs by referencing the benefits flowing from the provisions it now says can be severed. 89 Fed. Reg. at 33,474, 33,859-62. The Rule does not meaningfully "address[]" how it could satisfy that cost-benefit calculus without those provisions. *Ohio*, 144 S. Ct. at 2055.

Given the Rule's focus on implementing the Administration's view of what *Bostock* requires, *see* Op., R.100, PageID#2004; 89 Fed. Reg. at 33,859-60, there is "substantial doubt" the Department would have adopted the Rule "without the prohibition[]" on gender-identity discrimination—defeating severability. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 292-93 (4th Cir. 2020) (citation omitted). The Rule itself links its "purpose" to the three challenged provisions. 89 Fed. Reg. at 33,476. At minimum, the district court did not err by declining to rewrite the Rule. *See* Op., R.100, PageID#2085. Especially when the Department did not meaningfully

56

advance its severability arguments below. *Tennessee*, 2024 WL 3453880, at *4.

Dispositively, the Department continues to ignore both the district court's "wide latitude" to craft interim relief and its factual findings that a partial injunction would sow "widespread confusion" and cause wasted costs. *Doster v. Kendall*, 54 F.4th 398, 441-42 (6th Cir. 2022) (citing *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017)); Stay Op., R.117, PageID#2381, 2403. Here, the district court assessed the unrebutted evidence and held that it showed partial relief would cause great harm with little benefit since schools would still be left guessing how the rule applies in a range of areas. Stay Op., R.117, PageID#2381, 2403-05; Tr., R.109, PageID#2142. The stay panel agreed. *Tennessee v. Cardona*, 2024 WL 3453880, at *4. Declining to hurl the States and their schools into this compliance conundrum was a proper exercise of discretion, not an abuse.

## CONCLUSION

This Court should affirm the district court's entry of preliminary relief against the Department's 2024 Title IX rule.

Dated: August 26, 2024                    Respectfully submitted,

JONATHAN SKRMETTI
   Attorney General and Reporter

*/s/ Whitney D. Hermandorfer*
J. MATTHEW RICE
   Solicitor General
WHITNEY D. HERMANDORFER
   Director of Strategic Litigation
HARRISON GRAY KILGORE
VIRGINIA N. ADAMSON
   Counsel for Strategic Litigation &
   Assistant Solicitors General
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3491
whitney.hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*

THEODORE E. ROKITA
   Attorney General

*/s/ James A. Barta*
JAMES A. BARTA
   Solicitor General
CORRINE L. YOUNGS
   Policy Director and Legislative
Counsel
JOSHUA DAVID
   Deputy Attorney General - Policy
INDIANA ATTORNEY GENERAL'S
OFFICE
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for the State of Indiana*

RUSSELL COLEMAN
   Attorney General

*/s/ Matthew F. Kuhn*
MATTHEW F. KUHN
   Solicitor General
JOHN H. HEYBURN
   Principal Deputy Solicitor General
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
matt.kuhn@ky.gov

*Counsel for the Commonwealth of Kentucky*

DAVE YOST
   Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
   Solicitor General
MATHURA SRIDHARAN
   Deputy Solicitor General
OFFICE OF THE OHIO
ATTORNEY GENERAL
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for the State of Ohio*

58

JASON S. MIYARES
   Attorney General

*/s/ Kevin M. Gallagher*
KEVIN M. GALLAGHER
   Principal Deputy Solicitor General
BRENDAN T. CHESTNUT
   Deputy Solicitor General
VIRGINIA ATTORNEY GENERAL'S
OFFICE
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

PATRICK MORRISEY
   Attorney General

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS
   Solicitor General
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol, Bldg. 1, Room E-26
1900 Kanawha Blvd. E.
Charleston, West Virginia 25305
304-558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume requirements and contains 12,947 words.  *See* Fed. R. App. P. 27(d)(2)(A).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*s/ Whitney D. Hermandorfer*
WHITNEY D. HERMANDORFER

## CERTIFICATE OF SERVICE

On August 26, 2024, I filed an electronic copy of this brief with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under Sixth Circuit Rule 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

/s/ Whitney D. Hermandorfer
Whitney D. Hermandorfer

## DESIGNATION OF COURT DOCUMENTS

Plaintiffs-Appellees designate the following record documents relevant to

this appeal pursuant to Sixth Circuit Rules 28(b)(1)(A)(i) and 30(g)(1):

| Record Entry Number | Description | PageID Numbers |
|---|---|---|
| R.1 | States' Complaint | 1-799 |
| R.19 | States' PI Mot. | 838-984 |
| R.63 | Intervenors' PI Mot. | 1383-1436 |
| R.72 | Intervenors' Complaint | 1486-1718 |
| R.73 | Defs.' Response to States' PI Mot. | 1542-1575 |
| R.91 | Defs' Response to Intervenors' PI Mot. | 1791-1819 |
| R.92 | States' PI Reply | 1820-1860 |
| R.99 | Intervenors' PI Reply | 1974-1995 |
| R.100 | Mem. Opinion and Order | 1996-2088 |
| R.103 | Notice of Appeal | 2093-2095 |
| R.104 | Defs.' Mot. for Partial Stay Pending Appeal | 2096-2104 |
| R.109 | PI Hearing Transcript | 2121-2310 |
| R.110 | States' Response to Mot. for Partial Stay | 2311-2322 |
| R.111 | Intervenors' Response to Mot. for Partial Stay | 2323-2331 |
| R.113 | Defs.' Partial Stay Reply | 2342-2349 |
| R.117 | Mem. Opinion and Order on Defs.' Mot. for Partial Stay | 2380-2405 |
| R.132 | Defs.' Filing of Administrative Record Portions | 2900-5048 |

**ADDENDUM**

# TABLE OF CONTENTS

## Statutes

Title IX of the Educational Amendments Act of 1972,
20 U.S.C. § 1681 *et seq.*

    20 U.S.C. § 1681..................................................................................A1

    20 U.S.C. § 1682..................................................................................A3

    20 U.S.C. § 1686..................................................................................A4

    20 U.S.C. § 1689(a)(6) ......................................................................A4

Javits Amendment, 88 Stat. 484 (1974)..................................................A5

## Regulations and Administrative Materials

34 C.F.R. § 106.2 (proposed 2024)...........................................................A5

34 C.F.R. § 106.10 (proposed 2024).........................................................A6

34 C.F.R. § 106.31(a)(2) (proposed 2024) ...............................................A6

34 C.F.R. part 106 (2023)

    § 106.32 ..............................................................................................A7

    § 106.33 ..............................................................................................A7

    § 106.34 ..............................................................................................A8

    § 106.41 ............................................................................................A10

    § 106.44 ............................................................................................A11

**20 U.S.C. § 1681**

**§ 1681. Sex**

**(a) Prohibition against discrimination; exceptions**

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

**(1) Classes of educational institutions subject to prohibition**

in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

**(2) Educational institutions commencing planned change in admissions**

in regard to admissions to educational institutions, this section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education, whichever is the later;

**(3) Educational institutions of religious organizations with contrary religious tenets**

this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization;

**(4) Educational institutions training individuals for military services or merchant marine**

this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine;

**(5) Public educational institutions with traditional and continuing admissions policy**

in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and

A1

continually from its establishment has had a policy of admitting only students of one sex;

**(6) Social fraternities or sororities; voluntary youth service organizations**

this section shall not apply to membership practices--

**(A)** of a social fraternity or social sorority which is exempt from taxation under section 501(a) of Title 26, the active membership of which consists primarily of students in attendance at an institution of higher education, or

**(B)** of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

**(7) Boy or Girl conferences**

this section shall not apply to--

**(A)** any program or activity of the American Legion undertaken in connection with the organization or operation of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

**(B)** any program or activity of any secondary school or educational institution specifically for--

**(i)** the promotion of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

**(ii)** the selection of students to attend any such conference;

**(8) Father-son or mother-daughter activities at educational institutions**

this section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex; and

**(9) Institution of higher education scholarship awards in "beauty" pageants**

this section shall not apply with respect to any scholarship or other financial assistance awarded by an institution of higher education to any individual because such individual has received such award in any pageant in which the attainment of such award is based upon a combination of factors related to the personal appearance, poise, and talent of such individual and in which participation is limited to individuals of one sex only, so long as such pageant is in compliance with other

nondiscrimination provisions of Federal law.

**(b) Preferential or disparate treatment because of imbalance in participation or receipt of Federal benefits; statistical evidence of imbalance**

Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: *Provided,* That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

**(c) "Educational institution" defined**

For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department.

---

**20 U.S.C. § 1682**

**§ 1682. Federal administrative enforcement; report to Congressional committees**

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall

be limited in its effect to the particular program, or part thereof, in which such non-compliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

---

## 20 U.S.C. § 1686

### § 1686. Interpretation with respect to living facilities

Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.

---

## 20 U.S.C. § 1689(a)(6)

### § 1689. Task Force on Sexual Violence in Education

### (a) Task Force on Sexual Violence in Education

Not later than September 1, 2022, the Secretary of Education, the Secretary of Health and Human Services, and the Attorney General shall establish a joint interagency task force to be known as the "Task Force on Sexual Violence in Education" that shall--

…

**(6)** develop recommendations on culturally responsive and inclusive approaches to supporting survivors, which include consideration of race, ethnicity, national origin, religion, immigrant status, lesbian, gay, bisexual, or transgender (commonly referred to as "LGBT") status, ability, disability, socio-economic status, exposure to trauma, and other compounding factors;

… .

---

A4

**Javits Amendment, 88 Stat. 484 (1974)**

PROVISION RELATING TO SEX DISCRIMINATION

SEC. 844. The Secretary shall prepare and publish, not later than 30 days after the date of enactment of this Act, proposed regulations implementing the provisions of Title IX of the Education Amendments of 1972 relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports.

———————————————

**34 C.F.R. § 106.2 (proposed 2024)**

**§ 106.2 Definitions.**

As used in this part, the term:

…

*Sex-based harassment* prohibited by this part is a form of sex discrimination and means sexual harassment and other harassment on the basis of sex, including on the bases described in § 106.10, that is:

(1) ***Quid pro quo harassment.*** An employee, agent, or other person authorized by the recipient to provide an aid, benefit, or service under the recipient's education program or activity explicitly or impliedly conditioning the provision of such an aid, benefit, or service on a person's participation in unwelcome sexual conduct;

(2) ***Hostile environment harassment.*** Unwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.,* creates a hostile environment). Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of the following:

(i) The degree to which the conduct affected the complainant's ability to access the recipient's education program or activity;

(ii) The type, frequency, and duration of the conduct;

(iii) The parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the conduct;

(iv) The location of the conduct and the context in which the conduct occurred;

A5

and

(v) Other sex-based harassment in the recipient's education program or activity;

… .

---

**34 C.F.R. § 106.10 (proposed 2024)**

**§ 106.10 Scope.**

Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

---

**34 C.F.R. § 106.31(a)(2) (proposed 2024)**

**§ 106.31 Education programs or activities.**

(a) *General.*

(1) Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient that receives Federal financial assistance.

(2) In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

(3) This subpart does not apply to actions of a recipient in connection with admission of its students to an education program or activity of:

(i) A recipient to which subpart C does not apply; or

(ii) An entity, not a recipient, to which subpart C would not apply if the entity were a recipient.

---

**34 C.F.R. § 106.32 (2023)**

**§ 106.32 Housing.**

(a) ***Generally.*** A recipient shall not, on the basis of sex, apply different rules or regulations, impose different fees or requirements, or offer different services or benefits related to housing, except as provided in this section (including housing provided only to married students).

(b) ***Housing provided by recipient.***

(1) A recipient may provide separate housing on the basis of sex.

(2) Housing provided by a recipient to students of one sex, when compared to that provided to students of the other sex, shall be as a whole:

(i) Proportionate in quantity to the number of students of that sex applying for such housing; and

(ii) Comparable in quality and cost to the student.

(c) ***Other housing.***

(1) A recipient shall not, on the basis of sex, administer different policies or practices concerning occupancy by its students of housing other than provided by such recipient.

(2) A recipient which, through solicitation, listing, approval of housing, or otherwise, assists any agency, organization, or person in making housing available to any of its students, shall take such reasonable action as may be necessary to assure itself that such housing as is provided to students of one sex, when compared to that provided to students of the other sex, is as a whole:

(i) Proportionate in quantity and

(ii) Comparable in quality and cost to the student.

A recipient may render such assistance to any agency, organization, or person which provides all or part of such housing to students only of one sex.

_____

**34 C.F.R. § 106.33 (2023)**

**§ 106.33 Comparable facilities.**

A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

_____

**34 C.F.R. § 106.34 (2023)**

**§ 106.34 Access to classes and schools.**

(a) *General standard.* Except as provided for in this section or otherwise in this part, a recipient shall not provide or otherwise carry out any of its education programs or activities separately on the basis of sex, or require or refuse participation therein by any of its students on the basis of sex.

(1) *Contact sports in physical education classes.* This section does not prohibit separation of students by sex within physical education classes or activities during participation in wrestling, boxing, rugby, ice hockey, football, basketball, and other sports the purpose or major activity of which involves bodily contact.

(2) *Ability grouping in physical education classes.* This section does not prohibit grouping of students in physical education classes and activities by ability as assessed by objective standards of individual performance developed and applied without regard to sex.

(3) *Human sexuality classes.* Classes or portions of classes in elementary and secondary schools that deal primarily with human sexuality may be conducted in separate sessions for boys and girls.

(4) *Choruses.* Recipients may make requirements based on vocal range or quality that may result in a chorus or choruses of one or predominantly one sex.

(b) *Classes and extracurricular activities* —

(1) *General standard.* Subject to the requirements in this paragraph, a recipient that operates a nonvocational coeducational elementary or secondary school may provide nonvocational single-sex classes or extracurricular activities, if—

(i) Each single-sex class or extracurricular activity is based on the recipient's important objective—

(A) To improve educational achievement of its students, through a recipient's overall established policy to provide diverse educational opportunities, provided that the single-sex nature of the class or extracurricular activity is substantially related to achieving that objective; or

(B) To meet the particular, identified educational needs of its students, provided that the single-sex nature of the class or extracurricular activity is substantially related to achieving that objective;

(ii) The recipient implements its objective in an evenhanded manner;

(iii) Student enrollment in a single-sex class or extracurricular activity is completely voluntary; and

(iv) The recipient provides to all other students, including students of the excluded sex, a substantially equal coeducational class or extracurricular activity in the same subject or activity.

(2) ***Single-sex class or extracurricular activity for the excluded sex.*** A recipient that provides a single-sex class or extracurricular activity, in order to comply with paragraph (b)(1)(ii) of this section, may be required to provide a substantially equal single-sex class or extracurricular activity for students of the excluded sex.

(3) ***Substantially equal factors.*** Factors the Department will consider, either individually or in the aggregate as appropriate, in determining whether classes or extracurricular activities are substantially equal include, but are not limited to, the following: the policies and criteria of admission, the educational benefits provided, including the quality, range, and content of curriculum and other services and the quality and availability of books, instructional materials, and technology, the qualifications of faculty and staff, geographic accessibility, the quality, accessibility, and availability of facilities and resources provided to the class, and intangible features, such as reputation of faculty.

(4) ***Periodic evaluations.***

(i) The recipient must conduct periodic evaluations to ensure that single-sex classes or extracurricular activities are based upon genuine justifications and do not rely on overly broad generalizations about the different talents, capacities, or preferences of either sex and that any single-sex classes or extracurricular activities are substantially related to the achievement of the important objective for the classes or extracurricular activities.

(ii) Evaluations for the purposes of paragraph (b)(4)(i) of this section must be conducted at least every two years.

(5) ***Scope of coverage.*** The provisions of paragraph (b)(1) through (4) of this section apply to classes and extracurricular activities provided by a recipient directly or through another entity, but the provisions of paragraph (b)(1) through (4) of this section do not apply to interscholastic, club, or intramural athletics, which are subject to the provisions of §§ 106.41 and 106.37(c) of this part.

(c) ***Schools*** —

(1) ***General Standard.*** Except as provided in paragraph (c)(2) of this section, a recipient that operates a public nonvocational elementary or secondary school that excludes from admission any students, on the basis of sex, must provide students of the excluded sex a substantially equal single-sex school or coeducational school.

(2) *Exception.* A nonvocational public charter school that is a single-school local educational agency under State law may be operated as a single-sex charter school without regard to the requirements in paragraph (c)(1) of this section.

(3) *Substantially equal factors.* Factors the Department will consider, either individually or in the aggregate as appropriate, in determining whether schools are substantially equal include, but are not limited to, the following: The policies and criteria of admission, the educational benefits provided, including the quality, range, and content of curriculum and other services and the quality and availability of books, instructional materials, and technology, the quality and range of extracurricular offerings, the qualifications of faculty and staff, geographic accessibility, the quality, accessibility, and availability of facilities and resources, and intangible features, such as reputation of faculty.

(4) *Definition.* For the purposes of paragraph (c)(1) through (3) of this section, the term "school" includes a "school within a school," which means an administratively separate school located within another school.

---

**34 C.F.R. § 106.41 (2023)**

**§ 106.41 Athletics.**

(a) *General.* No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) *Separate teams.* Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(c) *Equal opportunity.* A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are

available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

(d) *Adjustment period.* A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics at the elementary school level shall comply fully with this section as expeditiously as possible but in no event later than one year from the effective date of this regulation. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics at the secondary or post-secondary school level shall comply fully with this section as expeditiously as possible but in no event later than three years from the effective date of this regulation.

---

**34 C.F.R. § 106.44 (2023)**

**§ 106.44 Recipient's response to sexual harassment.**

(a) *General response to sexual harassment.* A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent. A recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances. For the purposes of this section, §§ 106.30, and 106.45, "education program or activity"

includes locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution. A recipient's response must treat complainants and respondents equitably by offering supportive measures as defined in § 106.30 to a complainant, and by following a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent. The Title IX Coordinator must promptly contact the complainant to discuss the availability of supportive measures as defined in § 106.30, consider the complainant's wishes with respect to supportive measures, inform the complainant of the availability of supportive measures with or without the filing of a formal complaint, and explain to the complainant the process for filing a formal complaint. The Department may not deem a recipient to have satisfied the recipient's duty to not be deliberately indifferent under this part based on the recipient's restriction of rights protected under the U.S. Constitution, including the First Amendment, Fifth Amendment, and Fourteenth Amendment.

(b) ***Response to a formal complaint.***

(1) In response to a formal complaint, a recipient must follow a grievance process that complies with § 106.45. With or without a formal complaint, a recipient must comply with § 106.44(a).

(2) The Assistant Secretary will not deem a recipient's determination regarding responsibility to be evidence of deliberate indifference by the recipient, or otherwise evidence of discrimination under title IX by the recipient, solely because the Assistant Secretary would have reached a different determination based on an independent weighing of the evidence.

(c) ***Emergency removal.*** Nothing in this part precludes a recipient from removing a respondent from the recipient's education program or activity on an emergency basis, provided that the recipient undertakes an individualized safety and risk analysis, determines that an immediate threat to the physical health or safety of any student or other individual arising from the allegations of sexual harassment justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal. This provision may not be construed to modify any rights under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, or the Americans with Disabilities Act.

(d) ***Administrative leave.*** Nothing in this subpart precludes a recipient from placing a non-student employee respondent on administrative leave during the pendency

of a grievance process that complies with § 106.45. This provision may not be construed to modify any rights under Section 504 of the Rehabilitation Act of 1973 or the Americans with Disabilities Act.