No. 24-5588

**IN THE UNITED STATE COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

STATE OF TENNESSEE, et al.,

*Plaintiff-Appellees,*

and

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL, et al.,

*Intervenor-Plaintiffs-Appellees*

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education, et al.,

*Defendant-Appellants.*

On Appeal from the United States District Court
for Eastern District of Kentucky, No. 2:24-cv-00072

**BRIEF FOR THE INDEPENDENT WOMEN'S LAW CENTER, WOMEN'S DECLARATION INTERNATIONAL USA, AND CONCERNED WOMEN FOR AMERICA AS *AMICI CURIAE* IN SUPPORT OF THE PLAINTIFFS-APPELLEES**

| | |
|---|---|
| Benjamin M. Flowers | Sylvia May Mailman |
| ASHBROOK BYRNE KRESGE LLC | *Counsel of Record* |
| PO Box 8248 | INDEPENDENT WOMEN'S LAW CENTER |
| Cincinnati, Ohio 45249 | 1802 Vernon Street NW, Ste. 1027 |
| (513) 201-5775 | Washington, DC 20009 |
| bflowers@ashbrookbk.com | (202) 807-9986 |
| | may.mailman@iwf.org |

*Attorney for Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-5588          Case Name: Tennessee et al. v. Cardona et al.

Name of counsel: Sylvia May Mailman

Pursuant to 6th Cir. R. 26.1, Independent Women's Law Center
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ September 3, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Sylvia May Mailman

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-5588          Case Name: Tennessee et al. v. Cardona et al.

Name of counsel: Sylvia May Mailman

Pursuant to 6th Cir. R. 26.1, Women's Declaration International USA
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

    No

---

CERTIFICATE OF SERVICE

I certify that on _____September 3, 2024_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Sylvia May Mailman

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 24-5588            Case Name: Tennessee et al. v. Cardona et al.

Name of counsel: Sylvia May Mailman

Pursuant to 6th Cir. R. 26.1, Concerned Women for America
                                                    *Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ September 3, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Sylvia May Mailman

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ...................................................... i

TABLE OF AUTHORITIES ......................................................................... v

STATEMENT OF *AMICI* INTEREST ............................................................... 1

SUMMARY OF THE ARGUMENT ................................................................ 3

ARGUMENT ............................................................................................. 5

    I.    Requiring male access to female locker rooms harms women in violation of Title IX ............................................................................ 7

    II.   The Final Rule unlawfully threatens women's sports beyond the locker room. ........................................................................................ 11

CONCLUSION ......................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Line Pilots Ass'n v. F.A.A.*,
   3 F.3d 449 (D.C. Cir. 1993)...................................................................11

*Data Marketing Partnership, LP v. Dept. of Labor*,
   45 F.4th 846 (5th Cir. 2022)................................................................11

*Kentucky v. Yellen*,
   54 F.4th 325 (6th Cir. 2022)...........................................................4, 14

*South Dakota v. Dole*,
   483 U.S. 203 (1987).........................................................................4, 14

*Texas v. Cardona*,
   No. 4:23-CV-00604-O, 2024 WL 2947022 (N.D. Tex. June 11,
   2024) .................................................................................................10

*Utility Air Regulatory Group v. EPA*,
   573 U.S. 302 (2014).............................................................................13

## Other Authorities

34 C.F.R. §106.10.......................................................................................12

34 C.F.R. §106.33.......................................................................................10

34 C.F.R. §106.41(a) .............................................................................11, 13

34 C.F.R. §106.41(b) .............................................................................12, 13

117 Cong. Rec. 30399 (Aug. 6, 1971) ........................................................6

118 Cong. Rec. 5807 (Feb. 28, 1972) (Statement of Sen. Birch
   Bayh) ................................................................................................3, 6

Brief of *Amicus Curiae* Women's Declaration International USA, *West Virginia Secondary School Activities Commission v. B.J.P.*, No. 24-44 (U.S., Aug. 15, 2024) ........................................................................13

Don Sabo & Phil Veliz, Women's Sports Foundation, *Go Out and Play: Youth Sports in America* (2008) ...........................................................6

Doreen Denny, Concerned Women for America, *CWA's Victory in Transgender Sports Case a Win for Women's Rights* (Oct. 20, 2020) .........................................................................................................2

Ellen J. Staurowsky, et al., Women's Sports Foundation, *Her Life Depends On It III: Sport, Physical Activity, and the Health and Well-Being of American Girls and Women* (2015) ...............................................5

Ernst & Young, PRNewswire, *Female executives say sport helps accelerate leadership and career potential* (Oct. 9, 2014) ....................................5

Independent Women's Forum, *Competition: Title IX, Male-Bodied Athletes, and the Threat to Women's Sports* (2d ed. 2023) ...............................5

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ..........................................................2, 4, 6, 7, 10, 12, 14

Opinion of the Ohio Attorney General, No. 2023-006 (May 26, 2023) ...............................................................................................10, 11

Paul C. Sweeney, *Abuse Misuse & Abrogation of the Use of Legislative History: Title IX & Peer Sexual Harassment*, 66 UMKC L. Rev. 41 (1997) ...................................................................................5

U.S. Statement of Interest, *B.J.P. v. West Virginia State Board of Education*, No. 2:21-cv-00316, ECF No. 42 (S.D. W. Va. June 17, 2021) .......................................................................................12, 13

**STATEMENT OF *AMICI* INTEREST**

Independent Women's Law Center (IWLC) is a project of Independent Women's Forum (IWF), a nonprofit, non-partisan 501(c)(3) organization founded by women to foster education and debate about legal, social, and economic issues. IWF promotes access to free markets and to the marketplace of ideas. It also supports policies that expand liberty, encourage personal responsibility, and limit the reach of government. Independent Women's Law Center supports this mission by advocating—in the courts, before administrative agencies, in Congress, and in the media—for equal opportunity, individual liberty, and respect for the American constitutional order.

Women's Declaration International (WDI, of which WDI USA is one chapter) is an all-volunteer global organization of women who fight to protect women and girls as a sex class. It consists of women from every walk of life and of diverse races, ethnicities, religions, and sexual orientations. WDI USA is a nonpartisan organization, but its supporters generally consider themselves liberal, very liberal, or progressive. WDI USA works to advance the Declaration on Women's Sex-Based Rights, which reaffirms women's sex-based rights, including women's rights to reproductive integrity and the elimination of all forms of discrimination against women and girls that result from the redefinition of the category of sex to include "gender identity" throughout U.S. law, policy, and practice.

Concerned Women for America (CWA) is the largest public policy women's organization in the United States with members in all fifty states, and thousands within the Sixth Circuit. Through its grassroots organization, CWA encourages policies that strengthen and protect women and families and advocates for the virtues that are central to America's cultural health and welfare. CWA has a deep interest in working against nullification of women's sports and protecting female athletes from the injustice of competing against biological males. In 2020, the Department of Education's Office of Civil Rights agreed with CWA's complaint against a university's policy regarding male participation in women's sports, finding that the school violated Title IX equal opportunity protections for female athletes and requiring the school to rescind its policy. *See* Doreen Denny, Concerned Women for America, *CWA's Victory in Transgender Sports Case a Win for Women's Rights* (Oct. 20, 2020), https://perma.cc/8JZX-FFLL.

IWLC, WDI USA, and CWA are concerned that the Department of Education's Final Rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. § 106, *et seq.*), by redefining Title IX's prohibition on "sex" discrimination to encompass "gender identity" discrimination, will reverse the gains women have achieved in the law's 52-year existence, particularly with regard to athletics. Women have already lost competitions, roster spots, and been forced to drop out of competitions when males "identify" as women on the field. These same males have inflicted life-

long injuries on the women Title IX is supposed to protect. Moreover, women have been forced to endure invasive losses of privacy when men gain access to *female* locker rooms. As a women's group, IWLC strongly opposes any interpretation of Title IX that would force women to accept, as a condition for competing in sports, unfair competition and nudity in the presence of members of the stronger sex. Such a regime is regressive and violates the core premise of Title IX.

All parties consented to the filing of this brief, and IWLC and WDI USA are therefore permitted to file under Rule 29(a)(2) of the Federal Rules of Appellate Procedure. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitted the brief; and no one—other than the *amici curiae*—contributed money that was intended to fund preparing or submitting the brief.

## SUMMARY OF THE ARGUMENT

Title IX protects against sex-based discrimination. It does so, in part, by expressly recognizing differences between the two sexes. For example, the law ensures that women have equal educational opportunities by permitting schools to host sex-segregated sports and to segregate the sexes in spaces "where personal privacy must be preserved," are explicitly permitted. 118 Cong. Rec. 5807 (Feb. 28, 1972) (Statement of Sen. Birch Bayh). That is how the law has always been understood.

Lacking the votes in Congress to repeal this historic triumph for women, the Department of Education has purported to revise it by administrative fiat. According to the Department, Title IX's prohibition on "sex" discrimination *in fact* prohibits discriminating based on gender identity. Pursuant to this novel rewriting of Title IX, the Department demands that schools allow males to use women's locker rooms and (seemingly) requires that men "identifying" as women be permitted to compete in women's sports. It promulgated these demands through a Final Rule, *see Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. §106, *et seq.*), that is both arbitrary and contrary to law. As University of Pennsylvania swimmer Paula Scanlan experienced, stripping nude and showering before a male eighteen times per week, caused her—as a woman—tangible, sex-based harm. Title IX cannot plausibly be interpreted to require that.

Moreover, the Department throws sex-based protections under the Title IX athletics regulation into uncertainty. The Department purports not to resolve, with the Final Rule, the question whether athletics can be segregated by biological sex. That harms women seeking fair competition. And the uncertainty the Final Rule stokes regarding the permissibility of women-only sports violates the Constitution: conditions attached to Spending Clause legislation (such as Title IX) are unenforceable unless they are unambiguous. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022).

**ARGUMENT**

Originally introduced by Senator Birch E. Bayh as the Women's Equality Act of 1971, Title IX has today helped millions of women to pick new courses of study, gain equal access to educational resources, and engage in athletics in ways unthinkable by prior generations. *See* Paul C. Sweeney, *Abuse Misuse & Abrogation of the Use of Legislative History: Title IX & Peer Sexual Harassment*, 66 UMKC L. Rev. 41, 54 (1997); Complaint, R.1, PageID#15.

"Prior to the passage of Title IX, fewer than 5% of female students participated in high school sports; by 2019, that number had grown to approximately 43%." Independent Women's Forum, *Competition: Title IX, Male-Bodied Athletes, and the Threat to Women's Sports*, 12 (2d ed. 2023), https://perma.cc/GX6F-ZMVY. "The female share of athletic scholarships has also increased dramatically during this time. In 1972, almost no such scholarships existed." *Id*. "By 2017, women received from 41% to 45% of athletic scholarship dollars, depending on the division in which they competed." *Id*.

All this is worth celebrating. Girls who play sports achieve outside of sports. They build traits like team leadership, collaboration, and self-confidence, all helpful in building successful careers and personal lives. *See* Ellen J. Staurowsky, et al., Women's Sports Foundation, *Her Life Depends On It III: Sport, Physical Activity, and the Health and Well-Being of American Girls and Women* (2015), https://perma.cc/MZ2W-T2H8. In a survey of 400 women executives, 94% reported having competed as athletes. Ernst & Young, PRNewswire, *Female executives say sport helps accelerate leadership and career*

*potential* (Oct. 9, 2014), https://perma.cc/3ZBD-L6NJ. And it builds happier families, measured by feelings of closeness, reliance, and fulfilment. Research shows both single-parent and dual-parent families reported higher satisfaction when girls participate in sports. Don Sabo & Phil Veliz, Women's Sports Foundation, *Go Out and Play: Youth Sports in America* 49–50 (2008), https://perma.cc/TU5G-RXU4.

In many contexts—including athletics, restrooms, and locker rooms—Title IX permits schools to foster opportunities for women by allowing schools to offer women-only sports and spaces. That was quite intentional. Sponsoring Senator Birch E. Bayh explained that Title IX would not "require integration of dormitories between the sexes," nor would it require "the de-segregation of football fields." 117 Cong. Rec. 30399, 30407 (Aug. 6, 1971). Instead, Congress was "trying to … provide equal access for women and men students to the educational process and the extra-curricular activities in a school, where there is not a unique facet such as football involved." *Id*. This is the same sponsoring senator who would later explain that, under Title IX, such "differential treatment by sex" was permissible "where personal privacy must be preserved." 118 Cong. Rec. at 5807.

The Final Rule dissolves all that in two notable ways. One, the Department demands that men be allowed into women's locker rooms. 89 Fed. Reg. at 33,818. And two, the Department generally defines Title IX's prohibitions on "sex" discrimination to require treating transgender-identifying boys and men (and other boys and men who assert harm from sex-based separation)

as though they were women, throwing the protections under the Title IX athletics regulation into uncertainty. If allowed to take effect, the Final Rule will devastate women's athletics in a manner that is contrary to law, unreasoned, and entirely unclear. This violates the Administrative Procedure Act and constitutional requirements governing legislation (like title IX) enacted pursuant to the Spending Clause.

## I.    Requiring male access to female locker rooms harms women in violation of Title IX

The Department says that sex-specific locker rooms—permitted under Title IX for the law's entire existence—may no longer be sex-specific. Instead, schools must grant locker-room access based on gender identity, so that males who "identify" as women may access women's locker rooms. 89 Fed. Reg. at 33,818. The Final Rule says so in a hushed way, permitting female locker rooms in "certain circumstances," *id*., but *not* circumstances that would result in excluding men who identify as "women" from women's locker rooms, *see id*.  So, under the Final Rule, locker rooms must cease to be sex-specific when a male concludes that using a men's locker room is inconsistent with his felt sense of "gender identity." Put differently, locker rooms can be sex specific until males insist they can't be.

When locker rooms can't be segregated by sex—sex, not gender identity—women bear the costs.

Take the experience of former University of Pennsylvania swimmer and Independent Women's Forum ambassador Paula Scanlan. In the fall of

7

2019, when Paula and her teammates first learned that who they already knew as William, now Lia, Thomas would be joining their team, the women's primary concern was not competitions, roster spots, or fairness—it was the locker room.

The coaches assigned the 6'4" fully intact male a locker inside the women's room, Paula nervously asked her coach for an accommodation, to be as far away as possible. But this didn't help her teammates, several of whom were forced to undress next to a male 18 times a week for an entire year, all due to random locker assignments. And the distance was unhelpful. When Paula went into the locker room to change for the first time that season, she immediately felt her stomach churn with unease—not the feeling one enjoys before undressing. Having shared locker rooms with hundreds if not thousands of girls before, she had never felt this invasiveness. Not only was Paula left to suffer emotional distress, she couldn't speak of it, to avoid accusations of bigotry.

One of Paula's teammates, forced to change next to Thomas, simply couldn't expose her body in the way she was being asked to. So instead, she was relegated to a single-stall restroom. The male replaced the female.

Swimming locker rooms are not a places of modesty. Swimmers completely change out of their swimsuits after every practice and often shower in the open. Paula, like her teammate, couldn't give up her bodily integrity to shower with a male, so she stopped showering at the pool. She would put

8

her soaking wet hair up and walk home, even in the brutal Northeastern winter.

But freezing and inconvenience were not the worst parts for Paula, it was the constant fear she felt in the locker room. She started changing as quickly as possible, trying to minimize her time in the locker room. She would bury her head in her locker and cover herself with a towel while changing, almost pretending that minimizing what she saw or shielding small bits of her body would somehow alleviate the incredible loss of privacy. But often, while changing, she would hear a masculine voice in the background. Paula would jump and worry that someone was in the locker room who shouldn't be there. She had to ignore her own innate instincts and try to compete right afterward.

Then came the nightmares. At least once a week, Paula would wake up in a pool of sweat. Her nightmares varied, but they all involved assault, vulnerability, and having men in a private space, and would often come before early morning practices, where her nightmare would be in essence a reality. Paula's right to participate in athletics free from discrimination, harassment, privacy violations, or mental anguish was simply cast aside.

Paula's story is as concerning as it is the obvious result of this policy. And that violates the promise of Title IX.

"Title IX explicitly appreciates the innate biological variation between men and women that occasionally warrants differentiation—and even separation—to preserve educational opportunities and to promote respect for

both sexes." *Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022, at *32 (N.D. Tex. June 11, 2024), *order superseded by* 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024). The statutory language enshrines "Congress's view that separating the two sexes 'where personal privacy must be preserved' is not the type of discrimination prohibited by the statute." *Id.* (citing 118 Cong. Rec. at 5807 (Statement of Sen. Birch Bayh)).

This personal privacy Title IX is supposed to protect is not desired because of bigotry; it is a natural instinct rooted in biological realities. The first of those realities that males alone have the biological capability to impregnate women. Combine that with other objective facts—men are, on average, larger, stronger, and more violent than women—and it is not hard to see why women are *naturally* nervous when made to expose their bodies around males. *Cf.* Opinion of the Ohio Attorney General, No. 2023-006 at 14–15 (May 26, 2023), https://perma.cc/UT8L-Z56F. The Department's demand that schools provide locker-room access in accordance with gender identity ignores these biological realities and, in the process, violates Title IX's unmistakable and longstanding requirement to account for the "unique facet[s]" of the sexes.

Moreover, the dissolution of sex-segregated locker rooms lacks reason. On the one hand, the rule announces that schools violate Title IX unless they allow male students access to the female locker room. 89 Fed. Reg. at 33,820–21. On the other hand, the Department acknowledges that the existing regulatory scheme allows schools to have sex-separated locker rooms, 34 C.F.R.

§106.33, and that the best reading of that regulation is that schools *can* reserve access to sex-separated locker rooms based on biological sex. *Id*. at 33,821. Bizarrely, however, the Department *leaves that existing regulation in place*. *Id.* The Department says the existing regulation is void because it violates Title IX itself, *id.*, leaving the regulation in a zombie-like state where it still appears on the books but supposedly has no force.

Perhaps the Department didn't want to take the political hit of actually saying that it is forcing schools to let males into female bathrooms, locker rooms, and showers. But creating a scheme where its regulations are now in direct conflict—confusing regulated parties and students alike—was not a reasonable approach to rulemaking. *See Data Marketing Partnership, LP v. Dept. of Labor*, 45 F.4th 846, 857 (5th Cir. 2022). *Air Line Pilots Ass'n v. F.A.A.*, 3 F.3d 449, 453 (D.C. Cir. 1993).

## II.   The Final Rule unlawfully threatens women's sports beyond the locker room.

The district court believed that women's sports, outside the locker room, are preserved "until the Proposed Athletics Rule"—a different rule under consideration by the Department—"is finalized and issued." Order, R.100, PageID#2073–74. We wish we shared the district court's confidence. But the Final Rule hardly gives plaintiff States, and millions of girls, clarity regarding the extent schools may offer women-only sports.

While the longstanding athletics regulation prohibits discrimination on the basis of sex in athletics programs, 34 C.F.R. §106.41(a), the Final Rule

redefines sex discrimination, as used in Title IX to include discrimination on the basis of gender identity, 89 Fed. Reg. at 33,886 (proposing new 34 C.F.R. §106.10). Logically, then, the Final Rule requires schools to abandon sex-specific sports in favor of sports based on gender identity. At the very least, schools are left uncertain as to their obligations, and are likely to sacrifice women-only sports if that is what it takes to avoid being sued by males who want to compete with females.

That is not the only source of uncertainty. While the longstanding athletics regulation goes on to explicitly permit schools to "operate or sponsor separate teams for members of each sex where selection for such teams is based on competitive skill or the activity involved is a contact sport," 34 C.F.R. §106.41(b), the Final Rule says "that otherwise permissible sex separation is consistent with Title IX *as long as* it is carried out in a manner that does not impose more than de minimis harm on affected students," 89 Fed. Reg. at 33,811 (emphasis added). While the Department says it will allow "de minimis harm"—in other words, sex-based sports—"permitted by" §106.41(b), it is unclear what that de minimis harm might consist of. The Department of Justice has taken the position that the "separate teams" language in 34 C.F.R. §106.41(b) *does* permit female teams, but only so long as those teams include "transgender girls," which is to say, biological males. U.S. Statement of Interest, *B.J.P. v. West Virginia State Board of Education*, No. 2:21-cv-00316, ECF No. 42 at 11–12 (S.D. W. Va. June 17, 2021). The Department derives this conclusion from the overriding statutory protection prohibiting

discrimination on the basis of sex. *Id*. at 11 ("[T]he implementing regulation cannot override the statutory prohibition against discrimination on the basis of sex." (quoting *Grimm v. Gloucester County School Board*, 972 F.3d 586, 618 (4th Cir. 2020) (emphasis omitted)). Under this understanding, the Final Rule bears directly on athletics. And it creates tremendous uncertainty. For starters, what are "transgender girls"? *See* Brief of *Amicus Curiae* Women's Declaration International USA at 19–21, *West Virginia Secondary School Activities Commission v. B.J.P.*, No. 24-44 (U.S., Aug. 15, 2024) (explaining there is no "coherent category of human beings called 'transgender'"). How do schools tell? Does any male who identifies as a woman on particular day qualify? If not, who does?

As this suggests, the Final Rule, and the administration's understanding of it, leaves vast uncertainty regarding how or whether the redefinition of sex-based discrimination affects the athletics regulation, including 34 C.F.R. §106.41(a).

At worst, the Department has redefined sex-based sports, including those permitted by 34 C.F.R. §106.41(b), as gender-identity based sports, thus requiring the inclusion of males in women's sports without any statutory basis. That violates the APA. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 328 (2014) (reaffirming the "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate").

The middle-ground possibility is that the Department has left schools to guess. But that violates the Constitution: conditions attached to Spending Clause legislation (such as Title IX) are unenforceable unless they are unambiguous. *Dole*, 483 U.S. at 207; *Kentucky*, 54 F.4th at 347. A rule prohibiting sex-segregated sports in undefined circumstances does *not* follow unambiguously from the Final Rule's text. And any such rule would unconstitutionally subject States and other recipients to an ambiguous funding condition. So, the middle-ground position is necessarily contrary to law and thus invalid under the APA.

At best, single-sex athletics are entirely untouched. But that makes the Final Rule unreasoned and arbitrary, because it offers no rational basis for reading "sex" to mean "sex" in Title IX's application to sports, while reading "sex" to mean "gender identity" (at least sometimes) in Title IX's application to regulations governing bathrooms and locker rooms. *Cf.* 89 Fed. Reg. at 33,817. Without a clearly articulated explanation regarding why certain parts of an educational institution's campus and activities must comply with the Final Rule's "gender identity" mandate while others do not, the agency's contradictory reasoning constitutes a level of rulemaking arbitrariness prohibited by the APA.

## CONCLUSION

The Department wishes to require gender identity-based access to women's spaces in federally funded education programs. It lacks the statutory authority to do so. And for good reason. Congress has not gathered sufficient votes to demand that freshmen girls undress with senior boys, nor that women's records across the country be replaced by individuals who have gone through male puberty (a class of people traditionally referred to as "men").

Independent Women's Law Center, Women's Declaration International USA, and Concerned Women for America respectfully request this Court affirm the district court's ruling granting injunctive relief.

Dated: September 3, 2024

Benjamin M. Flowers
ASHBROOK BYRNE KRESGE LLC
PO Box 8248
Cincinnati, Ohio 45249
(513) 201-5775
bflowers@ashbrookbk.com

/s/ Sylvia May Mailman

Sylvia May Mailman
  *Counsel of Record*
INDEPENDENT WOMEN'S LAW CENTER
1802 Vernon Street NW, Ste. 1027
Washington, DC 20009
(202) 807-9986
may.mailman@iwf.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this *amicus* brief complies with the type-volume requirements set forth in Federal Rule of Appellate Procedure 29(a)(5), as it contains 3,496 words, from the Statement of *Amici* Interest through the Conclusion. I further certify that the brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Palatino Linotype font.

<u>/s/ Sylvia May Mailman</u>
Sylvia May Mailman

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief with the Court via the appellate CM/ECF system on September 3, 2024. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Sylvia May Mailman
Sylvia May Mailman