No. 24-5588

# United States Court of Appeals for the Sixth Circuit

———————————

STATE OF TENNESSEE, ET AL.,
PLAINTIFFS-APPELLEES,

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL, ET AL.,
INTERVENORS-APPELLEES,

*v.*

MIGUEL CARDONA, ET AL.,
DEFENDANTS-APPELLANTS.

———————————

*APPEAL FROM THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE,
NO. 24-CV-72, HON. DANNY C. REEVES, PRESIDING*

———————————

**BRIEF OF AMERICA FIRST LEGAL FOUNDATION AS *AMICUS CURIAE* SUPPORTING APPELLEES AND AFFIRMANCE**

———————————

GENE P. HAMILTON
REED D. RUBINSTEIN
NICHOLAS R. BARRY
*America First Legal Foundation*
*611 Pennsylvania Ave. SE #231*
*Washington, D.C. 20003*
*(202) 964-3721*
*gene.hamilton@aflegal.org*

CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay Street #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-5588            Case Name: State of Tennessee v. Cardona

Name of counsel: Christopher Mills

Pursuant to 6th Cir. R. 26.1, Amicus America First Legal Foundation
                                          *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

---

CERTIFICATE OF SERVICE

I certify that on _____ September 3, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Christopher Mills
Spero Law LLC, 557 East Bay St.
#22251, Charleston, SC 29413

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................ ii

Interest of *Amicus Curiae* .......................................................1

Introduction .............................................................................3

Argument..................................................................................6

    I.    The Rule unlawfully conflates biological sex with gender identity.........................................................................6

        A.    Sex is biological. .......................................................7

        B.    Title IX does not cover gender identity discrimination. ...........10

    II.    The Rule would nullify Title IX's protections for women. ................15

        A.    The Rule renders Title IX's administration absurd. .................15

        B.    The Rule threatens women's opportunities—and safety. .........19

Conclusion ............................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) .................10

*Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791
(11th Cir. 2022) ......................................................... 7, 9, 11, 13, 15, 22

*Bostock v. Clayton County*, 590 U.S. 644 (2020) .......................... 1, 3, 7, 11, 12, 13

*Cape* v. *Tennessee Secondary Sch. Athletic Ass'n*, 563 F.2d 793
(6th Cir. 1977) ...................................................................20

*Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ................2

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)........................ 9, 10

*Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30 (2012)..................................8

*Frontiero v. Richardson*, 411 U.S. 677 (1973)............................................................3

*Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016).......................16

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).........................7

*Grove City Coll. v. Bell*, 465 U.S. 555 (1984)............................................................8

*Kuhn v. Washtenaw Cnty.*, 709 F.3d 612 (6th Cir. 2013)........................................10

*L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) .........................................................9

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
370 F.3d 275 (2d Cir. 2004) .......................................................... 8, 19

*Meriwether* v. *Hartop*, 992 F.3d 492 (6th Cir. 2021) ..............................................20

*NCAA v. Alston*, 594 U.S. 69 (2021) ......................................................................21

*Neese v. Becerra*, 640 F. Supp. 3d 668 (N.D. Tex. 2022)........................................19

*Nguyen v. INS*, 533 U.S. 53 (2001)...........................................................................9

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ..................................................................11

*United States v. Virginia*, 518 U.S. 515 (1996) ....................................................4, 9

STATUTES

20 U.S.C. § 1681 ................................................................................ 3, 7, 13

20 U.S.C. § 1686 ................................................................................3, 7

Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (Aug. 21, 1974) .................7

OTHER AUTHORITIES

A. McClure, *After a Male Caused Her Partial Paralysis, Female Volleyball Player Payton McNabb Now Fights to Protect Women's Sports*, Independent Women's Forum, https://perma.cc/FFC3-68QV ................................................21

A. Wilson, *NCAA Title IX 50th Anniversary: The State of Women in College Sports* (2022), https://perma.cc/4CDW-PLQZ ...............................................20

Am. Compl., *Gaines v. NCAA*, No. 1:24-cv-01109-MHC, Doc. 64 (N.D. Ga. June 26, 2024) ..............................................................................................22

*Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832 (Dec. 2015), https://perma.cc/6FAS-676M ................................................................16

I. Yip, *Nonbinary runner Nikki Hiltz advances to semifinals for Team USA*, NBC News (Aug. 6, 2024), https://perma.cc/AJ75-2MPS ..............................14

J. Rafferty, *Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 Pediatrics no. 4 (Oct. 2018), https://perma.cc/8PYT-CGUG ..............................................................17

K. Camburn, *9 Young People Explain what Being Non-binary Means to Them* (July 14, 2019), https://perma.cc/SSD6-ZFML ....................................16

L. Gilbert, *Female Athlete's Injury Creates Outrage Around Coed Sports*, The Daily Signal (Nov. 7, 2023), https://perma.cc/G4F8-35YL ...................22

M. Koenig, *School stands by trans basketball player accused of hurting opposing girls, blasts 'harmful' criticism*, New York Post (Feb. 28, 2024), https://perma.cc/5TV8-W9GE ..............................................................21

*Massachusetts school calls for change after female field hockey player hurt by boy's shot*, CBS News (Nov. 6, 2023), https://perma.cc/NRM2-LTJW .............21

N. Barber, *The evolutionary psychology of physical attractiveness: Sexual selection and human morphology*, 16 Ethnology and Sociobiology 395 (1995)...2

Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21 ...............................................................................10

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* (2022), https://perma.cc/KM5L-F26V .......................... 16, 18

*The Gender Book*, https://perma.cc/42WU-KRLX ...................................................17

The Trevor Project, *National Survey on LGBT Youth Mental Health 2019*,
https://perma.cc/5MTL-GFBG.........................................................................6

**RULES**

Enforcement of Title IX of the Education Amendments of 1972 With Respect to
Discrimination Based on Sexual Orientation and Gender Identity in Light of
*Bostock v. Clayton County*, 86 Fed. Reg. 32637 (2021) ......................................22

Nondiscrimination on the Basis of Sex in Education Programs or Activities
Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (2022) ...................2

Nondiscrimination on the Basis of Sex in Education Programs or Activities
Receiving Federal Financial Assistance,
89 Fed. Reg. 33474 (2024) ................................................ 2, 4, 11, 13, 14, 18, 20

Nondiscrimination on the Basis of Sex Under Federally Assisted Education
Programs and Activities, 40 Fed. Reg. 24128 (1975) ...........................................8

Preventing and Combating Discrimination on the Basis of Gender Identity or
Sexual Orientation, 86 Fed. Reg. 7023 (2021).....................................................2

**REGULATIONS**

34 C.F.R. § 106.32 ....................................................................................................4, 7

34 C.F.R. § 106.33 ................................................................................................ 3, 4, 7

34 C.F.R. § 106.34 ...........................................................................................................7

34 C.F.R. § 106.37 .........................................................................................................20

34 C.F.R. § 106.40 ......................................................................................................7, 8

34 C.F.R. § 106.41 ........................................................................................... 3, 4, 7, 8

34 C.F.R. § 106.43 ...........................................................................................................7

34 C.F.R. § 106.52 ...........................................................................................................7

34 C.F.R. § 106.59 ...........................................................................................................7

34 C.F.R. § 106.61 ...........................................................................................................7

## INTEREST OF *AMICUS CURIAE*

America First Legal Foundation is a nonprofit organization dedicated to promoting the rule of law in the United States by preventing executive overreach, ensuring due process and equal protection for every American citizen, and encouraging understanding of the law and individual rights guaranteed under the Constitution and laws of the United States.[1]

America First Legal has a substantial interest in this case. First, it represents parents nationwide who are fighting, *inter alia*, to protect their daughters' physical safety, personal privacy, and access to sports and other educational opportunities. Second, as a participant in notice-and-comment rulemaking and an organization often engaged in litigation to protect the rule of law, it has an interest in ensuring that the Executive Branch does not abuse the Constitution, the Administrative Procedure Act, and controlling Supreme Court authorities, as it has done here. Third, America First Legal's undersigned attorneys include the former Trump Administration official who authored the Department of Education's Office of General Counsel memorandum on *Bostock v. Clayton County*, 590 U.S. 644 (2020), referenced in the Biden Administration's Final Rule. *See* Nondiscrimination on the Basis of Sex in

---

[1] All parties consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and, no person—other than the *amicus curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474, 33807, 33820 (2024). The referenced memorandum is attached as Exhibit 1.

The Biden Administration's criticisms of the memorandum have included inconsistency with Executive Order 13988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (2021), and failure to "explain how a school should determine a student's 'biological' sex."[2] First, executive orders do not rewrite statutes. *See Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996). Second, the settled science is that there are self-evident biological differences in morphology between males and females and that these differences are critical to human reproduction. *See, e.g.*, N. Barber, *The evolutionary psychology of physical attractiveness: Sexual selection and human morphology*, 16 Ethnology and Sociobiology 395 (1995). Thus, the Biden Administration's assertion that the federal government must "explain" to a school (or anyone else) how to determine biological sex erases objective reality. The infinitely more difficult question is how to determine "gender identity," and the Biden Administration's guidance makes no attempt to explain *that*. *See infra* Part II.A.

---

[2] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390, 41530–31 (2022).

2

## INTRODUCTION

Title IX, enacted in 1972 and titled "Sex," provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination" under any education program or activity receiving federal financial assistance. 20 U.S.C. § 1681(a). Statutory and regulatory text and structure, Supreme Court precedents, and all other available evidence show that the ordinary public meaning of the term "sex" at the time of Title IX's enactment referred to biological male and female, not "gender identity." Under Title IX, "sex, like race and national origin, is an immutable characteristic determined solely by" biology. *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion). Gender identity is a "distinct concept[] from sex." *Bostock*, 590 U.S. at 669.

Congress did not blind itself to reality when enacting Title IX. Title IX recognizes that ensuring equality between men and women requires accounting for and accommodating biological differences through, for instance, "separate living facilities for the different sexes," "separate toilet, locker room, and shower facilities," and "separate [sports] teams." 20 U.S.C. § 1686; 34 C.F.R. §§ 106.33, 106.41(b).[3] In accord with the broader statutory prohibition on sex discrimination, male and female

---

[3] All references to Title IX regulations refer to the regulations as they existed before the Rule.

3

facilities must be "comparable," and schools must provide "equal athletic opportunity for members of both sexes." 34 C.F.R. §§ 106.32(b), 106.33, 106.41(c). In short, Title IX forbids treating one sex worse than the other; it does not forbid (and sometimes mandates) recognizing that boys and girls have "inherent," "enduring" biological differences. *United States v. Virginia*, 518 U.S. 515, 533 (1996).

The Biden Administration's Rule, by contrast, upends the plain text, the relevant statutory context, and Congress's uniquely clear legislative intent by forcing schools nationwide to disregard biological differences between boys and girls, nullifying all the ways that Congress sensibly recognized that boys and girls are not the same. The Rule here interprets Title IX's prohibition on sex discrimination to "include" "discrimination against an individual on the basis of their . . . gender identity." 89 Fed. Reg. at 33803. The Department of Education asserts that such discrimination "is sex discrimination because [it] necessarily involves consideration of a person's sex." *Id.* at 33802.

The Rule elides the critical, enduring distinctions between males and females that form the meaning of the statutory term "sex." In relevant Title IX cases, the issue presented has been whether a person with some different gender identity can engage in some sex-selective activity. Again, such activities and places—sports, living facilities, bathrooms—are statutorily permitted to discriminate based on biological sex because it is relevant to all those situations. Presumably, that's why the

4

Department here tries to run from the issue of school athletics—while imposing a Rule that will make it impossible for schools to have sports teams separated by sex. The Department simply wants some biological boys to be considered girls—but Title IX cares only about biological sex.

When biological sex is a relevant and permissible basis for differential treatment, "gender identity" does not flip the table. This is because biological sex is not the same as the recent notion of "gender identity." A rule that no boy may enter and use the girls' bathroom is permitted under Title IX. That a boy calling himself a girl (or anything else) also cannot use the girls' bathroom does not result in unlawful sex discrimination, for this person has been treated the same as any other boy. The boy's gender identity is irrelevant. To reach a contrary result, the Rule rewrites Title IX and overrides Supreme Court precedents.

The Rule's unlawful conflation of biological sex and gender identity turns Title IX on its head. Rather than protect women's facilities, for instance, the Rule opens them to male intrusion. The Rule makes physical differences between male and female irrelevant—rendering null even the possibility of preventing men who have gone through puberty from entering girls' spaces or playing on their teams. Rather than protect privacy, the Rule upends centuries of common practice and opens otherwise closed bathrooms and locker rooms to anyone at any time based on self-proclaimed identities. By the Rule's logic, gender identity trumps all.

These ill-effects of the Rule will snowball. It is not possible to maintain two facilities (or teams) that are sex- *and* gender identity-separated. If a biological male is entitled to run girls' cross-country, it would presumably be impermissible sex discrimination to forbid *another* biological male (regardless of gender identity) from also competing on the girls' team. And what about the other "more than 100 gender identities"?[4] Ultimately, the Rule destroys Title IX: once one replaces "sex" with "gender identity" and defines "gender identity" as all varieties of fluid expression without connection to sex, every activity or facility must be open to a person based on their own self-described, internal, outwardly-invisible, and ever-changing "identity."

Title IX does not require ending women's sports, throwing intimate facilities open to all, and otherwise disregarding the biological reality that boys and girls are different. The Court should affirm.

## ARGUMENT

## I.    The Rule unlawfully conflates biological sex with gender identity.

When Title IX contemplates sex-based treatment, it cannot violate Title IX for schools to act accordingly. In other words, if Title IX allows schools to separate sports, living facilities, and bathrooms based on biological sex, then Title IX could

---

[4] The Trevor Project, *National Survey on LGBT Youth Mental Health 2019*, at 7, https://perma.cc/5MTL-GFBG.

not simultaneously make it unlawful to exclude opposite-sex individuals, no matter how they identify. Concluding otherwise, as the Department of Education did, unlawfully conflates sex and gender identity.

### A.    Sex is biological.

Sex has always, including at the time of Title IX, meant biological sex. *See Bostock*, 590 U.S. at 655; *id.* at 734–44 (Alito, J., dissenting) (Appendix A); *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812–15 (11th Cir. 2022) (en banc); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632–34 (4th Cir. 2020) (Niemeyer, J., dissenting). Throughout, the statute articulates the distinction between the two sexes, *e.g.*, "both sexes," "Boy or Girl," "Father-son or mother-daughter activities," 20 U.S.C. § 1681(a)(2), (7), (8); *see also id.* § 1686.

Longstanding regulations echo this distinction. *E.g.*, 34 C.F.R. §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43, 106.52, 106.59, 106.61. Shortly after enacting Title IX, Congress passed the Javits Amendment, instructing the Secretary of Health, Education, and Welfare to publish regulations implementing the provisions of Title IX "which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (Aug. 21, 1974). Congress reserved the right to review any regulation following publication to determine whether it was "inconsistent with the Act from which it derives its authority." *Id.*, § 509, 88 Stat. at 567

(cleaned up). The Secretary of Health, Education, and Welfare subsequently published Title IX regulations, including regulatory text identical to the current text of the Department's athletics regulations. *Compare* Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities, 40 Fed. Reg. 24128, 24142–43 (1975)*, with* 34 C.F.R. § 106.41. After congressional review, including over six days of hearings, Congress allowed the regulations to go into effect. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004) (laying out the history of the Javits Amendment, and the response from Congress to the regulations promulgated thereunder). Thus, the Department's pre-Rule regulations validly and authoritatively clarified Congress's view of a recipient's non-discrimination duties under Title IX, including with respect to sex-separated athletics under 34 C.F.R. § 106.41. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984).

Additional evidence that the Department historically considered the term "sex" and human biology inextricably linked may be found in the Department's regulations expressly prohibiting discrimination related to pregnancy. 34 C.F.R. § 106.40(b)(1); *see id.* § 106.40(b)(5) (referring to the protected student as a "she"). Biological males, regardless of their "gender identity" or surgical procedures, forever have one X and one Y chromosome and cannot ovulate or carry and bear children. *See Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30, 55 (2012) (Ginsburg,

J., dissenting) ("[I]t is the capacity to become pregnant which primarily differentiates the female from the male." (cleaned up)).

Biological sex is real. It "is not a stereotype." *Adams*, 57 F.4th at 813. "Recognizing and respecting biological sex differences does not amount to stereotyping—unless Justice Ginsburg's observation in *United States* v. *Virginia* that biological differences between men and women 'are enduring' amounts to stereotyping." *L.W. v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023) (quoting 518 U.S. at 533). "[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." *Virginia*, 518 U.S. at 533.

The Supreme Court has likewise recognized that governmental policies can and often should recognize the inherent differences between the sexes. As it explained in one case, "[t]o fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not be—risks making the guarantee of equal protection superficial, and so disserving it." *Nguyen v. INS*, 533 U.S. 53, 73 (2001); *see also, e.g., Virginia*, 518 U.S. at 550 n.19 (explaining that admitting women to VMI "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468–69 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part) ("A sign that says 'men only'

looks very different on a bathroom door than a courthouse door."); *cf.* Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21 ("Separate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy.").

In sum, sex is biological, and that's how Title IX uses the term.

### B.    Title IX does not cover gender identity discrimination.

Where sex provides an appropriate basis for drawing distinctions—as in sports, facilities, and single-sex groups expressly protected by Title IX—a person is not excluded "because of" or "based on" gender identity. Instead, a person is excluded based on sex. A boy excluded from a girls' facility is excluded for one reason: because he is a boy. His gender identity matters no more than the color of his shoes. That's why Judge Easterbrook explained that the question here boils down to whether "Title IX uses the word 'sex' in the genetic sense." *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 775 (7th Cir. 2023) (opinion concurring in the judgment). As explained above, as Judge Easterbrook agrees, and as the Department does not meaningfully dispute, Title IX's reference to "sex" means biological sex.

Under both general equal protection and Title IX principles, a plaintiff alleging discrimination must show that he "was treated differently than a similarly situated" person. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013); *see also Cleburne*, 473 U.S. at 439. Nondiscrimination laws "keep[] governmental

10

decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). And for sex-based policies permitted by Title IX, "biological sex is the 'relevant respect' with respect to which persons must be 'similarly situated,' because biological sex is the sole characteristic on which" those policies are based. *Adams*, 57 F.4th at 803 n.6 (cleaned up). Thus, biological males are similarly situated to each other for purposes of these policies. Prohibiting a male who identifies as something else from using the girls' bathroom does not treat similarly situated people differently. Absent differential treatment, no Title IX claim exists.

The Rule's conclusion otherwise wrongly conflates gender identity with biological sex. Relying on *Bostock*, the Rule insists that discrimination based on gender identity" "is sex discrimination because [it] necessarily involves consideration of a person's sex." 89 Fed. Reg. at 33802. But for sex-separated facilities or activities, it makes no difference whether a biological boy is a transgender girl or nonbinary or a eunuch or any of the other 100+ gender identities. *Bostock*'s inquiry is inapt, because we already know that such policies discriminate based on sex. Even if "discrimination based on . . . transgender status necessarily entails discrimination based on sex," *Bostock*, 590 U.S. at 669, discrimination based on sex does not necessarily entail discrimination based on gender identity. Sex-separated activities obviously discriminate based on sex—and gender identity is irrelevant.

*Bostock* confirms this result. That decision "proceed[ed] on the assumption" that the term "sex," as used in Title VII, "refer[red] only to biological distinctions between male and female." 590 U.S. at 655. Not only did *Bostock* proceed on that assumption, it *depends* on the understanding that gender identity is a "distinct concept[] from sex." *Id.* at 669. *Bostock* provided the hypothetical of "an employer who fires a transgender person" who is biologically male, explaining that "[i]f the employer retains an otherwise identical employee who" is biologically female, "the employer intentionally penalizes a [male] person . . . for traits or actions that it tolerates in a[] [female] employee" and thus engages in sex discrimination. *Id.* at 660. If that is true—a puzzle considered below—it is only because the employee's sex is, in reality, male.

Presumably that's why the Department never really applied *Bostock*'s "straightforward rule": "chang[e] the [person's] [gender identity]" and see if it "yield[s] a different choice by the" policy. 590 U.S. at 659–60. When it comes to sex-separated activities, the choice would remain the same: no matter a male's gender identity, they are not entitled to participate in the female activity. Again, that's because the policy discriminates based on sex, not gender identity. And *sex*—

12

biological sex—is the relevant classification under which individuals asserting a Title IX claim must be similarly situated. *See Adams*, 57 F.4th at 803 n.6.[5]

Last and more broadly, the Department took an unwarranted leap from *Bostock*'s definition of "transgender" to the more encompassing term of "gender identity." *Bostock* assumed a simple definition: transgender means the opposite of one's biological sex. *See* 590 U.S. at 660–61 ("transgender status [is] inextricably bound up with sex"). The Rule does too: "The Department understands the term 'transgender' to refer to a person whose sex assigned at birth differs from their gender identity." 89 Fed. Reg. at 33803. This assumption is dubious: as explained in more detail below, we are now told that there are more than 100 gender identities, and transgender is an umbrella, dynamic term. See *infra* Part II.A. A prominent athlete who is biologically female and identifies as transgender and non-binary recently

---

[5] Of course, there could be many reasons not to apply *Bostock*'s reasoning in this context. Unlike Title VII, Title IX is not a "broad rule" lacking exceptions. *Bostock*, 590 U.S. at 669. The word "exceptions" is found within the first four words of Title IX. 20 U.S.C. § 1681(a). Title IX has a host of exceptions clarifying that "sex" is either male or female, and the two sexes can often be separated. *See* 20 U.S.C. § 1681(a)(1)–(9) (e.g., "Social fraternities or sororities; voluntary youth services organizations;" "Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations . . . limited to persons of one sex;" "Boy or Girl conferences;" "Boys State;" "Girls State;" and "'beauty' pageants"). These broad *exceptions* show that sex is often a permissible—and appropriate—consideration under Title IX. But the Department's reasoning fails even when fully applying *Bostock*'s logic, as explained.

competed for the United States in the Olympics—in the female competition.[6] Nothing prohibits a biological female from identifying as a transgender female.

In any event, though, the Rule is not limited to this narrow concept of "transgender," but instead is tied to "gender identity," which the Department "understands" "to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth." 89 Fed. Reg. at 33809. On this definition of gender identity as a person's internal sense of identity—nonbinary, two-spirit, genderflux, eunuch, bigender, agender—without necessary connection to sex, how could it be true that discrimination based on gender identity "is" discrimination based on sex? The Department has no explanation. Once its outdated stereotypes are corrected, gender identity has no inherent connection with sex, and the Rule's logic falls apart.

Of course, the Court need not go down the gender identity rabbit hole to grasp the simple points botched by the Department: "Sex" under Title IX means biological sex. A student excluded based on sex is not excluded based on gender identity. A student may thus be excluded from a bathroom, sport, or single-sex group for being the opposite sex, regardless of the student's appearance, identification, or orientation. And schools do not face liability under Title IX for recognizing reality-based

---

[6] I. Yip, *Nonbinary runner Nikki Hiltz advances to semifinals for Team USA*, NBC News (Aug. 6, 2024), https://perma.cc/AJ75-2MPS.

differences between boys and girls. The Department of Education's Rule is unlawful.

## II.    The Rule would nullify Title IX's protections for women.

Conflating "sex" and "gender identity" eviscerates Title IX, denying women and girls the legal protection that Congress intended to provide. As the Eleventh Circuit explained, if "sex" includes "gender identity," then "the various carveouts" for sex-separated activities like living facilities and sports teams "would be rendered meaningless." *Adams*, 57 F.4th at 813.  Reading "sex" as "gender identity" "would result in situations where an entity would be prohibited from installing or enforcing the otherwise permissible sex-based carve-outs when the carve-outs come into conflict with a transgender person's gender identity"—even though Title IX's text and longstanding regulations permit sex-based carveouts, not "gender identity"-based ones. *Id.* at 814. The results would be both absurd and profoundly discriminatory against women.

### A.    The Rule renders Title IX's administration absurd.

Reading "sex" in Title IX as "gender identity" would result in many absurdities. First, it is impossible to maintain activities or facilities that are separated by *both* sex and gender identity. As soon as a school permits a boy to run on the girls' cross-country team, that team is no longer sex-separated.  Then presumably it would also discriminate based on gender identity to keep males who identify as males from

that formerly-female team. This interpretation would put schools "in an impossible situation," and in practice would seem to redefine "sex" in Title VII as "*only* gender identity"—contradicting text, history, and tradition. *Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 737–38 (4th Cir. 2016) (Niemeyer, J., concurring in part and dissenting in part) (emphasis added); *see supra* Part I.

One might respond that the answer is *four* teams: for females who identify as females, females who identify as males, males who identify as males, and males who identify as females. Beyond being administratively impossible, that solution would *still* discriminate, at least applying the Rule. The World Professional Association for Transgender Health refers to "gender identity" as a "person's deeply felt, internal, intrinsic sense of their own gender."[7] Transgender advocacy groups say there are at least 100 such identities. *See supra* note 4. Further confusing the matter is that, according to the American Psychological Association, "some people" "experience their gender identity as fluid."[8]

---

[7] *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, S252 (2022), https://perma.cc/KM5L-F26V ("WPATH Standards").

[8] *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832, 836 (Dec. 2015), https://perma.cc/6FAS-676M; *see* K. Camburn, *9 Young People Explain what Being Non-binary Means to Them* (July 14, 2019), https://perma.cc/SSD6-ZFML ("I choose to see my gender as a creature that exists not *because* of me or *for* me, rather, it exists *through* me. I am merely a conduit of expression for the multitude of ways gender takes form. Each day is different.").

16

Likewise, the American Academy of Pediatrics says that being transgender is not limited to those "whose gender identity does not match their assigned sex," but "also encompasses many other labels individuals may use to refer to themselves" and "can be fluid, shifting in different contexts."[9] Being "transgender," the AAP explains, is "not [a] diagnos[i]s," but a "personal" and "dynamic way[] of describing one's own gender experience."[10] The AAP suggests the following "explanation" of "gender identity,"[11]—note especially the "Rules":[12]



---

[9] J. Rafferty, *Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 Pediatrics no. 4, at 2 (Oct. 2018), https://perma.cc/8PYT-CGUG.
[10] *Id.* at 3.
[11] *Id.*
[12] *The Gender Book*, https://perma.cc/42WU-KRLX.

The Department's Rule seems to parrot these expansive definitions, explaining that it "understands gender identity to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth." 89 Fed. Reg. at 33,809. But making this definition part of Title IX deprives the statute of meaning. Take a biological boy who has a "gender identit[y] that encompass[es] or blend[s] elements of other genders"—and one "that changes over time."[13] He wishes to use the girls' locker room. Under the Rule, how would a school avoid federal government investigation and a Title IX violation? By excluding him, the school has not treated him differently from other males, but that is not good enough. The school has no other students with this gender identity to compare him to, at least that day, much less a female student with this gender identity. But that's no matter: under the Rule, "den[ying] a [blending/changing] student access to a sex-separate facility or activity consistent with that student's gender identity . . . would violate Title IX's general nondiscrimination mandate." 89 Fed. Reg. at 33818.

And how does the school know which facility is "consistent" with the 100+ gender identities? The Department shrinks from this impossible task, explaining that it "does not specify how a [school] must provide access to sex-separate facilities for students who do not identify as male or female," though the Department is "aware" that many schools "rely on a student's consistent assertion." *Id.* at 33818–19. What

---

[13] WPATH Standards, *supra* note 7, at S80.

that means in practice is that a student can have access on any given day to whichever facility the student desires—no matter the privacy or safety concerns of other students, or even what the student's parents have to say. *See id.* at 33818 (suggesting "coordinat[ion] with the student, and the student's parent or guardian *as appropriate*" (emphasis added)).

This is the Rule's effect. Every program or activity would be open on demand to any person at the moment they verbalize any gender identity, whatever that identity might mean, regardless of its relation to biological sex, and no matter if it changed from the moment before. Bathrooms, locker rooms, living facilities, and sports teams could not be subject to any meaningful rules at all. *See generally Neese v. Becerra*, 640 F. Supp. 3d 668, 680 (N.D. Tex. 2022) ("If 'on the basis of sex' included 'sexual orientation' and 'gender identity,'" "Title IX and its regulations would be nonsensical."). Congress could not have intended these absurdities.

**B.    The Rule threatens women's opportunities—and safety.**

Under the Rule, Title IX could not fulfill its goal of combatting "pervasive discrimination against women with respect to educational opportunities." *McCormick*, 370 F.3d at 286. By elevating gender identity over sex, the Rule would strip women of opportunities, deprive them of private spaces, undermine their pursuit of equality, and endanger their physical safety.

Title IX's enactment has led to a flourishing environment in girls' sports. "The girls' high school participation rate is greater than 11 times what it was when Title IX was passed, an increase of more than 1,000%."[14] Yet still today, girls' participation numbers are below what the boys' participation numbers were in 1972 at Title IX's passage.[15] The Rule would undermine this progress: "It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape v. Tennessee Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977). Though the Department fakes a punt on athletics, its Rule admonishes that a "categorical" sex separation of sports will not be acceptable. 89 Fed. Reg. at 33817.

Girls who are displaced by biological boys in sports do not stand a chance. If they continue to compete in the female category, they lose. And they lose more than just competitions, they lose opportunities. Coaches will recruit biological males for women's teams. Schools will be forced to allocate scholarships away from biological females to males. *See Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("[U]nder Title IX, universities must consider sex in allocating athletic scholarships, 34 C.F.R. § 106.37(c)."). As the Supreme Court discussed in *NCAA v.*

---

[14] A. Wilson, *NCAA Title IX 50th Anniversary: The State of Women in College Sports* (2022), at 15, https://perma.cc/4CDW-PLQZ.
[15] *Id.*

20

*Alston*, athletics provide a host of opportunities: "paid internships," "athletic awards," "academic and graduation awards," "graduate degrees," "vocational school," "tutoring," and much more. 594 U.S. 69, 104–06 (2021). If Title IX is re-defined, female athletes will routinely be blocked from these opportunities.

Ignoring differences between sexes will also endanger women. There is no shortage of recent examples. For instance, Payton McNabb, a North Carolina volleyball player, is currently dealing with partial paralysis and a traumatic brain injury due to a "spike by a male athlete who identified as transgender" in 2022. Payton was in high school when the injury occurred.[16]

A Massachusetts girls' basketball team forfeited a game this year due to injuries from a male player.[17]

In 2023, a female field hockey player "was hit in the mouth by a shot from a boy" and "suffered 'significant facial and dental injuries.'"[18] The girl was hospitalized. And the incident left "horror in the eyes" of her teammates who "sobb[ed] not only in fear for their teammate, but also in fear that they had to go back out onto the

---

[16] A. McClure, *After a Male Caused Her Partial Paralysis, Female Volleyball Player Payton McNabb Now Fights to Protect Women's Sports*, Independent Women's Forum, https://perma.cc/FFC3-68QV.

[17] M. Koenig, *School stands by trans basketball player accused of hurting opposing girls, blasts 'harmful' criticism*, New York Post (Feb. 28, 2024), https://perma.cc/5TV8-W9GE.

[18] *Massachusetts school calls for change after female field hockey player hurt by boy's shot*, CBS News (Nov. 6, 2023), https://perma.cc/NRM2-LTJW.

field and continue a game, playing against a male athlete who hospitalized one of our own."[19]

Safety, of course, goes beyond the field of play. If biological males are allowed to compete because of their gender identity, they will be allowed to access the girls' showers, locker rooms, and bathrooms. The NCAA is currently being sued for allowing a biological male "complete and unrestricted access to the women's locker rooms, showers, and restrooms," causing girls to be anxious, "stressed out," and feeling their "privacy and sense of safety was violated."[20]

The Rule flings the door open to all these negative consequences for girls and women seeking an equal opportunity to compete, learn, and live.

\*    \*    \*

The Department has proclaimed that its interpretation "is most consistent with the purpose of Title IX, which is to ensure equal opportunity."[21] But "[c]hanging how we define 'female' so that it includes individuals of both sexes, and then disallowing any distinctions among them on the basis of sex, is by definition and in effect a rejection of Title IX's equality goals." *Adams*, 57 F.4th at 820 (Lagoa, J.,

---

[19] *Id.*; L. Gilbert, *Female Athlete's Injury Creates Outrage Around Coed Sports*, The Daily Signal (Nov. 7, 2023), https://perma.cc/G4F8-35YL.
[20] Am. Compl. ¶ 477, *Gaines v. NCAA*, No. 1:24-cv-01109-MHC, Doc. 64 (N.D. Ga. June 26, 2024).
[21] Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32637, 32639 (2021).

concurring). The Department's Rule would make the equality sought by Title IX impossible by denying the biological reality that men are not women. The Department's Rule is unlawful.

## CONCLUSION

The Court should affirm.

Respectfully submitted,

s/ Christopher Mills

GENE P. HAMILTON
REED D. RUBINSTEIN
NICHOLAS R. BARRY
*America First Legal Foundation*
*300 Independence Ave. SE*
*Washington, D.C. 20003*
*(202) 964-3721*
*gene.hamilton@aflegal.org*
*reed.rubinstein@aflegal.org*
*nicholas.barry@aflegal.org*

CHRISTOPHER MILLS
*Spero Law LLC*
*557 East Bay Street #22251*
*Charleston, SC 29413*
*(843) 606-0640*
*cmills@spero.law*

Counsel for *Amicus Curiae*

SEPTEMBER 3, 2024

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 4,620 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3. This document has been scanned for viruses and is virus-free.

Dated:  September 3, 2024

<div style="margin-left:40%">

/s Christopher Mills
Christopher Mills

</div>

## CERTIFICATE OF SERVICE

I, Christopher Mills, an attorney, certify that on this day the foregoing Brief was served electronically on all parties via CM/ECF.

Dated:  September 3, 2024

<div align="right">

s/ Christopher Mills
Christopher Mills

</div>