No. 24-5588

# In the United States Court of Appeals for the Sixth Circuit

◆

STATE OF TENNESSEE, et al.,
*Plaintiffs-Appellees,*

and

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL, et al.,
*Intervenors-Plaintiffs-Appellees,*

v.

MIGUEL CARDONA, as Secretary of Education, et al.,
*Defendants-Appellants.*

◆

On Appeal from the United States District Court for the
Eastern District of Kentucky, No. 2:24-cv-00072

## BRIEF OF BILLY BURLEIGH, KATHYGRACE DUNCAN, LAURA PERRY SMALTS, JANE SMITH, AND THE MANHATTAN INSTITUTE AS *AMICI CURIAE* SUPPORTING APPELLEES AND AFFIRMANCE

ILYA SHAPIRO
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

JOSHUA K. PAYNE
JORDAN CAMPBELL
RONALD MILLER
DANIEL SEPULVEDA
CAMPBELL MILLER PAYNE, PLLC
5955 Alpha Rd. #1491
Dallas, TX 75240
(214) 316-7156
josh@cmppllc.com

Counsel for *Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: __24-5588__          Case Name: __TN, et al v. Miguel Cardona, et al__

Name of counsel: __Joshua K. Payne__

Pursuant to 6th Cir. R. 26.1, __Billy Burleigh__
                            *Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
    identity of the parent corporation or affiliate and the relationship between it and the named
    party:

> No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
    in the outcome?  If yes, list the identity of such corporation and the nature of the financial
    interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____September 3, 2024_____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ __Joshua K. Payne__
  __Campbell Miller Payne, PLLC__
  __5955 Alpha Rd #1491Dallas, TX 75240__

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: __24-5588__          Case Name: __TN, et al v. Miguel Cardona, et al__

Name of counsel: __Joshua K. Payne__

Pursuant to 6th Cir. R. 26.1, __KathyGrace Duncan__

*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
     identity of the parent corporation or affiliate and the relationship between it and the named
     party:

> No.

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
     in the outcome?  If yes, list the identity of such corporation and the nature of the financial
     interest:

> No.

---

### CERTIFICATE OF SERVICE

I certify that on _____ September 3, 2024 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ __Joshua K. Payne__
__Campbell Miller Payne, PLLC__
__5955 Alpha Rd #1491Dallas, TX 75240__

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-5588                    Case Name: TN, et al v. Miguel Cardona, et al

Name of counsel: Joshua K. Payne

Pursuant to 6th Cir. R. 26.1, Laura Perry Smalts
                              *Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

### CERTIFICATE OF SERVICE

I certify that on _____ September 3, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Joshua K. Payne
 Campbell Miller Payne, PLLC
 5955 Alpha Rd #1491Dallas, TX 75240

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-5588      Case Name: TN, et al v. Miguel Cardona, et al

Name of counsel: Joshua K. Payne

Pursuant to 6th Cir. R. 26.1, Jane Smith (pseudonym)
Name of Party

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____ September 3, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Joshua K. Payne
Campbell Miller Payne, PLLC
5955 Alpha Rd #1491Dallas, TX 75240

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-5588            Case Name: TN, et al v. Miguel Cardona, et al

Name of counsel: Joshua K. Payne

Pursuant to 6th Cir. R. 26.1, Manhattan Institute
                                      *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____ September 3, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Joshua K. Payne
   Campbell Miller Payne, PLLC
   5955 Alpha Rd #1491 Dallas, TX 75240

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................i

TABLE OF AUTHORITIES.....................................................................ii

INTEREST OF *AMICI CURIAE* ........................................................ 1

SUMMARY OF ARGUMENT ................................................................3

ARGUMENT ...........................................................................................4

  I.  The Individual *Amici* Know from Personal Experience That
      Youthful Gender Transition Is Harmful ...........................................4

  II. Scientific Evidence Demonstrates That Youthful Gender
      Transition Is Harmful .....................................................................15

    A. Encouraging Children to Transition Changes Outcomes by
        Preventing Natural Desistance. ....................................................15

    B. Detransitioning Is on the Rise, and Also Shows That Young
        People Become Comfortable with Their Sex over Time. ..............17

    C. Evidence Is Lacking for Benefits That Would Outweigh the
        Clear Harms of Transitioning to Minors. ....................................20

CONCLUSION .....................................................................................23

CERTIFICATE OF COMPLIANCE .......................................................24

CERTIFICATE OF SERVICE................................................................25

# TABLE OF AUTHORITIES

## Other Authorities

Carly Guss, et al., *Transgender and Gender Nonconforming Adolescent Care: Psychosocial and Medical Consideration*s, 27(4) Curr. Opin. Pediatr. 421-426 (2015) ........................................................................16

Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69(9) J. Homosex. 1602-1620 (2022), Epub Apr. 30, 2021 ................................................................ … 18

*Independent Review of Gender Identity Services for Children and Young People: Final Report*, The Cass Review (April 2024)…………………………………………………………………………..21

Isabel Boyd, et al., *Care of Transgender Patients: A General Practice Quality Improvement Approach*, 10(1) Healthcare 121 (2022)............19

J. Straub, et al., *Risk of Suicide and Self-Harm Following Gender-Affirmation Surgery*, 16(4):e57472 Cureus 1-9 (2024)…………………………………………………………………………22

Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment Is Failing Trans Kids*, Wash. Post, Nov. 24, 2021 ......19

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners,* 50(8) Arch. Sex. Behav. 3353-3369 (2021) ..........................................................................18, 20

Lisa Marchiano, *Gender Detransition: A Case Study*, 66(4) J. of Anal. Psychol. 813-832 (2021) ........................................................19

Pamela Paul, *As Kids, They Thought They Were Trans. They No Longer Do.*, N.Y. Times, Feb. 2, 2024.............................................20

Pamela Paul, *Why Is the U.S. Still Pretending We Know Gender-Affirming Care Works?*, N.Y. Times, July 12, 2024 .......................21, 22

Pien Rawee, et al., *Development of Gender Non-Contentedness During Adolescence and Early Adulthood*, 53 Arch. Sex. Behav. 1813-1825 (2024)…....................................................................15, 16

R. Hall, et al., *Access to Care and Frequency of Detransition Among a Cohort Discharged by a UK National Adult Gender Identity Clinic: Retrospective Case-Note Review*, 7(6):e184 BJPsych Open. 1-8 (2021)19

Ruth Hall, et al., *Impact of Social Transition in Relation to Gender for Children and Adolescents: A Systematic Review*, Archives of Disease in Childhood 1 (2024)…....................................................................21

Thomas D. Steensma, et al., *Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52(6) J. Am. Aca. Child Adolesc. Psychiatry 582-590 (2013)...17

Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102(11) J. of Clinic. Endocrin. & Metab. 3869-3903 (2017)..............................................................................16, 17

## INTEREST OF *AMICI CURIAE*

*Amici* Billy Burleigh, KathyGrace Duncan, Laura Perry Smalts, Jane Smith, and the Manhattan Institute respectfully submit this brief in support of Appellees and affirmance.[1]

Billy Burleigh, KathyGrace Duncan, Laura Perry Smalts, and Jane Smith experienced gender dysphoria when they were adolescents and young adults. They were led to believe that "affirming" perceptions of themselves as members of the opposite sex for the purpose of "gender transition" would resolve their gender dysphoria and permit them to live healthy, well-adjusted lives. Sadly, these *amici* learned through their experiences that such affirmation did not resolve their mental health issues or gender dysphoria. Instead, the pathway they were led down, which included social transitioning and medical interventions such as cross-sex hormones and surgeries, only caused physical harm and increased their distress as they realized their bodies had been irreversibly altered based upon a false promise.

---

[1] A pseudonym is being used to protect the identity of *amicus* Jane Smith and her family members. No counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made a monetary contribution intended to fund the preparation or submission of the brief. All parties have consented to the filing of this brief.

The Manhattan Institute is a nonprofit policy research foundation whose mission is to develop and disseminate ideas that foster individual responsibility and agency across multiple dimensions. It has sponsored scholarship and filed briefs opposing regulations that interfere with constitutional liberties, including in several cases pending in circuit courts regarding pediatric gender care and parental rights.

*Amici* support the ability of states, organizations, and individuals like Appellees to protect young people from the harms of transitioning by not "affirming" a student's perception as a member of the opposite sex and instead maintaining traditionally separate spaces for women and girls and upholding free speech rights.

*Amici* respectfully submit this brief to provide this Court with an understanding of the experiences of detransitioners, the evidence showing that youthful gender transition is harmful, and the evidence showing that gender dysphoria often resolves when children are allowed to grow up naturally without being steered into a path of medical or social transition.

## SUMMARY OF ARGUMENT

Billy Burleigh, KathyGrace Duncan, Laura Perry Smalts, and Jane Smith are living proof that "affirming" a young person to identify as the opposite sex is deeply harmful. These individuals experienced gender dysphoria when they were adolescents and young adults. They were led to believe that social and medical gender transition, including cross-sex hormones and surgical procedures, would resolve their gender dysphoria and permit them to live healthy, well-adjusted lives. Sadly, these *amici* learned through their experiences that transitioning did not resolve their mental health issues or gender dysphoria, but only caused physical harm and increased their distress as they realized their bodies had been irreversibly altered based upon a false promise.

Consistent with the experiences of the individual *amici*, available evidence shows that gender dysphoria usually resolves on its own or through counseling a young person to cope with the reality of their natural sex. Social and medical transition is thus unnecessary and often harmful. Furthermore, evidence is lacking for benefits that would outweigh the clear harms of transitioning to minors.

3

## ARGUMENT

## I.   The Individual *Amici* Know from Personal Experience That Youthful Gender Transition Is Harmful

### Billy Burleigh

Billy Burleigh grew up in a good family with supportive parents. But in the first grade he began experiencing intrusive thoughts that "God made a mistake. I'm a girl." Through elementary school he had learning and emotional difficulties. He was in emotional pain, and he withdrew from others, trying to cope. He was sexually abused in sixth grade by a male diving coach.

Looking for answers to his distress, the prevailing information he received was that the only way to overcome the disconnect was to change his body to conform to what his mind was telling him. Driven by depression and thoughts of suicide, Billy was willing to try anything to relieve his suffering. He told his therapist he wanted to transition, and she provided him a letter to begin cross-sex hormones. Billy was prescribed spironolactone, to block testosterone, and estrogen. He underwent multiple surgeries. Starting at age 34, he underwent vaginoplasty, labioplasty, an Adam's apple shave, facial plastic surgery, and voice feminization surgery.

However, no matter how many surgeries he had, every time Billy looked in the mirror he saw a man staring back at him. Despite a successful professional career and passing well as a woman he still had all the same problems and mental distress he had before transitioning. After seven years, he began to detransition. What helped Billy come to terms with his male body was finding peace with God and a wonderful faith community. With the help of healthy relationships with other men and a community that loved and supported him, he was able to make the journey back to embracing his male self. Billy got married in 2011 and is currently living happily as a male, a husband, and father, although he still must live with the consequences of a scarred body and the inability to engage sexually with his wife.

Based on his experience, Billy believes strongly that, even with parental consent, interventions aimed at "affirming" a discordant gender identity are harmful to children. They are putting a band-aid on the underlying issues that the child is having. Children are looking for acceptance, significance, and security. "Gender-affirming" treatments are offered to satisfy those needs, but from his own painful experience Billy warns they cannot do that long term. Billy has spoken with many

detransitioned young people. Many of them have experienced trauma and/or sexual abuse. Billy has realized that these kids need therapy and a safe environment to work through and address the severe mental health issues they are experiencing. Children facing the struggles Billy faced need help with their thoughts, not a body "fix" with hormones and surgery.

### KathyGrace Duncan

From a very young age, KathyGrace was gender nonconforming; she preferred male attire, thought she was a "boy," and wanted to live as one. However, it was not until after she had medically transitioned and lived for many years as a man that she was able to reflect on the complex true origins and causes of her self-perception and gender dysphoria. Growing up in a dysfunctional family in which her mother was often the victim of her father's emotional and verbal abuse, KathyGrace intuited the message that "my dad would love me if I were a boy." Sexual abuse by a family member between the ages of 10 and 12 further convinced her that being a girl meant being unsafe and unlovable.

In sixth grade, she learned about female to male transsexuals, leading her to conclude that her distress was caused by not having the

"right" body and the only way to live a normal life was to medically transition and become a heterosexual male. At age 19, she began living as a man named Keith and went to a therapist who formally diagnosed her with gender dysphoria. She began testosterone and a year later had a mastectomy. At the time, she believed changing her body was necessary so that what she saw in the mirror matched what she felt on the inside. She never viewed her condition as touching on mental health issues, and neither did the therapist who diagnosed her. Whether her self-perception and desire to transition was related to her mental health issues was never explored.

After 11 years passing as a man and living a relatively "happy" and stable life (which included having a number of girlfriends), KathyGrace realized that she was living a lie built upon years of repressed pain and abuse. Hormones and surgery had not helped her resolve underlying issues of rejection, abuse, and sexual assault. Her desire to live as a man was a symptom of deeper, unmet needs.

With the help of life coaches and a supportive community, KathyGrace returned to her female identity and began addressing the underlying issues that had been hidden in her attempt to live as a man.

She experienced depression that she had repressed for years and grieved over the irreversible changes to her body. KathyGrace believes that if someone had walked with her through her feelings instead of affirming her desire to transition, she would have been able to address her mental health issues more effectively and not spent so many years making and recovering from a grave mistake.

**Laura Perry Smalts**

Laura Perry Smalts will never experience giving birth to or breastfeeding a child because she became convinced that she was "born in the wrong body" and that her body needed to be altered to conform to her belief that she was really male. She now realizes that there are far better and healthier ways to assist a child who is distressed with her body that bring long-term resolution, and her story is living proof of that truth.

Like many detransitioners, Laura did not conform to gender stereotypes and experienced sexual abuse by a neighbor and family dysfunction during childhood, which contributed to her believing that she was really a boy. From an early age she fantasized about being a boy and wrote stories of herself as a male character but was not aware of the concept of being transgender until age 25. The desire to become male had

become so strong that she began searching on the internet and was shocked to find numerous stories, websites, and support groups related to being transgender.

Laura went to a support group which immediately affirmed her as "transgender." From that point on, she was absolutely convinced that she was a "man trapped in a woman's body" and her body needed to be fixed. She started taking testosterone at age 25 after receiving a diagnosis of gender identity disorder and letter from a therapist. Laura's physician, who was aware of her history of chronic hormone imbalance, nevertheless prescribed the cross-sex hormones on the same day. During nine years on testosterone, Laura experienced her voice getting lower, her jaw becoming more masculinized, her body shape changing, more hair growing on her body, and hair receding on her scalp. Her blood became very thick so that she became in danger of a stroke. Laura had to undergo therapeutic blood withdrawals to thin her blood.

With the medical interventions to support "gender transition," Laura fully passed as male and would have described herself as happy for the first few years. However, she also began to have problems with her memory and cognitive functioning. She became anxious, depressed,

and neurotic about talking to people, becoming obsessed with "every detail of life fitting a male narrative." She couldn't function at work. Still, Laura was convinced that she wanted these interventions and underwent a double mastectomy at age 27 and complete hysterectomy, sending her into menopause, at age 30.

During the time that she lived as a man, Laura was constantly reminded of the truth, but had to constantly override it, which she found to be exhausting. After seven years of medical transition treatments, Laura was depressed and suicidal. She was so restless she had difficulty sleeping and staying focused at work. She credits faith in Jesus Christ and the "positive message of love in God's Word," as what brought true healing in her heart. If Laura had not given her life to Christ, she believes that she would have taken her own life because she realized she could neither escape the pain of her past nor become the man she longed to be. She entered a support group that helped her process the pain of her life and talk openly about the sexual trauma, issues with her mother, and rejection by others. She began working through a healing community, which restored her emotionally and psychologically as a woman. She received counseling that helped her see the broken patterns, process

negative thinking towards herself, and understand healthy womanhood. She began to realize that she was not a man but had fixated on becoming a person who would be loved. In 2016 she detransitioned. In May 2022, Laura got married and no longer experiences any gender dysphoria.

Laura believes minors do not have the capacity to appreciate the gravity of these decisions, which involve the complications of medical transition and what children would be giving up, including sexual function and parenting. Nor does she believe a parent should be allowed to radically alter their child's body or allow their child to be sterilized because their child is experiencing a mental ailment. Based on her experience, Laura believes transition procedures do not solve anything but only give temporary relief, like taking a pain killer for a broken bone. From personal experience, Laura knows there are far healthier ways to help children resolve distress with their bodies.

**Jane Smith**

Jane grew up in a deeply traumatic family setting. Her parents were hoarders, so she grew up surrounded by filth. Horrifically, she was sexually abused by her father, an alcoholic, for years growing up. Undoubtedly related to her traumatic upbringing, Jane suffered from

post-traumatic stress disorder, night terrors, severe depression and anxiety, and she developed an eating disorder. Jane even became suicidal and at one point was hospitalized when she became delirious and threatened to kill herself.

Since the age of 16, Jane had gone to therapy to try to help treat her mental health issues. Around this time, Jane also began to be heavily influenced online by sites and groups on Tumblr and other social media platforms that promoted transgenderism as a panacea for people struggling with mental health issues, like depression and anxiety. During her treatment with her first therapist, as this online influence started to sink in, Jane asked the therapist whether he thought she might be transgender. Despite admitting that he did not have much familiarity with the subject matter, the therapist said that he thought she might be since she was "so logical and analytical" (evidently, the therapist thought of logic and analysis as male-typical traits), but he did not account for the trauma Jane faced every day. Since the therapist did not know much about transgender issues, he referred Jane to a second therapist, who passed her along to the purported experts at one of the most prominent gender clinics in the Midwest.

Jane decided to go to the aforementioned gender clinic. She was entirely open about and shared her highly troubled past and her existing, profound mental health struggles. She relayed that she was not sure she was transgender. Despite all of this, on her first visit, the staff at the clinic began referring to her with male pronouns and offered to prescribe her cross-sex hormones. Jane declined the initial invitation since, again, she was not even sure she felt she was transgender. However, she continued to return to the clinic. After a number of additional visits—at each one she again was offered cross-sex hormone prescriptions—she decided that she wanted to try to become a boy. The clinic underplayed the known side-effects, simply reading a list of outcomes and describing them as some minor things that "might" happen. Instead, Jane was told that she would finally get to "experience male puberty."

She did not experience male puberty. She stayed on testosterone and other "gender-affirming" medications for almost six years. And it wrecked her body. Within the past few years, Jane decided to detransition and identify as her natural female self. She realized she could never become a man; instead, she can now appreciate that she was

just young, confused, vulnerable, and bisexual and had been seduced and deceived to buy into an idea she could never actually attain.

Life has become exceedingly difficult given the permanent effects of the cross-sex hormones. Her voice has permanently changed—she was a soprano but is now a baritone—and she feels that she does not recognize the voice coming out of her own body, a deeply disturbing reality for her. Others are also taken aback when they see her returning feminine appearance but then "hear a man's voice" when she talks; she suspects she has lost out on three job opportunities because of it. She grew facial hair and has to shave to try to stave off the male appearance it brings. She struggles with eating disorders. She has joint issues, general fatigue, and increased vascularity. She randomly gets extremely nauseous. Jane has vaginal atrophy and other adverse effects in her genitals. And she feels that her brain has been severely compromised.

Once a very successful student who graduated high school early with multiple scholarship offers, Jane now struggles to hold a job. And she is angry. Angry at the doctors who did this to her. Angry that someone with her extreme mental health comorbidities could have been offered life-altering cross-sex hormones after a single visit by the

purported experts at a prestigious gender clinic. And she is angry that due to a harsh statute of limitations in her home state of Ohio, she has no recourse in the courts, as she did not realize the harm and abuse that was inflicted upon her until it was too late under existing Ohio law.

## II. Scientific Evidence Demonstrates That Youthful Gender Transition Is Harmful

### A. Encouraging Children to Transition Changes Outcomes by Preventing Natural Desistance.

Over the last 50 years, numerous scientific studies have shown that gender dysphoria in children is not fixed. Instead, the vast majority of prepubertal children with gender dysphoria *who do not socially or medically transition* will stop feeling dysphoric by the time they reach adulthood. Eleven peer-reviewed studies published between 1972 and 2021 investigated the persistence of childhood-onset gender dysphoria, and all reached the same conclusion: "among prepubescent children who feel gender dysphoric, the majority cease to want to be the other gender over the course of puberty—ranging from 61-88% desistance across the large, prospective studies." Expert Report of James M. Cantor, PhD, *Poe, et al. v. Labrador, et al.*, No. 1:23-cv-00269 (D. Idaho), ECF 56-4 at 57-58 (listing studies); *see also* Pien Rawee, et al., *Development of Gender Non-*

*Contentedness During Adolescence and Early Adulthood*, 53 Arch. Sex. Behav. 1813-1825, 1813 (2024) ("Gender non-contentedness, while being relatively common during early adolescence, in general decreases with age and appears to be associated with a poorer self-concept and mental health throughout development."). No published study has shown otherwise.

Given this evidence, the Endocrine Society's Clinical Practice Guidelines acknowledge "the large majority (about 85%) of prepubertal children with a childhood diagnosis did not remain GD/gender incongruent in adolescence." Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102(11) J. of Clinic. Endocrin. & Metab. 3869-3903, 3879 (2017).

Yet among children *who are affirmed in a transgender identity*, multiple studies have found that few or none grow into comfort with their biological sex: "The gender identity affirmed during puberty appears to predict the gender identity that will persist into adulthood." Carly Guss, et al., *Transgender and Gender Nonconforming Adolescent Care: Psychosocial and Medical Consideration*s, 27(4) Curr. Opin. Pediatr. 421-

426, 421 (2015); *see also* Thomas D. Steensma, et al., *Factors Associated With Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, 52(6) J. Am. Aca. Child Adolesc. Psychiatry 582-590, 588-89 (2013) (childhood social transitions are "important predictors of persistence").

Available evidence, then, suggests that affirming a transgender identity in children changes outcomes and prevents natural desistance in many children. Because, as the Endocrine Society recognizes, "we cannot predict the psychosexual outcome for any specific child," Hembree, et al. at 3876, protecting the freedom of States to maintain separate spaces for girls and not "affirm" a student's transgender identity would preserve children's ability to desist naturally, with their natal bodies and functions intact.

## B. Detransitioning Is on the Rise, and Also Shows That Young People Become Comfortable with Their Sex over Time.

Consistent with these studies and the experiences of the individual *amici* here, research shows that an increasing number of youth and adults are detransitioning, indicating harm and lack of efficacy of the interventions. Vandenbussche 2021, for example, is a survey of 237 detransitioners with 70% reporting that they detransitioned after

realizing their gender dysphoria was related to other issues. Elie Vandenbussche, *Detransition-Related Needs and Support: A Cross-Sectional Online Survey*, 69(9) J. Homosex. 1602-1620, 1606 (2022), Epub Apr. 30, 2021. And Littman 2021 is a survey of 100 detransitioners where 60% reported their decision to detransition was motivated by the fact that they "became comfortable identifying with their natal sex." Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50(8) Arch. Sex. Behav. 3353-3369, 3361 (2021).

In her study, Dr. Littman found that, as is true of the individual *amici*, a majority of the study subjects felt that they had been rushed into "gender-affirmative" interventions with irreversible effects without the benefit of adequate psychologic evaluation. *Id.* at 3364-3366. Dr. Littman also found that several of the participants in her study felt pressured to transition from their doctors or therapists. *Id.* at 3366. Thirty-eight percent of participants in Dr. Littman's study said that their gender dysphoria was caused by trauma or mental health issues, and more than half said that transitioning delayed or prevented them from getting treatment for their trauma or mental health issues. *Id.* at 3361-3362.

18

In addition, many clinicians have commented on the rising numbers of detransitioners they are seeing. *See, e.g.,* Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment Is Failing Trans Kids*, Wash. Post, Nov. 24, 2021, https://tinyurl.com/52ktuhyy (noting "rising number of detransitioners that clinicians report seeing," which is typically "youth who experienced gender dysphoria and other complex mental health issues, rushed to medicalize their bodies and regretted it"); Lisa Marchiano, *Gender Detransition: A Case Study*, 66(4) J. of Anal. Psychol. 813-832, 814 (2021) ("[T]he number of young people detransitioning (reaffirming their natal sex) … appears to be increasing. Detransitioners are now sharing their stories online and entering therapy."); *see also* R. Hall, et al., *Access to Care and Frequency of Detransition Among a Cohort Discharged by a UK National Adult Gender Identity Clinic: Retrospective Case-Note Review*, 7(6):e184 BJPsych Open. 1-8, 1 (2021) ("Detransitioning might be more frequent than previously reported."); Isabel Boyd, et al., *Care of Transgender Patients: A General Practice Quality Improvement Approach*, 10(1) Healthcare 121 (2022) ("[T]he detransition rate found in this population is novel and questions may be raised about the phenomenon of overdiagnosis, overtreatment, or

iatrogenic harm as found in other medical fields.").

Dr. Littman observed that her research into detransitioners "adds to the existing evidence that gender dysphoria can be temporary." Littman 2021 at 3365. She concluded that "intervening too soon to medicalize gender dysphoric youth risks iatrogenically derailing the development of youth who would otherwise grow up to be LGB nontransgender adults." *Id.*

## C. Evidence Is Lacking for Benefits That Would Outweigh the Clear Harms of Transitioning to Minors.

Earlier this year, the *New York Times* published accounts of detransitioners, which demonstrate the negative effects of "unproven treatments for children." Pamela Paul, *As Kids, They Thought They Were Trans. They No Longer Do.*, N.Y. Times, Feb. 2, 2024, https://tinyurl.com/2jv8md99. As one detransitioner, who is also a psychotherapist, put it: "'You're made to believe these slogans . . . . Evidence-based, lifesaving care, safe and effective, medically necessary, the science is settled — and none of that is evidence based.'" *Id.* (quoting Paul Garcia-Ryan).

The same publication also highlighted that "[g]ender-affirming care can include social transition," such as that at issue in this case, which

involves "allowing kids to change their name, appearance and pronouns" at school. Pamela Paul, *Why Is the U.S. Still Pretending We Know Gender-Affirming Care Works?*, N.Y. Times, July 12, 2024, https://tinyurl.com/43t7u29z. Indeed, a recent systematic review of evidence regarding social transition reported an "absence of robust evidence of the benefits or harms of social transition for children and adolescents." Ruth Hall, et al., *Impact of Social Transition in Relation to Gender for Children and Adolescents: A Systematic Review*, Archives of Disease in Childhood 1, 1 (2024).

In what is widely regarded as the most comprehensive review of available evidence, Dr. Hilary Cass, a renowned pediatrician in the United Kingdom, found adequate evidence lacking to support transition in children and young people. *See Independent Review of Gender Identity Services for Children and Young People: Final Report*, The Cass Review (April 2024), https://tinyurl.com/3st6ftkh. Dr. Cass emphasized that social transition should be thought of as an "active intervention because it may have significant effects on the child or young person in terms of their psychological functioning and longer-term outcomes." *Id.* at 158.

As the *New York Times* summarized, Dr. Cass's four-year review

"found no definitive proof that gender dysphoria in children or teenagers was resolved or alleviated by what advocates call gender-affirming care, in which a young person's declared 'gender identity' is affirmed and supported with social transition, puberty blockers and/or cross-sex hormones." Pamela Paul, *Why Is the U.S. Still Pretending We Know Gender-Affirming Care Works?*, N.Y. Times, July 12, 2024, https://tinyurl.com/43t7u29z.

Dr. Cass also noted the lack of "clear evidence that transitioning kids decreases the likelihood that gender dysphoric youths will turn to suicide, as adherents of gender-affirming care claim." *Id.* That finding is consistent with another recent study, which found that patients who had undergone sex-modification surgery had "a 12.12 times greater risk of suicide attempts" than patients who had not undergone such surgery. J. Straub, et al., *Risk of Suicide and Self-Harm Following Gender-Affirmation Surgery*, 16(4):e57472 Cureus 1-9, 3 (2024). Patients who had undergone surgery also had "a 7.76 times higher risk of PTSD." *Id.*

Scientific evidence, as well as the experiences of the individual *amici* here and other detransitioners, shows gender transition is harmful and supports Appellees' position, which declines to promote transitioning

and instead maintains traditionally separate spaces for women and girls based on biological sex and upholds free speech rights.

## CONCLUSION

*Amici* respectfully submit that this Court should affirm the judgment of the district court.

Dated: September 3, 2024          Respectfully submitted,

ILYA SHAPIRO                       /s/ JOSHUA K. PAYNE
MANHATTAN INSTITUTE                JOSHUA K. PAYNE
52 Vanderbilt Ave.                 JORDAN CAMPBELL
New York, NY 10017                 RONALD MILLER
(212) 599-7000                     DANIEL SEPULVEDA
ishapiro@manhattan.institute       CAMPBELL MILLER PAYNE,
                                   PLLC
                                   5955 Alpha Rd. #1491
                                   Dallas, TX 75240
                                   (214) 316-7156
                                   josh@cmppllc.com

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,346 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Respectfully submitted, this 3rd day of September, 2024.

/s/ Joshua K. Payne
Joshua K. Payne

Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Joshua K. Payne
Joshua K. Payne

Counsel for *Amici Curiae*