No. 24-5588

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

STATE OF TENNESSEE, et al.,

Plaintiffs – Appellees,

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL, et al.,

Intervenors-Plaintiffs-Appellees,

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education, et al.,

Defendants – Appellants.

On Appeal from the United States District Court for
the Eastern District of Kentucky No. 2:24-cv-00072
The Honorable Danny C. Reeves

BRIEF OF CHILD & PARENTAL RIGHTS CAMPAIGN, INC. AS
AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND
AFFIRMATION

MARY E. MCALISTER (COUNSEL OF RECORD)
VERNADETTE R. BROYLES
ERNEST G. TRAKAS
ATHINA M. GIOUVALAKIS
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
mmcalister@childparentrights.org
Attorneys for Amicus Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

CORPORATE DISCLOSURE STATEMENT ...........................................1

INTEREST OF AMICUS CURIAE .........................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................3

LEGAL ARGUMENT .............................................................................4

   A.  The Regulations Compel Educators to Facilitate Harming Children. ...............................................................................................4

   B.  The Regulations Violate Parents' Fundamental Constitutional Rights. .............................................................................................10

      1.  The Rules Violate The Fundamental Right of Parents to Direct The Education And Upbringing of Their Children. ..........................13

      2.  The Regulations Violate Parental Rights To Direct the Medical and Mental Health Decision-making For Their Children. ...............16

      3.  The Regulations Will Trigger Child Protective Services Reports. . ...............................................................................................18

      4.  The Regulations Interfere with States' Rights. ..........................20

C.  The Regulations Violate Girls' Privacy and Safety Under Title IX. 21

CONCLUSION .....................................................................................26

Certificate of Compliance with Type-Volume Limits, Typeface Requirements and Type-Style Requirements. ......................................27

Certificate of Service for Electronic Filing ..........................................28

# TABLE OF AUTHORITIES

## Cases

*Blair v. Appomattox County School District,*
No. 24-1682 (4th Cir.)................................................................ 2, 11, 19

*Doe v. Madison Metropolitan Sch. Dist.,*
No. 20-454 (Wis. Cir. Ct. Dane Cnty.) ...................................... 11

*Doe v. Weiser,*
No. 24-02185 (D. Colo.)............................................................... 11

*Foote v. Ludlow Public Sch.,*
No. 23-1069 (1st Cir.) .............................................................. 2, 11

*Landerer v. Dover Area School District,*
No. 24-00566 (M.D. Pa.) ............................................................. 2

*Lavigne v. Great Salt Bay Cmty. Sch. Bd.,*
No. 24-1509 (1st Cir.) .......................................................... 11, 12

*Littlejohn v. Leon Cnty. Sch.,*
No. 23-10385 (11th Cir.).............................................................. 11

*Mead v. Rockford Public Sch. Dist.,*
No. 23-01313 (W.D. Mich.) .......................................................... 11

*Meyer v. Nebraska,*
262 U.S. 390 (1923) ..................................................................... 13

*Parents Protecting Our Children v. Eau Claire Area Sch. Dist.,*
No. 23-1534 (7th Cir.)................................................................... 11

*Parham v. J.R.,*
442 U.S. 584 (1979) ................................................................ 16, 18

*Perez v. Broskie,*
No. 3:22-cv-83 (M.D. Fla.) ....................................................... 2, 11

*Pierce v. Society of Sisters*,
   268 U.S. 510 (1925) ...................................................................... 13, 14

*Regino v. Staley*,
   No. 23-16031 (9th Cir.) .................................................................. 11

*Ricard v. USD 475 Geary Cnty., KS Sc. Bd.*,
   No. 22-04015 (D. Ks.) .................................................................... 16

*Thomas v. City Sch. of Decatur*,
   No. 23-13467 (11th Cir.) ........................................................ 3, 12, 23

*Troxel v. Granville*,
   530 U.S. 57 (2000) ........................................................................ 14, 15

*United States v. Virginia*,
   518 U.S. 515 (1996). ...................................................................... 21

*Vitsaxaki v. Skaneateles Central Sch. Dist.*,
No. 24-00155 (N.D.N.Y.) .................................................................... 11

*Willey v. Sweetwater County School District #1*,
   No. 23-cv-69 (D. Wyo.) ................................................................... 2, 11

**Statutes**

Ala. Code § 26-1-6 ................................................................................ 21

Ariz. Rev. Stat. § 1-601 ........................................................................ 21

Fla. Stat. Ch. 1014 ................................................................................ 21

Ga. Code § 20-2-786 ............................................................................. 21

Idaho Code §§32-1010 to 32-1014 ....................................................... 21

Iowa Code § 601-1 ................................................................................ 21

Kan. Stat. Ann. § 38-141 ...................................................................... 21

Mich. Comp. Laws § 380.10 .................................................................. 21

N.C. Gen. Stat. Ch. 114A ...................................................................... 21

N.D. Cent. Code § 14.09-32.1 ...................................................... 21

Nev. Rev. Stat. § 126.036 ........................................................... 21

Okla. Stat tit. 25 §§ 25-2001 to 25-2002 ................................... 21

Tenn Code. § 36-8-104 .............................................................. 21

Tex. Fam. Code § 151.001 ......................................................... 21

Utah Code § 30-5a-103; ............................................................. 21

Va. Code Ann. § 1-240.1 ........................................................... 21

W. Va. Code § 49-1-105(b)(4) ................................................... 21

Wyo. Stat. § 14-2-206 ................................................................ 21

## Other Authorities

Alexa Shrake, *Citing religious, parental rights, Hoosier couple asks SCOTUS for relief after trans child was removed*, Ind. Law. (Feb. 19, 2024), ................................................................................... 19

Andrew Amos, *The gender-affirming model of care is incompatible with competent, ethical medical practice*, 32 Australasian Psychiatry 177, 220-223 (2024) .................................................................... 5

B.J. Casey et al., *The adolescent brain*, 1124 Annals N.Y. Acad. Sci. 1, 111-126 (2008) ........................................................................ 25

Corrinne Hess, *Federal complaint filed in Sun Prairie trans student shower incident*, Wis. Pub. Radio (June 15, 2023) ...................... 23

Dan C. Li et al., *Social experience in adolescence shapes prefrontal cortex structure and function in adulthood*, Molecular Psychiatry (2024) ................................................................................... 25

Darios Getahun et al., *Cross-sex Hormones & Acute Cardiovascular Events in Transgender Persons: A Cohort Study*, 169 Annals Internal Med. (2018) ......................................................... 6

Darrell Ehrlick, *Contempt charges, case dismissed against Glasgow couple*, Daily Montanan (Feb. 22, 2024) ........................... 19

Decl. of James Cantor, Ph.D. (Psychologist) in *Eknes-Tucker v. Ivey*, No 2:22-cv-00184 (M.D. Ala.), Dkt. #69-2 at 14-15 ....................................7

Decl. of Michael Laidlaw, M.D. (Endocrinologist) in *Eknes-Tucker v. Ivey*, No 2:22-cv-00184 (M.D. Ala.), Dkt. #69-3 at 11 ...........................7

*Doe v. Weiser*, No. 24-02185 (D. Colo.), Compl., Document 1-5, at 18 ...12

*Early Social gender Transition in Children is Associated with High Rates of Transgender Identity in Early Adolescence*, SOC'Y FOR EVIDENCE BASED GENDER MED. (May 6, 2022) ......................................5

Gabrielle M. Etzel, *New study finds 12-fold higher risk of suicide attempt for adult transgender patients*, WASH. EXAMINER (May 17, 2024) ........................................................................................6

J. Cohn, *Politics Aside, Healthcare Considerations Motivate More Caution before Medical Intervention for Trans-Identifying Youth*, 3 J. CONTROVERSIAL IDEAS (2023) ................................................5

Jastyn A. Pöpplau et al., *Development of Prefrontal Circuits and Cognitive Abilities*, COLD SPRING HARBOR PERSP. BIOLOGY (2024),.....25

Jay N. Giedd, *The Teen Brain: Insights from Neuroimaging,* 42 J. ADOLESCENT HEALTH 335–43 (2008) ...................................25

Kaylee McGhee White, *Deserie's story: How the state is using gender ideology to steal children away from their parents*, WASH. EXAMINER (July 27, 2022), ....................................................................19

Kelsey Bolar & Andrea Mew, *EXCLUSIVE: Female student alleges she was raped in trans-inclusive bathroom at New Mexico middle school*, POST MILLENIAL (June 20, 2023).........................................24

KOKH Staff, *Edmond parent files lawsuit after daughter 'severely beaten' in bathroom by trans student*, OKC FOX (June 1, 2023), ........24

*Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, No. 24-1509 (1st Cir.), *Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, No. 23-00158 (D. Me), Document 1-5...........................................................................12

*Littlejohn v. Leon Cnty. Sch.,* No. 23-10385 (11th Cir.), 1st Amend. Compl., *Littlejohn v. Leon Cnty. Sch.*, No. 21-00415 (N.D. Fla.), Dkt. No. 38-1, at 19 ..................................................................................... 12

Luke Rosiak, *Loudoun County Schools Tried To Conceal Sexual Assault Against Daughter In Bathroom, Father Says*, DAILY WIRE (Oct. 11, 2021) .................................................................................................... 23

Mauro E. Kerckhof et. al. *Prevalence of Sexual Dysfunctions in Transgender Persons: Results from the ENIGI Follow-Up Study*, 16 J. SEX MED. 2018-2029 (2019) .................................................................... 5

*Mead v. Rockford Public Sch. Dist.*, No. 23-01313 (W.D. Mich.), Response in Opposition to Motion to Dismiss, Dkt. #21, at 28-29 ...... 12

Michael Biggs, *Revisiting the effect of GnRH analogue treatment on bone mineral density in young adolescents with gender dysphoria*, 34 J. PEDIATRIC ENDOCRINOLOGY & METABOLISM 821, 937-939 (2021), ......... 6

Michelle A. Cretella*, Gender Dysphoria in Children & Suppression of Debate,* 21 J. AM. PHYSICIANS & SURGEONS 50, 52 (2016) ...................... 5

Orma Ravindranath et al., *Pubertal development underlies optimization of inhibitory control through specialization of ventrolateral prefrontal cortex*, 58 DEV. COGNITIVE NEUROSCI. (2022) ....................................... 25

Paul W. Hruz, *A clarion call for high-quality research on gender dysphoric youth*, 112 ACTA PAEDIATRICA (2023), 2259, 2266-2268, ....... 5

Philip J. Cheng et al., *Fertility concerns of the transgender patient*, 8 TRANSLATIONAL ANDROLOGY & UROLOGY 182, 209-218 (2019) .............. 5

Pien Rawee et al., *Development of Gender Non-Contentedness During Adolescence and Early Adulthood*, 53 ARCHIVES SEXUAL BEHAV. 1813-1825 (2024) ............................................................................................ 5

Robert Hart, *Transgender People Twice as Likely to Die As Cisgender People, Study Finds*, FORBES (May 16, 2022), ....................................... 5

Sallie Baxendale, *The impact of suppressing puberty on neuropsychological function: A review*, 113 ACTA PAEDIATRICA 1125, 1156-1167 (2024) ...................................................................... 6

Stephen B. Levine et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, 48 J. SEX & MARITAL THERAPY 645, 706-727 (2022) ........................................... 5,7-9

*Thomas v. City Schools of Decatur*, No. 23-13467 (11th Cir.), Appellant's App., Vol. IV, Page 148, Dkt. #24-4 ....................................................... 12

Virginia Aabram, *Teenager found guilty in Loudoun County bathroom assault*, WASH. EXAMINER (Oct. 26, 2021) ........................................... 23

WALTER BOCKTING, *Ch. 24: Transgender Identity Development*, 1 AM. PSYCH. ASS'N HANDBOOK OF SEXUALITY & PSYCHOLOGY 744, 750 (Deborah L. Tolman & Lisa M. Diamond eds., 2014) .......................... 6

*Willey v. Sweetwater Cnty. Sch. Dist. #1*, No. 23-00069, Document 26-9, at 3-15 (D. Wyo.) ...................................................................... 12

## Regulations

34 C.F.R. § 106.44 ................................................................... 16

34 C.F.R. § 106.6 ................................................................... 20

34 C.F.R. § 106.10 ................................................................... 22

34 C.F.R. § 106.31(a)(2), ........................................................... 3

## CORPORATE DISCLOSURE STATEMENT

Amicus curiae Child & Parental Rights Campaign ("CPRC") is a nonprofit organization, does not have a parent corporation, and does not issue stock. CPRC is not aware of any publicly owned corporation, not a party to the appeal, with a financial interest in the outcome of this case.

## INTEREST OF AMICUS CURIAE [1]

CPRC is a nonprofit, public-interest law firm that represents Plaintiffs across the country in challenging actions that threaten parental rights, including, as is true of the regulations here, policies, practices, and customs that intentionally violate parental rights and endanger the well-being of children. In particular, CPRC represents parents challenging school districts which have concealed from parents that their children are being treated as something other than their sex at school, including the use of alternate names and pronouns and permitted use of opposite sex privacy facilities. *See, e.g., Blair v. Appomattox County School District,* No. 24-1682 (4th Cir.); *Foote v. Ludlow School Committee,* No. 23-1069 (1st Cir.); *Landerer v. Dover Area School District,* No. 24-00566 (M.D. Pa.); *Littlejohn v. Leon County School Board,* No. 23-10385 (11th Cir.); *Perez v. Broskie,* No. 3:22-cv-83 (M.D. Fla.), and *Willey v. Sweetwater County School District #1,* No. 23-cv-69 (D. Wyo.). CPRC also represents students who have been harmed by the

---

[1]    No counsel for a party authored this brief in whole or in part; no one, other than amicus and its counsel, made a monetary contribution for its preparation or submission; and all parties have consented to its filing.

implementation of school policies based on subjective gender identity, rather than objective biological reality. *Thomas v. City Sch. of Decatur*, No. 23-13467 (11th Cir.).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Department's regulations compel schools to immediately and unquestionably affirm a student's assertion of a discordant gender identity or face liability for violating Title IX. (*See e.g.,* 34 C.F.R. Section 106.31(a)(2), which defines refusing to treat a student in accordance with his or her stated gender identity as "more than *de minimis* harm" for purposes of establishing a violation of Title IX). No where is notification to or the consent of minor students' parents required or even mentioned. This will have wide-ranging consequences for the student asserting a discordant identity, other students, school staff, and parents.

CPRC respectfully submits this amicus curiae brief detailing the damage caused by the Department compelling schools to, *inter alia*, facilitate harmful interventions for gender dysphoric children, violate parents' fundamental rights to direct the upbringing and mental health/ medical care of their children, and violate female students' rights to

3

safety and privacy. CPRC respectfully requests that this Court affirm the district court's order.

## LEGAL ARGUMENT

### A.    The Regulations Compel Educators to Facilitate Harming Children.

The most troubling consequence of the Department's regulations is the compelled facilitation of harmful interventions for gender dysphoric children. Without citing either legal authority or scientifically credible evidence, the Department has determined that the only acceptable response to children who state that they are experiencing a disconnect between their body and a perceived "gender identity" is **immediate and unquestioning affirmation** of the discordant gender identity. Through the regulations, the Department compels all educational institutions to adopt and implement that response or face loss of federal funds and possible civil litigation. In so doing, the Department is compelling educational institutions to facilitate interventions that are harmful to children.

In requiring immediate and unquestioning affirmation of a child's asserted discordant gender identity, the Department is compelling schools to engage in a mental health intervention known as "social

4

transitioning" that remains controversial and is supported only by low

quality evidence.[2]

---

[2]     *See, e.g.*, J. Cohn, *Politics Aside, Healthcare Considerations Motivate More Caution before Medical Intervention for Trans-Identifying Youth*, 3 J. CONTROVERSIAL IDEAS (2023), 10.35995/jci03010010; Andrew Amos, *The gender-affirming model of care is incompatible with competent, ethical medical practice*, 32 AUSTRALASIAN PSYCHIATRY 177, 220-223 (2024), https://doi.org/10.1177/10398562241239478; Paul W. Hruz, *A clarion call for high-quality research on gender dysphoric youth*, 112 ACTA PAEDIATRICA (2023), 2259, 2266-2268, https://doi.org/10.1111/apa.16895; Stephen B. Levine et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, 48 J. SEX & MARITAL THERAPY 645, 706-727 (2022), https://doi.org/10.1080/0092623X.2022.2046221; Michelle A. Cretella*, Gender Dysphoria in Children & Suppression of Debate,* 21 J. AM. PHYSICIANS & SURGEONS 50, 52 (2016), https://www.transgendertrend.com/wp-content/uploads/2016/07/cretella.pdf. *See also* Pien Rawee et al., *Development of Gender Non-Contentedness During Adolescence and Early Adulthood*, 53 ARCHIVES SEXUAL BEHAV. 1813-1825 (2024), doi: 10.1007/s10508-024-02817-5 (15-year study in the Netherlands demonstrates that close to 75 percent of youth ages 11-26 outgrow their discomfort with their sex by age 26. Notably, the return to comfort is directly related to the span of elapsed time.); *Early Social gender Transition in Children is Associated with High Rates of Transgender Identity in Early Adolescence*, SOC'Y FOR EVIDENCE BASED GENDER MED. (May 6, 2022), https://segm.org/early-social-gender-transition-persistence; Robert Hart, *Transgender People Twice as Likely to Die As Cisgender People, Study Finds*, FORBES (May 16, 2022), https://www.forbes.com/sites/roberthart/2021/09/02/transgender-people-twice-as-likely-to-die-as-cisgender-people-study-finds/; Philip J. Cheng et al., *Fertility concerns of the transgender patient*, 8 TRANSLATIONAL ANDROLOGY & UROLOGY 182, 209-218 (2019), doi:10.21037/tau.2019.05.09; Mauro E. Kerckhof et. al. *Prevalence of Sexual Dysfunctions in Transgender Persons: Results from the ENIGI*

Professional associations which have developed guidelines for "gender transitioning" for children, including the American Psychological Association, caution against the type of immediate affirmation contained in the regulations that "runs the risk of neglecting individual problems the child might be experiencing and may involve an early gender role transition that might be challenging to reverse if cross-gender feelings do not persist."[3]

Studies show that if children are not immediately and unquestioningly affirmed in their discordant gender identity, or "socially

---

*Follow-Up Study*, 16 J. SEX MED. 2018-2029 (2019) doi: 10.1016/j.jsxm.2019.09.003; Gabrielle M. Etzel, *New study finds 12-fold higher risk of suicide attempt for adult transgender patients*, WASH. EXAMINER (May 17, 2024), https://www.washingtonexaminer.com/policy/healthcare/3007980/new-study-finds-12-fold-higher-risk-of-suicide-attempt-for-adult-transgender-patients/; Sallie Baxendale, *The impact of suppressing puberty on neuropsychological function: A review*, 113 ACTA PAEDIATRICA 1125, 1156-1167 (2024), https://doi.org/10.1111/apa.17150; Darios Getahun et al., *Cross-sex Hormones & Acute Cardiovascular Events in Transgender Persons: A Cohort Study*, 169 ANNALS INTERNAL MED. (2018), https://www.acpjournals.org/doi/10.7326/M17-2785; Michael Biggs, *Revisiting the effect of GnRH analogue treatment on bone mineral density in young adolescents with gender dysphoria*, 34 J. PEDIATRIC ENDOCRINOLOGY & METABOLISM 821, 937-939 (2021), https://doi.org/10.1515/jpem-2021-0180.

[3]    WALTER BOCKTING, *Ch. 24: Transgender Identity Development*, 1 AM. PSYCH. ASS'N HANDBOOK OF SEXUALITY & PSYCHOLOGY 744, 750 (Deborah L. Tolman & Lisa M. Diamond eds., 2014).

transitioned", from 61 to as many as 88 percent will come to terms with their sex.[4] But, those who are immediately and unquestioningly affirmed by peers and teachers at school, as required under these regulations, will be far less likely to desist from their body dysphoria.[5] If socially transitioned, a high percentage of children will then pursue medical and surgical interventions which have irreversible life-altering consequences for school age children, like **sterility and life-long sexual dysfunction**.[6] These interventions interrupt a child's healthy growth and development and come with significant risks, including loss of bone density, infertility, cognitive impairment, dangerous blood clots, cardiovascular disease, and cancer.[7] None have ever been approved by the FDA for this purpose and the long-term risks remain unknown.

Medical researchers have shown that the affirmation approach, including social transitioning followed by medical and surgical interventions, is based on low quality evidence.[8] In particular,

---

[4]    Decl. of James Cantor, Ph.D. (Psychologist) in *Eknes-Tucker v. Ivey*, No 2:22-cv-00184 (M.D. Ala.), Dkt. #69-2 at 14-15.

[5]    Decl. of Michael Laidlaw, M.D. (Endocrinologist) in *Eknes-Tucker v. Ivey*, No 2:22-cv-00184 (M.D. Ala.), Dkt. #69-3 at 11.

[6]    *Id.* at 5.

[7]    *Id.* at 5-6.

[8]    Levine, *supra* note 2, at 709.

researchers have described five scientific observations that "question and refute the assumption that an individual's experience of incongruence between sex and gender identity is best addressed by supporting the newly assumed gender identity with psychosocial affirmation and medical interventions."[9]

> 1.    The most foundational aspect of the diagnoses of "gender dysphoria" (DSM-5) and "gender incongruence" (ICD-11), requisite for the provision of medical treatment, is in flux, as professionals disagree on whether the presence of distress is a key diagnostic criterion, as stated in the DSM-5, or is irrelevant, as is the case according to the latest ICD-11 criteria for adolescents and adults (American Psychiatric Association, 2013; World Health Organization, 2024). Further, these diagnoses have never been properly field-tested.

> 2.    There are no randomized controlled studies demonstrating the superiority of various affirmative interventions compared to alternatives. There isn't even agreement about which outcome measures would be ideal in such studies.

> 3.    There are few long-term follow-up studies of various interventions using predetermined outcome measures at designated intervals. Studies that have been conducted are, at best, inconsistent. Higher quality studies with longer-follow-up fail to demonstrate durable positive impacts on mental health.

> 4.    Rates of post-transition desistance, increased mental suffering, increased incidence of physical illness, educational

---

[9]    *Id.*

failure, vocational inconstancy, and social isolation have not been established.

5.    Numerous cross-sectional and prospective studies of transgender adults consistently demonstrate a high prevalence of serious mental health and social problems as well as suicide. Controversies about how to deal with trans-identified youth must consider the well described vulnerabilities of transgender adults.[10]

The regulations represent the federal government taking sides on a consequential, controversial medical and mental health issue with life-altering consequences for K-12 students, all of whom are still in various stages of mental and physical development.

By mandating that schools accede to a gender dysphoric child's demands without question (and without the involvement of the child's parents, medical professionals working with the family, and/or legal documentation), the Department is directing educators to supersede the authority of parents and to become mental health professionals and engage in a controversial mental health intervention or face loss of federal funds and potential civil litigation. Educators are forced to cooperate with a protocol that will facilitate harm to their students. The regulations place the government's imprimatur on an unproven protocol

---

[10]    *Id.*

that is not supported by the type of scientifically sound evidence that should undergird any regulation relating to vulnerable children.

As discussed more fully *infra,* the regulations also deny parents the right to direct decisions regarding their children's mental, psychological, physical, and spiritual well-being for both the present and *the long-term*. The regulations provide no exceptions from the mandate of immediate affirmation of a child's discordant gender identity that would permit parents to exercise their right to make a contrary decision that the parents determine to be in their developing child's best interest. Such consequences cannot in any way be reconciled with Congress' purposes for enacting Title IX in 1972. Therefore, they exceed the Department's delegated authority under 20 U.S.C. § 1682.

## B.   The Regulations Violate Parents' Fundamental Constitutional Rights.

The regulations vastly increase the already widespread usurpation of parental authority by schools, teachers, counselors and administrators who claim that they are obligated to endorse a child's discordant identity without notice to or the consent of, and even over the objections of their

10

parents.[11] Schools now have the imprimatur of the federal government

on their claims that they must accede to children's demands for social

affirmation regardless of parental involvement or objection.[12]

---

[11]    *See Littlejohn v. Leon Cnty. Sch.,* No. 23-10385 (11th Cir.); *Foote v. Ludlow Public Sch.,* No. 23-1069 (1st Cir.); *Blair v. Appomattox Cnty. Sch. Dist.,* No. 24-1682 (4th Cir.); *Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, No. 24-1509 (1st Cir.); *Regino v. Staley*, No. 23-16031 (9th Cir.); *Parents Protecting Our Children v. Eau Claire Area Sch. Dist.*, No. 23-1534 (7th Cir.); *Perez v. Clay Cnty. Sch.,* No. 22-0083 (M.D. Fla.); *Doe v. Weiser*, No. 24-02185 (D. Colo.); *Mead v. Rockford Public Sch. Dist.*, No. 23-01313 (W.D. Mich.); *Vitsaxaki v. Skaneateles Central Sch. Dist.*, No. 24-00155 (N.D.N.Y.); *Willey v. Sweetwater Cnty. Sch. Dist. #1*, No. 23-00069 (D. Wyo.); *Doe v. Madison Metropolitan Sch. Dist.,* No. 20-454 (Wis. Cir. Ct. Dane Cnty.).

[12]    *See e.g., Littlejohn v. Leon Cnty. Sch.,* No. 23-10385 (11th Cir.), 1st Amend. Compl., *Littlejohn v. Leon Cnty. Sch.*, No. 21-00415 (N.D. Fla.), Dkt. No. 38-1, at 19 (The District stated in its "Transgender/Gender Nonconforming Student Support Plan": "The U.S. Department of Education and the U.S. Department of Justice interpret Title IX to require that when a student or the student's parent or guardian, as appropriate, notifies the school administration that the student will assert a gender identity that differs from previous representations or records, the school will begin treating the student consistent with the student's gender identity."); *Doe v. Weiser*, No. 24-02185 (D. Colo.), Compl., Document 1-5, at 18 (The "27J Schools LGBTQ+ Toolkit" states, "LGBTQ+ students are protected from discrimination, bullying, and harassment under federal and state laws including Title IX, the federal law that bans discrimination in public schools on the basis of sex."); *Mead v. Rockford Public Sch. Dist.*, No. 23-01313 (W.D. Mich.), Response in Opposition to Motion to Dismiss, Dkt. #21, at 28-29 (The district referenced "the school's obligations under Title IX and federal and state constitutions" when defending district staff treating the Meads' daughter as a boy without their knowledge or consent.); *Willey v. Sweetwater Cnty. Sch. Dist. #1*, No. 23-00069, Document 26-9, at 3-15 (D. Wyo.) (District

11

As noted above, the regulations compel school officials to affirm a student's discordant gender identity – that is to authorize social transitioning of minor children – in all educational programs or activities, otherwise face liability for violating Title IX. (*See e.g.,* 34 C.F.R. Section 106.31(a)(2)). Remarkably, however, the regulations do not require notice to or the consent of the child's parents, the involvement of the family's medical professionals, or legal documentation. This interferes with decades of Supreme Court precedent establishing that it is parents, not schools or the federal government, who have both the

personnel failed to notify or obtain consent from parents of a child who was being socially transitioned at school in a district in which the School Board attorney frequently referenced Title IX in addressing members of the public concerned about the district's policies regarding gender dysphoric students.); *Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, No. 24-1509 (1st Cir.), *Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, No. 23-00158 (D. Me), Document 1-5 (Principal Kim Schaff wrote, "Title IX prohibits discrimination on the basis of sex, sexual orientation, and gender identity" in defense of district conduct that included coaching a child on a secret gender transition behind her parents' backs.); *Thomas v. City Schools of Decatur*, No. 23-13467 (11th Cir.), Appellant's App., Vol. IV, Page 148, Dkt. #24-4. ("Superintendent David Dude cited Title IX as authority for a district protocol that permitted students to use privacy facilities based on their self-proclaimed gender identity. In November 2017, a 5-year-old girl reported being sexually assaulted by a male classmate who was permitted to be in the girls' bathroom.").

responsibility and right to direct the education, upbringing, care, custody, and control of their children.

### 1. The Rules Violate The Fundamental Right of Parents to Direct The Education And Upbringing of Their Children.

The rules cannot be reconciled with the Supreme Court's longstanding determination that parents have the fundamental right to direct their children's education and upbringing. *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Troxel v. Granville*, 530 U.S. 57 (2000). In *Meyer*, the Court noted that the right to liberty guaranteed by the Constitution had not been defined with exactness, but "[w]ithout doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and *bring up children*, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Id.* at 399. "[T]his liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to

some purpose within the competency of the state to effect." *Id.* at 399-400.

In *Pierce*, the Court reiterated that "rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the state" when it invalidated an Oregon law prohibiting non-public schools. 268 U.S. at 535. It further stated:

> The fundamental theory of liberty upon which all governments in this Union repose *excludes any general power of the state to standardize its children* by forcing them to accept instruction from public teachers only. The child is *not the mere creature of the state*; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

*Id.* (emphasis added). By attempting just such a standardization, the "Act of 1922 unreasonably interferes with the liberty of parents and guardians to *direct the upbringing and education of children* under their control." *Id.* at 534-35. That is also what the Department has done here, and it is equally violative of fundamental parental rights.

In overturning a state court's decision granting grandparent visitation over the objection of the children's mother, the *Troxel* Court said, "[t]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply

14

because a state judge [or the Department] believes a 'better' decision could be made." 530 U.S. at 72-73. "So long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel,* 530 U.S. at 68-69.

This long-standing Supreme Court precedent makes clear that it is not within the competency, or the delegated authority of the Department to mandate that parents' constitutionally protected rights be disregarded and their children socially transitioned at school without parental notification and consent.

A federal district court recently explained how parents' rights are violated by the type of regulations proposed by the Department:

> Presumably, the District may be concerned that some parents are unsupportive of their child's desire to be referred to by a name other than their legal name. Or the District may be concerned that some parents will be unsupportive, if not contest, the use of pronouns for their child that the parent views as discordant with a child's biological sex. But this merely proves the point that the District's claimed interest is an impermissible one because it is intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit. And whether the District likes it or not, that constitutional right includes the right of a parent to

15

have an opinion and to have a say in what a minor child is called and by what pronouns they are referred.

*Ricard v. USD 475 Geary Cnty., KS Sc. Bd.*, No. 22-04015 (D. Ks.), Ruling

on Motion for Preliminary Injunction [Dkt. 21] (May 9, 2022), p. 14-15.

### 2.    *The Regulations Violate Parental Rights To Direct the Medical and Mental Health Decision-making For Their Children.*

As discussed *supra*, the actions mandated by the regulations involve mental health interventions, socially transitioning minor children, that often lead to medical and surgical interventions. Furthermore, the regulations require that district Title IX Coordinators **provide "supportive measures"** to children, including counseling, upon being notified of conduct that may constitute sex-based discrimination. 34 C.F.R. § 106.44(g). Presumably that would include gender identity issues. Again, nowhere do the regulations require parental notification and consent.

In addition to violating parents' constitutionally protected right to direct the upbringing and education of their children, the regulations infringe on the fundamental rights of parents to direct medical and mental health care for their minor children. *Parham v. J.R.*, 442 U.S. 584, 604 (1979). *Parham* affirmed that parents (not public schools or the

Department) "retain a substantial, if not the dominant, role in [medical and mental health care decisions for their children], absent a finding of neglect or abuse." *Id*. Unless the parent has been determined by a court of law to be unfit, and if there are no judicial findings of neglect or abuse, then the longstanding presumption is that parents act in the best interests of their children. *Id*.

> Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with **broad parental authority over minor children**. Our cases have consistently followed that course; our constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations. . . . Surely, this includes a "high duty" to recognize symptoms of illness and to seek and follow medical advice. The law's concept of the family rests on a presumption that **parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions**. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

*Id*. at 602 (emphasis added).

Notably, the Supreme Court stated, "**Simply because the decision of a parent is not agreeable to a child, or because it involves risks, does not automatically transfer the power to make that decision from the parents to some agency or officer of the**

17

**state**," *e.g.,* the Department and school districts. *Id.* at 603 (emphasis added). "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. **Parents can and must make those judgments**." *Id* (emphasis added). The *Parham* Court affirmed that parental decision-making predominates, even when the parents' choice is disagreeable to the child – indeed, in the *Parham* case, Plaintiffs were a group of children who had sued their parents over the parents' mental health decisions with which they disagreed. Most certainly, parental authority remains undiminished, even if the parents' decision-making conflicts with a minor child's preferred name and pronouns. *Id.* at 603. The Department is once again contravening established Supreme Court precedent in mandating that schools disregard parents to undertake the social transitioning of minor children, a life-altering decision affecting children's health and well-being.

### 3.   *The Regulations Will Trigger Child Protective Services Reports.*

Furthermore, because the regulations presume that preventing a student from participating in any education program or activity consistent with their gender identity subjects that child to harm (See §

18

106.31(a)(2) "more than de minimis harm"), the regulations provide the basis for school officials to threaten to, or actually, report parents who are not in agreement with socially transitioning their child to state child protective services. Parents who are exercising their rights to uphold biological reality and not endorse their child's discordant gender identity may be labeled as abusive or unfit and have to defend against charges of child endangerment.[13]

---

[13] *See e.g., Blair v. Appomattox Cnty. Sch. Dist.,* No. 24-1682 (4th Cir.) (A young girl S.B. suffering from gender dysphoria ran away, was trafficked, prohibited by authorities from returning to her loving parents after being rescued, and placed into a home for boys where she was once again subjected to sexual violence, all whilst her parents were subjected to a social services investigation for abuse charges, which were determined to be unfounded.); Kaylee McGhee White, *Deserie's story: How the state is using gender ideology to steal children away from their parents*, WASH. EXAMINER (July 27, 2022), https://www.washingtonexaminer.com/news/2873907/deseries-story-how-the-state-is-using-gender-ideology-to-steal-children-away-from-their-parents/ (A Texas parent was reported to child protective services by a psychiatrist who decided during a five-minute visit with the child that the parent's refusal to affirm the boy's desire to identify as a girl warranted investigation. The case was promptly dismissed by the authorities.); Alexa Shrake, *Citing religious, parental rights, Hoosier couple asks SCOTUS for relief after trans child was removed*, IND. LAW. (Feb. 19, 2024), https://www.theindianalawyer.com/articles/citing-religious-parental-rights-hoosier-couple-asks-scotus-for-relief-after-trans-child-was-removed (An Indiana Catholic couple lost custody of their minor son A.C. who, contrary to the parents' beliefs, sought to be referred to as a girl, following two reports that they were abusing or neglecting the child.); Darrell Ehrlick, *Contempt charges, case dismissed*

This is antithetical to the founding principle of the Department, that "[P]arents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." 20 USC § 3401(3). Such profoundly impactful threats to parental rights were never considered nor intended by Congress and consequently, it is wholly outside of the authority delegated to the department to enact regulations consistent with Congressional intent.

### 4.    *The Regulations Interfere with States' Rights.*

Finally, the regulations usurp states' rights to protect parental rights through 34 C.F.R. § 106.6(b), which provides that the obligation to comply with the proposed regulations is not "obviated or alleviated by any State or local law or other requirement." At least twenty states have passed legislation protecting the fundamental rights of parents to direct the upbringing, care, and education of their children.[14] The

---

*against Glasgow couple*, DAILY MONTANAN (Feb. 22, 2024), https://dailymontanan.com/2024/02/22/contempt-charges-case-dismissed-against-glasgow-couple/ (A 14-year old girl was removed from her parents' Montana home by the authorities after her parents objected to her transition to a male identity due to their religious beliefs.)

[14] W. VA. CODE § 49-1-105(b)(4); MICH. COMP. LAWS § 380.10; TEX. FAM. CODE § 151.001; COLO. REV. STAT. § 13-22-107; NEV. REV. STAT. § 126.036;

regulations create legal uncertainty about the enforceability of **state laws protecting parental rights** where they may be viewed as conflicting with the new federal regulations. This will assuredly be exploited by activist officials and likely require expensive court action to resolve the conflicts.

### C. The Regulations Violate Girls' Privacy and Safety Under Title IX.

The regulations also require that girls and women surrender their rights to privacy and safety in ways that are antithetical to decades of Supreme Court precedent and to the *raison d'etre* for Title IX's passage over 50 years ago. The subjective "inner feelings of gender identity" on the part of some students do not change the fact that "[p]hysical differences between men and women ... are enduring." *United States v. Virginia,* 518 U.S. 515, 533 (1996). Those inherent physical differences create privacy and safety concerns that must be addressed by separate

---

VA. CODE ANN. § 1-240.1; KAN. STAT. ANN. § 38-141; OKLA. STAT tit. 25 §§ 25-2001 to 25-2002; ARIZ. REV. STAT. § 1-601; IDAHO CODE §§32-1010 to 32-1014; UTAH CODE § 30-5a-103; WYO. STAT. § 14-2-206; FLA. STAT. CH. 1014; MONT. CODE ANN. § 40-6-701; GA. CODE § 20-2-786; ALA. CODE § 26-1-6; IOWA CODE § 601-1; N.C. GEN. STAT. CH. 114A; N.D. CENT. CODE § 14.09-32.1; TENN CODE. § 36-8-104.

but equal facilities for engaging in undressing, personal hygiene, and other private bodily functions outside the presence of members of the opposite sex. *Id.* at 551 n.19.

The Department's regulations, including 34 C.F.R. §§ 106.10 and 106.31(a)(2), render the concept of separate privacy facilities meaningless as schools are required to grant access to such facilities not based on the physiological realities for which they were developed, but rather on the subjective feelings of children. A boy with all the physical characteristics of a young male but who has an internal feeling that he is "female" must be permitted to use restrooms, locker rooms and showers with girls (biological females), and vice versa. The regulations provide for no exceptions. Girls who have histories of sexual trauma, conscientious beliefs about bodily privacy, or other safety, religious, psychological, or emotional concerns about being in a state of full or partial undress in the presence of the opposite sex, are left with no choice but to surrender their privacy spaces to males that subjectively identify as female.

The safety concerns associated with permitting members of the opposite sex in these private spaces are tragically and cogently illustrated by multiple incidences in which female students were

22

assaulted by male classmates who were permitted to be in girls' restrooms under school board policies that granted access to privacy facilities based on gender identity. In Loudoun County, Virginia, a teenage girl was raped and sodomized in the high school bathroom by a male classmate who was permitted to be in the girls' restroom under the district's policy.[15] In Decatur, Georgia a five-year-old girl reported being sexually assaulted in a bathroom by a male classmate who was permitted to be in the girls' bathroom per district policy.[16] In Sun Prairie, Wisconsin, four 14-year old girls were exposed to the genitalia of a male classmate who was permitted to be in the girls' bathroom per district policy.[17] In Edmond, Oklahoma, a 15-year old girl was violently beaten by a 17-year old male classmate who was permitted to be in the girls'

---

[15]    Luke Rosiak, *Loudoun County Schools Tried To Conceal Sexual Assault Against Daughter In Bathroom, Father Says*, DAILY WIRE (Oct. 11, 2021), https://www.dailywire.com/news/loudoun-county-schools-tried-to-conceal-sexual-assault-against-daughter-in-bathroom-father-says; Virginia Aabram, *Teenager found guilty in Loudoun County bathroom assault*, WASH. EXAMINER (Oct. 26, 2021), https://www.washingtonexaminer.com/news/907397/teenager-found-guilty-in-loudoun-county-bathroom-assault/.

[16]    *Thomas v. City Sch. of Decatur*, No. 23-13467 (11th Cir.).

[17]    Corrinne Hess, *Federal complaint filed in Sun Prairie trans student shower incident*, WIS. PUB. RADIO (June 15, 2023), https://www.wpr.org/education/federal-complaint-filed-sun-prairie-trans-student-shower-incident.

bathroom by district policy.[18] In Rio Rancho, New Mexico, a 12-year old girl was raped in the girls' bathroom by an older male student who was permitted to use the girls' bathroom per district policy.[19] Certainly, not all children who assert a discordant gender identity will engage in such conduct. However, removing access restrictions that deter biological males from entering single sex female privacy facilities creates vulnerabilities for girls and opportunities for improper behavior that sex-separated facilities were created to deter. Privacy facilities are no longer safe spaces for girls and women.

The regulations requiring that access to privacy facilities be based on how a child subjectively identifies instead of physiological reality also has a powerful indoctrinating effect on all students. Children who are told to respect authority figures at school are being directed to suspend

---

[18]    KOKH Staff, *Edmond parent files lawsuit after daughter 'severely beaten' in bathroom by trans student*, OKC FOX (June 1, 2023), https://okcfox.com/news/local/edmond-memorial-high-school-bathroom-incident-transgender-student-lawsuit-theresa-gooden-parent-angela-grunewald-october-26-2022-senate-bill-615-biological-sex-public-schools-oklahoma-county-district-court-may-25-2023.

[19]    Kelsey Bolar & Andrea Mew, *EXCLUSIVE: Female student alleges she was raped in trans-inclusive bathroom at New Mexico middle school*, POST MILLENNIAL (June 20, 2023), https://thepostmillennial.com/exclusive-female-student-alleges-she-was-raped-in-trans-inclusive-bathroom-at-new-mexico-middle-school.

biological reality and unquestioningly accept that children of one sex can in fact become the opposite sex. Authority figures at school will contradict parental teaching on the values of truthfulness, scientifically verifiable facts, privacy, bodily integrity and matters of fundamental religious belief. Children will be taught to deceive their parents either by commission or omission, further conflicting with parental instruction regarding truthfulness and respect. Children, including adolescents, whose brains, and in particular the prefrontal cortexes, have not yet matured, are wholly incapable of reconciling the conflicting messages[20] and will be left with emotional and psychological harm.

---

[20]     *See e.g.,* Jastyn A. Pöpplau et al., *Development of Prefrontal Circuits and Cognitive Abilities*, COLD SPRING HARBOR PERSP. BIOLOGY (2024), doi: 10.1101/cshperspect.a041502; Jay N. Giedd, *The Teen Brain: Insights from Neuroimaging,* 42 J. ADOLESCENT HEALTH 335–43 (2008); B.J. Casey et al., *The adolescent brain*, 1124 ANNALS N.Y. ACAD. SCI. 1, 111-126 (2008), doi: 10.1196/annals.1440.010; Orma Ravindranath et al., *Pubertal development underlies optimization of inhibitory control through specialization of ventrolateral prefrontal cortex*, 58 DEV. COGNITIVE NEUROSCI. (2022), doi: 10.1016/j.dcn.2022.101162; Dan C. Li et al., *Social experience in adolescence shapes prefrontal cortex structure and function in adulthood*, MOLECULAR PSYCHIATRY (2024), https://doi.org/10.1038/s41380-024-02540-6.

## CONCLUSION

By compelling schools to affirm a student's assertion of a discordant gender identity or face liability for violating Title IX, the Department's regulations facilitate harmful interventions for gender dysphoric children, violate parents' fundamental rights to direct the upbringing and mental health / medical care of their children, and violate female students' rights of safety and privacy. CPRC respectfully requests that this Court affirm the district court's order.

Dated: September 3, 2024.

*/s/ Mary E. McAlister*
MARY E. MCALISTER (COUNSEL OF RECORD)
VERNADETTE R. BROYLES
ERNEST G. TRAKAS
ATHINA M. GIOUVALAKIS
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
Post Office Box 637
Monroe, VA 24574
770.448.4525
mmcalister@childparentrights.org
Attorney for Amicus Curiae

## Certificate of Compliance with Type-Volume Limits, Typeface Requirements and Type-Style Requirements

1. This document complies with the type-volume limits of Fed. R. App. P. 32(f), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,354 words.

2. The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because this document has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14 point.

Dated: <u>September 3, 2024</u>

*/s/ Mary E. McAlister*
Attorney for Amicus Curiae.

27

## Certificate of Service for Electronic Filing

I hereby certify that on September 3, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Mary E. McAlister*
Mary E. McAlister
