**No. 24-5588**

# In the
# United States Court of Appeals
## for the Sixth Circuit

━━━━━━━━━━━━━━━━━━━━━━●━━━━━━━━━━━━━━━━━━━━━

STATE OF TENNESSEE; COMMONWEALTH OF KENTUCKY;
STATE OF OHIO; STATE OF INDIANA; COMMONWEALTH OF VIRGINIA;
STATE OF WEST VIRGINIA,

*Plaintiffs-Appellees,*

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL;
A.C. by her next friend and mother Next Friend, Abigail,

*Intervenors/Plaintiffs-Appellees,*

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education;
U.S. DEPARTMENT OF EDUCATION;

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington, No. 2:24-cv-00072.
The Honorable Danny C. Reeves, Chief District Judge Presiding.

_____

### *AMICUS CURIAE* BRIEF OF DEFENSE OF FREEDOM INSTITUTE
### IN SUPPORT OF APPELLEES

_____

DONALD A. DAUGHERTY, JR.*
MARTHA A. ASTOR
DEFENSE OF FREEDOM INSTITUTE
1455 Pennsylvania Avenue, NW
Suite 400
Washington DC 20004
(414) 559-6902

*Attorneys for Amicus Curiae
Defense of Freedom Institute*

*Admission Pending



COUNSEL PRESS · (866) 703-9373                    PRINTED ON RECYCLED PAPER

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 24-5588 _____     Case Name: State of Tennessee v. Cardona _____

Name of counsel: Martha A. Astor and Donald A. Daugherty, Jr. _____

Pursuant to 6th Cir. R. 26.1, Defense of Freedom Institute for Policy Studies _____
                                         *Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

### CERTIFICATE OF SERVICE

I certify that on _____ September 3, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Martha Astor _____
_____
_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# <u>TABLE OF CONTENTS</u>

DISCLOSURE OF CORPORATE AFFILIATIONS AND
FINANCIAL INTEREST ........................................................................i

TABLE OF CONTENTS.........................................................................ii

TABLE OF AUTHORITIES .............................................................. iii

STATEMENT OF INTEREST.............................................................1

SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ........................................................................................6

    I.   Because Title IX Was Enacted Pursuant to the Spending
        Clause, Which Sets Limits On Congress's Authority That Do
        Not Apply To Title VII, *Bostock* Does Not Control. ................6

    II.  The Interpretation of Title IX Required to Justify the New
        Rule Would Violate Spending Clause Restrictions...............10

      A. Title IX Does Not So Clearly State The Proposed Conditions
         Set Forth In the New Rule That Recipients of Federal Funds
         Could Exercise Their Choice Knowingly and Cognizant Of
         The Consequences. ................................................................11

      B. Pressuring Plaintiffs–Appellees to Acquiesce to the Proposed
         Condition Would Be So Coercive As To Constitute
         Compulsion...........................................................................18

CONCLUSION...................................................................................22

CERTIFICATE OF COMPLIANCE ..................................................23

CERTIFICATE OF SERVICE ..........................................................24

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Alabama v. U.S. Sec'y of Ed.*,
No. 24-12444, 2024 U.S. App. LEXIS 21358 (11th Cir. August 22, 2024) ....................................................................................... 5

*Arkansas v. U.S. Dep't of Educ.*,
No. 4:24-CV-636-RWS, 2024 U.S. Dist. LEXIS 130849 (E.D. Mo. July 24, 2024) ................................................................................ 4, 15

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) ................................................................... 12

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ............................................................ passim

*Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*,
No. 4:24-CV-00461-O, 2024 U.S. Dist. LEXIS 122716 (N.D. Tex. July 11, 2024).................................................................................. 4

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) ................................................................... 12

*Cutter v. Wilkinson*,
423 F.3d 579  (6th Cir. 2005) ................................................ 9, 18

*Davis v. Monroe Cnty, Sch. Bd.*,
526 U.S. 629 (1999) ............................................................... 7, 8, 9

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998) ............................................................. 7, 8, 12

*Haight v. Thompson*,
763 F.3d 554 (6th Cir. 2014) ..................................................... 13

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ..................................................................... 7, 8, 16

*Kansas v. U.S. Dep't of Educ.*,
    No. 24-4041-JWB, 2024 U.S. Dist. LEXIS 116479 (D. Kan. July 2,
    2024) ...................................................................................................... 4, 14

*Kentucky v. Yellen*,
    54 F.4th 325 (6th Cir. 2022) .......................................... 8, 11, 12, 16, 18

*Kollartisch v. Mich. State Univ. Bd. of Trs.*,
    944 F. 3d 613 (6th Cir. 2019) ................................................................ 7

*Louisiana v. U.S. Dep't of Educ.*,
    No. 24-30399, 2024 U.S. App. LEXIS 17886 (5th Cir. 2024) ............. 1, 2

*Louisiana v. U.S. Dep't. of Educ.*,
    No. 3:24-cv-563-TAD-KDM, 2024 U.S. Dist. LEXIS 105645
    (W.D. La. June 13, 2024) ..................................................................... 2, 15

*Marks v. United States*,
    430 U.S. 188 (1977) .................................................................................. 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ........................................................................... passim

*New York v. United States*,
    505 U.S. 144 (1992) .................................................................................. 19

*Oklahoma v. Cardona*,
    No. CIV-24-00461-JD, 2024 U.S. Dist. LEXIS 135314
    (W.D. Ok. July 31, 2024) ........................................................................... 4

*Oklahoma St. Dep't. of Educ. v. U.S.*,
    No. 5:24-cv-00459-JD (W.D. Ok. filed May 6, 2024) .............................. 4

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ................................................................ 10, 11, 12, 18

*Sch. Dist. v. Sec'y of the United States Dep't of Education*,
  584 F.3d 253  (6th Cir. 2009.) .......................................................... 17, 18

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ................................................................................. 8

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
  600 U.S. 181 (2023) ................................................................................. 7

*Tennessee v. Becerra*, No. 24-5220, 2024 U.S. App. LEXIS 21521 (6th
  Cir. August 26, 2024 ........................................................................ 8, 21

*Tennessee v. Cardona*, No. 24-5588, 2024 U.S. App. LEXIS 17600 (6th
  Cir. July 17, 2024). ........................................................................... 2,5

*Tennessee v. Cardona*, No. 2:24-cv-072-DCR, 2024 U.S. Dist. LEXIS
  106559 (E.D. Ky. June 17, 2024) ......................................................... 14

*Texas v. United States*, No. 2:24-CV-86-Z, 2024 U.S. Dist. LEXIS 121812
  (N.D. Tex. July 11, 2024) ................................................................. 4, 15

*U.S. Dep't. of Educ. v. Louisiana*, 603 U.S. _____, 2024 U.S. LEXIS 2983
  (2024) ...................................................................................................... 2

*West Virginia v. Dep't of Treasury*,
  59 F.4th 1124 (11th Cir. 2023) .............................................................. 9

## Constitutional Provisions

U.S. Const. article I, § 8 ...................................................................... 2, 8

## Statutes

20 U.S.C. § 1682 ....................................................................................19

## Regulations

34 C.F.R. § 106.10 ............................................................................ 6, 15

**Other Authorities**

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,* 89 Fed. Reg. 33,474 (Apr. 29, 2024) .......................................................................... 1, 14, 15

*Restatement (Second) of Contracts*, § 201(2)(a)...................................... 13

*Restatement (Second) of Contracts*, § 201(2)(b)...................................... 14

U.S. Dep't. of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs, by State*............................................................ 20

U.S. Dep't. of Justice, Civil Rights Division, Title IX Legal Manual, V. *Federal Funding Agency Methods to Enforce Compliance* .................. 19

## STATEMENT OF INTEREST[1]

The Defense of Freedom Institute for Policy Studies ("DFI") is a national nonprofit organization dedicated to defending and advancing educational freedom and opportunities for every American family and student and to protecting the civil and constitutional rights of Americans in educational settings.  As part of that effort, DFI is co-counsel for Mississippi, Louisiana, Montana, and Idaho, along with the Attorneys General for those four states, in *Louisiana v. U.S. Dep't of Educ.*, No. 24-30399, 2024 U.S. App. LEXIS 17886 (5th Cir. July 17, 2024), which challenges new regulations under Title IX published by the Department of Education (the "Department") on April 29, 2024, *see Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,* 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the "New Rule").[2]  Plaintiffs-Appellees here challenge

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity, other than amicus curiae or its counsel, contributed money to fund the brief's preparation or submission. All parties have consented to the filing of this brief.

[2] The District Court for the Western District of Louisiana preliminarily enjoined enforcement of the New Rule in the plaintiff-states in *Louisiana*,

the New Rule on the same grounds as DFI's clients do in the separate

lawsuit.  In this brief, DFI focuses on the validity of the New Rule as an

exercise of Congress's authority under the Spending Clause, U.S. Const.

art. I, § 8.

## SUMMARY OF ARGUMENT

On the day he was inaugurated, President Biden directed all

federal agencies to revise their policies to reflect the reasoning of the

Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644

(2020).  *See* Exec. Order 13,988, *Preventing and Combating*

*Discrimination on the Basis of Gender Identity or Sexual Orientation*, 86

Fed. Reg. 7023, 7023 (Jan. 20, 2021).  *Bostock* held that Title VII's

prohibition on employment discrimination "because of [an] individual's .

---

No. 3:24-cv-563, 2024 U.S. Dist. LEXIS 105645 (W.D. La. June 13, 2024).
On interlocutory appeal, the Department moved for a partial stay, which
the Fifth Circuit denied. *Louisiana*, 2024 U.S. App. LEXIS 17886, at *7.
Similarly, the District Court below enjoined enforcement preliminarily in
the plaintiff-states, and the Department's request to this Court for a
partial stay was denied. *Tennessee v. Cardona*, No. 54-5588, 2024 U.S.
App. LEXIS 17600, ECF No. 123 (6th Cir. July 17, 2024).  The
Department then applied to the Supreme Court for such relief pending
appeal in both the Fifth and Sixth Circuits, which the Supreme Court
denied in a single decision. *See U.S. Dep't. of Educ. v. Louisiana*, 603
U.S. _____, 2024 U.S. LEXIS 2983 (2024) (per curiam).

. . sex" included terminating an employee simply for being gay or transgender because, under that statute's text, "[s]ex plays a necessary and undisguisable role" in such decisions. *Bostock*, 590 U.S. at 652, 658.

Consistent with the inaugural directive, Defendants-Appellants argue to this Court that *Bostock*'s reasoning applies here because the "texts of [Title VII and Title XI] demonstrate that they serve the same purpose of eradicating sex discrimination." Br. of Appellants, ECF No. 49 at 12,23. Furthermore, Appellants argue, the District Court "was wrong to conclude that the Rule likely violates the Spending Clause." *Id.* Thus, they ask that this Court vacate the District Court's preliminary injunction. *Id.*, at 53.

As a threshold matter, however, since Appellants filed their brief on August 6, 2024, the United States Supreme Court has rejected unanimously their request for such relief while this Court considers their appeal: "Importantly, all Members of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule, including the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Louisiana*, 603 U.S. at 2.

3

Furthermore, the Court did not find "a sufficient basis to disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule," such that the scope of the injunction was overbroad. *Id. at 3.*[3]

The Supreme Court's refusal to disturb the preliminary injunction while this Court considers this appeal in the regular course is consistent with the decisions thus far of nearly every lower court that has considered the validity of the New Rule.[4]

---

[3] Four justices dissented from this part of the decision, stating that they "would stay the preliminary injunctions except as to the three provisions above, in keeping with the traditional principle of equitable remedies that 'relief afforded [to] the plaintiffs' must not 'be more burdensome than necessary to redress the complaining parties." *Id.*, at 2 (Sotomayor, J., dissenting in part).

[4] Besides the instant case and DFI's action in the Western District of Louisiana, 5 other district courts have heard or are hearing similar challenges to the New Rule. *See Kansas v. U.S. Dep't of Educ.*, No. 24-4041-JWB, 2024 U.S. Dist. LEXIS 116479 (D. Kan. July 2, 2024); *Texas v. United States*, No. 2:24-CV-86-Z, 2024 U.S. Dist. LEXIS 121812 (N.D. Tex. July 11, 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, No. 4:24-CV-00461-O, 2024 U.S. Dist. LEXIS 122716 (N.D. Tex. July 11, 2024); *Arkansas v. U.S. Dep't of Educ.*, No. 4:24-CV-636-RWS, 2024 U.S. Dist. LEXIS 130849 (E.D. Mo. July 24, 2024); *Oklahoma v. Cardona*, No. CIV-24-00461-JD, 2024 U.S. Dist. LEXIS 135314 (W.D. Ok. July 31, 2024); *Oklahoma St. Dep't of Educ. v. U.S.,* No. 5:24-cv-00459-JD (W.D. Ok. filed May 6, 2024)(along with this case and the Louisiana case, collectively referred to herein as the "New Rule Litigation."). Only the district court in Alabama has upheld the New Rule thus far, and its

Similarly, with regard to the specific issue of whether *Bostock* controls, this Court has already explained in denying Appellants' request for a partial stay that "Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, [including] Title IX." *Tennessee v. Cardona*, No. 24-5588, 2024 U.S. App. LEXIS 17600, at *8 (6th Cir. July 17, 2024). Besides the textual differences between Titles VII and IX, "[n]o less importantly, Congress enacted Title IX as an exercise of its Spending Clause power, which means that Congress must speak with a clear voice before it imposes new mandates on the States. The same is not true of Title VII." *Id.*, at *8-9, ECF, at 5 (citations omitted). Again, this Court's legal conclusion is consistent with the decisions thus far of nearly every lower court in the New Rule Litigation. Like those other courts, this Court should now again reject Appellants' misinterpretation of *Bostock* and Title IX.

_____

decision was promptly reversed by the Eleventh Circuit, which provided a "rule-wide injunction" in Alabama, Florida, Georgia, and South Carolina." *Alabama v. U.S. Sec'y of Ed.*, No. 24-12444, 2024 U.S. App. LEXIS 21358, at * 22-23 (11th Cir. August 22, 2024).

While Title IX was enacted pursuant to Congress's Spending Clause authority, Title VII was enacted pursuant to its power to regulate interstate commerce. As a result, the Spending Clause is completely irrelevant to Title VII and was not mentioned or considered in *Bostock*; nonetheless, it is essential to properly analyzing Title IX because it constrained Congress's authority to place conditions on funds provided under that statute.

A prohibition under Title IX on discrimination based on gender identity, as set forth in the New Rule, *see, e.g.,* 34 C.F.R. § 106.1 and as Appellants argue for here and in the other New Rule Litigation cases, would violate Congress's exercise of its spending powers by (1) imposing a requirement that was not unambiguously clear to states when Title IX was enacted in 1972 and (2) effectively coercing Plaintiffs-Appellees into now exposing themselves to civil liability for sexual orientation discrimination in exchange for funds that they first began receiving five decades ago. *Id.*

<u>**ARGUMENT**</u>

I.    **Because Title IX Was Enacted Pursuant to the Spending Clause, Which Sets Limits On Congress's Authority That Do Not Apply To Title VII, *Bostock* Does Not Control.**

The Supreme Court has recognized that notwithstanding some textual similarities, Titles VII and IX are "vastly different." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283-84 (1998)).  Most notably, Title VII focuses exclusively on hiring and firing in employment, while Title IX's entire purpose is to ensure equal educational opportunities for women and girls.

Another significant difference is that Congress enacted Title IX under its Spending Clause power, *see Davis v. Monroe Cnty, Sch. Bd.*, 526 U.S. 629, 640 (1999), and Title VII under the Commerce Clause, *see Kollartisch v. Mich. State Univ. Bd. of Trs.*, 944 F. 3d 613, 629 (6th Cir. 2019). Thus, while Title VII regulates employers directly pursuant to Congress's expressly enumerated power under Article I, Section 8, *see Students for Fair Admissions, Inc. v. President & Fellows of Harv. College*, 600 U.S. 181, 238, 256-57 (2023), Title IX creates an arrangement in the nature of a contract between the federal government

7

and states and other recipients accepting funds it offers under the statute, *see Jackson*, 544 U.S. at 181-82; *Tennessee v. Becerra*, No. 24-5220, 2024 U.S. App. LEXIS 21521, at *8 (6th Cir. August 26, 2024). Under its Spending Clause authority, Congress may impose conditions on recipients of federal funds that go beyond its expressly enumerated powers. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012). ("Congress may use this power to . . . condition such a grant [of federal funds] upon the States' 'taking certain actions that Congress could not require them to take.'") (citation omitted); *Davis*, 526 U.S. at 640; *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022). "That contractual framework distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition." *Gebser*, 524 U.S. at 286.

Congress's spending clause authority "is of course not unlimited . . . but is instead subject to several general restrictions." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). The two restrictions relevant here are that conditions imposed upon states receiving federal funds (1) must be "unambiguous[]" so that states can "exercise their choice knowingly, cognizant of the consequences of their participation," and (2) must not

"be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Id*. at 207–11 (internal quotations omitted); *see also Cutter v. Wilkinson*, 423 F.3d 579, 585 (6th Cir. 2005). Each of these requirements is "equally important" and each must be "equally" satisfied for a condition on funding to be constitutional. *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023).

These restrictions "ensur[e] that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Sebelius*, 567 U.S. at 577. For example, the restrictions help to preserve "the political accountability key to our federal system." *Id.*, at 578. "[W]hen a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds," "state officials can fairly be held politically accountable for choosing to accept or refuse [a] federal offer." *Id.*

By contrast, Title VII was enacted pursuant to Congress's interstate commerce power, which grants expansive regulatory authority. *Id.*, at 549-50. Thus, "the requirement that recipients receive adequate notice of Title IX's proscriptions . . . bears on the proper definition of 'discrimination'" under that statute, *Davis*, 526 U.S. at 651

9

(cleaned up), but "whether a specific application [of Title VII] was anticipated is irrelevant," *Bostock*, 590 U.S. at 677 (cleaned up).  The limits imposed by the Spending Clause were not at issue in *Bostock*, yet they are fundamental to any analysis under Title IX.

## II.    The Interpretation of Title IX Required to Justify the New Rule Would Violate Spending Clause Restrictions.

The proposed condition advanced by the New Rule fails the two Spending Clause requirements.  First, such a condition on the acceptance of federal funding is not "unambiguously" clear from the face of Title IX.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  Discrimination on the basis of "sex" and of "gender identity" do not have identical meanings, *see Bostock*, 590 U.S. at 669 ("We agree that homosexuality and transgender status are distinct concepts from sex."), so being on statutory notice of the former does not necessarily mean being on notice of the latter.  And this would seem to also be true at the time Title IX was enacted.  *See Bostock,* 590 U.S. at 686, 702-04 (Alito, J., dissenting).  Thus, Plaintiffs–Appellees could not "voluntarily and knowingly" agree that in exchange for federal funds under Title IX, they would expose themselves to civil liability for failing to prohibit

gender identity or sexual orientation discrimination. *Sebelius*, 567 U.S. at 577.

Second, forcing Plaintiffs–Appellees to now choose between accepting conditions that went unmentioned for decades and facing the potential loss of a significant percentage of their education funding "is economic dragooning that leaves the States with no real option but to acquiesce." *Id.* at 582. The Spending Clause gives Congress no authority to engage in such federal coercion.

### A. Title IX Does Not So Clearly State The Proposed Conditions Set Forth In the New Rule That Recipients of Federal Funds Could Exercise Their Choice Knowingly and Cognizant Of The Consequences.

Given that "[t]he legitimacy of Congress's power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract,'" the Supreme Court "insist[s] that Congress speak with a clear voice" when it imposes conditions on the receipt of federal funds. *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "'[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously' and with a 'clear voice.'" *Yellen*, 54 F.4th at 348 (quoting *Pennhurst*, 451 U.S. at 17). "'[L]egislation enacted pursuant to the spending power is

11

much in the nature of a contract,' and therefore, to be bound by 'federally imposed conditions,' recipients of federal funds must accept them 'voluntarily and knowingly.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). Like any party entering into a contract, "[s]tates cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington*, 548 U.S. at 296 (quoting *Pennhurst*, 451 U.S. at 17).

A recipient's understanding of the deal it entered into with the federal government is critical to the Spending Clause analysis. "The legitimacy of Congress'[s] power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract'" *Yellen*, 54 F.4th at 348. (quoting *Arlington*, 548 U.S. at 296); *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022) (courts must "construe the reach of Spending Clause conditions with an eye toward 'ensuring that the receiving entity of federal funds [had] notice that it will be liable'") (quoting *Gebser*, 524 U.S. at 287). The clear statement rule requires that "if Congress desires to condition the States' receipt of federal funds, it 'must do so

unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation," including being subject to sex discrimination claims in federal court. *Haight v. Thompson*, 763 F.3d 554, 596 (6th Cir. 2014).

The "bargain" struck between Congress and the states in the mid-1970's did not clearly and unambiguously include the latter consenting to potential liability for gender identity discrimination in exchange for federal funds. Black letter contract law holds that Plaintiffs–Appellees' understanding of the bargain trumps any different understanding now put forth by Appellants:

> Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made . . . that party [here, Plaintiffs-Appellees] did not know of any different meaning attached by the other [here, Appellants], and the other knew the meaning attached by the first party.

*Restatement (Second) of Contracts*, § 201(2)(a). Although there is no dispute that the parties here knew that they both understood Title IX to prohibit discrimination on the basis of an individual's biological sex, there was no reason for Plaintiffs–Appellees to know that the United States had a more expansive understanding until, five decades later, it first asserted that Title IX also prohibited gender identity and sexual

13

orientation discrimination. At the least, the United States "had reason to know the meaning attached by" Plaintiffs–Appellees to the term "sex" when it first began providing funding under Title IX, *id.*, § 201(2)(b), which also supports the conclusion that Plaintiffs–Appellees' understanding prevails.

As *Bostock* acknowledged repeatedly, reading Title VII's language to encompass gender identity or sexual orientation discrimination was, at the least, "a new application" that was largely "unexpected" by Congress when it enacted the statute. *See, e.g., Bostock*, 590 U.S. at 649, 673-82. But if a ban on gender identity and sexual orientation discrimination is a new application not anticipated when Title VII was passed, recipients of federal funds under Title IX could not be clearly on notice that that the statute might similarly extend as far as it does in the New Rule. The District Court correctly recognized that the extension of Title IX to these "unexpected applications" was not consistent with Congress's Spending Clause authority. *Tennessee v. Cardona*, No. 2:24-cv-072-DCR, 2024 U.S. Dist. LEXIS 106559, at *43-46 (E.D. Ky. June 17, 2024).

Like the District Court, *Id.* at *129-30, the other courts in the New Rule Litigation have rejected Appellants' contention that *Bostock* controls their interpretation of Title IX.   *See, e.g., Louisiana*, 2024 U.S. Dist. LEXIS 105645, at *29-30, 34; *Kansas*, 2024 U.S. Dist. LEXIS 116479, at *27-28;  *Texas*, 2024 U.S. Dist. LEXIS 121812, at *13-14.  The courts further concluded that when Title IX was enacted in 1972, it did not  clearly  and  unambiguously  encompass  sexual  orientation discrimination,  such  that  recipients  would  have  had  notice  of  the condition.  *See, e.g., Louisiana*, 2024 U.S. Dist. LEXIS 105645, at *29; *Kansas*, 2024 U.S. Dist. LEXIS 116479, at *27-28; *Arkansas*, 2024 U.S. Dist. LEXIS 130849,  at *42.

Appellants assert that "Title IX places recipients of federal funds clearly on notice that they must comply with the prohibition on sex-based discrimination in all of its forms." Br. Of Appellants at 24, ECF No. 49. Undermining this contention, however, is their allegation elsewhere in their brief that the New Rule only "clarifies" the meaning of the term "sex."  *Id.*, at 1 ("The first such provision (§ 106.10) clarifies that discrimination on the basis of gender identity is necessarily a form of discrimination on the basis of sex."); *see also New Rule*, 89 Fed. Reg. at

15

33476 ("These regulations . . . [c]larify that sex discrimination includes discrimination on the basis of . . . gender identity."). This begs the question if Title IX has clearly and unambiguously encompassed gender identity and sexual orientation since 1972, why is the New Rule now needed to clarify it? *See Yellen*, 54 F.4th at 347 (Spending Clause requires that agency rules must "follow[] *clearly* from the . . . [statutory] text.") (emphasis in original). Title IX did not, in fact, give the constitutionally-required notice, which explains why Appellants now need to "clarify" it with the New Rule.

Contrary to Appellants' contention (at 24), *Jackson* does not support their argument that Title IX provides the requisite clear statement. There, the Court focused on the meaning of the term "discrimination," and concluded that "retaliation" was one type of such "intentional unequal treatment," 544 U.S. at 175 (citation omitted); however, *Bostock* and nearly every other court that has considered the separate term "sex" has proceeded with the understanding that there are only *two* types – male and female – and never found the term to be "broad."

16

Where a current Secretary of Education argues that a provision should be interpreted differently than a former Secretary interpreted it, a court will consequently find that the meaning "is unclear." *Sch. Dist. v. Sec'y of the United States Dep't of Educ.*, 584 F.3d 253, 277 (6th Cir. 2009). Such is the case with the New Rule, which conflicts directly with the Department's previous interpretations of Title IX. *See, e.g.,* Memorandum for Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights, *Re: Bostock v. Clayton Cty.,* Department of Education, (January 8, 2021) https://tinyurl.com/sszpkk2x , at 1, 6 ("[T]he Department's longstanding construction of the term 'sex' in Title IX to mean biological sex, male or female, is the only construction consistent with the ordinary public meaning of "sex" at the time of Title IX's enactment. . . . [T]he ordinary public meaning of "sex" at the time of Title IX's enactment was biological sex, male or female, not transgender status or sexual orientation."). This conflict also argues against a clear statement in Title IX that would support the New Rule.

The new conditions contained in the New Rule were simply not part of the original bargain that Appellees consented to under Title IX. Appellants hope to inject it into the parties' agreement after-the-fact,

17

which supports the conclusion that they seek to coerce acceptance out of Appellees. *Sebelius*, 567 U.S. at 584 (quoting *Pennhurst*, 451 U.S. at 25) ("'Congress' power to legislate under the spending power . . . does not include surprising participating States with postacceptance or 'retroactive' conditions.'").

### B. Pressuring Plaintiffs–Appellees to Acquiesce to the New Rule's New Conditions Would Be So Coercive As To Constitute Compulsion.

Assuming, *arguendo*, that Title IX clearly states the proposed condition, acceptance by Plaintiffs-Appellees cannot be voluntary if it has been coerced out of them by the federal government. *See Wilkinson*, 423 F.3d at 585; *Yellen*, 54 F.4th at 347-48. Thus, courts must "scrutinize Spending Clause legislation to ensure that Congress is not using financial inducements to exert a 'power akin to undue influence.' . . . [W]hen 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *Sebelius*, 567 U.S. at 577 (citations omitted)[5].

---

[5]Although in *Sebelius*, the Chief Justice wrote for a plurality that the federal government had engaged in unconstitutional coercion in attaching conditions to the Affordable Care Act, in cases where the Supreme Court's majority agrees on a result, but has no single rationale

18

Among other things, federal coercion erodes political accountability: "when the State has no choice, the Federal Government can achieve its objectives without accountability. . . Indeed, this danger is heightened when Congress acts under the Spending Clause, because Congress can use that power to implement federal policy it could not impose directly under its enumerated powers." *Sebelius*, 567 U.S. at 578; *see also New York v. United States*, 505 U.S. 144, 168 (1992) ("where the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished").

The New Rules' interpretation of Title IX effectively imposes a new condition by leveraging the potential loss of long-existing funding. If a recipient of federal funds fails or refuses to comply with Title IX, the federal government can take steps to terminate its funding. *See* 20 U.S.C. § 1682; U.S. Dep't. of Justice, Civil Rights Division, Title IX Legal Manual, V. *Federal Funding Agency Methods to Enforce Compliance*, available at https://tinyurl.com/byjsscde. The termination of federal

---

that explains the assent of those justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977).

funding would cripple a recipient; Tennessee and its local programs received at least $3,368,495,310 of funding from the Department last year and are projected to receive at least $3,540,638,930 this year. *See* U.S. Dep't. of Educ., *Funds for State Formula-Allocated and Selected Student Aid Programs, by State*, available at https://tinyurl.com/4k2rr5hh (last accessed August 30, 2024). If all of the plaintiffs-states' funding were terminated, the numbers would be enormous; their local programs received a combined $20,032,440,329 last year and are predicted to receive $21,136,244,814 in the coming year. *Id.*[6]

Furthermore, the reason why the proposed condition is coercive is not only that Plaintiffs-Appellees may lose funding, but that the "threatened loss" of funding alone gives them no option "but to acquiesce" to the New Rules' interpretation of Title IX. *Sebelius*, 567 U.S. at 582. The mere prospect of a loss of substantial funding that Plaintiffs–

---

[6] Last year Indiana received $3,340,895,914 in funding and is predicted to be funded at $3,519,121,557 in the coming year. Kentucky received $2,425,330,125 in the prior year and is projected to receive $2,544,538,929 next school year. Ohio received $5,253,034,935 last year and is projected to receive $5,485,301,955 in the coming year. Virginia received $4,777,874,170 in the prior school year and is predicted to be funded at $4,938,806,556. In the prior year West Virgina received $1,066,809,875 and is projected to receive $1,107,836,887 in the coming year.

Appellees have long relied on to educate students is so enormous that they would have no real choice. *Becerra*, 2024 U.S. App. LEXIS 21521, at * 4-5. (federal government threatens to terminate funding to Tennessee for failure to conform to HHS's interpretation of Title X).

It is entirely reasonable for recipients like Plaintiffs–Appellees to be concerned about their federal funding if they do not adhere to the Department's interpretation of Title IX, which is undoubtedly a high priority for the Biden Administration (and its possible successor). The Executive Branch is pursuing an (overly) aggressive interpretation of Title IX in the New Rule Litigation, having gone so far as to seek emergency relief (unsuccessfully) from the Supreme Court.

Besides the possible loss of federal funding, Plaintiffs–Appellees will face certain exposure to litigation like the discrimination claims at the heart of this lawsuit. Furthermore, given that under the New Rule, Title IX encompasses a broad understanding of sex discrimination, *see New Rule*, 89 Fed. Reg. at 33376, Plaintiffs–Appellees would almost certainly have to defend against many new varieties of Title IX claims in the future.

## **CONCLUSION**

For the foregoing reasons, as well as those set forth in Plaintiffs'-

Appellees' brief, the judgment of the District Court should be affirmed.

September 3, 2024

                                    Respectfully submitted,

                                    */s/ Martha A. Astor*
                                    Martha A. Astor
                                    Counsel, Litigation
                                    Donald A. Daugherty, Jr.*
                                    Senior Counsel, Litigation
                                    Martha A. Astor
                                    Counsel, Litigation
                                    Defense of Freedom Institute
                                    for Policy Studies
                                    1455 Pennsylvania Avenue, NW
                                    Suite 400
                                    Washington, DC 20004
                                    (414) 559-6902
                                    Don.Daugherty@dfipolicy.org
                                    Martha.Astor@dfipolicy.org

                                    ***Counsel for Amicus Curiae***

# CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century font.

This document complies with the word limits established by Federal Rule of Appellate Procedure 29(a)(5) because the brief contains 4,388 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

Dated:  September 3, 2024

*/s/ Martha A. Astor*
Martha A. Astor
Counsel for Amicus Curiae

23

# CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2024, I e-filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. All participants who are CM/ECF registered will be served with the foregoing document.

*/s/ Martha A. Astor*
Martha A. Astor