No. 24-5588

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

STATE OF TENNESSEE, et al.,

Plaintiffs-Appellees,

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL;
A.C., by her next friend and mother Next Friend, Abigail Cross,

Intervenors-Plaintiffs-Appellees,

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Eastern District of Kentucky

_____

## REPLY BRIEF FOR APPELLANTS

_____

*Of Counsel:*

LISA BROWN
*General Counsel*
*U.S. Department of Education*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

MELISSA N. PATTERSON
STEPHANIE R. MARCUS
JACK STARCHER
DAVID L. PETERS
STEVEN A. MYERS
*Attorneys, Appellate Staff*
*Civil Division, Room 7232*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ..............................................................1

ARGUMENT ............................................................................................2

I.      Plaintiffs Are Unlikely to Prevail on the Merits. ....................................2

    A.      The Supreme Court's Order Denying an Emergency Stay Does Not Resolve This Appeal. ..............................................................2

    B.      Gender-Identity Discrimination Is Necessarily Sex Discrimination. ..............................................................................4

    C.      Section 106.31(a)(2)'s De Minimis Harm Standard Effectuates Title IX's Text. ..............................................................................8

    D.      The Rule's Prohibition on Hostile-Environment Harassment Raises No First Amendment Concerns. ..........................................14

II.     The Remaining Factors Weigh Against Preliminary Relief. .................. 21

    A.      Plaintiffs Failed to Establish Irreparable Harm. ..........................21

    B.      The Equities and Public Interest Weigh Against an Injunction. ..............23

III.    At a Minimum, the Injunction Is Overbroad. .....................................23

CONCLUSION ...................................................................................... 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Bostock v. Clayton County,*
   590 U.S. 644 (2020) .............................................................. 1, 4, 5, 6, 7, 10, 12

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.,*
   526 U.S. 629 (1999) ............................................................... 14, 15, 16

*Department of Educ. v. Louisiana,*
   --- S. Ct. ---, No. 24A78, 2024 WL 3841071 (U.S. Aug. 16, 2024) ................... 2, 3, 24

*Doe v. Columbia Univ.,*
   831 F.3d 46 (2d Cir. 2016) ............................................................... 6

*Doe v. Miami Univ.,*
   882 F.3d 579 (6th Cir. 2018) ........................................................... 19

*Doe v. Princeton Univ.,*
   30 F.4th 335 (3d Cir. 2022) ............................................................... 6

*Doe v. Purdue Univ.,*
   928 F.3d 652 (7th Cir. 2019) ............................................................. 6

*Doe v. Samford Univ.,*
   29 F.4th 675 (11th Cir. 2022) ........................................................... 6

*Doe v. Trustees of Bos. Coll.,*
   892 F.3d 67 (1st Cir. 2018) ............................................................... 6

*Doe v. University of Denver,*
   1 F.4th 822 (10th Cir. 2021) ............................................................. 6

*Doster v. Kendall,*
   54 F.4th 398 (6th Cir. 2022) ........................................................... 27

*Entertainment Prods., Inc. v. Shelby County,*
   588 F.3d 372 (6th Cir. 2009) ........................................................... 18

*Gebser v. Lago Vista Indep. Sch. Dist.,*
   524 U.S. 274 (1998) ............................................................... 15, 16

*Grimm v. Gloucester Cty. Sch. Bd.,*
   972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ........................... 23

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) ............................................................................... 19

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005)..................................................................... 7, 8, 9, 11

*Kentucky v. Biden*,
    57 F.4th 545 (6th Cir. 2023) .............................................................. 21

*L.M. v. Town of Middleborough*
    677 F. Supp. 3d 29 (D. Mass. 2023) ................................................. 17

*L.W. ex rel. Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023) ...............................................................8

*Leary v. Daeschner*,
    228 F.3d 729 (6th Cir. 2000) ............................................................. 22

*Members of the City Council of the City of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) .......................................................................... 18

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) .................................................. 7-8, 8, 17

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024) ...................................................................... 26

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*,
    305 F.3d 566 (6th Cir. 2002) ............................................................. 24

*Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*,
    109 F.4th 453 (6th Cir. 2024) ..................................................... 17, 19

*Pelcha v. MW Bancorp, Inc.*,
    988 F.3d 318 (6th Cir. 2021) ...............................................................8

*Rowles v. Curators of the Univ. of Mo.*,
    983 F.3d 345 (8th Cir. 2020) ................................................. 6, 18, 19, 20

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ............................................................................ 16

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001) .............................................................. 20

*Schwake v. Arizona Bd. of Regents*,
  967 F.3d 940 (9th Cir. 2020) ............................................ 6

*Speech First, Inc. v. Cartwright*,
  32 F.4th 1110 (11th Cir. 2022) ........................................ 20

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020), *as revised* (Oct. 30, 2020) ............................................ 20

*Tennessee v. Department of Educ.*,
  104 F.4th 577 (6th Cir. 2024) ........................................ 22

*Union Home Mortg. Corp. v. Cromer*,
  31 F.4th 356 (6th Cir. 2022) ........................................ 27

*Waldo v. Consumers Energy Co.*,
  726 F.3d 802 (6th Cir. 2013) ........................................ 19

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ................................................ 12

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .......................................... 22, 24

**Statutes:**

Education Amendments of 1974,
  Pub. L. No. 93-380, tit. VIII, pt. D, § 844, 88 Stat. 484, 612 ...............................12

20 U.S.C. § 1681(a) ................................................ 7

20 U.S.C. § 1681(a)(6) ............................................ 9

20 U.S.C. § 1686 .................................................. 8

42 U.S.C. § 2000e-2(a)(1) ......................................... 7

**Administrative Materials:**

34 C.F.R. § 106.2 .......................................... 1, 14, 18, 20, 25

34 C.F.R. § 106.10 ................................................ 1

34 C.F.R. § 106.31(a)(2) ......................................... 1, 11

34 C.F.R. § 106.33 ..................................................................... 10

34 C.F.R. § 106.34(a)-(b) ....................................................... 10

34 C.F.R. § 106.37(c) ................................................................ 8

34 C.F.R. § 106.40 ..................................................................... 25

34 C.F.R. § 106.44(j)(2) .......................................................... 25

34 C.F.R. §§ 106.45-106.46 .................................................. 25

34 C.F.R. § 106.71 .................................................................... 25

62 Fed. Reg. 12,034 (Mar. 13, 1997) .................................. 15

85 Fed. Reg. 30,026 (May 19, 2020) .................................. 16

89 Fed. Reg. 33,474 (Apr. 29, 2024) ................................... 5, 9, 10, 11, 12, 13, 14, 17, 26

## INTRODUCTION AND SUMMARY

Title IX's prohibition on sex discrimination, like Title VII's corresponding provision, is "written in starkly broad terms." *Bostock v. Clayton County*, 590 U.S. 644, 680 (2020). Consistent with those broad terms, the Rule provides that discrimination on the basis of gender identity is a form of discrimination "on the basis of sex," 34 C.F.R. § 106.10; that unless otherwise permitted by Congress, schools may not bar individuals from accessing sex-separate facilities consistent with their gender identity, *id.* § 106.31(a)(2); and that schools must address sex-based harassment that is "so severe or pervasive that it limits or denies a person's ability to participate" in the school's education program, *id.* § 106.2. These three provisions properly implement the statute's broad terms and are consistent with binding precedent of this Court and the Supreme Court, including *Bostock*. There was thus no basis for the district court to enjoin them. Even if there were, the court's blunderbuss injunction, which reached provisions that plaintiffs did not challenge and cause them no injury, was overbroad. This Court should therefore vacate—or at a minimum, substantially narrow—the injunction.

# ARGUMENT

## I.    Plaintiffs Are Unlikely to Prevail on the Merits.

### A.    The Supreme Court's Order Denying an Emergency Stay Does Not Resolve This Appeal.

The Supreme Court's denial of the Department's emergency stay request does not require this Court to affirm the district court's injunction.  In declining to partially stay this and another preliminary injunction pending appeal, the Supreme Court reasoned that "[i]n this emergency posture in this Court, the burden is on the Government as applicant" to show entitlement to relief and that "[o]n this limited record and in its emergency applications, the Government has not provided this Court a sufficient basis to disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule."  *Department of Educ. v. Louisiana*, --- S. Ct. ----, No. 24A78, 2024 WL 3841071, at *1 (U.S. Aug. 16, 2024) (per curiam).  The Court also stated that it "today accept[ed] that the plaintiffs were entitled to preliminary injunctive relief as to [the] three provisions of the rule" challenged by plaintiffs, noting that the dispute before the Court concerned "the interim period while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals."  *Id.*  Justice Sotomayor—joined by Justices Kagan, Gorsuch, and Jackson—dissented, explaining that the "injunctions are overbroad" because they "bar the Government from

enforcing the entire rule—including provisions that bear no apparent relationship to [the plaintiffs'] alleged injuries." *Id.* at *2 (Sotomayor, J., dissenting in part).

The Supreme Court's order denying the Department a stay does not even mention *Bostock* or the text of Title IX, making the states' claim that the Court reached out to "settle[]" the underlying merits of this appeal regarding the applicability of *Bostock*'s reasoning to Title IX's text implausible. States Br. 20. Nor did the Court address any other merits issue. Rather, the Court's order merely noted that "all Members of the Court *today* accept[ed]" that the plaintiffs were entitled to preliminary relief as to the challenged provisions, a statement describing only a stay-stage determination regarding the preliminary injunctions, as the dissent made clear. *Louisiana*, 2024 WL 3841071, at *1 (emphasis added); *see id.* at *2 (Sotomayor, J., dissenting in part) ("For now, on the briefing and record currently before us, I would stay the preliminary injunctions except as to the three [challenged] provisions … ."). Moreover, the Supreme Court noted that this Court had "already expedited its consideration of the case and scheduled oral argument for October" and emphasized that it "expect[ed] that the Courts of Appeals will render their decisions with appropriate dispatch." *Id.* at *1 (per curiam). That observation would make little sense if the Supreme Court already "dictate[d]," in a brief per curiam order without any meaningful discussion, "affirmance." States Br. 20.

3

**B.     Gender-Identity Discrimination Is Necessarily Sex Discrimination.**

Plaintiffs' challenge to § 106.10 rests upon a mischaracterization of that provision.  Correctly understood, § 106.10 answers only one question pertinent to this litigation: where individuals are subject to discriminatory unequal treatment solely because they are transgender—such as by receiving detention "simply for being … transgender," *Bostock*, 590 U.S. 644, 651 (2020)—is that discrimination "on the basis of sex" under Title IX?  Reflecting the statute's plain text, § 106.10 makes clear that the answer is yes; punishing a student "for traits or actions" that a school "would not have questioned in members of a different sex" assigned at birth is a decision in which "[s]ex plays a necessary and undisguisable role." *Id.* at 652.  Other provisions of the Rule answer related but distinct questions—including what constitutes discrimination when schools separate individuals on the basis of sex (§ 106.31(a)(2)) or permit unwelcome sex-based conduct (§ 106.2)—but § 106.10 deals only with what it means for discrimination to be "on the basis of sex."

Given the plaintiffs' indication that they do not discriminate against individuals "simply for being … transgender," *Bostock*, 590 U.S. at 651; *see, e.g.*, States' Stay Opp'n 21-22, their continued opposition to § 106.10 is surprising.  Plaintiffs nonetheless maintain that discriminating against someone for being transgender is *not* sex discrimination, but they cannot avoid the plain import of *Bostock*, which recognizes that "it is impossible to discriminate against a person for being homosexual or

4

transgender without discriminating against that individual *based on sex*." 590 U.S. at 660 (emphasis added). *Bostock*'s reasoning applies with equal force to Title IX's materially identical language, and plaintiffs' various arguments for resisting that conclusion do not withstand scrutiny.

1.    Plaintiffs contend that § 106.10 is unlawful because Title IX adopts a "binary meaning of 'sex.'" States Br. 23; *see* Intervenors Br. 19. Yet the Department is not asking this Court to hold otherwise; as the Rule explains, gender-identity discrimination is sex discrimination "even if [sex] is understood to mean only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. 33,474, 33,802 (Apr. 29, 2024) (quoting *Bostock*, 590 U.S. at 655).

2.    Plaintiffs observe that Congress has elsewhere legislated regarding gender identity but has not amended § 1681(a) to expressly mention gender-identity discrimination. *See* States Br. 26. *Bostock* rejected identical arguments, pointing to the absence of "authoritative evidence explaining why later Congresses adopted other laws referencing sexual orientation but didn't amend this one." 590 U.S. at 670. The same is true of Title IX.

Plaintiffs similarly suggest that there is "no evidence … that Congress enacted Title IX to address sexual orientation or gender identity." States Br. 26; *see also* Intervenors Br. 22 (suggesting that Congress principally intended to protect women). *Bostock* similarly acknowledged that "few in 1964 would have expected Title VII to apply to discrimination against homosexual and transgender persons" or "that the law

would turn out to protect male employees." 590 U.S. at 673, 678. But that did not matter, because "people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Id.* at 674.

3.     There is no textual basis for treating Title IX differently from Title VII with regard to what sex discrimination encompasses. The states contend that while Title VII's "because of" standard prohibits discrimination where sex is one of several but-for causes of alleged discrimination, Title IX's "on the basis of" standard requires that sex be the only (or perhaps principal) cause. *See* States Br. 29-30. Yet the Supreme Court used the two terms interchangeably in *Bostock*. *See* Opening Br. 22. And plaintiffs cite no case interpreting Title IX to impose a higher causation standard, relying instead on cases addressing the word "the" in vastly different contexts. *See* States Br. 22. In actuality, appellate courts have uniformly concluded that alleged discrimination is actionable under Title IX even when sex is only one but-for cause. *See Doe v. Trustees of Bos. Coll.*, 892 F.3d 67, 90 (1st Cir. 2018); *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016); *Doe v. Princeton Univ.*, 30 F.4th 335, 343 (3d Cir. 2022); *Doe v. Purdue Univ.*, 928 F.3d 652, 667-68 (7th Cir. 2019); *Rowles v. Curators of the Univ. of Mo.*, 983 F.3d 345, 359 (8th Cir. 2020); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020); *Doe v. University of Denver*, 1 F.4th 822, 830 (10th Cir. 2021); *Doe v. Samford Univ.*, 29 F.4th 675 (11th Cir. 2022).

Nor is it relevant that Title IX includes statutory carve-outs permitting sex differentiation in specific contexts. *See* States Br. 31; Intervenors Br. 21. Whatever limits those provisions have, *see* States Br. 31, they do not undermine the core insight that discrimination for being transgender is sex discrimination and is thus barred in any context where Title IX's nondiscrimination mandate applies. Indeed, the exceptions only underscore the scope of that core mandate. *See* Opening Br. 23. And for related reasons, plaintiffs' observation that *Bostock* might apply differently to statutes focusing on groups instead of individuals, States Br. 25-26; Intervenors Br. 32, is irrelevant: Title IX, like Title VII, prohibits discrimination against individuals. *Compare* 20 U.S.C. § 1681(a) (prohibiting discrimination against any "person"), *with* 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination against "any individual").

Finally, plaintiffs' invocation of interpretive canons—under the Spending Clause, federalism, and the major-questions doctrine—fails. *See* States Br. 34-37; Intervenors Br. 38-40. Like the provision at issue in *Bostock*, Title IX is "written in starkly broad terms." 590 U.S. at 680; *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Any "elephant," then, "has never hidden in a mousehole; it has been standing before us all along." 590 U.S. at 680. Congress did not need to speak any more clearly than it did.

4.    Retreating from the text, plaintiffs contend that this Court has already rejected *Bostock*'s application to Title IX. Not so. As the states acknowledge, the stay panel's decision is not binding. *See* States Br. 27. As for *Meriwether v. Hartop*, 992 F.3d

492 (6th Cir. 2021), its indication that "principles announced in the Title VII context" do not "automatically apply in the Title IX context," *id.* at 510 n.4, referenced the regulatory exception for athletic scholarships and the statutory provision addressing living facilities, 34 C.F.R. § 106.37(c); 20 U.S.C. § 1686; it does not suggest a difference in the statutes' core, parallel nondiscrimination commands. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021), concerns *Bostock*'s application to the Age Discrimination in Employment Act; it does not address whether Title IX's prohibition on sex discrimination encompasses discrimination on the basis of gender identity. And *L.W. ex rel. Williams v. Skrmetti*'s refusal to apply *Bostock* to the Equal Protection Clause—on the basis of what it believed were pertinent "[d]ifferences between the language of the statute and the Constitution," 83 F.4th 460, 484 (6th Cir. 2023)—should not preclude this Court from applying *Bostock*'s reasoning to the materially identical text of Title IX, which was not at issue in *Skrmetti*.

## C. Section 106.31(a)(2)'s De Minimis Harm Standard Effectuates Title IX's Text.

Plaintiffs' arguments concerning § 106.31(a)(2)'s de minimis harm standard fare no better. The provision neither contravenes Title IX, States Br. 38-41; Intervenors Br. 35-38, nor is arbitrary and capricious, States Br. 48-51; Intervenors Br. 51-53.

1. "Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition." *Jackson*, 544 U.S. at 175. The de minimis harm standard effectuates the text and structure of that

nondiscrimination mandate. Because "the concept of discrimination includes an element of injury or harm," 89 Fed. Reg. at 33,815, Title IX's nondiscrimination mandate—and, by extension, § 106.31(a)(2)—implicates "only" those sex-based distinctions "that subject[] any person to legally cognizable injury[,] *i.e.*, more than de minimis harm," *id.* at 33,814. In addition, § 106.31(a)(2) gives effect to Title IX's "specific, narrow exceptions," *Jackson*, 544 U.S. at 175, by excepting contexts in which Congress permitted recipients to differentiate on the basis of sex—such as membership in fraternities and sororities, 20 U.S.C. § 1681(a)(6)—even if doing so causes cognizable harm.[1]

Plaintiffs offer no sound reason to doubt the interpretation underpinning § 106.31(a)(2). They stress that "not all sex separation constitutes discrimination" under Title IX. States Br. 23; *see* Intervenors Br. 21. But the Department "does not interpret Title IX to prohibit all sex-based distinctions or separation." 89 Fed. Reg. at 33,814. Section 106.31(a)(2) tracks Title IX's text and structure by prohibiting sex-based distinctions "only" where those distinctions "subject[ a] person to legally cognizable injury" and only if Congress has not otherwise allowed for such differential treatment. *Id.* Plaintiffs also assert that "Title IX never mentions de minimis harm,"

---

[1] It makes no difference whether § 1686's carve-out for sex-separate living facilities is a "rule of construction" or one of Title IX's "exceptions." Intervenor Br. 21. Section 106.31(a)(2) bars differential treatment that causes more than de minimis harm "unless there is a statutory basis for allowing otherwise," 89 Fed. Reg. at 33,814, however that basis is framed.

Intervenors Br. 35, and that the Rule's "conception of harm" is "gerrymandered," States Br. 40.  But no one disputes that "the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals."  *Bostock*, 590 U.S. at 681 (some quotation marks omitted); *see* States Br. 21-22 (addressing definition of "discrimination"); Intervenors Br. 19-20 (same).  Section 106.31(a)(2)'s "conception of harm" simply reflects that common understanding of the text.

Plaintiffs nonetheless insist that the Department erred in applying § 106.31(a)(2)'s de minimis harm standard to contexts involving individuals accessing sex-separate activities and facilities, like restrooms, consistent with their gender identity.  States Br. 38-39; Intervenors Br. 37.  To start, that contention does not undermine the general de minimis harm standard in § 106.31(a)(2)'s first sentence, which makes clear that the provision protects all students from harmful treatment that differentiates on the basis of sex and that is not permitted by Congress.[2]  89 Fed. Reg. at 33,818.  In any event, plaintiffs are mistaken that there is anything unlawful about the application of § 106.31(a)(2)'s general standard to specifically recognize that harm arises where a school "prevents a person from participating in an education program

---

[2] The Rule does not give "preferential treatment" to transgender students. States Br. 40 (quotation marks omitted).  Nor does § 106.31(a)(2) "violate[] its own anti-discrimination mandate."  *Id.*; Intervenors Br. 52 (similar).  When cisgender students access sex-separate activities and facilities—like restrooms or certain classes and extracurricular activities, *see* 34 C.F.R. §§ 106.33, 106.34(a)-(b)—consistent with their sex assigned at birth, it imposes no cognizable sex-based harm, as plaintiffs seemingly recognize by defending sex separation in those contexts.  *See* States Br. 24-25.

10

or activity consistent with the person's gender identity." 34 C.F.R. § 106.31(a)(2). Indeed, plaintiffs do not contest that evidence-based determination; they simply disagree that such harm should amount to prohibited discrimination. But the Rule's straightforward application of the de minimis harm standard to "contexts for which there is no statutory exception, such as sex-separate restrooms," faithfully implements both the statute's broad nondiscrimination mandate and the limited contexts where Congress implemented a different rule. 89 Fed. Reg. at 33,819.

The Rule's treatment of gender identity does not render Title IX's exceptions "meaningless" or suggest that "separation based on sex always entails discrimination based on gender identity." States Br. 38-39 (quotation marks omitted). Again, § 106.31(a)(2) tracks the "specific" and "narrow exceptions" and exclusions to Title IX's nondiscrimination mandate. *Jackson*, 544 U.S. at 175. Absent a "statutory basis" for "allowing otherwise," 89 Fed. Reg. at 33,814, Title IX prohibits sex-based distinctions that cause harm. But where there is such a statutory basis, schools may draw sex-based distinctions that would otherwise be prohibited because they subject individuals to harm. Because § 106.31(a)(2) reflects Congress's own distinctions, plaintiffs are wrong that it "leads to bizarre results" that "Congress never intended." Intervenors Br. 3, 36. Congress "could have, but did not," exempt other sex-separate education programs and activities, including school facilities like restrooms, from the general nondiscrimination mandate. 89 Fed. Reg. at 33,821. Plaintiffs' atextual speculation about Congress's supposed intent cannot overcome the "words on the

11

page" actually "adopted by Congress and approved by the President." *Bostock*, 590 U.S. at 654.

For similar reasons, plaintiffs err in arguing that the de minimis harm standard implicates the major-questions doctrine. States Br. 40-41. Section 106.31(a)(2) simply effectuates a commonsense understanding of "discrimination" and the distinctions "Congress … itself" drew in enacting Title IX, *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation marks omitted). Because the standard does not entail any discretionary "policy decisions," *id.* (quotation marks omitted), it does not implicate the major-questions doctrine. *See* 89 Fed. Reg. at 33,815.

2.    Section 106.31(a)(2) is not arbitrary and capricious. Much of plaintiffs' arguments on this front collapse into their flawed assertion that the Rule contravenes Title IX by drawing "illogical distinctions," particularly with regard to athletics. States Br. 48; *see* Intervenors Br. 51. But the Rule reflects the distinctions that Congress itself drew. The Department reasonably explained that the Rule excepts sex-separate athletic teams from the de minimis harm standard because separate legislation "made clear that the Title IX regulations should reflect the fact that athletic competition raises unique considerations." 89 Fed. Reg. at 33,819 (discussing Education Amendments of 1974, Pub. L. No. 93-380, tit. VIII, pt. D, § 844, 88 Stat. 484, 612).

Separately, the Rule reasonably addressed concerns related to privacy, safety, and compliance. *Contra* States Br. 49-51. The Rule makes clear that "the Department strongly agrees that recipients have a legitimate interest in protecting all students'

safety and privacy." 89 Fed. Reg. at 33,820. The experience of schools across the country, moreover, supports the Department's conclusion that those interests can be safeguarded "without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity." *Id.*; *see* Brief of Amici Curiae California, et al., at 11 ("[T]he experience of school administrators in thirty-one states and the District of Columbia demonstrates that sex-based protections for gender identity in bathroom- and locker room-use policies result in no safety or privacy risks.").[3]

Indeed, plaintiffs apparently disclaim the district court's unsupported assertion that "transgender students pose a safety risk to other students," Op., RE100, PageID #2068; *see* States Br. 49. Plaintiffs instead argue that the Rule "provides men more cover to enter women's private spaces." States Br. 50. But the Department addressed that concern, explaining that schools may take "steps to ensure privacy and safety for all students in a recipient's sex-separate facilities—steps that many recipients already take consistent with their general codes of conduct, including rules prohibiting harassment, assault, and other forms of misconduct." 89 Fed. Reg. at 33,820.

Equally unavailing are plaintiffs' assertions that the Rule fails to address schools' concerns regarding gender-identity verification. States Br. 50-51. Schools may take reasonable measures to verify individuals' gender identity, including by

---

[3] For the same reason, intervenors are wrong that the Rule "burdens" any constitutional right to bodily privacy. Intervenors Br. 50.

relying on a person's "consistent assertion" or "written confirmation by the student or student's parents, counselor, coach, or teacher." 89 Fed. Reg. at 33,819. Those measures may be applied to any "person" accessing a school's facilities or activities, *id.*, not just students. *Contra* States Br. 51. And the fact that the Rule distinguishes reasonable means of compliance from "invasive" or "burdensome" measures, 89 Fed. Reg. at 33,819, hardly renders the Rule "contradict[ory]," States Br. 50.

### D. The Rule's Prohibition on Hostile-Environment Harassment Raises No First Amendment Concerns.

Section 106.2's definition of hostile-environment harassment bars "[u]nwelcome" and "offensive" sex-based conduct "so severe or pervasive that it limits or denies a person's ability to participate" in a recipient's education program. 34 C.F.R. § 106.2. That standard neither chills nor compels speech. And it is not invalid simply because it—like standards long applied under both Title IX and Title VII—departs in certain respects from the standard for judicially implied damages actions announced in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999).

1. Plaintiffs' reliance on *Davis* is misplaced. *See* States Br. 42-43; Intervenors Br. 43-44. The district court did not enjoin § 106.2's definition of hostile-environment harassment because it departed from *Davis*, and for good reason. In *Davis*, the Supreme Court addressed the "scope of liability in private damages actions" under Title IX's judicially implied right of action, 526 U.S. at 641, a context in which

courts have "a measure of latitude to shape a sensible remedial scheme that best comports with the statute," *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998). The question in *Davis* was "whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages." 526 U.S. at 639. The Court thus addressed "the proper definition of 'discrimination' in *the context of a private damages action*." *Id.* at 649 (emphasis added). In that specific "context," *id.*, the Court concluded that schools "are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *id.* at 650.

Nothing in *Davis* suggested that its standard for damages liability created as part of the Court's authority to shape the judicially implied private right of action controls in the administrative-enforcement context. The Court instead recognized that the standards would differ, explaining "we are asked to do more than define the scope of the behavior that Title IX proscribes" in determining what conduct "support[s] a private suit for money damages." *Davis*, 526 U.S. at 639. The Court also repeatedly and approvingly cited the Department's then-applicable hostile-environment standard, *id.* at 647-48, 651, which—like the Rule—defined prohibited sex-based harassment to include "severe, persistent, or pervasive" conduct, 62 Fed. Reg. 12,034, 12,034 (Mar. 13, 1997). Far from affixing a "single meaning" to any term in Title IX, States Br. 43

(quotation marks omitted), *Davis* recognized that the circumstances under which recipients could be found liable for violating Title IX turned on the nature of the action and the relief sought. Indeed, even the 2020 Rule did more than "simply codify" *Davis*. *See* 85 Fed. Reg. 30,026, 30,033 (May 19, 2020).

Plaintiffs likewise misread *Davis* in asserting that its damages standard was necessary "to ensure harassment does not infringe protected speech." States Br. 42. Although the dissent discussed the First Amendment, the majority nowhere suggested that its holding was motivated by such concerns. *See* 526 U.S. at 667 (Kennedy, J., dissenting). Rather, the Court made clear that the standard reflected the appropriate limits on Title IX's judicially implied damages action, *see id.* at 640 (majority opinion), which implicates issues of fair notice not presented in the administrative-enforcement context, *see Gebser*, 524 U.S. at 290 (explaining that federal funding can be terminated administratively only after "notice and unsuccessful efforts to obtain compliance" and limiting implied private damages action under Title IX to "comparable conditions").

2.    Plaintiffs, like the district court, wrongly assert that § 106.2's hostile-environment standard "compels … students and teachers to use[] 'preferred' rather than accurate pronouns." States Br. 44; *see* Intervenors Br. 49. As explained, Opening Br. 35-39, the Rule merely requires schools to address sex-based harassment, which is not the same as "telling" individual students and staff "what they must say." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006). This Court recently recognized that a policy can bar harassing conduct—even including the

"intentional use of non-preferred pronouns"—without "unconstitutionally compel[ling] speech." *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 468 (6th Cir. 2024).

Plaintiffs' contrary arguments misconstrue the Rule.  The Rule nowhere "inform[s] schools that addressing harassment requires adhering to students' preferred pronouns."  States Br. 47.  Nor can plaintiffs manufacture a "pronoun issue" from other filings or agency actions that predate the Rule.  States Br. 45; *see* Intervenors Br. 45-47.  At bottom, the Rule neither mandates that anyone use particular pronouns, nor requires anyone to affirm "any particular view on any issue."  89 Fed. Reg. at 33,505.[4]  That distinguishes *Meriwether*, which concerned a policy requiring faculty to "refer to students by their preferred pronoun[s]" despite the religious objections of a faculty member.   992 F.3d at 498-500 (alteration in original) (quotation marks omitted).  Nothing in the Rule would require a recipient to adopt the policy at issue in *Meriwether* or otherwise "require[] or authorize[] a recipient to violate anyone's First Amendment rights."  89 Fed. Reg. at 33,516.

3.    The Rule also is not facially overbroad or vague.  States Br. 44-47; Intervenors Br. 40-49.  Plaintiffs make no showing that the Rule proscribes a

---

[4] Plaintiffs do not advance their argument by analogizing to the facts of *L.M. v. Town of Middleborough*, 677 F. Supp. 3d 29, 39 (D. Mass. 2023), a case that did not implicate Title IX and that the Rule cited for the uncontested principle that "schools can prohibit speech that is in 'collision with the rights of others to be secure and be let alone,'" 89 Fed. Reg. at 33,504 (quoting *L.M.*, 677 F. Supp. 3d at 38).

substantial amount of protected speech "in an absolute sense" or relative to the Rule's "plainly legitimate sweep." *Entertainment Prods., Inc. v. Shelby County*, 588 F.3d 372, 379 (6th Cir. 2009) (quotation marks omitted). Like the district court, plaintiffs focus on the standard's application to a narrow category of speech involving pronouns and gender-identity issues. States Br. 45-46; Intervenors Br. 41-43. Plaintiffs' arguments about those contexts are not only wrong, *supra* p.16-17, but also irrelevant because "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge," *Members of the City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).

Plaintiffs' vagueness challenges are, if anything, even less developed. States Br. 45; Intervenors Br. 48-49. Plaintiffs nowhere explain how the Rule fails to provide notice of the proscribed conduct, which "is defined and narrowed using language with common usage and understanding" in the antidiscrimination context. *Rowles*, 983 F.3d at 358. Instead, plaintiffs assert that the standard is "subjective," States Br. 45, but the Rule provides that conduct must be "subjectively *and* objectively offensive" to qualify as harassment and explains that the "fact-specific [hostile-environment] inquiry … includes consideration" of several objective factors, such as the "parties' ages" and "duration of the conduct," 34 C.F.R. § 106.2 (emphasis added).

More fundamentally, plaintiffs' overbreadth and vagueness arguments cannot be squared with the fact that courts—including this one—have long applied analogous standards under both Title VII and Title IX without facial First

Amendment difficulties. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (applying "severe or pervasive" standard under Title VII); *Doe v. Miami Univ.*, 882 F.3d 579, 590 (6th Cir. 2018) (Title IX); *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013) (Title VII); *see also Rowles*, 983 F.3d at 355 (rejecting overbreadth challenge to standard nearly identical to § 106.2). This precedent demonstrates that the Rule's hostile-environment standard poses no overbreadth or vagueness problems.

Plaintiffs' efforts to distinguish that precedent fall flat. Their suggestion that the Title VII standard does (or should) differ from the Title IX standard, States Br. 46, is foreclosed by this Court's acknowledgement that "[a] Title IX hostile-environment claim is analogous to a Title VII hostile-environment claim," *Doe*, 882 F.3d at 590 (citing *Harris*'s Title VII standard). Plaintiffs also observe that many of these cases "do not discuss overbreadth" or vagueness, States Br. 47, but that is the point: this Court (and others) have long applied analogous standards without discerning constitutional concerns. Moreover, where vagueness or overbreadth concerns were raised, courts—including this one—rejected them. *See Parents Defending Educ.*, 109 F.4th at 471; *Rowles*, 983 F.3d at 356. Likewise, plaintiffs contend that the cases "involved policies that did not 'target speech.'" States Br. 47 (quoting *Rowles*, 983 F.3d at 358). That is not only wrong, *see Harris*, 510 U.S. at 21 (applying hostile-environment standard to allegedly harassing speech); *see also Doe*, 882 F.3d at 587, 590, but also irrelevant because § 106.2's hostile-environment standard also "do[es] not

19

target speech but instead prohibit[s] conduct," *Rowles*, 983 F.3d at 358; *see* 34 C.F.R.

§ 106.2 (prohibiting offensive and unwelcome "sex-based *conduct*" (emphasis added)).

Indeed, plaintiffs' out-of-circuit examples of overbroad or vague policies only

underscore the propriety of § 106.2's definition. States Br. 46-47. *Speech First, Inc. v.

Cartwright*, 32 F.4th 1110 (11th Cir. 2022), involved a "staggeringly broad" and non-

exhaustive policy that extended to actions based on "a long list of characteristics,"

including "political affiliation"; covered a wide array of conduct, including any "that

may be humiliating"; and "reache[d] not only a student's own speech, but also her

conduct 'encouraging,' 'condoning,' or 'failing to intervene' to stop another student's

speech." *Id.* at 1115, 1125 (quotation marks omitted). Section 106.2's hostile-

environment standard has none of those features. Plaintiffs' other examples are

equally inapposite. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 n.16 (5th Cir.

2020), *as revised* (Oct. 30, 2020) (addressing standing to challenge speech restrictions

"outside Title IX protected categories"); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d

200, 216-17 (3d Cir. 2001) (addressing standard that required no "showing of severity

or pervasiveness" and "punishe[d] not only speech that actually causes disruption, but

also speech that merely intends to do so").[5]

---

[5] Plaintiffs offer no substantial response to the Department's explanation that
the Rule protects parental rights. *See* Opening Br. 43-44.

## II.     The Remaining Factors Weigh Against Preliminary Relief.

### A.     Plaintiffs Failed to Establish Irreparable Harm.

Plaintiffs fail to demonstrate that the Rule—and particularly the provisions that they challenge—will cause irreparable harm.  *See generally* Opening Br. 44-48.

1.     The states principally assert that their compliance costs constitute irreparable harm.  *See* States Br. 52-53.  But they do not tie such costs to the challenged provisions, simply suggesting that they will need to "digest 'hundreds of pages of a rule.'"  States Br. 52 (quoting Op., RE100, PageID #2075).  The vast majority of the Rule, however, consists of provisions the states have not challenged.

Beyond that, the states made no effort to quantify their anticipated costs, let alone as a percentage of their budgets or as compared to ordinary costs of Title IX compliance.  *See* Opening Br. 45.  The states suggest that a "quantification requirement doesn't exist," States Br. 52 (citation omitted), but this Court looks to "the peculiarity *and size*" of compliance costs in considering preliminary relief, *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (emphasis added).

2.     The Department demonstrated that any potential loss of funding is not the sort of imminent, irreparable harm that could support preliminary injunctive relief because funding could not be terminated until the Department has completed the extensive process required by statute.  Instead of contesting that proposition, the states contend that a mere incentive to comply with the Rule is irreparable harm.  *See* States Br. 53-54 (citing *Tennessee v. Department of Educ.*, 104 F.4th 577 (6th Cir. 2024)).

But if mere "pressure to change their laws" were irreparable injury, *Tennessee*, 104

F.4th at 613, then simply challenging a federal regulation could establish a regulated

party's irreparable harm, notwithstanding that a "preliminary injunction is an

extraordinary remedy never awarded as of right," *Winter v. Natural Res. Def. Council,*

*Inc.*, 555 U.S. 7, 24 (2008).  To the extent that *Tennessee* so holds, we maintain our

disagreement.  *See* Opening Br. 47.

       3.     Finally, the intervenors suggest that they face potential constitutional

injuries.  The Christian Educators Association identifies no record evidence

suggesting that the Rule will be applied in violation of its members' First Amendment

rights, simply citing the complaint for the possibility that "some members will self-

censor their speech" or experience injury to their "right to bodily privacy."

Intervenors Br. 54.  The "proof required for the plaintiff to obtain a preliminary

injunction is much more stringent than the proof required to survive a summary

judgment motion," *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000), and such

speculation is insufficient.

      Nor may intervenors ground irreparable harm on A.C.'s participation in athletics,

a subject the Rule does not address.  *See* Opening Br. 7, 9 n.2.  And regarding restrooms,

it bears emphasis that A.C. attends a "West Virginia public school," Intervenors'

Compl., RE72, PageID #1487; an injunction against the Rule would not affect Fourth

Circuit precedent holding that, under Title IX itself, students must be permitted to

access the restroom consistent with their gender identity.  *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020).

### B.    The Equities and Public Interest Weigh Against an Injunction.

Plaintiffs do not substantially dispute that the equities and public interest favor enforcement of a regulation intended to stamp out sex discrimination.  *See* Opening Br. 49.  Plaintiffs suggest the Department is "trying to rewrite a statute contrary to law," Intervenors Br. 55, but that argument collapses with the merits.  Nor is the timeline for "promulgating the Rule" relevant, States' Br. 54; the Department's careful consideration of public comments is a reason to let the Rule take effect, not to enjoin it.

## III.    At a Minimum, the Injunction Is Overbroad.

Finally, the injunction is overbroad insofar as it extends to provisions that plaintiffs did not challenge and do not cause them injury—including § 106.10 and § 106.2 beyond the definition of hostile-environment harassment as applied to gender-identity discrimination.  *See* Opening Br. 49-53.  Plaintiffs' contrary arguments are wrong.

A.    The intervenors suggest that the Department forfeited its severance arguments.  Yet the Department's district court briefs specifically addressed severability, *see* Defs.' Opp'n to Pls.' Mot., RE73, PageID #1573; Defs.' Opp'n to Intervenors' Mot., RE91, PageID #1818-19, and plaintiffs responded, *see* States'

Reply, RE92, PageID #1839; Intervenors' Reply, RE99, PageID #1993. When defense counsel reminded the district court that "we did argue for severability," Tr., RE109, PageID #2141, the court agreed, *see id.* And both the district court and the motions panel expressly addressed severability. *See* Op., RE100, PageID #2085; Stay Order 6-9.

Before the district court had found any provision likely invalid, it would have been unreasonable to expect the government to specifically explain how the remaining portions would continue to operate. Plaintiffs evidently assume that an injunction of one provision of an omnibus rule presumptively justifies an injunction of the entire rule, shifting the burden to the government to justify any exceptions. But that is backwards: a preliminary injunction is an "extraordinary" remedy that may be awarded only "upon a clear showing" by the *plaintiffs* that they are "entitled to such relief." *Winter*, 555 U.S. at 22.

B.      Plaintiffs further contend that the Supreme Court has already rejected the Department's severability arguments. *See* Intervenors Br. 56. That too is wrong: the stay applications were evaluated in an "emergency posture" and on a "limited record" where "the burden is on the Government as applicant to show" entitlement to emergency relief. *Louisiana*, 2024 WL 3841071, at *1. Here, by contrast, *plaintiffs* have the burden to justify the injunction. *See, e.g.*, *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

C.      Plaintiffs continue to object to the Department's demonstration that the challenged provisions operate independently from other provisions.  Yet the Rule makes dozens of unrelated changes, most of which have nothing to do with gender identity.  To identify a few examples:

- The Rule requires recipients to provide pregnant and post-partum students with reasonable modifications and to inform pregnant students of their rights. 34 C.F.R. § 106.40(b).

- The Rule alters the definition of "complainant" to permit complaints by former students and employees who suffered discrimination while participating or attempting to participate in a covered program.  *Id.* § 106.2.

- The Rule clarifies that recipients must prohibit retaliation, including peer retaliation, and take appropriate action in response to information about conduct that reasonably may constitute retaliation.  *Id.* § 106.71.

- The Rule provides recipients with more flexibility regarding the timing and structure of grievance procedures.  *Id.* §§ 106.45-106.46.

- The Rule affirms that recipients may disclose certain information to parents and legal guardians about their minor children.  *Id.* § 106.44(j)(2).

The district court did not find any of those provisions unlawful, and there was no basis to enjoin them.

The states nevertheless maintain that numerous provisions of the Rule intersect with § 106.10.  States Br. 55.  At the outset, that argument assumes that § 106.10 is properly enjoined—which it is not, both because it correctly interprets Title IX and because it does not harm the states.  But even if § 106.10 remained enjoined, every other Rule provision could continue to function by operating under Title IX's

25

prohibition against discrimination "on the basis of sex," without further regulatory gloss. That includes the unchallenged definitions in § 106.2; the requirements for Title IX Coordinators in § 106.8; the protections for pregnant and post-partum students in § 106.40; the provisions specifying recipients' obligations to respond to sex discrimination in § 106.44; the grievance-procedure provisions in § 106.45 and § 106.46; the employers' duties in § 106.57 and § 106.60; and the clarification regarding retaliation in § 106.71. *See generally* Opening Br. 51-52.

Nor does *Ohio v. EPA*, 144 S. Ct. 2040, 2054-55 (2024), undermine the Rule's express severability determinations, which specify that the Rule's provisions are "intended to operate independently of each other," that "the potential invalidity of one provision should not affect the other provisions," and that provisions not deemed unlawful "operate separately from the clarification of the scope of sex discrimination under § 106.10." 89 Fed. Reg. at 33,848. In *Ohio*, the Court stayed challenged rule provisions that injured the challengers because it concluded that EPA had not adequately responded to comments objecting that the agency's justification for the rule would no longer be valid if the rule applied in fewer states than originally contemplated. 144 S. Ct. at 2054-2055. Yet plaintiffs do not suggest that they or anyone else raised similar objections to severability during the rulemaking here. To the contrary, the Rule's preamble notes that there were no comments on severability. 89 Fed. Reg. 33,848.

At most, the states fall back on district courts' "wide latitude" to craft preliminary relief.  States Br. 57 (quoting *Doster v. Kendall*, 54 F.4th 398, 441 (6th Cir. 2022)).  But however wide that latitude is, a court abuses its discretion "when there is a risk that it restrains legal conduct."  *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 364 (6th Cir. 2022).  Neither the states nor the intervenors offer any substantial response.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

*Of Counsel:*

LISA BROWN
*General Counsel*
*U.S. Department of Education*

MELISSA N. PATTERSON
 /s/ Steven A. Myers
STEPHANIE R. MARCUS
JACK STARCHER
DAVID L. PETERS
STEVEN A. MYERS

*Attorneys, Appellate Staff*
*Civil Division, Room 7232*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*Steven.A.Myers@usdoj.gov*

September 2024

27

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6470 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Steven A. Myers*
Steven A. Myers

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*s/ Steven A. Myers*
Steven A. Myers