Nos. 24-5588

## UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

◆

STATE OF TENNESSEE; COMMONWEALTH OF KENTUCKY; STATE OF OHIO;
STATE OF INDIANA; COMMONWEALTH OF VIRGINIA; STATE OF WEST VIRGINIA,

*Plaintiffs-Appellees*,

&

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL; A.C., by her next friend
and mother Next Friend, Abigail Cross,

*Plaintiffs-Appellees*,

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education,
U.S. DEPARTMENT OF EDUCATION,

*Defendants/Appellants.*

### BRIEF OF ARKANSAS AND 19 OTHER STATES AS
*AMICI CURIAE* SUPPORTING APPELLEES

Tim Griffin
  Arkansas Attorney General
Nicholas J. Bronni
  Solicitor General
Dylan L. Jacobs
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@Arkan-
sasAG.gov

# TABLE OF CONTENTS

Table of Authorities ................................................................ iii

Interests of Amici Curiae and Summary of Argument ........................................... 1

Argument........................................................................................................ 3

I.    Under both the Supreme Court's Spending Clause
      precedents and the major-questions doctrine, the
      Department cannot prevail absent a clear grant of
      congressional authority for the Final Rule. ........................................ 3

      A.    The Department cannot impose its rewrite of
            Title IX on States under the Spending Clause
            because it lacks clear congressional
            authorization........................................................................... 3

      B.    The Department's rewrite of Title IX decides
            major questions without clear congressional
            authorization........................................................................... 5

II.   Even without a clear-statement requirement, the Final
      Rule is unlawful................................................................................. 7

      A.    The Department's attempt to extend Title IX
            discrimination beyond biological sex is
            contrary to Title IX's text, history, and purpose........................ 7

      B.    The Final Rule's expansion of harassment is
            unlawful. ............................................................................... 15

Conclusion ................................................................................................. 18

Additional Counsel ................................................................................... 19

Certificate of Compliance ......................................................................... 21

Certificate of Service ................................................................................ 22

# TABLE OF AUTHORITIES

**Cases**

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,
    57 F.4th 791 (11th Cir. 2022) ...............................................................4, 7, 12, 13

*Alabama v. U.S. Sec'y of Educ.*,
    No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024).... 10, 11-12, 15, 17

*Arkansas v. U.S. Dep't of Educ.*,
    4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) . 10, 15, 17-18

*Bostock v. Clayton County*,
    590 U.S. 644, 140 S. Ct. 1731 (2020)................................................... 2, 9-11, 13

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
    526 U.S. 629 (1999)...............................................................................2-3, 15-17

*Dep't of Educ. v. Louisiana*,
    Nos. 24A78 & 24A79, 2024 WL 3841071 (U.S. Aug. 16, 2024).................... 2-3

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)..........................................................................................5

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005).........................................................................................13

*Kansas v. U.S. Dep't of Educ.*,
    No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024) ......... 6, 10, 17-18

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024)............................................................................... 15-16

*Louisiana v. U.S. Dep't of Educ.*,
    No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. June 13, 2024)....5-7, 10-12,
    17-18

*Neese v. Becerra*,
    2022 WL 1265925 (N.D. Tex. Apr. 26, 2022) ..................................................6

*Oklahoma v. U.S. Dep't of Educ.*,
    No. CIV-24-00461-JD, 2024 WL 3609109 (W.D. Okla. July 31, 2024).....10, 18

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981)..............................................................................................4

*South Dakota v. Dole*,
483 U.S. 203 (1987)............................................................................... 3-4

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022). ..........................................................16

*Tennessee v. Cardona*,
No. 2:24-cv-72, 2024 WL 3019146 (E.D. Ky. June 17, 2024) ..7-9, 12-14, 17-18

*Tennessee v. Cardona*,
No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) .......................... 10-11

*Tennessee v. Cardona*,
No. 2:24-cv-72, 2024 WL 3631032 (E.D. Ky. July 10, 2024)..........................11

*Texas v. U.S. Dep't of Educ.*,
No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex July 11, 2024) ...................10

*United States v. Lopez*,
514 U.S. 549 (1995).................................................................................6

*West Virginia v. Dep't of Treasury*,
59 F.4th 1124 (11th Cir. 2023) ................................................................4

*West Virginia v. EPA*,
597 U.S. 697 (2022)............................................................................ 5-7

## Statutes

20 U.S.C. 1681 ....................................................................... 7-8, 11, 13

20 U.S.C. 1686 ............................................................................ 8, 13-14

20 U.S.C. 1689 ................................................................................... 7-8

42 U.S.C. 2000e ...................................................................................11

## Regulations

89 Fed. Reg. at 33, 477 ......................................................... 5-6, 16-17

34 C.F.R. 106 ................................................................................ 8, 14, 17

## INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT

*Amici curiae* are the States of Arkansas, Alabama, Alaska, Idaho, Iowa, Florida, Georgia, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Utah, and Wyoming. *Amici* States are collectively responsible for thousands of public schools and universities which receive and depend upon federal funds. The Final Rule makes continued eligibility for federal funding contingent on compliance with the Department's unlawful extension of Title IX's prohibition of discrimination "on the basis of sex" to include gender identity and sexual orientation, and its unlawful expansion of sexual-harassment liability. The Final Rule runs roughshod over the States' sovereign interests and unique role in the context of education. Many of *Amici* States' own laws could become unenforceable if the Department's unlawful attempt at preemption were allowed to succeed. But every challenge to the Final Rule thus far has resulted in injunctive relief against its enforcement.

*Amici* States submit this brief to address two points. First, the Department bears the burden not simply to show that Title IX permits the Final Rule's unprecedented regulatory extension of the statute's prohibition on sex discrimination and harassment, but that it clearly does so. Both the Supreme Court's Spending Clause precedents and the major-questions doctrine impose a clear-statement rule on the kind of abrupt reimagining of longstanding legislative authority that the

Department has engaged in here. Federal agencies administering Spending Clause statutes cannot go beyond the bargain struck when the statute was passed and impose additional obligations that the States never agreed to accept. And the regulatory reshaping of every public school and university in the Nation is exactly the type of rulemaking the Supreme Court has held must be clearly authorized by Congress. The Department cannot meet that standard.

Second, under any standard the Final Rule's novel discrimination and harassment mandates are unsupported by Title IX's text, history, and purpose. On discrimination, the Final Rule purports to rely upon the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). But that Title VII ruling has no relevance here, and in fact, the Final Rule's importation of *Bostock*'s approach renders the statutory text nonsensical. On harassment, the Final Rule conflicts with the *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), which defined Title IX harassment differently, and conflicts with basic First Amendment principles.

Given those problems, it's unsurprising that every case challenging the Final Rule has yielded an injunction barring its enforcement. And critically, rejecting an application to stay this Court's previous decision and a similar decision by the Fifth Circuit, all nine members of the Supreme Court "accept[ed] that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule,

2

including the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Dep't of Educ. v. Louisiana*, No. 24A78, 2024 WL 3841071, at *1 (U.S. Aug. 16, 2024). This Court should decline to disturb that approach and should instead affirm the decision below.

## ARGUMENT

**I.    Under both the Supreme Court's Spending Clause precedents and the major-questions doctrine, the Department cannot prevail absent a clear grant of congressional authority for the Final Rule.**

The Department lacked the statutory authority to adopt the Final Rule, and this Court should affirm the decision below.

A.    <u>The Department cannot impose its rewrite of Title IX on States under the Spending Clause because it lacks clear congressional authorization.</u>

The Final Rule violates the limitations of the Spending Clause, and so would Title IX itself if the Final Rule were a valid interpretation of it. Title IX was passed under Congress's Spending Clause authority. *Davis*, 526 U.S. at 640. That "power is of course not unlimited, but is instead subject to several general restrictions." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). These restrictions include requirements that: (1) conditions must be "unambiguous[]" so States can "exercise their choice knowingly, cognizant of the consequences of their participation"; (2) conditions must be related to the "federal interest in the project"; (3)

3

spending must not "induce the States to engage in activities that would themselves be unconstitutional"; and (4) spending must not "be so coercive as to pass the point at which 'pressure turns into compulsion.'"  *Id*. at 203-11.  Each requirement is "equally important" and must be "equally" satisfied for a spending condition to be constitutional.  *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023).

The conditions imposed by the Final Rule fail these requirements.  First, the Final Rule's conditions are not "unambiguously" clear.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  The States did not "voluntarily and knowingly" agree to investigate and punish speech; rely on self-professed gender identity instead of biological sex to administer educational programs; abolish sex-specific bathrooms, locker rooms, rooming assignments, and sports; or violate staff and students' constitutional rights in exchange for federal funds under Title IX.  *Id. See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 816 (11th Cir. 2022) (en banc) ("The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable.").  Second, the Final Rule's conditions run counter to the federal interest in Title IX enforcement—promoting equal opportunities to both sexes—because it will deprive women of educational opportunities.  S*ee id.* at 819-21.  Third, the Rule will impermissibly induce recipients "to engage in activities

that would themselves be unconstitutional," *Dole*, 483 U.S. at 210, including infringing on free speech and free exercise. Fourth and finally, the "threatened loss" of a significant percentage of States' education funding "is economic dragooning that leaves the States with no real option but to acquiesce." *NFIB v. Sebelius*, 567 U.S. 519, 582 (2012).

Title IX's mandate of providing equal educational opportunities for women—and its conditioning of federal funds on compliance with that mandate—was crystal clear in 1972. But in continuing to accept federal funding for the next five decades, States did not sign up for the confusion of the Final Rule's gender-identity mandate. The Department cannot impose it now.

B. The Department's rewrite of Title IX decides major questions without clear congressional authorization.

The Final Rule decides major questions, such as such as whether to force States, schools, administrators, teachers, and students to treat a person's self-professed, unverifiable, potentially changing "gender identity" on par with, or as a replacement for biological sex. Those questions must be decided by "Congress itself" or, at the very least, by "an agency acting pursuant to a clear delegation from that representative body." *West Virginia v. EPA*, 597 U.S. 697, 735 (2022).

The Final Rule falls neatly within the Supreme Court's major-questions doctrine. First, the Final Rule has enormous social and political significance. *See id.* at 721. How to address and treat people claiming a gender identity that differs

5

from their biological sex has prompted state legislation in numerous areas, and the proposed rule here garnered over 240,000 comments.  89 Fed. Reg. at 33,477; s*ee, e.g.*, *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-CV-00563, 2024 WL 2978786, at *13 (W.D. La. June 13, 2024) (holding that the Final Rule is of "vast political significance because it will affect every public elementary school, middle school, high school, and college in the United States that receive federal funding").  Second, the Rule has significant economic consequences because it threatens millions of dollars of funding for State educational programs.  *See, e.g.*, *Kansas v. United States Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *12 (D. Kan. July 2, 2024) ("States are threatened with hundreds of millions, or even billions, of dollars of lost funding if they fail to comply with the Final Rule.").

Third, the Final Rule is "novel" and "transformative," and Congress "has consistently rejected proposals" to expand Title IX to prohibit discrimination based on sexual orientation and gender identity.  *West Virginia*, 597 U.S. at 716, 724, 731-32; *Neese v. Becerra*, 2022 WL 1265925, at *13 (N.D. Tex. Apr. 26, 2022) ("Legislators tried to amend Title IX to include 'sexual orientation' and 'gender identity' on multiple occasions, but those attempts failed."); *see also, e.g.*, Equality Act, H.R. 5, 117 Cong. 9(2) (2021); Title IX Take Responsibility Act of 2021, H.R. 5396, 117 Cong. (2021).  Fourth, the Rule intrudes on education, which is an area "where States historically have been sovereign," *United States v. Lopez*, 514

U.S. 549, 564 (1995), implicating not only the major questions doctrine, but also the federalism canon, *see West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring).

All told, the Department cannot point to any statutory authority supporting its dramatic rewrite of Title IX, let alone the clear authority required to weigh in on the major questions the Final Rule attempts to answer. The Final Rule's re-definition of "sex" discrimination is illegal on its face and should remain enjoined. Such a ruling would merely maintain the status quo that has existed since Title IX's enactment in 1972 based on the universal understanding that "sex" means biological sex, not gender identity.

## II.    Even without a clear-statement requirement, the Final Rule is unlawful.

### A.    The Department's attempt to extend Title IX discrimination beyond biological sex is contrary to Title IX's text, history, and purpose.

As originally understood, Title IX's prohibition of discrimination on the basis of sex "meant biological sex, *i.e.*, discrimination between males and females." *Adams*, 57 F.4th at 812. This follows from the ordinary meaning of the word "sex" as understood in 1972. *See Tennessee v. Cardona*, No. 2:24-cv-72, 2024 WL 3019146, at *9 (E.D. Ky. June 17, 2024) (collecting contemporary dictionary definitions of "sex" as binary)); *Louisiana*, 2024 WL 2978786, at *11 (same). It also accords with Title IX's structure, which references "sex" in binary terms. *See* 20 U.S.C. 1681(a)(2) (referring to "one sex" and "both sexes"); 1681(a)(8) (referring to "father-son or mother-daughter activities," "one sex," and "the other sex"). The

7

statute lists sexual orientation and gender identity as a "status" separate from one's sex, so those terms cannot be synonymous. *See id.* 1689(a)(6) ("lesbian, gay, bi-sexual, or transgender (commonly referred to as 'LGBT') status").

Title IX's prohibition on sex discrimination does not—and has never been understood to—prohibit all sex distinctions. Indeed, the statute expressly states it doesn't "prohibit any educational institution . . . from maintaining separate living facilities for the different sexes." 20 U.S.C. 1686; *see also id.* 1681(a)(6), (7) (al-lowing sex-restricted membership in fraternities, sororities, Boys/Girls State, and Boys/Girls Nation). The Department's regulations further confirm that the statute doesn't prohibit "separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. 106.33, or "separate [sports] teams for members of each sex," *id.* 106.41(b). Recipients have operated under this commonsense understanding of Ti-tle IX for decades.

The Final Rule trades that decades-long understanding for one that is irrec-oncilable with Title IX's text and purpose, the Department's history of enforce-ment, and common sense. Under the Final Rule, sex separation violates Title IX when it excludes a transgender-identifying person along with the other members of his or her sex from opposite-sex spaces—even where the Department's longstand-ing regulations would allow it (such as in showers)—unless the statute specifically provides otherwise (such as in living facilities). Thus, a funding recipient need not

allow a transgender-identifying biological male to share a dorm-room hall with a female, but it must allow him to share her shower area.  *See Tennessee*, 2024 WL 3019146, at *12.

The Department doesn't try to justify its interpretation of sex discrimination using the original understanding of Title IX's text or its purpose of providing equal educational opportunities to women.  Given Title IX's specific allowance for sex separation, that's unsurprising.  Instead, it hangs its hat entirely on the Supreme Court's decision in *Bostock v. Clayton County*, which held that employment discrimination based on sexual orientation or transgender status is necessarily discrimination "because of sex" under Title VII.  590 U.S. 644, 658 (2020).  But the Final Rule turns even *Bostock*'s logic on its head by declaring that enforcing sex separation amounts to gender-identity discrimination where it requires a transgender-identifying individual to be treated the same as other members of his or her sex.  Thus, while Title IX has for decades uncontroversially allowed recipients to exclude males from women's showers without being understood to discriminate on the basis of sex, the Final Rule deems such a policy to be gender-identity discrimination (and thus prohibited sex discrimination) when applied to males who identify as transgender.  Title IX's text does not compel that result.

*Bostock* does not change that calculus.  Every appellate court, including every member of the Supreme Court, and all but one district court have rejected the

9

Department's near-verbatim *Bostock*-based argument.  Instead, courts in the suits challenging the Final Rule, including this one, have correctly recognized that "sex" in Title IX's antidiscrimination provision refers to biological sex, rather than gender identity.  *See Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4 (11th Cir. Aug. 22, 2024) ("Given [that] 'sex' in Title IX unambiguously refers to biological sex and not gender identity, it is certainly highly likely that the Department's new regulation defining discrimination 'on the basis of sex' to include gender identity is contrary to law and in excess of statutory . . . authority") (internal quotations omitted); *accord Tennessee v. Cardona*, 2024 WL 3453880, at *2-4 (6th Cir. July 17, 2024), *Arkansas v. U.S. Dep't of Educ.*, No. 4:24-CV-636-RWS, 2024 WL 3518588, at *14-17 (E.D. Mo. July 24, 2024); *Oklahoma v. U.S. Dep't of Educ.*, No. CIV-24-00461-JD, 2024 WL 3609109, at *4-6 (W.D. Okla. July 31, 2024); *Kansas*, 2024 WL 3273285, at *8-11; *Louisiana*, 2024 WL 2978786, at *10-12; *Texas v. U.S. Dep't of Educ.*, No. 2:24-CV-86-Z, 2024 WL 3405342, at *5-7 (N.D. Tex July 11, 2024).  The Department claims to assume (*e.g.*, Appellants' Br. at 19) that sex is binary, but fails to grapple with its implications in the Title IX context.  Instead, as it did in the Final Rule, the Department relies on *Bostock* to contend that discrimination based on gender identity or sexual orientation is prohibited by Title IX.

Courts have correctly rejected incorporating *Bostock*'s gloss on sex discrimination under Title VII into Title IX, given the different statutory text and contexts in which those statutes operate.  As this Court recognized, "Title VII and Title IX . . . use materially different language: discrimination 'because of' sex in Title VII and discrimination 'on the basis of' sex in Title IX."  *Tennessee*, 2024 WL 3453880, at *2 (quoting 42 U.S.C. § 2000e–2(a)(1), and 20 U.S.C. § 1681(a)). While Title VII's "because of" language "indicat[es] cause-and-effect, 'on the basis of' is a [phrase] that indicates a foundational criterion upon which distinctions are made.  In the context of Title IX, that criterion is sex—male or female."  *Tennessee v. Cardona*, No. CV 2:24-072-DCR, 2024 WL 3631032, at *3 (E.D. Ky. July 10, 2024) (reviewing dictionary support).

*Bostock*'s rationale cannot be imported into the Title IX context.  As this Court explained, "*Bostock* is a Tile VII case," and "Title VII's definition of discrimination . . . do[es] not neatly map onto other areas of discrimination."  *Tennessee*, 2024 WL 3453880, at *2.  *Bostock*'s conception of sex discrimination hinges on its determination that an employee's "sex" or "homosexuality or transgender status is not relevant to employment decisions."  *Bostock*, 590 U.S. at 660.  Because of that narrow context, *Bostock* "simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX."  *Tennessee*, 2024 WL 3453880, at *2.  As for Title IX, that

11

statute "is about schools and children—and the school is not the workplace." *Alabama* 2024 WL 3981994, at *5 (quotations omitted); *see also Louisiana*, 2024 WL 2978786, at *12 ("Title IX's purpose [is] to protect biological women from discrimination in education."). Sex-based distinctions can thus be highly relevant to Title IX's guarantee of equal educational opportunities for women. Indeed, "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Adams*, 57 F.4th at 811. Thus, "ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities." *Tennessee*, 2024 WL 3019146, at *35.

Allowing the Final Rule to go into effect would "wreak[] havoc on Title IX and produce[] results that Congress could not have intended." *Id.* at *12. "For example," a recipient "may separate students [by sex] for purposes of fraternities and sororities, but not for purposes of utilizing bathrooms." *Id.* "Likewise, recipients . . . may require children to participate in the Boy Scouts or Girl Scouts consistent with the student's biological sex but may not require the same for sex education or physical education classes." *Id*. But there's no serious argument that Congress was more concerned about males' being allowed into women's social clubs than girls' showers. "Enacting the changes in the Final Rule would subvert the original purpose of Title IX"—to protect women and girls—instead focusing on transgender status. *Louisiana*, 2024 WL 2978786, at *12. That's because, as the

12

Eleventh Circuit has observed, the Department's attempted inclusion of gender identity within sex discrimination "would provide more protection against discrimination on the basis of transgender status under the statute and its implementing regulations than it would against discrimination on the basis of sex." *Adams*, 57 F.4th at 814.

The Department attempts to explain away the puzzling results of its importation of *Bostock* by implying that Section 1681's general language prohibiting discrimination on the basis of sex would, standing alone, prohibit *all* those instances of sex separation. But Sections 1681(a)(1)-(9) and 1686, it says, are one of a few limited "contexts Congress permitted recipients to separate or distinguish on the basis of sex, even if doing so causes cognizable harm." Appellants' Br. 26. Thus, it continues, anything not specifically carved out by the text (such as bathrooms) is fair game for the Final Rule's gender-identity-driven approach to sex discrimination under *Bostock*.

The problem for the Department's argument is that, while the items listed in Section 1681(a)(1)-(9) are termed as exceptions to the statute's prohibition on sex discrimination, Section 1686 is not. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) (noting the "specific, narrow exceptions to [Title IX's] broad prohibition," and citing to Section 1681 but not Section 1686). Rather, that section says that "nothing contained [in Title 20] shall be construed to prohibit any

13

[funding recipient] from maintaining separate living facilities for the different sexes." 20 U.S.C. 1686. That language is not a narrow carve-out from a general prohibition but is instead an instruction on how that prohibition (and the statute as a whole) must be interpreted. And it makes clear Congress's intent that sex separation in contexts where biological differences matter—such as living facilities, bathrooms, locker rooms, and athletics—is not discrimination under Title IX. *See Tennessee*, 2024 WL 3019146, at *12-13. Common sense is in accord.

The Department attempts to buttress its textual argument by pointing to longstanding regulations, which address living facilities separately from bathrooms, locker rooms, and showers, implying that the Department has long treated those areas as distinct under the statutory framework. Appellants' Br. 27. But those regulations only further undercut the Department's position. The 1975 housing and bathroom regulations—still codified at 34 C.F.R. 106.32 and 106.33, respectively—are functionally identical in wording. They were proposed together, adopted together, approved by Congress together, and use the same "may provide separate [facilities] on the basis of sex" language. *Id*. Thus, from earliest inception the Department has recognized that Title IX does not prohibit sex separation where biological differences give rise to privacy and safety concerns, regardless of whether those areas are specifically listed in Section 1686. The Final Rule thus

14

exceeds the Department's authority by eschewing that understanding and expanding Title IX's prohibition on sex discrimination beyond what Congress intended.

B.    <u>The Final Rule's expansion of harassment is unlawful.</u>

The Final Rule's new harassment standard is unlawful both because it exceeds the Department's statutory authority and violates the First Amendment.

The Final Rule exceeds the Department's authority by adopting a more expansive definition of "harassment" than *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999).  The Department doesn't dispute that the Final Rule is broader than the harassment standard the Supreme Court articulated in *Davis* but instead claims that having two harassment standards—depending on who sues—is statutorily permissible.  Appellants' Br. 34 n.5.

But *Davis*'s liability standard didn't rest on who the plaintiff happened to be; it rested on what Title IX's text "makes clear."  *Davis*, 526 U.S. at 650; *see Alabama*, 2024 WL 3981994, at *5 (holding that "the Supreme Court" in *Davis* was "interpreting the same word in the same statute to address the same legal question: the meaning of 'discrimination' under Title IX");  *see also Arkansas*, 2024 WL 3518588, at *17 (holding "that the Department's decision to expand the definition of sexual harassment beyond the standard articulated in *Davis* based on an 'administrative enforcement' justification [likely] exceeds the Department's statutory authority and/or is contrary to law").  The Supreme Court has recently explained that

15

"statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024). *Davis* is conclusive as to what constitutes sexual harassment under Title IX, and the Department cannot substitute its own interpretation for the Supreme Court's.

The Final Rule is also unlawful because it violates the First Amendment. The Final Rule unconstitutionally chills protected expression and even compels speech. Indeed, the Eleventh Circuit has held that a harassment policy with nearly identical language to the Final Rule "almost certainly unconstitutionally over-broad" and "an impermissible content- and viewpoint-based speech restriction." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125 (11th Cir. 2022). And its application to the Title IX context raises additional concerns. For example, failure to abide by a student's insistence on biologically inaccurate pronouns would likely constitute harassment under the Final Rule since it could have some negative impact and, under that rule, that's sufficient. *See* 89 Fed. Reg. at 33,816, 33,819-20 (explaining that gender-identity discrimination inherently inflicts more than de minimis harm under the Final Rule's approach).

The Department doesn't really disclaim that rule will force students, teachers, and staff to abide by a student's insistence on biologically inaccurate pronouns. Instead, the Department relies on the Title IX regulations' statement that recipients aren't required to "[r]estrict any rights that would otherwise be protected

16

from government action by the First Amendment." 34 C.F.R. 106.6(d)(1); *see also* 89 Fed. Reg. 33,474, 33,505 (Apr. 29, 2024). And it attempts to downplay the Final Rule's impact by claiming that the Final Rule doesn't require anyone to use any particular pronouns, but instead merely regulates schools. Appellants' Br. 15. But the Final Rule is clear: "So long as the offended individuals complain with sufficient vigor, the refusal to abide by preferred pronouns can be deemed harassment and exposes a recipient of Federal funds to liability under Title IX." *Tennessee*, 2024 WL 3019146, at *22; *see also id.* at *21-22 (reviewing DOJ amicus brief arguing that even a facially neutral approach of refusing to use honorifics such as "Mr." and "Ms." altogether can "create[] a risk of Title IX liability" where "students correctly recognize" the decision is "motivated by an aversion to referring to transgender students by names and pronouns that accord[] with their gender identity" (quotations omitted)). The Department cannot run away from the implications of its rule.

"Ultimately, the Department's regulation contravenes the Supreme Court's construction of Title IX 'discrimination' set out in *Davis* and runs headlong into the First Amendment concerns animating decisions like *Davis*." *Alabama*, 2024 WL 3981994, at *6. The district court here—like other courts considering the same issue—was therefore correct to conclude that the Final Rule's harassment standard is nothing "less than a tacit endorsement of a content-based heckler's

veto." *Tennessee*, 2024 WL 3019146, at *22; *accord Arkansas*, 2024 WL 3518588, at *17-18; *Kansas*, 2024 WL 3273285, at *15; *Oklahoma*, 2024 WL 3609109, at *7-8; *Louisiana*, 2024 WL 2978786, at *13.

### CONCLUSION

The Court should affirm the preliminary injunction entered by the district court.

Dated: September 3, 2024               Respectfully submitted,

                                       Tim Griffin
                                         Arkansas Attorney General

                                       Nicholas J. Bronni
                                         Solicitor General
                                       Dylan L. Jacobs
                                         Deputy Solicitor General
                                       OFFICE OF THE ARKANSAS ATTORNEY
                                       GENERAL
                                       323 Center Street, Suite 200
                                       Little Rock, AR 72201
                                       (501) 682-6302
                                       Nicholas.Bronni@ArkansasAG.gov

                                       *Counsel for Amici Curiae*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

TREG TAYLOR
Alaska Attorney General

ASHLEY MOODY
Florida Attorney General

CHRIS CARR
Georgia Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS W. KOBACH
Kansas Attorney General

LIZ MURRILL
Louisiana Attorney General

LYNN FITCH
Mississippi Attorney General

ANDREW BAILEY
Missouri Attorney General

AUSTIN KNUDSEN
Montana Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

DREW H. WRIGLEY
North Dakota Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY J. JACKLEY
South Dakota Attorney General

KEN PAXTON
Texas Attorney General

SEAN REYES
Utah Attorney General

BRIDGET HILL
Wyoming Attorney General

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5). This brief contains 4,056 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

In addition, this response complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: September 3, 2024

/s/ *Nicholas J. Bronni*
Nicholas J. Bronni
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on September 3, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

*s/ Nicholas J. Bronni*
Nicholas J. Bronni
*Counsel for Amici Curiae*