**No. 24-5588**

---

In the

# United States Court of Appeals

## For the Sixth Circuit

———————

STATE OF TENNESSEE, et al.

*Plaintiffs – Appellees,*

CHRISTIAN EDUCATORS ASSOCIATION INTERNATIONAL;
A.C., by her next friend and mother Next Friend, Abigail Cross,

*Intervenor – Plaintiffs – Appellees,*

v.

MIGUEL CARDONA, in his official capacity as Secretary of Education, et al.,

*Defendants – Appellants*

———————

Appeal from the United States District Court
for the Eastern District of Kentucky, No. 2:24-cv-00072
The Honorable **Danny C. Reeves**, Judge Presiding

---

**BRIEF OF *AMICUS CURIAE* INTERNATIONAL CONSORTIUM ON
FEMALE SPORT IN SUPPORT OF APPELLEES AND AFFIRMANCE**

---

WILLIAM BOCK III
KROGER GARDIS & REGAS, LLP
111 MONUMENT CIRCLE, SUITE 900
INDIANAPOLIS, IN 46204
TEL: (317) 692-9000

*Counsel for Amici Curiae*

## <u>DISCLOSURE STATEMENT</u>

The undersigned counsel confirms that neither the International Consortium on Female Sport (ICFS), nor any of its members has a parent corporation and no publicly held corporation owns 10% or more of the stock of ICFS of any of its members.

## <u>TABLE OF CONTENTS</u>

DISCLOSURE STATEMENT ................................................................ i

TABLE OF AUTHORITIES................................................................ iv

INTEREST OF *AMICI CURIAE* ........................................................1

SUMMARY OF ARGUMENT.............................................................2

ARGUMENT ....................................................................................4

I.    EXPERIENCE OF INDIVIDUAL *AMICI* .....................................5

    A.    Linda Blade, Ph.D. ...........................................................5

    B.    Sharron Davies, MBE.......................................................8

    C.    Cathy Devine, MSc ........................................................10

    D.    Ro Edge, Save Women's Sport Australasia.........................13

    E.    Fiona McAnena, Fair Play for Women ...............................15

II.    TITLE IX AND INTERNATIONAL LEGAL PROTECTIONS FOR
WOMEN'S RIGHTS.....................................................................16

    A.    International Bill of Human Rights.....................................17

    B.    United Nations Convention on the Elimination of All Forms of
Discrimination Against Women .........................................18

    C.    Olympic Charter..............................................................19

    D.    International Human Rights Documents and the Protection of Women
in Sport .......................................................................19

III.    FURTHER PROTECTION OF WOMEN'S RIGHTS IN
INTERNATIONAL SPORT ..........................................................23

    A.    International Olympic Committee Framework .....................23

    B.    World Rugby Rules .........................................................25

    C.    World Aquatics Sport Rules .............................................25

    D.    World Athletics Rules......................................................26

    E.    World Boxing Council Rules ............................................27

IV.    U.S. OLYMPIC AND AMATEUR SPORTS ACT........................27

V.    CONCLUSION............................................................................29

CERTIFICATE OF COMPLIANCE .....................................................32

CERTIFICATE OF SERVICE ...................................................................................33

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**U.S. Statutes**

Olympic and Amateur Sports Act, 36 U.S.C. § 220501 *et seq* ...............................27

Title IX of the 1972 Education Amendments, Pub. L. 92-318, Title IX,
    20 U.S.C. § 1681 *et seq.* .............................................................. passim

36 U.S.C. § 220503 ...............................................................................28

36 U.S.C. § 220505(c) ...........................................................................28

36 U.S.C. § 220524 ...............................................................................28

**Rules**

Fed. R. App. P. 29(a)(4)(E) ......................................................................1

Fed. R. App. P. 32(a)(5) .........................................................................32

Fed. R. App. P. 32(a)(6) .........................................................................32

Fed. R. App. P. 32(a)(7)(B) .....................................................................32

Fed. R. App. P. 32(f).............................................................................32

**International Legal Instruments**

International Bill of Human Rights.................................................... 2, 16-19

International Convention on Civil and Political Rights...........................................18

International Convention on Economic Social and Cultural Rights........................18

UN Convention on the Elimination of All Forms of Discrimination Against Women
    .................................................................................................. 2, 17-18

UN Convention on the Elimination of Discrimination Against Women ................18

UN Core Human Rights Instruments......................................................... 11-12, 17

UN International Bill of Human Rights....................................................17

Universal Declaration of Human Rights .................................................................18

**Other Authorities**

Coleman, D.L., *et al*., "Re-Affirming the Value of the Sports Exception to Title
    IX's General Non-Discrimination Rule," 27 *Duke J. of Gender L. &amp; Pol'y*
    69, 80 (2020) ........................................................................................... 3

Coleman, D.L., "The Olympic Movement in International Law," *Cambridge
    University Press* (December 7, 2020) ................................................. 12

Gledhill, N., "Blood doping and related issues," *Medicine and Science in Sports
    and Exercise*: Volume 14 - Issue 3 – pp. 183-189 ............................... 10

Handelsman, D.J., Hirschberg, A.L., Bermon, S., "Circulating Testosterone as the
    Hormonal Basis of Sex Differences in Athletic Performance," Endocr. Rev. 2018
    Oct; 39(5): 803-829 ............................................................................. 21

Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport:
    Perspectives on Testosterone Suppression and Performance Advantage," *Sports
    Medicine*, (2021) 51:199-214 ............................................................... 9

Thibault, V., Guillaume, M., Berthelot, G., El Helou, N., Schaal, K., Quinquis, L.,
    Nassif, H., Tafflet, M., Escolano, S., Herine, O., Toussaint, J.F., "Women and
    men in sport performance: The gender gap has not evolved since 1983," *Journal
    of Sports Science and Medicine* (2010) 9, 214-223 ............................. 9

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are the International Consortium on Female Sport (ICFS) and members identified in this brief. ICFS is a non-governmental organization of sports organizations and women's sports advocates from across the political spectrum and around the world committed to the foundational principle that "fairness and safety for female[2] athletes in sport is ensured by having a dedicated category for those born female."[3]

ICFS members and supporters who have specifically signed off on this brief include: Save Women's Sport Australasia (Australia & New Zealand); Fair Play for Women United Kingdom; Save Women's Sports, Spain; La Rueda Rosa, Mexico; Canadian Women's Sex-Based Rights, Linda Blade, PhD; Sharron Davies MBE; Cathy Devine, MSc, Fiona McAnena; and Ro Edge.

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), counsel affirms the undersigned counsel authored this brief, no counsel for any party authored this brief in whole or in part, and no party, party's counsel, or person other than the *amicus curiae*, its members, or counsel, contributed money intended to fund preparing or submitting this brief.

[2] As used in this brief the terms "male" and "female" and "man" and "woman" and "girls" and "boys" are used to refer solely to members of the male or female sex and without regard to gender identification. Therefore, for example, the term "female athlete" refers to a competitor who is biologically female at birth and who has not experienced male puberty.

[3] https://www.icfsport.org/.

## SUMMARY OF ARGUMENT

In accordance with the tenets of the International Bill of Human Rights (IBHR) and the intent of the United Nations (UN) Convention on the Elimination of All Forms of Discrimination against Women (CEDAW, Article 10(g)) women and girls have a right to access and participate in sports in a manner that is fair and safe and without discrimination.

Sport operates not just in the U.S. but globally as a gateway to opportunity for women. The experience of *amici* is that, like a faithful friend and traveling companion, their record of athletic achievement has accompanied them for life—opening doors, bridging cultural divides, and creating good will. Due to the success of Title IX of the 1972 Education Amendments, Pub. L. 92-318, Title IX, 20 U.S.C. § 1681 *et seq*. ("Title IX") and the regulations promulgated thereunder in requiring that women have equally resourced sports programs to men, the pathway to success for many women from around the world has, like several *amici*, been through participation in sport at U.S. high schools, colleges, and universities. Thus, Title IX has for 50-years played a massively significant role in the development of women's rights not just in the U.S. but around the world.

*Amici* are actively involved in women's rights issues in international sport outside the U.S. and uniquely situated to comment on: the global importance, to the protection and development of rights for women, of protecting the female

2

category in U.S. and international sports against male entrants, the importance of Title IX and its historic protection of a separate female category[4] to the development of women's rights and opportunities globally, the developing trend for international sport organizations to increase protection of the female category of competition against male entrants, and the need for the U.S. to continue to protect the rights of women in sport to prevent women's rights from being diminished around the world.

*Amici* are informed by experience and united in their view that sex equality matters in all aspects of life, including in sport. To be denied the right to access and participate in sport in a manner that is unfair, unsafe, and unequal to males, including by being required to compete against male competitors in the women's category, is discrimination against women.

*Amici* urge the Court to consider Title IX's instrumental and historic role in the development of women's rights globally and its continuing status alongside the IBHR and CEDAW as a legal bulwark against patriarchy and subordination of women. Informed by this historic context, *amici* ask the Court to not deviate from

---

[4] Coleman, D.L., *et al*., "Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule," 27 *Duke J. of Gender L. & Pol'y* 69, 80 (2020) ("biological differences between males and females that account for the [athletic] performance gap, as well as those sex traits and related customs that raised safety and privacy concerns, were key to [Title IX] discussions and decisions around" sex-segregated sports).

the historic and scientific understanding of who a woman is, as doing so would subordinate women in sport to second class status, placing upon them the unbearable burden of a new patriarchy. The experience of Appellee A.C. in this case is consistent with the experience of elite female athletes across the globe: when males compete in the women's category, females lose and are demoted to second tier status. This is why *amici* believe that preventing the trammeling of women's rights by male competitors who identify as transgender has become one of the central human rights issues of our time, and it is why those who care about the protection and advancement of women, care about protection of the women's category in sports.

## **ARGUMENT**

*Amici* are concerned that the Department of Education's ("D.O.E's") new Title IX Rule equating trans-identifying-males to women, thereby avoiding the clear meaning of the term "sex," and undermining sex-based protections for women and girls will ultimately undermine women's high school and collegiate sports. It is the view of *amici* that rational and fully informed decisions regarding women's sport cannot be made without hearing the voices of sportswomen and researchers who have dedicated their lives to the advancement of women's sport and lived through the challenges of expanding opportunities for women in sport. Following are the voices of some of these women.

## I.    EXPERIENCE OF INDIVIDUAL *AMICI*

### A.    Linda Blade, Ph.D.

Linda Blade has been President of Athletics Alberta in Canada since 2014. She was an NCAA All-American at the University of Maryland in Track and Field Heptathlon (1984). In 1994, she graduated with a PhD in Kinesiology from Simon Fraser University  in British Columbia, Canada. Dr. Blade has been a track and field coach for 30 years and a pioneering instructor for World Athletics, the international federation for track and field, training coaches for female athletes in Islamic states in Africa and the Middle East. Dr. Blade explains:

"Soon after I obtained my PhD, I happened to be residing in Africa, on the southern edge of the Sahara Dessert in the city of Kano, Nigeria, where I served as Lecturer at Bayero University Kano (BUK) in the Faculty of Physical Education. As BUK happened to be a centre for Islamic studies in West Africa, I had to adjust quickly and fearlessly to being a lone female university instructor navigating the complex cultural and religious expectations of that institution. The uniqueness of my identity in that context caught the eye of World Athletics' leadership over at Monaco headquarters.

"I was soon recruited into the World Athletics certification program and sent to various countries around the globe to mentor and certify grassroots coaches. Being a female instructor in this context was rare, so when the need arose for

World Athletics to send an instructor to teach women how to coach girls in Islamic states that duty often fell to me.

"And so it was I found myself in Tehran, Iran (1995) as the first Western woman since the Iranian revolution to be engaging with fellow sportswomen in a historic bid to re-start track and field for female athletes in that country. I have been assured my presence made a significant difference in the lives of many Muslim women of that region.

"I say all this to emphasize I have managed to offer mentorship to hundreds of coaches and athletes around the world (many in Canada, of course); in quite a few cases changing the trajectory of their lives and, in one case, being directly involved with the winning of an Olympic gold medal (2002).

"Without Title IX and a full NCAA athletic scholarship none of this would have happened. As team captain with a full athletics scholarship at the University of Maryland (graduating in 1985) I majored in pre-medicine and graduated *Cum Laude* with a degree in Zoology. I emerged a learned athlete with All American status in Track and Field Heptathlon.

"To this day, I consider myself most fortunate that my entry into the NCAA system happened within the first decade after Title IX was established in law. My journey is typical of so many international female student-athletes who have blossomed within a support system that both enhanced our performance

capabilities in sports and fostered careers in knowledge-based industries. It is fair to argue that our impact on American colleagues was as positive as their impact upon us foreign students. In its own unique way, the NCAA system promotes excellence of mind and body through contested engagement at the highest level of achievement. It is fair to say that as many of us women returned to our home countries to launch careers and families, the economic benefits to our communities have been as valuable as those delivered by our American sisters to the greater socio-economic prosperity of the USA. And there is no question that the impact has been significant. A study conducted by Ernst & Young in 2018 found 94% of female C-suite executives had sports in their background. There can be no question that the ubiquitousness of the "soccer mom" across the Western world is directly attributable to the huge growth in female sports participation Title IX engendered. I would be remiss if I failed to point out that this expansion of sports culture has helped little boys as much as little girls. It is the abundance of interested women who keep sports going through coaching, volunteering, chauffeuring, fundraising, officiating and (like me) leading.

"The moment Title IX no longer serves the interest of biological females in sports, all of this greatness grinds to a halt. The energy and positive intent that fuels school and community sports will vanish. Without these grassroots beginnings, where will the future champions come from? And who will be left to

care, anyway? It is the bleakness of this spectre that compels me to advocate for the continuance of Title IX as originally intended.

"Sport as a sex-based right for women and girls has manifested itself as one those rare instances in history where 'everybody wins' - both for women and for their communities. To deny that this wonderful piece of legislation was meant, specifically, for the female-born participant is to undermine fifty years of the very best outcomes that competitive sports can foster. Please, let's keep this going for another century and beyond."

### B.    Sharron Davies, MBE

British swimmer Sharron Davies was awarded the Member of the Most Excellent Order of the British Empire (MBE) by Queen Elizabeth for her service to British sport and her actions as a role model for young women. Sharron Davies won the Olympic silver medal in the 400m individual medley in 1980. She was the youngest ever member of a British national team in 1974, competing for the UK in international competition when she was only 11 years old. Ms. Davies competed in Olympics Games in the '70s, '80s and '90s and is a recognized television personality in Britain. She briefly studied in the U.S. at the University of California (Berkeley) on a sports scholarship, until a family issue took her back to the UK. She also spent time training at the world-class facilities of universities in Austin and Nashville. She says:

"Elite swimmers train 20 or more hours a week so getting a job in Britain when I left high school wasn't an option, but a US sports scholarship let me train and study. It was a well-trodden path for British sports women. A few of my Olympic team-mates went too.

"My whole career has come from my success in sport. That opportunity is being taken away from young women today. Being an all-American is a special achievement, one that makes your resumé stand out. Sport works for everyone by having categories, and those categories must exclude the people who don't belong in them. Without a protected female category, women and girls are missing out. Competing against males means the girls don't have an equal chance.[5] Male puberty advantage cannot be mitigated so we're asking young females to start a race with a known disadvantage.[6] This does not happen in men's sport. The World

---

[5] *See*, *e.g*., Thibault, V., Guillaume, M., Berthelot, G., El Helou, N., Schaal, K., Quinquis, L., Nassif, H., Tafflet, M., Escolano, S., Herine, O., Toussaint, J.F., "Women and men in sport performance: The gender gap has not evolved since 1983," *Journal of Sports Science and Medicine* (2010) 9, 214-223, p. 214, *available at*: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3761733/ ("Sex is a major factor influencing best performances and world records" in Olympic sport… Men outperformed women in all sports with a mean difference of $10.0\% \pm 2.94\%$ depending upon event.").

[6] *See*, *e.g.*, Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine*, (2021) 51:199-214 (reporting that "the performance gap between males and females becomes significant at puberty and often amounts to 10—50% depending on sport.").

Anti-Doping Agency's (WADA) sole job is to stop that.[7] When males are included in female sport they are excluding females from the very category solely designed to exclude male advantage. This is sex discrimination."

### C.    Cathy Devine, MSc

Cathy Devine is an independent researcher and expert in sport policy, equality, and human rights for girls and women. She was formerly Senior Lecturer for 23 years at the University of Cumbria, UK and is the former Secretary of the British Philosophy of Sport Association. Ms. Devine is a frequent author of articles on human rights and sport and is the lead author of the Canadian High Performance Athlete Project for Sport Canada. She has insight into how claims

---

[7] For instance, on October 20, 1968, East Germany's Margitta Gummel threw the shot a world record, 19.61 meters, beating teammate Marita Lange by 0.83m and winning gold at the Mexico City Olympics. East German secret police (Stasi) files later showed Gummel using oral turinabol over an 11-week period when she obtained her performance gain, a 1.6 meter or 9% improvement within a single season. *See also* Gledhill, N., "Blood doping and related issues," *Medicine and Science in Sports and Exercise*: Volume 14 - Issue 3 – pp. 183-189, *available at*: https://journals.lww.com/acsm-msse/Abstract/1982/03000/Blood_doping_and_related_issues__a_brief_review.5.aspx (showing a 5-9% increase in VO2max from *blood doping* one of the most notorious and successful means of doping ever devised).
Yet, gains from the worst forms of doping are less than male competitive advantage many transgender athletes have over females. Thus, permitting transgender eligibility in the female category stands in sharp contrast to anti-doping rules which provide the slightest performance advantage can justify placing a drug on the banned list.

regarding international human rights standards should be assessed. Ms. Devine observes:

"Gender identity is not explicitly protected in the UN human rights infrastructure, there is no duty under UN protocols to pass legislation on 'self-identification' for gender identity and the concept of gender identity has no treaty recognition in international law.[8] Individual human rights experts have differing views regarding the relative importance to be given to 'sex' and 'gender identity' and should not be considered to be experts outside their particular area of expertise.

"It is important to understand that some international 'human rights organisations' have departed from the UN Core Human Rights Instruments and elevate emerging/contested rights based on 'gender identity' above established rights based on 'sex.'[9] This is the reverse of the explicit protections outlined in UN human rights instruments and is disputed by other human rights experts who regard this as 'retro-fitting' gender identity where treaties and other binding sources make reference to sex.'[10] For example, this unfortunately includes human rights

---

[8] *See, e.g.*, https://www.scottishlegal.com/articles/alessandra-asteriti-un-experts-advice-on-gender-bill-ignores-womens-concerns
[9] *See* https://www.cambridge.org/core/journals/american-journal-of-international-law/article/olympic-movement-in-international-law/90CF8B7F4FA64A2EEC49F881606BA225
[10] *Id.*

organisations such as SHIFT and the Centre for Human Rights and Sport. For this

reason, when statements are made by 'independent international human rights

organisations' or other 'independent experts' their statements should be tested

against the content of the UN Core Human Rights Instruments to ensure an

accurate understanding of international human rights obligations. As Duke

University Law Professor Doriane Coleman has explained:

> Institutions within international law, such as the Human Rights
> Council and UN Special Rapporteurs, may use their authority to
> reinterpret existing human rights or to affirm new ones. But where
> emerging rights and interpretations collide with established ones, or
> where the generative process is itself flawed or doesn't reflect broad
> and deep consensus, on the principle of consent of the governed it
> isn't wrong for Movement organizations to continue to abide by their
> own, otherwise lawful commitments.[11]

"Any international or national review of eligibility regulations for female

classification for transgender athletes are, by definition, concerned with eligibility

for female sport categories. Therefore, the human rights of female athletes to

freedom of belief, freedom of expression, non-discrimination, and equal

opportunities on the basis of sex must be considered. Further, given the potential

for a conflict of rights, it is essential that equality impact assessments are

---

[11] Coleman, D.L., "The Olympic Movement in International Law," *Cambridge University Press* (December 7, 2020), *available at*:
https://www.cambridge.org/core/journals/american-journal-of-international-law/article/olympic-movement-in-international-law/90CF8B7F4FA64A2EEC49F881606BA225.

undertaken in order to reveal any reduction of benefits to other population groups explicitly protected from non-discrimination and entitled to equal opportunities. Therefore, it is imperative to conduct direct surveys of female athletes rather than merely rely on consultation with groups claiming to represent their views.

"There can be significant pressures and adverse effects experienced by athletes who stand up for rights of female athletes when such come into conflict with the interests of males asserting transgender rights. However, anonymized, scientific surveys regularly demonstrate overwhelming support among females for protection of the female category in sport against male entrants even if those entrants identify as transgender and recognition that transgender eligibility in the female category will disproportionately harm and disadvantage women."

### D.    Ro Edge, Save Women's Sport Australasia

Ro Edge is the New Zealand Spokeswoman for Save Women's Sport Australasia. She reports:

"Many of New Zealand's top female athletes and teams benefit from the Title IX scholarship opportunities in the USA, which provide player development opportunities simply not available for most women in New Zealand. And the

number of New Zealand athletes who are taking advantage of Title IX opportunities is growing each year.[12]

"Title IX significantly improves the competitiveness of many New Zealand women's teams against our international competition. Below is just a snapshot of the importance it plays in just three women's sports in New Zealand, with the following number of players in each of the current squads of these teams having attended, or currently attending, U.S. colleges on sporting scholarships:

- 85% of New Zealand Women's Tall Fern Basketball players.
- 53% of New Zealand Women's Football Ferns.
- 35% of New Zealand Senior Women's Lacrosse Team.

"New Zealand female athletes are not alone in benefiting from Title IX scholarships. In Division I, 35.4% of women's tennis players are international students. The percentage is also high in Division II, with 26.9% of women's players coming from outside the U.S.[13]

"Title IX plays a crucial role in the development of female athletes globally."

---

[12] *See* https://www.rnz.co.nz/news/tokyo-olympics/449086/kiwi-athletes-in-us-cheered-on-olympians-from-afar

[13] *See* https://www.crimsoneducation.org/nz/blog/campus-life-more/how-to-get-athletic-scholarships/

### E.    Fiona McAnena, Fair Play for Women

Fiona McAnena is the Director of Sport at Fair Play for Women in the United Kingdom. This role gives her a unique perspective on the impact of Title IX upon young female athletes in the UK. Her comments follow.

"Fair Play For Women, in the UK, hears from female athletes of all ages, and from the parents of schoolgirls, about their hopes and ambitions in sport. In the UK there is growing awareness of, and interest in, the opportunity to attend an American university on a sport scholarship. There is no comparable scholarship system in UK universities, both in terms of the financial support and the world-class sports facilities and resources. This attracts some of the brightest and most talented young people to U.S. colleges. We estimate that hundreds of British girls are now crossing the Atlantic each year on a U.S. sports scholarship, as indicated by this article aimed at UK high schoolers, titled *Sport Scholarships to USA Universities are a No Brainer for Girls*.[14] The current generation of female college students can see themselves making a career in sport - competing, coaching, commentating – in ways which simply were not available to women in the past. Much of this is because of the richness and diversity of Title IX support for females across a range of sports. This is particularly appealing for young female

---

[14] *Available at*: https://www.thescholarshiphub.org.uk/sport-scholarships-usa-universities-are-no-brainer-girls/.

athletes from outside the USA. They are encouraged by a unique proposition in which they will not be given the old equipment after the boys have finished with it, or asked to schedule their training around the boys' preferences, as used to happen, and still does in many other countries. Sexism in sport remains a challenge, but Title IX has been a beacon of fairness for women and girls, and a model for others to follow. Many of the GB Olympic team, male and female, across multiple sports, have studied and trained in the USA.

"This will remain true as long as it is acknowledged that Title IX was designed to ensure that those with female bodies are given equal opportunities, and that in sport this requires female-only teams and events. The need to respect identities should not be conflated with the need to provide equality of opportunity on the basis of sex. Women cannot identify into male teams and qualify for men's scholarships; male biological advantage precludes this. If males are permitted to claim female scholarships on the basis of identity and not sex, the result will be that the gender equity and equal opportunities for both sexes that was intended by Title IX will be totally undermined."

## II.    TITLE IX AND INTERNATIONAL LEGAL PROTECTIONS FOR WOMEN'S RIGHTS

Title IX exists within a broader international context of human rights instruments protecting the rights of girls and women. For instance, the International Bill of Human Rights which prevents discrimination on the basis of

"sex" was drafted in 1948, some twenty-four years prior to Title IX's adoption, and the UN Convention on the Elimination of All Forms of Discrimination Against Women (CEDAW) was drafted in 1979, within five years of when the relevant regulations under Title IX were adopted. Thus, understanding the context of these international instruments protecting against discrimination on the basis of "sex" is important to understanding Title IX's place within an international framework that has historically protected sex-based rights.

### A.    International Bill of Human Rights

Equal human rights on the basis of sex are an established and explicit cornerstone of international and national human rights and equality law. The UN International Bill of Human Rights,[15] the UN Core Human Rights Instruments[16] and the Olympic Charter[17] all outline explicit established rights, protections, and entitlements on the basis of sex. This means females are entitled to equal opportunities with males (regardless of gender identity) and should not be discriminated against as compared with males (regardless of gender identity).

---

[15] *Available at*:
https://www.ohchr.org/sites/default/files/Documents/Publications/Compilation1.1en.pdf
[16] *Available at*: https://www.ohchr.org/en/core-international-human-rights-instruments-and-their-monitoring-bodies
[17] *Available at*:
https://stillmed.olympics.com/media/Document%20Library/OlympicOrg/General/EN-Olympic-Charter.pdf?_ga=2.129405324.1470283416.1676031860-1515610965.1669221933

There are established explicit international and national protections for females on the basis of sex. The International Bill of Human Rights comprises the Universal Declaration of Human Rights (UDHR)[18], the International Convention on Civil and Political Rights (ICCPR)[19] and optional protocols, and the International Convention on Economic Social and Cultural Rights (ICESCR)[20] and optional protocols and refers to "sex" 102 times. The expanded body of human rights law comprises the nine Core International Human Rights Instruments, which are binding on a majority of current nation states and contain extensive and explicit rights to equal opportunities and non-discrimination on the basis of sex.

## B.  United Nations Convention on the Elimination of All Forms of Discrimination Against Women

The UN Convention on the Elimination of Discrimination Against Women (CEDAW)[21] explicitly references the equal right of women and men to participate in sport (Articles 10g and 13c) and is clear that:

---

[18] *Available at*: https://www.un.org/en/about-us/universal-declaration-of-human-rights

[19] *Available at*: https://www.ohchr.org/en/instruments-mechanisms/instruments/international-covenant-civil-and-political-rights

[20] *Available at*: https://www.ohchr.org/en/instruments-mechanisms/instruments/international-covenant-economic-social-and-cultural-rights

[21] *Available at*: https://www.ohchr.org/en/instruments-mechanisms/instruments/convention-elimination-all-forms-discrimination-against-women

the term "discrimination against women" shall mean any distinction, exclusion or restriction made on the basis of sex.

### C.    Olympic Charter

The Olympic Charter is not an international human rights instrument *per se*. Nevertheless, it is worthwhile to note that the Olympic Charter has long echoed the terminology of the IBHR and CEDAW, expressing an intent to secure protection against discrimination based on "sex" by stating:

> rights and freedoms...shall be secured without discrimination of any kind, such as race, colour, sex, sexual orientation, language, religion, political or other opinion, national or social origin, property, birth or other status.

### D.    International Human Rights Documents and the Protection of Women in Sport

Significantly, there is no explicit reference to gender identity in the International Bill of Human Rights, any of the nine Core International Human Rights Instruments or the Olympic Charter, and gender identity has no established basis in international law.[22] Gender identity therefore can be considered to be, at best, an emerging/contested right which should not, however, conflict with more explicit and established rights. While it may be accepted that no one should be discriminated against because of their gender identity, *as compared with other*

---

[22] *See* https://www.scottishlegal.com/articles/alessandra-asteriti-un-experts-advice-on-gender-bill-ignores-womens-concerns

*members of their sex*, even that right is not yet clearly established in international law.

However, the key question raised in connection with eligibility rules regarding the female category is different than the question of whether gender identity rights should be recognized. Rather, the question raised in relation to the female category is whether the long-established right against discrimination on the basis of "sex" must be trumped by a new found right un-related to sex and based upon an individual's self-described gender identity.

As the history of international protections of sex-based rights (including the somewhat shorter history of Title IX) demonstrates, sex-based rights are firmly established in the law and both traditionally and textually different from gender-based rights. Sex-based rights have long provided for the protection of women vis-à-vis males, providing a significant means by which women have advanced towards a status of equality with men. Particularly in regard to sport, however, as the foregoing experiences of the *amici* reflect, that progress towards equality based on sex has been long, painfully slow, and is still incompletely realized in many if not all locations around the world.

The relatively recent demotion of sex-based rights for women in favor of gender-based rights have significant implications for the international protection of women's rights as those rights have traditionally been understood. First, as

explained by the *amici*, the elevation of gender-based rights over sex-based rights will adversely impact the opportunities of women. Second, and alongside this loss of opportunity for women, is the relegation of women in sport to second-tier status within the women's category due to the fact that in virtually all cases women are unable to fairly compete on a level playing field with males who seek to self-identify into the women's category but retain biological male advantages.[23] Additionally, in many sports, biological advantage retained by a male who wishes to self-identify into the women's category actually puts women who wish to play their sport at extreme safety and injury risk.

In sum, eligibility criteria which permit competition in opposite sex categories by way of gender identity asymmetrically affect the female category of every sport requiring physical strength, speed or stamina (*i.e.*, virtually every sport yet developed) by permitting insurmountable male advantage in the very sex-based female category that was originally designed to exclude male advantage. In so doing, upholding gender-based rights over sex-based rights in sport destroys sex-based rights for females by subjecting them to unfair competition, unsafe

---

[23] *See*, *e.g.*, Handelsman, D.J., Hirschberg, A.L., Bermon, S., "Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance," *Endocr. Rev.* 2018 Oct; 39(5): 803-829, p. 803 ("Elite athletic competitions have separate male and female events due to men's physical advantages in strength, speed, and endurance so that a protected female category with objective entry criteria is required.").

competition and unequal opportunities in sport in comparison to males possessing male physiological advantages.

That recognition of a new right to gender identity for those individuals who retain male advantages in sport would be allowed to erode the rights and advancement of women is a perverse and unprecedented result never previously seen in the admittedly too short history of the protection of rights for women. It is well recognized that in some situations rights may come into conflict, and in those situations a choice regarding which right is to be given precedence must be made. *Amici* offer three reasons why protecting the sex-based rights of women is to be preferred. First, the sex-based rights of women are clearly established and long recognized in international law. Second, the sex-based rights of women need to be protected in sport because women are physiologically disadvantaged when competing against males. Third, as demonstrated by *amici*, the advancement and well-being of women globally requires the protection of their sex-based rights in sport.

Fortunately, as explained below, there is an emerging consensus among leading sports in the Olympic Movement that the women's category of elite sporting competition must be protected against those who would self-identify into the category while retaining male advantage. The Court should consider both the historic protection of sex-based rights which have heretofore in the sport context

meant protecting women against males who possess sex-linked physiological advantages alongside this emerging consensus as further confirmation of what has always been true: that to protect the rights of women the female category of sport cannot include males. Maintaining a preference for sex-based rights as the Court's North Star will lead the Court to a correct interpretation of Title IX that is consistent with maintaining fair competition, protecting the health and well-being of athletes, and an emerging international consensus that allowing individuals who retain male advantage to self-identify into the women's category of sport is neither wise nor workable.

## III.   FURTHER PROTECTION OF WOMEN'S RIGHTS IN INTERNATIONAL SPORT

Multiple international sport federations in the Olympic Movement have recently established eligibility rules which limit or prohibit transgender eligibility in the women's category.

### A.   International Olympic Committee Framework

As noted above, the Olympic Charter has long protected sex-based rights and does not extend protection on the basis of "gender identity." The International Olympic Committee (IOC) merely permits international sport federations to take into account "gender identity" as one of many factors in developing sport eligibility criteria. On November 16, 2021, the IOC released a document entitled "IOC Framework on Fairness, Inclusion and Non-Discrimination on the Basis of

Gender Identity and Sex Variations"[24] ("IOC Framework"). This document recommended an evidence based, sport-by-sport approach to eligibility criteria for transgender eligibility in sport.

The IOC Framework is sometimes described as an IOC "rule" relating to transgender eligibility, but such a description is not accurate. Rather, the IOC Framework contemplates that international sport federations will each develop their own transgender eligibility rules specifically tailored to the needs and demands of the sport and its athletes.

Importantly, the IOC recognized the importance of "competitive advantage" and preventing risk of injury in establishing such eligibility rules. The IOC recommended eligibility criteria for men's and women's categories should strive to meet three principles of "fairness" which the IOC identified as: (a) providing confidence no athlete "within a category has an unfair and disproportionate competitive advantage," (b) "preventing a risk to the physical safety of other athletes;" and (c) preventing athletes from claiming gender identity to compete in a category different from the category persistently used by the athlete.

---

[24] *Available at*:
https://stillmed.olympics.com/media/Documents/News/2021/11/IOC-Framework-Fairness-Inclusion-Non-discrimination-2021.pdf.

### B.    World Rugby Rules

World Rugby was the first international sport federation to adopt comprehensive eligibility rules prohibiting eligibility in the women's category for trans identifying males. Rugby's decision to exclude athletes who had experienced male puberty from the women's category of elite international competitions was based on a detailed review of the scientific literature as well as original research commissioned by World Rugby. Its guidelines contain a specific critique of the literature regarding testosterone suppression in trans identifying males, finding that suppression was insufficient to eliminate or significantly reduce material male competitive advantage.[25]

### C.    World Aquatics Sport Rules

In 2022 World Aquatics,[26] the international governing body for swimming and other aquatics sports, determined that a male athlete who wishes to identify into the female category can only do so in international competition "if they can establish to World Aquatic's comfortable satisfaction that they have not experienced any part of male puberty beyond Tanner Stage 2[27] or before age 12,

---

[25] *Available at*: https://www.world.rugby/the-game/player-welfare/guidelines/transgender/women.

[26] Previously known by the acronym "FINA."

[27] *I.e.*, the onset of male puberty.

whichever is later."[28] This decision was made by World Aquatics specifically to protect "competitive fairness" in the women's category.

### D.    World Athletics Rules

On March 23, 2023 World Athletics, the global governing body for the sport of track and field, confirmed that "no transgender athlete who had gone through male puberty would be permitted to compete in female world ranking competitions from 31 March."[29]

World Athletics President Sebastian Coe said the decision was "guided by the overarching principle which is to protect the female category."[30] He explained that:

> Decisions are always difficult when they involve conflicting needs and rights between different groups, but we continue to take the view that we must maintain fairness for female athletes above all other considerations[.]
>
> We will be guided in this by the science around physical performance and male advantage which will inevitably develop over the coming years. As more evidence becomes available, we will review our position, but we believe the integrity of the female category in athletics is paramount.[31]

---

[28] *Available at*: https://resources.fina.org/fina/document/2023/03/27/dbc3381c-91e9-4ea4-a743-84c8b06debef/Policy-on-Eligibility-for-the-Men-s-and-Women-s-Competiition-Categrories-Version-on-2023.03.24.pdf.

[29] *Available at*: https://www.bbc.com/sport/athletics/65051900; *see also* https://worldathletics.org/news/press-releases/council-meeting-march-2023-russia-belarus-female-eligibility.

[30] *Id.*

[31] *Id.*

### E.    World Boxing Council Rules

Similarly, on December 29, 2022, the World Boxing Council announced that it would be adopting an "'at birth' rule, so that a transgender fighter assigned as male at birth, would only compete against a fellow transgender fighter who was also assigned as male at birth."[32] Under the WBC's rules "transgender fighters would not be permitted to fight non-transgender opponents."[33]

## IV.    U.S. OLYMPIC AND AMATEUR SPORTS ACT

Around the time it was adopting the Education Amendments to Title IX and the regulations thereunder authorizing, indeed mandating, separate women's sports teams in scholastic sports, Congress enacted the Olympic and Amateur Sports Act which established the United States Olympic & Paralympic Committee (USOPC) and U.S. sport national governing bodies (NGBs), making them responsible for sport eligibility determinations in relation to international competitions.[34]

Predictably, the congressional charge to the USOPC and NGBs was not without guidance or limitation in relation to women's sport. For instance, the Olympic and Amateur Sports Act, specifically mandates that a goal of the USOPC is "to encourage and provide assistance to amateur athletic activities for women."

---

[32] *See* https://www.insidethegames.biz/articles/1132037/wbc-new-transgender-category.

[33] *Id.*

[34] Olympic and Amateur Sports Act, 36 U.S.C. § 220501 *et seq*.

36 U.S.C. § 220503. That Congress thought it particularly needful to encourage athletic activities for women is made clear by the fact that the Act contains no express reciprocal goal of encouraging athletic activities for men.

At the same time, Congress required U.S. sport national governing bodies to "provide equitable support and encouragement for participation *by women* where separate programs for male and female athletes are conducted on a national basis." 36 U.S.C. § 220524 (emphasis added). Thus, Congress plainly recognized the need for sport programs to be separated by sex and required that programs devoted to women receive preference over programs for men. Congress obviously felt preference for women was necessary to provide equal opportunities for women in sport.

A duty of the USOPC under the Act is also to "serve as the coordinating body for amateur athletic activity in the United States directly related to international amateur athletic competition" and to "organize, finance, and control the representation of the United States in the competitions and events of the Olympic Games, the Paralympic Games, the Pan-American Games, and the Parapan American Games, and obtain, directly or by delegation to the appropriate national governing body, amateur representation for those games[.]" 36 U.S.C. § 220505(c).

As noted by *amici*, U.S. collegiate sports programs are the feeder programs to Olympic Committees and sport national governing bodies *both in the U.S. and around the world*. Thus, an interpretation of Title IX which regards "women" and the women's category as not sex-based and fixed but as gender-based and fluid would:

- harm the rights of girls and women and undermine the fairness and safety of girls' and women's sport,

- set eligibility rules in U.S. high school and collegiate sports on a collision course with rules in the Olympic Movement which are sex-based and protect the women's category from male advantage,

- put Title IX at odds with international human rights standards protecting the sex-based rights of women, and

- deviate from the goals offsetting inherent male advantage and advancing biological women in comparison to biological men which were an underlying purpose of both Title IX and the Olympic and Amateur Sports Act.

## V.    CONCLUSION

Title IX and international human rights standards protecting the sex-based rights of women are integral to the advancement of women. Reinterpretation of sex-based rights by substituting self-identification for the bright line standard of

biology is inconsistent with history, science, and the text of Title IX. Reinterpreting Title IX as Appellants seek to do harms women.

Increasingly international sports organizations are recognizing that self-identification is not a fair means of setting eligibility standards. Self-identification would not work in boxing or wrestling weight categories any more than it works in the female category. Sex-based rules recently adopted by international sports only confirm that the same need that motivated Title IX's adoption still exists today: the need to draw a sport eligibility line and enforce protections (*or even preferences* as the Sports Act requires) for women based on biology.

Women still need the sex-based (*i.e.,* biology-based) protections for which Title IX was enacted. Courts should not permit the U.S. Department of Education through regulatory fiat to abandon this purpose and employ Title IX for a purpose for which it was not drafted.

The current generation, and the next, deserve the same protection Title IX has given women for half a century. The irreducible goal of Title IX for women in sport has always been a realistic opportunity for girls to compete fairly and safely in sport and win. This generation of girls asks for nothing more. They should be given nothing less.

Respectfully submitted,

*/s/ William Bock III*
William Bock III, Atty. No. 14777-49
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Fax: (317) 264-6832
E-mail: wbock@kgrlaw.com

*ATTORNEYS FOR AMICI CURIAE*
International Consortium on Female Sport

September 3, 2024

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,447 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

*/s/ William Bock III*
William Bock III, Atty. No. 14777-49
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Fax: (317) 264-6832
E-mail: wbock@kgrlaw.com

*ATTORNEYS FOR AMICI CURIAE*
International Consortium on Female Sport

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2024, I electronically filed the foregoing *Brief of Amicus Curiae International Consortium on Female Sport in Support of Appellees and Affirmance* with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ William Bock III*
William Bock III

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000