No. 24-5588

## In the
## United States Court of Appeals for the Sixth Circuit

STATE OF TENNESSEE, *et al.*,
*Plaintiffs-Appellees*,
v.
MIGUEL CARDONA, in his official capacity as Secretary of Education, *et al.*,
*Defendants-Appellants*.

**On Appeal from the
United States District Court for
the Eastern District of Kentucky**

**Brief *Amicus Curiae* of America's Future, Public Advocate of the United States, Eagle Forum, Eagle Forum Foundation, Clare Boothe Luce Center for Conservative Women, Leadership Institute, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin Foundation, One Nation Under God Foundation, LONANG Institute, Restoring Liberty Action Committee, and Conservative Legal Defense and Education Fund in Support of Plaintiffs-Appellees and Affirmance**

KERRY L. MORGAN
  Wyandotte, MI
J. MARK BREWER
  Johnson City, TX
JAMES N. CLYMER
  Lancaster, PA
JOSEPH W. MILLER
  Fairbanks, AK
PATRICK MCSWEENEY
  Powhatan, VA
RICK BOYER
  Lynchburg, VA

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
*Attorney of Record
September 3, 2024

*Attorneys for Amici Curiae*

## DISCLOSURE STATEMENT

The *amici curiae* herein, America's Future, Public Advocate of the United States, Eagle Forum, Eagle Forum Foundation, Clare Boothe Luce Center for Conservative Women, Leadership Institute, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin Foundation, One Nation Under God Foundation, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A).  These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them, except for LONANG Institute and Restoring Liberty Action Committee, which are nonprofit educational organizations.

*s/William J. Olson*
William J. Olson

i

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTEREST OF *AMICI CURIAE*. . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.    THE DOE RULE IS *ULTRA VIRES*, AS IT DOES NOT IMPLEMENT, BUT
      RATHER UNDERMINES, TITLE IX . . . . . . . . . . . . . . . . . . . . . 3

      A.    The Rule Destroys Personal Privacy for Women and Girls . . . . . 5

      B.    The Rule Destroys Women's and Girls' Sports . . . . . . . . . . . 9

      C.    The Rule Censors the Free Speech Rights of Teachers and
            Students . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.   THE *BOSTOCK* DECISION NEITHER CONTROLS NOR INFORMS A
      DECISION IN THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.  THE DOE RULE PRESUPPOSES THAT BIOLOGICAL SEX IS NOT AN
      IMMUTABLE AND UNIVERSAL REALITY, BUT RATHER A SOCIAL
      CONSTRUCT, CHANGEABLE AT WILL . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

Page

**STATUTES**

20 U.S.C. § 1686 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
42 U.S.C. § 2000e-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**CASES**

*Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) . . . . . . 21
*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) . . . . . . . . . . . 15, 16, 18, 24
*B.P.J. v. West Virginia*, 98 F.4th 542 (4th Cir. 2024) . . . . . . . . . . . . . . . 6
*Gavin Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) . . . 5
*Gloucester Cty. Sch. Bd. v. Grimm*, 141 S. Ct. 2878 (2021) . . . . . . . . . . . 6
*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) . . . . . . . . . 23
*Merriweather v. Hartop*, 992 F.3d 492 (6th Cir. 2021) . . . . . . . . . . . . . . 14
*Tennessee v. Dept. of Education*, 104 F.4th 577 (2024) . . . . . . . . . . . . . . 2
*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) . . . . . . . . 14, 15

**MISCELLANEOUS**

118 *Cong. Rec.* 5803 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19
118 *Cong. Rec.* 5804 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
118 *Cong. Rec.* 5807 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22
118 *Cong. Rec.* 5808 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
40 *Fed. Reg.* 24134 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22
89 *Fed. Reg.* 33474 (Apr. 29, 2024) . . . . . . . . . . . . . . . . . . 2, 4, 5, 15
P. Berger & T. Luckmann, The Social Construction of Reality: A Treatise
    in the Sociology of Knowledge (Knopf Doubleday: 1967). . . . . . . . . . 29
A.M. Codevilla, "The Rise of Political Correctness: From Marx to
    Gramsci to Trump," *Claremont Review of Books* (Fall 2016) . . . . . 25-28
R. del Giudice, "High School Girl Who Lost Race to Transgender Athletes
    Files Federal Complaint," *Daily Signal* (June 18, 2019). . . . . . . . . . . 11
D.L. Drakeman, The Hollow Core of Constitutional Theory (Cambridge
    Univ. Press: 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Executive Order 13,988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Executive Order 14,021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2
R. Gaydos, "Ex-NCAA swimmer still upset over Lia Thomas making it to
    500 finals in 2022 championships," *Fox News* (Mar. 23, 2023) . . . . . . 12

R. Gaydos, "Swimmer Riley Gaines slams ESPN for Lia Thomas Women's History Month segment," *Fox News* (Mar. 26, 2023) . . . . . . . . . . . 12

M. Ginsberg, "House Passes Ban On Men Participating In Women's Sports," *Daily Caller* (Apr. 20, 2023) . . . . . . . . . . . . . . . . . . . . 13

A. Hall, "Transgender Bathrooms Are An Assault On Reality And Freedom," *The Federalist* (July 11, 2016) . . . . . . . . . . . . . . . . 8, 9

E. Kao and A. Jones, "We Must Fight the Sexualization of Children by Adults," *Heritage Foundation* (Oct. 5, 2019) . . . . . . . . . . . . . . . . 7

J. Klein, "'Gender fluidity': The ever-shifting shape of identity," *BBC* (Sept. 14, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Liberty Counsel, "Predators in Women's Facilities" . . . . . . . . . . . . . . . . 8

J. Lohn, "A Look At the Numbers and Times: No Denying the Advantages of Lia Thomas," *Swimming World* (Apr. 5, 2022) . . . . . . 12

N. Modan, "Half of states now restrict trans student athletes," K12Dive.com (Feb. 13, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

M. Rothblatt, <u>The Apartheid of Sex: A Manifesto on the Freedom of Gender</u> (Crown Pub.: 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

H. Salem, "25 Signs of Child Grooming and Abuse Parents Should Recognize," *Family Education* (Aug. 2, 2023). . . . . . . . . . . . . . . . 7

B. Sandler, "Title IX: How We Got It and What a Difference It Made," 55 CLEV. ST. L. REV. 473 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

S. Soule, "I Am a Women's Track and Field Champion. Here's Why I Continue to Fight for the Future of Women's Sports," *Fox News* (Oct. 4, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

"Teacher Accused of Sexually Abusing Child," *KPRC2Click2H* (Apr. 18, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

iv

## INTEREST OF *AMICI CURIAE*[1]

America's Future, Public Advocate of the United States, Eagle Forum, Eagle Forum Foundation, Clare Boothe Luce Center for Conservative Women, Leadership Institute, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin Foundation, One Nation Under God Foundation, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of law. LONANG Institute and Restoring Liberty Action Committee are nonprofit educational organizations.

## STATEMENT OF THE CASE

On his first day in office, President Joe Biden issued Executive Order 13,988, which decreed that all "federal laws on the books that prohibit sex discrimination similarly 'prohibit discrimination on the basis of gender identity or sexual orientation.'" *Tennessee v. Cardona*, 2024 U.S. Dist. LEXIS 106559 at *14 (E.D. Ky. 2024) ("*Cardona I*"). Executive Order No. 14,021 directed

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

Secretary Cardona to "issue new guidance as needed to comply with the policy set forth in the Executive Order." *Id.* On June 22, 2021, the Department of Education ("DOE") issued guidance documents (86 *Fed. Reg.* 32637) implementing this new policy, which were enjoined by the district court for the Eastern District of Tennessee, and then affirmed by this court in *Tennessee v. Dept. of Education*, 104 F.4th 577 (2024), a case in which most of these *amici* filed a brief.[2]

On April 29, 2024, the Department issued a Final Rule, 89 *Fed. Reg.* 33474 (Apr. 29, 2024), which directed, *inter alia*, that, "for purposes of Title IX [of the Civil Rights Act, relating to education], '[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.'" *Cardona I* at *14. Six states filed this suit against the Department. *Id.* at *18. Joined by two intervenors, they sought an injunction asserting that the rule had effectively rewritten Title IX without congressional authorization. *Id.* at *21.

The district court found that the intent of the use of the term "sex" in Title IX was to preserve educational and sports opportunities for biological females

---

[2] Brief *Amicus Curiae of Public Advocate of the United States, et al.* *Tennessee v. Dept. of Education*, No. 22-5807 (Jan. 31, 2023).

2

vis-a-vis biological males, that the Final Rule's expansion of the term to include "gender identity" was arbitrary and capricious (*id.* at *40-41), and that plaintiffs were likely to succeed on their free speech claims. *Id.* at *79. It enjoined the Department from enforcing the Rule in the six states challenging the Rule. *Id.* at *131. This Court declined to stay the injunction, but expedited the appeal. *Tennessee v. Cardona*, 2024 U.S. App. LEXIS 17600 (6th Cir. 2024) ("*Cardona II*"). The Supreme Court likewise declined to stay the injunction. *See Dep't of Educ. v. Louisiana*, 2024 U.S. LEXIS 2983 (Aug. 16, 2024).

## ARGUMENT

### I. THE DOE RULE IS *ULTRA VIRES*, AS IT DOES NOT IMPLEMENT, BUT RATHER UNDERMINES, TITLE IX.

Purporting to implement Title IX, the Rule actually undermines it, imposing radical new requirements on educational institutions receiving federal funding in pursuit of an extremist "transgender" ideology. Although the Rule claims to "amend the definition of sex" in the context of sex discrimination, it actually twists the word beyond all recognition, to cover "'discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.'" *Cardona II* at *3. The Rule provides

not a shred of evidence that this new interpretation is consistent with the text, context, or purpose of Title IX.  The Rule's agenda is without statutory support:

- the term "gender identity" now "describe[s] an individual's sense of their gender, which may or may not be different from their sex assigned at birth."  89 *Fed. Reg.* at 33809.

- "the Rule amends 34 C.F.R. § 106.31(a)(2) to clarify that schools may not 'prevent[] a person from participating in an education program or activity consistent with the person's gender identity.'  [89 Fed. Reg.] at 33887.  As a result, § 106.31(a)(2) **applies to** '**restrooms and locker rooms**, access to classes and activities, and policies such as appearance codes (including dress and grooming codes).'"  *Cardona II* at *4 (emphasis added).

- The Rule "provide[s] that public schools may not categorically ban transgender students from playing sports consistent with their gender identity."  *Cardona I*  at *111.

- The Rule "amends 34 C.F.R. § 106.2 to add a prohibition on '**[h]ostile environment harassment**,' defined as '[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a

4

person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment).'  [89 Fed. Reg. at 33884.]" *Cardona II* at *3-4 (emphasis added).

- a student's preferred pronoun must be used by teachers and fellow students. *Id*.

Each of these provisions shamelessly undermines the protections for actual women and girls that Title IX was intended to protect.

### A.    The Rule Destroys Personal Privacy for Women and Girls.

Rather than an effort to "clarify" the meaning of the term "sex discrimination" (89 *Fed. Reg.* 33476), the Rule imposes and institutionalizes discrimination against biological females.  One critical casualty of the Rule is the personal privacy afforded women and girls by use of their own bathrooms and locker rooms, as well as their safety.

To compel schools to allow biological boys to fulfill their teenage dream — to shower with teenage girls — DOE expands on a deeply flawed decision of the Fourth Circuit case which allowed a biological girl to use the boys' restroom. *See* 89 Fed. Reg. 33805.  *Gavin Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).  In no way does that decision support the Rule.  Although

Justices Thomas and Alito would have granted certiorari in that early "gender identity" case, the Supreme Court declined. *Gloucester Cty. Sch. Bd. v. Grimm*, 141 S. Ct. 2878 (2021). That Fourth Circuit decision was seriously flawed, as detailed in four *amicus* briefs filed by most of these *amici* in this case.[3]

With respect to compelling girls to compete in school sports against biological boys, the DOE's faulty analysis is similar to that engaged in by the Fourth Circuit in *B.P.J. v. West Virginia*, 98 F.4th 542 (4th Cir. 2024). That case too is deeply problematic and is now pending on a petition for certiorari.[4] Most of these *amici* have filed a brief supporting that petition.[5] The plaintiff in that case, B.P.J., is a biological male who "identifies" as a "transgender girl" and demands the right to play on high school girls' teams.

---

[3] *G.G. v. Gloucester County School Board*, Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, Fourth Circuit (May 10, 2016); *Gloucester County School Board v. G. G.*, Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, U.S. Supreme Court (Jan. 10, 2017); *G.G. v. Gloucester County School Board*, Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, Fourth Circuit (May 15, 2017); *Gloucester County School Board v. Gavin Grimm,* Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, U.S. Supreme Court (Mar. 26, 2021).

[4] *West Virginia v. B.P.J.*, U.S. Supreme Court, Case No. 24-43.

[5] *Id.* Brief of *Amicus Curiae* America's Future, *et al.*

One of the intervenor plaintiffs in this case, A.C., is a biological female who described the emotional and mental harms to her caused by the invasion of her locker room by a biological boy. *See Cardona I* at *20. A.C.'s reaction is perfectly natural and proper. Although such matters are of little import to the current DOE, children have a natural sense of modesty which this Rule seeks to strip away from them. This aspect of the Rule not only violates deeply held religious principles of multiple religions, it should been seen for what it is — a deeply immoral Rule. No government should have the power to harm children in this manner and no court should permit it.[6]

In response to DOE's Notice of Proposed Rulemaking ("NPRM"), some of these *amici* submitted comments, highlighting these privacy issues and illustrating the invasion of males into female locker rooms. These *amici* noted the case of Riley Gaines, a University of Kentucky student and swimmer, who explained:

---

[6] *See* "When Do Children Feel Modesty?" You Are Mom (Mar. 15, 2019). Ripping away modesty is an attribute of "grooming" of children to become sexually available to adults. *See, e.g.*, E. Kao and A. Jones, "We Must Fight the Sexualization of Children by Adults," *Heritage Foundation* (Oct. 5, 2019); H. Salem, "25 Signs of Child Grooming and Abuse Parents Should Recognize," *Family Education* (Aug. 2, 2023). Reports of sexual abuse of children by both male and female teachers occurs regularly. "Teacher Accused of Sexually Abusing Child," *KPRC2Click2H* (Apr. 18, 2021).

she had felt "extreme discomfort" being forced to change in the same locker room as the male Thomas. "That's not something we were forewarned about, which I don't think is right in any means, changing in a locker room with someone who has different parts," Gaines said.[7]

Seven years ago, civil rights group Liberty Counsel compiled a list of more than 50 news stories of incidents across the country of men committing sexual assaults and taking indecent photographs in women's restrooms.[8] While most of the men were not transgender, all were biological males. In practice, opening women's bathrooms to men identifying as women simply opens women's bathrooms to men generally — for any assertion of a different "gender identity" is treated as an irrefutable fact. As the court below noted, "the Department undoubtedly dismissed many of these concerns." Men's and women's rooms have always been separate:

> Sex-specific bathrooms were originally established not only because of men and women's **distinct hygienic needs**, but also because **women are far more vulnerable to sexual assault** than men, and creating protected areas where only women strip naked prevents sexual violence. While some left-leaning publications have decried this idea as "paternalistic" and "antiquated," the estimated 1 in 6

---

[7] Comments of America's Future, *et al.*, to DOE at 9 (May 15, 2023).

[8] Liberty Counsel, "Predators in Women's Facilities."

women who will experience sexual assault (or the 17.7 million existing victims) might disagree.[9]

The "transgender" denial of reality encapsulated in the Rule creates a harsh, cold new reality for America's women and girls, which elevates those suffering from the mental illness of "gender dysphoria" and related conditions over the rights of all others.

### B.    The Rule Destroys Women's and Girls' Sports.

State schools have rules, and more recently state legislation, which seeks to promote women's sports and protect women.  Federal regulations now seek to undermine women's sports and remove that protection.  An Idaho law banning biological males from competing on girls' and women's teams designed specifically to deliver on Title IX's promise of equal access to sports for females is now pending on a petition for certiorari, which was supported by most of these *amici*.[10]  DOE believes that its Rule would override Idaho law and similar laws in fully half the states,[11] for any school receiving federal funding.

---

[9]  A. Hall, "Transgender Bathrooms Are An Assault On Reality And Freedom," *The Federalist* (July 11, 2016) (emphasis added).

[10]  *Little v. Hecox*, U.S Supreme Court, Case No. No. 24-38, Brief of Amicus Curiae America's Future, *et. al.* at 5.

[11]  N. Modan, "Half of states now restrict trans student athletes," K12Dive.com (Feb. 13, 2024).

Further, the Rule could introduce untenable disruption in school athletics, as the "gender identity" of a school's athletes is utterly mutable and may change at any time. According to transgender ideology, "gender fluidity" is just as real as "gender identity": "[f]or some people, gender identity and expression isn't fixed – rather, it can change daily."[12] According to "gender-fluid" psychologist Liz Powell, "gender fluidity enables people to take their identity and expression one day at time, instead of feeling tied to a single, overarching gender label." *Id.* According to Powell, gender "'is not a fixed point' … but rather flexible and able to shift depending on various factors, both within a person's internal self as well as their external surroundings." *Id.*

As some of these *amici* pointed out in Comments filed with DOE, "The scars inflicted by radical 'gender ideology' are not just physical. They are mental too, and have left deep wounds in the lives of girls denied a fair chance at sporting events because of schools adopting cruel and misguided policies like the NPRM."[13]

---

[12] J. Klein, "'Gender fluidity': The ever-shifting shape of identity," *BBC* (Sept. 14, 2022).

[13] Comments of America's Future, *et al.*, to DOE at 9 (May 15, 2023).

In 2019, Connecticut high school sprinter Selina Soule missed her chance to compete in the New England 55-meter regionals — because two biological boys ran faster than she did.[14]  "It wasn't long before I discovered that athletic associations have the power to make rules that directly impacted my ability to win races.  No matter how hard I trained, enduring long hours of practice, I just couldn't beat a boy."[15]

In 2018, a man named Will Thomas was listed on the roster of the Penn State men's swim team.[16]  The following season, Thomas "transitioned," identified as "Lia Thomas," and began swimming on the women's team.  On the men's team, Thomas was mediocre, but competing against women, Thomas dominated.  "During the last season Thomas competed as a member of the Penn men's team, which was 2018-19, [Thomas] ranked 554th in the 200 freestyle, 65th in the 500 freestyle and 32nd in the 1650 freestyle.  As [Thomas'] career at Penn wrapped, [Thomas] moved to fifth, first and eighth in those respective

---

[14]  R. del Giudice, "High School Girl Who Lost Race to Transgender Athletes Files Federal Complaint," *Daily Signal* (June 18, 2019).

[15]  S. Soule, "I Am a Women's Track and Field Champion.  Here's Why I Continue to Fight for the Future of Women's Sports," *Fox News* (Oct. 4, 2022).

[16]  Will Thomas, 2018-19 Men's Swimming and Diving, *Penn Athletics*.

events on the women's deck."[17]  In March 2022, Thomas snatched the NCAA women's championship in the 500-meters.[18]

In March 2023, ESPN lauded Thomas in its "Women's History Month" segment.[19]  Riley Gaines, the former University of Kentucky swimmer who was edged out by Thomas for a fifth-place title in another 2022 NCAA women's event, responded.  "Lia Thomas is not a brave, courageous woman who EARNED a national title," Gaines stated on Twitter.  "He is an arrogant, cheat who STOLE a national title from a hardworking, deserving woman.  The @ncaa is responsible.…  If I was a woman working at ESPN, I would walk out.  You're spineless @espn.'"  *Id*.

After Thomas spoke out in support of the Rule at the NPRM stage, Riley Gaines again responded.  "Under the guise of competitive fairness?  Are you really trying to say you would have won a national title against the men?  Does it not break your heart to see women lose out on these opportunities?  The Biden

---

[17]  J. Lohn, "A Look At the Numbers and Times: No Denying the Advantages of Lia Thomas," *Swimming World* (Apr. 5, 2022).

[18]  R. Gaydos, "Ex-NCAA swimmer still upset over Lia Thomas making it to 500 finals in 2022 championships," *Fox News* (Mar. 23, 2023).

[19]  R. Gaydos, "Swimmer Riley Gaines slams ESPN for Lia Thomas Women's History Month segment," *Fox News* (Mar. 26, 2023).

Admins proposed bill denies science, truth, and common sense."[20]  "This take is selfish and shows an utter disregard for women." *Id.*

DOE promulgated its rule because efforts to impose the desired transgender policy have failed in Congress.

> Congress has refused to expand Title IX to include gender identity. *See* Student Non-Discrimination Act of 2015 ("SNDA"), S. 439 114th Cong. (2015).  Just like the Final Rule, the SNDA prohibited discrimination based on actual or perceived sexual orientation or gender identity under any program or activity receiving federal financial assistance.  [*Cardona I* at *42.]

That bill failed in the Senate, while last year, **the House passed a ban on males in women's sports to reverse the Rule**, though it failed in the Senate and would have faced a certain veto from President Biden.[21]  But the Department's argument that it is simply "clarifying" the law fails in the face of the evidence that it is revolutionizing it.

---

[20]  Riley Gaines post https://x.com/Riley_Gaines_/status/1648141754640613379 (Apr. 17, 2023).

[21]  M. Ginsberg, "House Passes Ban On Men Participating In Women's Sports," *Daily Caller* (Apr. 20, 2023).

### C.    The Rule Censors the Free Speech Rights of Teachers and Students

In addition, the requirement of teachers to use a student's "preferred pronouns" has already been determined by this Court to be an impermissible infringement on Free Speech.  The court below highlighted this Court's recent decision in *Merriweather v. Hartop*, 992 F.3d 492 (6th Cir. 2021).  The case involved a Christian professor at Ohio's Shawnee State University whose religious convictions forbade him from using pronouns that failed to correspond with students' biological sex.  *Id.* at 498.  The district court explained, "[p]lainly stated:  '[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern.'  [*Merriweather*] at 508."  *Cardona I* at *58. This Court addressed:

> "**a struggle over the social control of language** in a **crucial debate** about the nature and foundation, or **indeed real existence, of the sexes**," *id.* at 508 (citation omitted)…. [*Merriweather*] also illustrates the profound significance of the First Amendment's protection of a teacher's in-class free speech rights more broadly. "If professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity." [*Cardona I* at *57-58 (quoting *Merriweather*) (emphasis added).]

As the Supreme Court has made clear, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what

14

shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The Rule is not only *ultra vires* in contravention of the clear text of Title IX, but blatantly unconstitutional.

The court below was correct: "The Department's new definition of 'discrimination on the basis of sex' wreaks havoc on Title IX and produces results that Congress could not have intended." *Cardona I* at *36. It also wreaks havoc on the First Amendment and will undermine girls' school sports programs. The Rule destroys Title IX in an act of obliteration, not interpretation.

## II. THE *BOSTOCK* DECISION NEITHER CONTROLS NOR INFORMS A DECISION IN THIS CASE.

The Department grounds its Final Rule in the Supreme Court's decision in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020). *See* 89 *Fed. Reg.* 33806-08. Regardless, as multiple Courts of Appeals — including this Court — have concluded, *Bostock* does not apply in any way to Title IX.

*Bostock* interpreted Title VII, which prohibits employers from making employment decisions "because of … sex." 42 U.S.C. § 2000e-2. *Bostock* determined that making an adverse employment decision against a homosexual or

transgender-identifying person that would not be made against a person of the opposite sex discriminates "because of sex," because the person's sex would be a "but-for" cause of the employment action. *Bostock* at 657. Accordingly, for purposes of Title VII, the Court stated, "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660. As this Court has noted, "Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX." *Cardona II* at *8.

*Bostock* expressly made clear that its reasoning was not to be used outside the context of Title VII, and that even in that context, the Court was only addressing adverse employment actions, not single-sex accommodations for privacy purposes. "Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind." *Bostock* at 681. The Biden DOE disregarded the cautionary language and relied on *Bostock* as if it had decided the issue here.

This Court correctly distinguished between Title VII and Title IX. First, Title IX deals with an entirely different regulated field — education rather than

employment.  Second, the language of Title IX differs from Title VII.  As this Court noted, "the statutes use materially different language: discrimination 'because of' sex in Title VII and discrimination 'on the basis of' sex in Title IX." *Cardona II* at *8.  Third, as this Court also pointed out, "[n]o less importantly, Congress enacted Title IX as an exercise of its Spending Clause power, U.S. Const. Art. I, § 8, cl. 1, which means that Congress must speak with a clear voice before it imposes new mandates on the States.  *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999)….  The same is not true of Title VII." *Id.* at *8-9.  Fourth, and most importantly, there is a massive structural difference between Title VII and Title IX, in that Title IX explicitly carves out areas where specific federally funded programs are textually entitled to make distinctions on the basis of the biological realities of sex.  Title VII does not.  This Court noted that:

> As many jurists have explained, Title VII's definition of discrimination, together with the employment-specific defenses that come with it, do not neatly map onto other areas of discrimination….  Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX.  [*Cardona II* at *8.]

17

*Bostock* conceded that "[t]hose who adopted the Civil Rights Act might not have anticipated their work would lead to" covering classes such as homosexual and transgender when the drafters were thinking of biological sex. *Bostock* at 653. Still "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another," Title VII must be applied as *Bostock* applied it. *Id*. The text and history of Title VII not only did not compel *Bostock*'s result, it did not permit it. In any event, the plain text of Title IX flatly forbids a similar result here.

Title VII makes no textual "carveouts" for when sex differences may be considered in the employment context, but Title IX does so, and those carveouts are based on the inherent biological differences between males and females. The legislative history of Title IX explains why biological differences between males and females, men and women, are relevant, indeed central, in the Title IX context. Title IX Senate sponsor Birch Bayh (D-IN) introduced the legislation, stating that its object was to ensure that females have the same educational opportunities available to males. Senator Bayh attacked "corrosive and unjustified discrimination against women."[22] He stressed that the bill was

---

[22] 118 *Cong. Rec.* 5803.

designed to address preferential treatment for biological males over females. *Id.*
He denounced stereotypes of females as "pretty things who go to college to find
a husband … and finally marry, have children and never work again."[23]  Senator
Bayh repeatedly lamented disparate opportunities in education and employment
between "males" and "females." *Id.*  "I am concerned that in 1970 the
percentage of the female population enrolled in college was markedly lower than
the percentage of the male population.…" *Id.*  He further added, "[i]t is of little
comfort for women to know that they are encouraged to further their schooling
but that … they will be earning far less than male colleagues for the rest of their
lives."[24]

Senator Bayh noted that Title IX's language dealt expressly with
differentiations on the basis of "sex."  "Central to my amendment are sections
1001-1005 which would prohibit discrimination **on the basis of sex** in federally-
funded education programs." *Id.* at 5807 (emphasis added).  Section 1007 of
Title IX required the Commissioner of Education to "investigate **sex**
discrimination at all levels of education … and report … recommendations for

---

[23]  118 *Cong. Rec.* 5804.

[24]  118 *Cong. Rec.* 5807.

action to guarantee equality of opportunity in education **between the sexes**." *Id.* at 5808 (emphasis added). There was no concept of "gender identity" involved in either the statute's intent or its text. As the district court noted:

> Title IX carves out exceptions for a number of traditional male-only or female-only activities, as long as similar opportunities provided for "one sex" are provided for "the other sex." See 20 U.S.C. §1681(a)(1)-(8).... Senator Bayh, one of the proposal's architects, stressed that Title IX "provide[d] equal access for women and men students to the educational process," but did not "desegregate" spaces and activities that have long been sex-separated. 117 Cong. Rec. 30407 (1971). [*Cardona I* at *11.]

One of these carveouts is that Title IX expressly allows schools to maintain "separate living facilities" by biological sex. "Notwithstanding anything to the contrary contained in this title, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686.

As the court below noted, the Final Rule, juxtaposed against the statutory text, produces a schizophrenic result that cannot be squared with Title IX's text. The Rule provides that "recipients of federal funds may still provide separate living facilities for the different sexes but may not require students to use the shower or locker room associated with their biological sex." *Cardona I* at *37.

20

**It is incomprehensible that the text of Title IX permits sex-segregated college cafeterias or laundry areas, but not bathrooms or locker rooms.**

The Eleventh Circuit is in accord, noting that the implementing regulations for Title IX expressly allow for "'separate toilet, locker room, and shower facilities on the basis of sex,' so long as the facilities 'provided for students of one sex [are] comparable to such facilities provided for students of **the other sex**.'" *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022) (quoting 34 C.F.R. § 106.33) (emphasis added). Notably, the regulations themselves envision the actual binary world of two biological sexes.

The way the DOE Office of Civil Rights ("OCR") interpreted Title IX at the time of its passage is also instructive. OCR promulgated regulations in 1975 to initially implement Title IX. The implementing regulations clearly envisioned two — and only two — distinct sexes, and were intended to close the gap between biological males and females in school athletics:

> The Department's intent … is to require institutions to take the interests of **both sexes** into account in determining what sports to offer. As long as there is no discrimination against members of **either sex**, the institution may offer whatever sports it desires…. In so doing, an institution should consider by a reasonable method it deems appropriate, the interests of **both sexes**. [40 *Fed. Reg*. 24134 (1975) (emphasis added).]

The regulations, in these earliest days of Title IX, also "permit[ted] separate teams for members of each sex where selection for the team is based on competitive skill or the activity involved is a contact sport." *Id*. Clearly, the text recognizes and accounts for inherent biological differences between men and women.

In his remarks, Senator Bayh made clear that Title IX would allow "differential treatment by sex" "in sports facilities or other instances where **personal privacy must be preserved**."[25] Nothing in the language of Title IX even contemplates allowing biological males to penetrate the locker rooms, bathrooms, and sports competitions of biological female students.

Dr. Bernice Sandler, a pioneer instrumental in the enactment of Title IX, recognized the salient fact that advocates of transgender ideology and too many courts fail to recognize. That is, in sports, "some sex segregation is necessary. **If all teams were integrated by sex, few women would have access to sports**." B. Sandler, "Title IX: How We Got It and What a Difference It Made," 55 CLEV. ST. L. REV. 473, 482 (2007) (emphasis added). That is precisely the evil Title IX sought to remedy.

---

[25] 118 *Cong. Rec.* 5807 (emphasis added).

22

Now the Department attempts to stretch the 1972-1975 term "sex discrimination" to encompass the 2024 term "gender identity." It is a blatant departure from the intent and text of Title IX to socially construct gender contrary to simple biology. In the intervening half-century, Congress has never redefined the word "sex" relative to Title IX in a manner so patently contrary to the legislation's text or intent. The Department has no such authority and no deference is accorded to the Rule. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).

As the court below correctly put it, "'Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities....' While undercutting that purpose, the Final Rule creates myriad inconsistencies with Title IX's text and its longstanding regulations." *Cardona I* at *40. The court added, "This is an impermissible result. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213-14 (1976) (noting that '[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the statute')." *Id.*

23

This Court and the court below were correct.  *Bostock* is irrelevant to Title IX, and the Department's purported "rulemaking" is impermissible lawmaking by fiat, contrary to the clear textual command of Title IX.

## III.  THE DOE RULE PRESUPPOSES THAT BIOLOGICAL SEX IS NOT AN IMMUTABLE AND UNIVERSAL REALITY, BUT RATHER A SOCIAL CONSTRUCT, CHANGEABLE AT WILL.

Putting aside what could fairly be described as the absurdities that the federal government seeks to impose on schools under the DOE Rule, discussed *supra*, the question remains what is the Biden Administration is attempting to accomplish?  Should this Court be tempted to reverse direction and sanction the DOE Rule on the assumption it was somehow mandated by the Equal Protection Clause, it would repudiate any pretense of examining the "historical core" of the Clause to adopt what Professor Donald L. Drakeman has termed "the hollow core of constitutional theory."[26]

The Rule mandates students and faculty speak and think in accordance with the progressive value of transgenderism.  We know from natural law that

---

[26]  *See* D.L. Drakeman, The Hollow Core of Constitutional Theory (Cambridge Univ. Press: 2020) at 3 ("For constitutional theory to return to its historical core … it needs to refocus on … the will of the lawmaker, the Framers' intentions….").

biological sex is a fixed reality, but progressive doctrine tells us that biological

sex is irrelevant, as explained by one of its earliest spokespersons:

> [T]transgenderism developed during the 1980s.  The guiding
> principle … is that people should be free to **change**, either
> **temporarily or permanently**, the sex type to which they were
> assigned since infancy … even if a sex type was real at birth, it **can
> now be changed at will**.…  [M. Rothblatt, <u>The Apartheid of Sex: A
> Manifesto on the Freedom of Gender</u> (Crown Pub.: 1995) at 16
> (emphasis added).]

We are told that we must not just respect, but embrace, the psychological

pathology inherent in a person believing he was born in the wrong body.  The

Rule demands faculty and students use the government's language to express the

government's thoughts.  The modesty of girls must be sacrificed.  Women's

sports must be sacrificed.  Girls must be put in danger.  No price is too high to

advance the progressive agenda of transgenderism.  And, under the Rule, faculty

and students must speak about transgenderism in a politically correct manner,

forsaking truth and reality, according to this rubric:

> "Comrade, your statement is factually incorrect."
> "Yes, it is. But it is politically correct."[27]

---

[27]  A.M. Codevilla, "The Rise of Political Correctness: From Marx to
Gramsci to Trump," *Claremont Review of Books* (Fall 2016).

When our nation's school systems are required to treat a lie as though it were the truth, there must be a powerful underlying agenda, which Professor Angelo M. Codevilla explained as follows:

> Because all progressives, Communists included, claim to be about creating **new human realities**, they are perpetually **at war against nature's laws** and limits. But since reality does not yield, progressives end up **pretending** that they themselves *embody* those new realities. Hence, any progressive movement's **nominal goal** eventually ends up being subordinated to the urgent, all-important question of the movement's own **power**. [*Id*. (emphasis added).]

We might ask, where do Progressives come up with this never ending series of demands on our society? Codevilla explained why the vicious attacks on those brave souls who are slow to embrace the Progressive's newest cause will never cease.

> Why does the American Left demand ever-new P.C. obeisances? In 2012 no one would have thought that defining **marriage between one man and one woman**, as enshrined in U.S. law, would brand those who do so as motivated by a **culpable psychopathology** called **"homophobia," subject to fines and near-outlaw status**. Not until 2015-16 did it occur to anyone that requiring persons with male personal plumbing to use public bathrooms reserved for men was a sign of the same pathology. Why had not these become part of the P.C. demands previously? **Why is there no canon of P.C. that, once filled, would require no further additions?**
>
> Because *the point of P.C. is not and has never been merely about any of the items that it imposes, but about the imposition itself*. [*Id*. (emphasis added).]

26

No one should think that accepting the illogic of transgenderism will satisfy the beast of Progressivism.  Rather, feeding the beast ensures that tomorrow there will be more demands that Americans yield to some other favored cause.  Polygamy?  Minor Attracted Persons?  Why not, once we have undermined the constraint of biology and religion?  And today's cause *du jour* not only demands that we suspend disbelief and embrace transgenderism — it also requires us to abandon Free Speech, to silence, or at least marginalize, all voices in opposition:

> **[T]hat power is insecure as long as others are able to question the truth of what the progressives say** about themselves and the world, progressive movements end up struggling not so much to create the promised new realities as to **force people to speak and act** as if these were real: **as if what is correct politically — i.e., what thoughts serve the party's interest — were correct factually**.  [*Id*. (emphasis added).]

The nation's school system presents perhaps the best area to mold the minds of the next generation to subordinate themselves to the escalating dictates of progressivism.  Accordingly, the DOE Rule requires both teachers and students to say what all know is false, in service to the collective.  Eight years ago, Codevilla anticipated such rules would be imposed on schools: "Progressive parties everywhere have sought to **monopolize educational and**

**cultural institutions** in order to **force those under their thumbs to sing their tunes or to shut up.**"  *Id*. (emphasis added).  Writing during earlier days of transgenderism, Codevilla stated:

> Consider **our ruling class's** very latest demand: Americans must agree that someone with a penis can be a woman, while someone else with a vagina can be a man.  **Complying with such arbitrariness is beyond human capacity**.  In Orwell's *1984*, as noted, Big Brother's agent demanded that Winston acknowledge seeing five fingers while he was holding up four.  But that is small stuff next to what the U.S. ruling class is demanding of a free people.  [*Id*. (emphasis added).]

Our progressive rulers are disrupters in our society — condemning both the past and the present, tearing down monuments, ridiculing our history, demeaning our institutions, always criticizing, never content, always demanding change.  Not believing in God, the Bible, or eternal life, they work to destroy what exists in the hope of creating the new man — a utopia in the here and now as a type of Heaven on Earth.  Meanwhile, while under constant attack, the rest of society labors to keep functioning the institutions on which our nation relies — most especially the family and the church.

To be sure, judges who challenge the transgender orthodoxy will pay a price even though they are part of our nation's ruling class.  Fortunately, under our constitutional scheme this will not include termination from employment, but

there are other costs that are imposed on dissident voices.  As physicist Eric

Weinstein described forces at work in a different context:

> Whatever it is is not really trying to fool you, it's trying to instruct
> you….  Think about [the establishment media] as a set of
> instructions for how to keep your job….  But if you say what you
> understand to be true, you can know what the consequences are….
> In essence, this is a lot like Caligula installing his horse as a
> Senator.  No one's fooled that the horse is an ordinary human
> senator.  The choice is, do you wish to say something.[28]

The district court boldly stood against this progressive threat, announcing

it would base its decision on reality at the outset of its opinion:  "There are two

sexes:  male and female."  *Cardona I* at *2.  This latest progressive cause of

transgenderism seeks to destroy what exists in pursuit of the creation of a new

human reality.  This progressive program is sometimes described as "imagining

what can be, unburdened by what has been."  To progressives, reality is only a

social construct.[29]  The Progressives at DOE seek to control the entire

government school environment, operating under no limiting principle, and if a

victory is achieved here today, they will seek to build upon it tomorrow.

---

[28]  *See* Eric Weinstein, Are we on the Brink of Revolution? *Chris
Williamson podcast* (Sept. 2, 2024) (14:00-15:33).

[29]  *See generally* P. Berger & T. Luckmann, The Social Construction of
Reality: A Treatise in the Sociology of Knowledge (Knopf Doubleday: 1967).

If courts do not ground the law in reality — in fixed and universal truths — then every right we enjoy is put at risk.  To approve DOE's effort to compel schools to bow to transgenderism, this Court would need to be unburdened not only **by what has been**, but also **by what actually is**.  The district court courageously refused to be politically correct at the cost of being factually and legally incorrect.  This court should do no less.

## CONCLUSION

For the foregoing reasons, the decision of the district court should be affirmed.

Respectfully submitted,

*/s/ William J. Olson*

KERRY L. MORGAN
  PENTIUK, COUVREUR & KOBILJAK, P.C.
  2915 Biddle Avenue, Suite 200
  Wyandotte, MI  48192

J. MARK BREWER
  209 N. Nugent Ave.
  Johnson City, TX 78636

JAMES N. CLYMER
  CLYMER MUSSER & SARNO, P.C.
  408 West Chestnut Street
  Lancaster, PA  17603

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
  wjo@mindspring.com
*Attorney of Record

PATRICK MCSWEENEY
  3358 John Tree Hill Road
  Powhatan, VA  23139

JOSEPH W. MILLER
  LAW OFFICES OF JOSEPH MILLER, LLC
  P.O. Box 83440
  Fairbanks, AK  99708

September 3, 2024
*Attorneys for Amici Curiae*

RICK BOYER
  INTEGRITY LAW FIRM
  P.O. Box 10953
  Lynchburg, VA  24506

31

## <u>CERTIFICATE OF COMPLIANCE</u>

IT IS HEREBY CERTIFIED:

1.      That the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Plaintiffs-Appellees and Affirmance complies with the type-volume limitation of Rule 29(a)(5), Federal Rules of Appellate Procedure, because this brief contains 6,480 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point CG Times.

    /s/ William J. Olson
William J. Olson
Counsel for *Amici*

Dated: September 3, 2024

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Plaintiffs-Appellees and Affirmance, was made, this 3rd day of September, 2024, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

*/s/William J. Olson*
William J. Olson
Attorney for *Amici Curiae*
